

Table of Contents
at Back of Compl.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**AUG 20 2020**

**JEFFREY P. COLWELL**
**CLERK**

Civil Action No. _____

(To be supplied by the court)

Khalfan Khamis Mohamed , Plaintiff

v.

Jones, (nurse) (individual Capacity),

Huddleston (nurse) (Ind. Capacity),

Osagie (physician's Asst) (Ind. Capacity),

United States , Defendant(s). see attached

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

---

**PRISONER COMPLAINT**

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

2-

Defendants, Continues

Brush, Officer, Ind. Capacity.

Espinoza, Officer, Ind. Capacity.

Miller, Officer, Ind. Capacity.

Murton, Lieutenant, Ind. Capacity.

3-

## A.    PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

Khalfan Khamis Mohamed Reg# 44623054 U-S Penitentiary max
(Name, prisoner identification number, and complete mailing address)

P.O.Box 8500, Florence, CO 81226-8500
(Other names by which you have been known)

*Indicate whether you are a prisoner or other confined person as follows: (check one)*

____    Pretrial detainee
____    Civilly committed detainee
____    Immigration detainee
____    Convicted and sentenced state prisoner
__✓__    Convicted and sentenced federal prisoner
____    Other: (*Please explain*) _____

## B.    DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1:    Jones, nurse, Not known'
(Name, job title, and complete mailing address)

Jone

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? __✓__ Yes ____ No (*check one*).  Briefly explain:

He was on duty and employed by the BOP at the ADX at all relevant times.

Defendant 1 is being sued in his/her __✓__ individual and/or ____ official capacity.

2

4-

Defendant 2: Huddleston, Nurse, Not Known
(Name, job title, and complete mailing address)

At the time the claim(s) in this complaint arose, was this defendant acting under
color of state or federal law? ✓ Yes ___ No (*check one*). Briefly explain:

He was on duty and employed by the BOP in
the ADX at all relevant times.

Defendant 2 is being sued in his/her ✓ individual and/or ___ official capacity.

Defendant 3: O. Sagie, physician's Assist., Not Known.
(Name, job title, and complete mailing address)

At the time the claim(s) in this complaint arose, was this defendant acting under
color of state or federal law? ___ Yes ___ No (*check one*). Briefly explain:

He was on duty and employed by the BOP in
the ADX, at all relevant times.

Defendant 3 is being sued in his/her ✓ individual and/or ___ official capacity.

## C.    JURISDICTION

*Indicate the federal legal basis for your claim(s): (check all that apply)*

___    42 U.S.C. § 1983 (state, county, and municipal defendants)

✓    *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)
(federal defendants)

✓    Other: (*please identify*) 28 USC § 1346(b)(1); 1346(b)(2); 1331

The U.S waives Sovereign immunity under §§ 2671-2680.

β

5-

Defendant 4: United States

Defendant 5: Brush, Officer, Not known,
          Ind. Capacity.
          He was on duty and employed by the BOP
          in the ADx at all relevant times.

Defendant 6: Espinoza, Officer, not known
          Ind. capacity.
          He was on duty and employed by the BOP
          in the ADx at all relevant times.

Defendant 7: Miller, Officer, not known.
          Ind. capacity.
          He was on duty and employed by the BOP
          in the ADx at all relevant times.

Defendant 8: Murton, Lieutenant, not known.
          Ind. capacity.
          He was on duty and employed by the BOP
          in the ADx at all relevant times.

6-

## D.   STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action.  For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim.  You do not need to cite specific legal cases to support your claim(s).  If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s).  Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

CLAIM ONE: ___See attached___

    Supporting facts:

7-

## BACK GROUND:

1- Due to the recent changes in the ADX's management of inmate which directly resulted in the injuries alleged in this complaint, I must make a statement before this court and any other observers to this action. As an initial matter in the event that I die. I declare that if the ADX-authority confiscate my property, interferes with my legal mail, torture me again, or retaliate against me for filing this complaint, then I will be forced to go on Hunger strike untill such oppression or retaliation stop, a move that may come with health complication which may result in my death or might be used by the ADX for such end. That is because I refuses to continue to live a life of misery and humiliation which I have suffered for the last two years due to the ADX's unchecked corruption, and I cannot go on without the prospect of justice. If this court stop seeing my filings, then that's because I have been forced to declare hunger strike that will end with one of the three mentioned possibities.

2- I'am a muslim prisoner from Zanzibar Tanzania, convicted of "terrorism" related charges, subjected to special Administrative measures (SAM's), housed at the H-unit, ADX, from December 2001 through November 2015 where the SAMs were removed from me and as a result, moved to F-unit where I was housed up to August 14, 2018, once more to be transferred to C-unit, the most brutal, cruel and barbaric Unit, with the most unproffessional troups, at least at the time, in the ADX.

3- For the most part of my life at the ADX, I have maintained clear and clear conduct, that's; since my arrival here up to August 23, 2018, the day I was brutaly tortured and subjected to an incident report to justify the said tortures, I have only once committed a "prohibitted act"; failure to provide urine sample in December 2001 in a day I was fasting, empty of urine that staff demanded after absstaining from food and drinks.

8-

4- While I was housed in the unit, cell # 108, Range A. Lower, my range's cells including my cell, were shaked down in the evening of August 19, 2018, and as a result the staff led by the case manager Mr. Coulson and Lieutenant Armijo, confiscated virtually all of my personal publications and books that I had in my cell. The publication confiscated included legal, leasure, and religious ones that not only I needed in my daily every day life as a sincere muslim, but also due to the fact that at the time I was working on two different manuscripts, one of which was the Holy Qur'aan translation to my language: Kiswahili (or: Swahili).

5- The August 19, 2018 shake down came without warning, and due to my deadly need of the books for my daily muslim life, and more so, for the complition of my manuscripts, I tried hard to plead to the case manager to allow me at least to keep some additional books temporarily so I can finish my projects, but he refused even after me telling him that without the necessary books, I couldnt complete my projects which I have been working on for the previous two years or so. After the shake down, I had form prisoners that they additional books were not confiscated, which led me to believe that I was targetted that night just as I was targetted in the recent removal from F-unit to that C-unit most brutal at the ADx. Later on, in october 1, 2018, a female Lieutenant informed me that the practice of confiscating the books was only implemented on those muslim prisoners with similer back-ground as mine, which only confirmed my initial assumption: I was targetted from the start.

9-

6- The next morning, August 20, 2018, on Monday, at a breakfast tray I started my peaceful protest in a way of Hunger strike which I always prefer due to the fact that it doesn't involve any violent act nor does it violate any of the BOP's and the ADX's policy or regulation. In that day, I prepared several Cop-outs or requests to the some of senior staff members to inform and declare to them my peaceful protest over the confiscation, my hunger strike. I sent that evening a Cop-out through a medical staff to ADX-medical Director at the time Dr. Oba along with my health medical provider, the Physician's assistant (the P.A) mr. Osagi. And the next morning, I submitted another Cop-out to the unit manager mr. Purco, through the correctional counselor. Along with those Cop-outs, I sent another one to an SIS official who have been responsible of my affairs for years, and in it: I explain that: my H.strike was, as always, peaceful, I need no violence, no harm any area. I also verbally informed the unit officers that I was in H.strike and didn't want no tray in my cell.

7- I informed all these staff so every one incharge would know of my peaceful protest and therefore, the medical staff and other appropriate officials would afford me all necessary medical attentions and treatments, with accordance to the BOP and ADX policies and Regulations. Between the day I started and declared my H.strike, Monday of August 20, 2018 and the day I was assaulted, Thursday of August 23, 2018, repeatedly I have asked the unit officers not to bring the food trays to me and leave them in my cell, but they insisted they had to do that with accordance to the policy but assured me not to worry, they records every time they picks the trays that: I am not taking food/drinks from them. I insisted that: because I knew some officers falsify the record by claiming that prisoner steal from the tray. Also, as a serious and an experienced H.striker, I always stop eating and drinking any thing but water, as soon as I decide to go H.strike, which cause me to substain abstain from eating and drinking even from my commisary items in my cell.

10-

8- On wenesday of wenesday of August 22, 2018 at the dinner tray, I had already missed 9-consecative meals, which with acurdance to the BOP and ADX's H-strike policy; should have prompted medical assessment. But there was no medical assessment afforded to me. By that evening I was already physically weak.

9- On that evening also, the case manager of the c-unit who was also previously the case manager of the F-unit and one of the senior staff led the shake down few nights earlier, Mr. Coulson came to speak with me because as he told me that his boss, the unit manager, Mr. Porco received my cop-out I sent him declaring my H-strike earlier that week. He also told me that: the unit officers and the Lieutanent, Armiho along with the unit team under Mr. Porco, are informing the captain, the warden's office and the medical staff of my H-strike and by that time, every one was aware that I have been in H-strike since monday morning.

10- I told the case manager that it will be hard for me to speak with him while he's standing behind the outer door since I was very weak and that will require me using my little remaining energy which I didn't want to do unnecessarily. The case manager then told me that, he has already seen himself that I was weak but it was important we talk that way because there was no officer who could come with him and open the outer door to talk with me. But he promissed me: He won't be long... Due to my respect to him and my hope that he may resolve the issue and therefore avoid longer H-strike, I agreed to speak with the case manager.

11- The case manager told me that his boss, unit manager wanted to know: why I was in H-strike? I answered that was because: the staff have been targetting and punishing me discriminately, first: by moving me from F-unit and then consficating my publications regardless of my unfinished projects.

11²—

12- The case manager then told me that the unit manager also wanted him to ask me: why I chosed H. strike in trying to solve my issue? I said: because it's the safest mean of protest and because the H. strike doesn't violate any of the BOP's nor ADX's policy or regulation and at the same time, according to my personal experience the H. strike related activities such as the force feedings, medical assessments... all are well recorded and usually are performed with video-camera which assures my and staffs safety. He then told me that the unit manager and others concerned wanted to know whether I'll be cooparative with the medical staff when they went to medically intervene or I'll resist? I said: I will be cooparative as I have always been, and I will avoid every thing that violate the policy. I also told the case manager that: I have already sent a cop-out to a senior SIS staff about my H. strike and my intention to be peaceful and not to go against any policy". I asked him also: to tell everyone what I have just told him...

13- The conversation with the case manager lasted for about 30-minutes or so. He then left and said he will pass our conversation to the unit manager and everyone concerned along with my request: to let everyone know that I intend to be peaceful and avoid violating any policy...

14- I woke up the following morning of August 23, 2018 feeling dizzy, fatigue and with bad headache, among other conditions typically felt by serious hunger strikers when they do it right. By that Thursday morning, I had already missed total of 10-consecutive trays, apart from some water. I haven't been eating or drinking any thing since shortly before the Sunday night (August 19, 2018) shake down.

12-

## Claim One: Battery
## I. FACTS ASSAULT

15. At Lunch time, three officers; Brush. miller and Baca, led by Brush. came to bring me the lunch trays but I once more stated to them that: I didn't want the trays and should take them out. Officer Brush then said to me: So are you gonna continue your H. strike?, I said "Yes". Brush then said I have to submit for hands cuff because "You already missed 11-trays", and they wanted to remove my property from my cell. I immediately submitted without saying any thing and I was handcuffed and taken to the range-law library which is located about 20-feet away from my Cell, Cell # 108.

16. At this time I was obviously physically weak and seemed sick, to extent that one of me the other two officers, seeing my physical weakness, asked me "Mohamed are you OK"?, as they escorting me to the law library, and I said "No, I am not OK", and he replied "yea, I can see that, you need to eat man". Apart from being weak and feeling ill, I was also feeling dizzy and cold and for that reason, I was wearing multiple layers of cold-clothes; thermals and sweaters... I had my muslim cap (kuffi) on my head and shower shows on my feet. I usually put my training shoes when I go out of my cell, but that morning I was too dizzy and tied tired...

17. Even though I was physically weak, dizzy, tired and now feeling sick, emotionally I was in full control of my feelings. As an experienced and serious H. striker started to strike in early 2000's, I have always made sure that my emotions are under control and that I always deprive me officers of any pretext that they may use to jump on me and assault me. Some time around 11:40 A.m or so, me three officers placed me in the law library and left me there.

13-

18- As I was in the law library, officer Brush went into my cell and started to collect my properties, not only the remaining commissary items, but everything else, including my essential daily religious items such as prayer rag, prayer schedule, the Holy Qur'an, the watch which I must have to know the time of my five obligatory daily prayers. He also took all of my legal and other personal materials. Among the property he took: was my two unfinished manuscripts mentioned earlier. see ¶¶4-5 with the third one which was finished and complete, also he took my journals that contained my daily-sex-life starting December 2001, through August 22, 2018. as well my notes, which summarized about 130-150 essential books which I had red previously. He even took the cup I used to drink water with, toilet papers, tooth paste, tooth brush, shampoo, soaps, cleaning materials, my medications including my high blood pressure pills... writing papers, pens, pencils ... and everything else. He only left 2-blankets, a pillow without its case and a pair of khaki prison clothes; a shirt and trouser. Brush took these items meliciously and sadistically. since there is no policy permits that. In my all previous H-strikes, which are alots, staff never consficated all of my property.

19- About an hour later since I was placed in the law library, the three officers, again led by Brush, came and asked me to take off my personal-commissary clothes and put on prison clothes which were old and full of holes. I told them very respectfully that: the BOP's and ADX's program statement doesn't require a prisoner to have no personal clothes during H-strike...no does it authorize the removal of my religious and other materials apart from food and drinks... I also stated that: I was very cold and needed my personal clothes to keep me warmed. Brush said: I don't care what the policy says. You're in H-strike, the policy is what I say.

14-

20- Hearing what Brush was saying. I asked him: are the one who decides or these issues or some one else directs you? He said: Lieutenant Armitho gave him such directions... Because I wanted the issued to be regulved in the best way possible, I asked that I needed to speak with the Lieutenant (Lt, hereafter). The officers left, saying "ok" to my request.

21- About 10-minutes or so later, the officers came back and Brush said to me: the Lt. want to talk to me in his office, so they wanted to take me there. I had previously heard prisoners saying that: prisoners often get assaulted at Lt's office - because there is no cameras there. For this, I said: No, he may come here and talk with me or you put me into my cell and he come there and speak with me.

22- At that moment, Brush replied: ok, we take you back to your cell". By this time. I started to see Brush showing aggressive signs, the way he speak and looks. I started to be worry, but I determined to continue to be respectful and control my emotions. and I so no reason for any one to harm me as long as I don't do any thing stupid to provoke them. I said to Brush after him saying: we take you back to your cell". "I think you try to trick me". But he assured me "No, we take you to your cell". They then opened the slot of the law library door, and Brush hand cuffed me, double locked the cuffs and then the door was opened and they started to escot me in the hall-way towards my cell.

23- Each of the three officers escoting me was much tuller and physically bigger than my self at 5ft 7 In., at the time I was obviously weak, tired and sick. As I was escoted from the law library, at no time I did ever became released from the mechanical restraints, nor did the officers lose their physicall control of my hands and upper arm, nor did I ever move suddanly, become angry or attempt to assault nor raise my voice.

25

24- When we arrived at my cell, (# 108, Range-A-lower, c-unit) I stopped thinking the officers had missed my cell, saying while looking toward my cell: " here is my cell, you told me you are going to put me back in my cell" I said these words while remaining calm, respectful and without posing any kind of threat against any officer.

25- At that moment, officer Brush immediately and without any warning nor need, threw me against the wall in area between my cell (108) and cell # 107 while forcefully, aggressively, maliciously and sadistically smashing my head multiple times against the wall, at the same time saying: "stop resisting, stop resisting" But I wasn't resisting at all nor did I have any energy in me to resist the three massive troops. I said loudly: " I'am not resisting any thing, I never resisted any thing... you told me you are going to put me back in my cell".

26- Brush's statements about "resisting" is a regular well-known officers' tactic. I had previously learned that; they often say that when they beat up prisoners in order to provide a factual and legal background for their torture of the prisoners and subsequent cover up which tends to be full of lies; i.e: the prisoner was resisting and thus the force was legally justified.

27- I can still remember how my previous dizzyness, headache...and sickness worsen as a result of that malicious and sadistic head-smashing and subsequent kickings and punchingsm. I felt and thought that my head was basting open due to the an extreme and excruciating pain of my head that I never experinced before.

28- I then found my self on the ground, dazed. and reeling from the head injury not knowing how I got there. My face was being crushed into the ground by one or two officers while Brush and perhaps one another officer began to punch, kick and spit on me as the other officers then swarmed, like insects on to the range, may be 10 more officers all of them now punching and kicking me. Here, as I was on the ground officers place legg restraints on me, and now I was fully restrained by hand and legg cuffs, but the torture never stop, it only got worst. At this time, as I was on the ground, and ever since my removal from the law library, I was not resisting nor attempting to do so and my only movements on the ground were the involuntary spasms that were the result of each punch or kick I sustained from the ADX's troops.

29- At one time while I was down, Brush placed his massive BOP's boot on my little neck and then pressed his boot and with full force meliciously and sadistically moved his boot right and left as if he was trying hard to crack or crush some thing lifeless or worthless like a stone or an ant as he was delivering me another extreme and excru-ciating pain. I was lying on my jaw, the position that allowed me to see to Brush as he was torturing me. As he was doing that at one stage I found my self I couldn't breath and I cried out laudly " I can't breath, I can't breath....you are trying to kill me."

30- When I was on the ground, Brush also made several concerted attempt to break my hands, toes, feet and leggs, focussing on each limbs. He may have had assistance in that from other offices too. The punches, kicks and subsequent attempts to break my bones with my phyisical weakness and excruciating pains, made focussing on the details of the assault difficult.

17-

31- As soon as the assault against me started, my feet became much vulnerable because those shower slippers I was wearing (sec 99 16, supra), came off or were removed by the troups as soon as the attack started. For this, Brush with assistance of his fellow officers, easly and again and again. were twisting and manupulating my toes, feets along with my hands meliciously and sadistically. While he was doing that I screamed un ashamedly and to my lungs capacity, " he's breaking my legs and hands ... they are trying to kill me". I repeated these words as well as that; "I never resisted any thing all I said was, I didn't want to go to the Lt's office and that they told me they were going to put me back to my cell.

32- I continued to cry out for the duration of time I was receiving the beatings and torture on the ground. During the beatings, Brush, whom by that time I could easly identified his voice and his the smell of his cologne, and his fellow officers repeatedly shouted at me "we're going gonna fuckin kill you,...no one is gonna believe you" and " scream louder bitch, ... this's America not an Iraq or Afghanistan...", as some other officers continued to spit on me.

33- Some or many people tends to describe me as a "soft speaking person". But that day as I was on the ground and afterwards during the tortures and even though I was very weak and sick.... I made sure that I screamed as loudly as I could, hopping that my noise may elect fellow prisoners of the crimes that were going on infront of their cells, and more importantly that my crying out may lead some superior staff to intervene and stop the melicious and sadistic torture. But the ADX didn't have a single staff that day who chose to behave in a such professional manner, rather, the opposite.

18-

34- I dont know for sure how many times, I was struck while I was on the ground, but I assume, was at least 70-times if not more. This number is only while I was on the ground before I was violently moved to the Observation cell (here after "Obs. cell) where I believe I was struck 100-times or more. I was also tortured along the way, on the hallway as I was escoted to the Obs. cell. I believe though I am not sure I remained on the ground sustaining those torture for several minutes, subject to be determined with the help of discovery in this case. Also, large number of ADX-troops assaulted me through punching, kicking, spitting, pulling my beard and eares, as well as verbal abuses, cursings, death threats...etc, but since I was on the ground face down or lying on my jaws, surrounded by large group of troups, : I couldn't recognize most of my tortures, the most reckognizable staff to me was Bush due to those two signatures described above, see ¶¶ 32.,: his voice and the smell of his perfumes that day.

35- The above described, unnecessary, melicious and sadistic acts took place in the area between my cell, # 108, and cell # 107, within the C-unit, Range-A, Lower.

36- I was then violently made to stand up which I-struggled to due because of my physical weakness, dizzyness, and illness states I was in, plus the deadly and excruciating pain all over my body especially on my right ankle which I believed was already broken by Bush and his fellow officers, I tried to step with my legs and walk as I was violently escoted towards the entrance of the range and then to the Obs. cell, but that attempt brought me an excruciating and unbearable pain.

37- Due to the above stated weakness, sickness...and pains, I ended up limping with an extreme dizzyness while lot of officers kicking, punching, kneeing, and cursing me while some were jacking me via my cuffs behind forcing me at a times to walk on my toes.

19a-                              12

38- At this time as I was meliciously and sadistically tortured by large group of the ADX's troops while I am in my way toward the entrance of the Range-A, and since immediately as I was forced to ground between cell 108 and 109; I was in full restraints; my hands and leggs were completely mechanically secured by the cuffs. And ever since I was removed from my cell to the law library, and then from the law library...to this moment; I never resisted any thing nor attempted to assault any officer in any way. All I was doing was screaming was described above, see supra ¶¶ 25, 31, see also infra, ¶¶ 39, 42.

39- Seeing that the officers were not satisfied with their previous tortures on me while I was on the ground, that time I knew that their goal was to murder me, and by that time I wished that they had done so due to the excruciating pains and fears I was going through. Because I had no doubt I will be soon be murdered, I was now with loud voice, but much lower compare to the previous one since my little energy and strength even that was going away, I was saying in Arabic: "Laa Ilaaha illa Llaah, Muhammadu Rasuululaah" i.e: There is no rightful God but Allah (The One God) and Muhammad (peace be upon him and upon all prophets) is His messenger" the statement, called by some as "Article of faith", that's highly encouraged to be said once a muslim witness the death or its couses and signs.

40- As the officers continued to beat me by all means they could in the hallway toward the entrance of the range. they were also forcing my head down because, I allege, they didn't want me to see and recognize them. Previously I heard other prisoners describing this dirty tactic as often used by prison guards... Now I was witnessing it my self. For that reason, even though I was tortured by large group of ADX's troops, I failed to identify most of them. The evidence including the camera should unshield the rest...

20

41- When I approached the entrance of the Range A-lower, I saw along other people standing, two Lieutenants standing next to each other. I only could see the Lts, and others for very few moments, because: as I was struggling to climb the few stairs that leads out from the Range-A, offices for short moment eased their grip off my head, the move that allowed me very briefly to raise my face and look at the people who were witnessing the tot torture and so some of them. The Lts. were: Lt. Armiho, refranced earlier, see supra ¶¶ 4, 9, 20, and Lt. Murton. I knew Lt. Murton for several years prior, when he was an officer in the H-unit, but I had no memory of dealing with him up to that day as a Lt.

42- After seeing the two Lieutenants standing there looking at, and witnessing the assault, I resumed my previous statements "I am not resisting. I never resisted anything, you're trying to kill me..." And also said here "You know for sure that I have maintained clear conducts for over 10 years now...". I screamed that intentionally hoping that those words may trigger those two senior staff to intervene and stop the torture, especially Lt. Murton who must have very much known me and my non-violent history at the A-X since he had worked for some time at the unit when I was there.

43- But No one intervened nor stopped the torture. From that time onwards, Lt. Murton took charge of the crime. He started by ordering me to stop limping and then not to cry out and speak, and promissed me that the more I limp and cry the more I will be beaten, and beaten I was.

21-

44- Lt. Morton at that time also gave order to his troops to put me into the Obs. cell as he was verbally attacking and abusing me, saying: "you wanna H. strike in the G.P. (that's general population, i.e. in oppose to the H-unit where he first knew me) this's what you gonna get mother fucker!" He repeated morethan once "look man, if you gonna keep talking, we gonna beat you more." or statement close to that. At another time he told me "you're strong terrorist who wanna to H. strike night, then stop that limping otherwise we gonna keep fuck you up" Even after I told him that I can't walk strait because the officers have already broke my ankle (or I said: my leg. he insisted his demands: shut my mouth and stop limping, both of which were by that time impossible; I couldn't control my movements due to the excruciating pains on my ankle, and couldn't keep silence since I was still hoping that there might be at least a single professional staff who may intervene and stop the torture.

44-The Obs. cell is located beyond the entrance to the A-Range at an opposite side to the unit-officers' location and Lieutanant's office. is a perfect spot to torture a prisoner since there's no camera in it and is isolated, far from all prisoners. The term "Observasation cell" was knew to me that day: No one had spoken it at my presence nor mentioned it to me. I heard it for the first time from Lt. Morton while giving the order to his troops. Later that day, I found out that officer Brush to while fabricating the charges against me, he wrote in the incident report that: I committed those prohibited acts when he was escorting me to the Obs. cell...Lie. As mentioned previously, see supra ¶¶ 21, 22, what he promised me, was to put me back into my cell.

45- I am not sure of the distance between the spot where I was initially attacked (an area between my cell #108 and #107) and the Obs. cell, I guess is about 50-metters, more or less. But I was continuassly, meliciously and sadistically tortured between the two spts.

-22-

46- As I was being pushed in the Obs. cell, while my face as always was kept down here, at the corner of the cell, officer miller gave me multiple hits with his knee right on my face increasing the deadly pains I was going through. Later that evening I found out I was bleeding through my nose. But miller wasn't the first nor the last to hit me on my face. To date I still periodically bleed through my nose.

47- Within the Obs. cell I was beaten like never before under observations and directions of Lt. Murton. The Obs. is not a too big in size and has a congrete bed in the middle, but about every officer who could fit himself in the Obs. took part in beating me, while Murton giving orders, like "put him against the wall", "bend, bend him down", "show this dirty Arab terrorist what's adx..." I still remember him saying these and other statements.

48- Also in the Obs. cell, officer Espinoza was one of the best troops that worked in complete coordination with Lt. Murton. Espinoza, whom like Murton, I had knew from the H-unit, in one Occassion for example, after I was forced to lie down on the Concrete bed, he and one or more other officers, repeatedly spat on me while using all kinds of curses and abusive languages against me. At one time, he was aggressively, maliciously and sadistically pulling my head and ears up and down, forcing me to follow his movement so I can reduce the untollerable and extreme pains I was receiving from his actions while I was already full of pains; dizzyness, illness with worsening headache. while Espinoza was doing so, he cursed me using statements such as "stupid little terrorist, you think this's Saudi-Arabia, this's the United state son of a bitch... we got your leader, Bin Laden, we soon gonna send you where he is, hell..." I think in this contle-xt, or in a different one he told me also "we kill terrorists. we gonna kill you mother fucker...", while his fellow officers coughing on me. He also told me repeatedly "this's not H-unit". At one time, when Espinoza was hitting me on my face. Lt. Murton said to him "Keep it to the body", to avoid incriminating evidence.

23-

49- My response to the tortures and officers in the Obs. cell was the same as the previous response...I never assaulted nor insulted any one nor tried to do so. But I kept repeating the previous statements saying that: I never resisted, I am not resisting... as well those Islamic recommended words, Supra ¶¶ 39, because I believed that Lt. Murton and his troops were about to murder me, as Murton kept ordering me to shut my mouth or other, they will beat me more, and once more said in the Obs. cell "look at you an Arab (or he said: an Arabic) bitch, you think there gonna be any one who gonna believe you... you must be crazy". And then he ordered his troops to beat me more, even though they never ceased doing so just as they never stopped spitting or me and racially and otherwise, insulting me.

50--As the tortures continued in the Obs. cell, at one time I learned that Osagie, the ADX's physician's assistant (here after: P.A) was there too witnessing the tortures. Not completely sure, but I believe I might have seen Osagie at the time I so the two Lieutenants See Supra. ¶¶ 41, As Lt. Murton and Officer Espinoza, I had known Osagie previously I knew him and he knew me for almost 20-years prior: he was at the ADX once I arrived here in late 2001, and he has dealt with me along with fellow Muslim prisoners at the H-unit virtually in each of our many H-strikes. From the start, in the early 2000's. I knew about Osagie presence at the Obs. cell after hearing his easly identifiable voice saying to the officers "is he still resisting", to which I responded "I'am not resisting, I never resisted any thing, are you (Osagie) also re witnessing this, see how they beat me" I also said in now my dying voice "Osagie, you know me more than any one of these people, tell the truth if I ever tryed to behave violently in any of my H-strikes or at any other time that you know of", or statement close to that.

24-

1-6

51- I never heard nor so Osagie after that moment. I believe after my statements he immediately left the crime scene perhaps to avoid liability... But Osagie not only was very familiar of my non violent behavior including during all of my hunger strikes, but also was very much respected by the staff I believe due to his long history working with prisoners... Had he wished to stop the crime, he would have easly done so, but he chose to allow it to continue. Also, Osagie was my medical provider who very well knew of medical history, issues and needs. He knew for example: at the time his fellow BOP's staff were torturing me, I was suffering from High Blood pressure, among other medical issues. Furthermore, Osagie knew for sure that: that day, August 23, 2018, was my fourth day in H'strike... He knew that I was weak, I wasn't eating because I informed him at the same time I informed other senior staff of my H'strike, see supra ¶¶ 6, just as the unit staff and others, also informed the medical staff of my H'strike, supra ¶¶ 9. In short: Osagie had the duty and responsibility to intervene and stop the torture for multiple relevent reasons, but not only chose not to do that, rather, he went further and beyond his designated responsibilities and capacities by giving those melicious officers the justification of their crimes against me.

52-Finally, I lost my little remaining streenght. I couldn't talk nor cry out no more due to the ongoing assault accompanied with extreme and excruciating pains almost every where or my body starting with my right ankle, also my wrists, jaws, face, head, back, toes, left ankle. etc. I was now more than ever before praying hard in my heart for death... I wished they would kill me in the spot... I was worried that they may lieve half dead and therefore spend long time at a BOP's medical center before the actual death serve me...

53- As my energy died down no more screaming, Lt. Murton and his troops also started to reduce the torture but not without more provocation. "you claimed you'll never stop barking. go ahead bitch" murton said.

25-4

54- When the beatings stopped, I didn't know for sure if that meant: no more beatings or there going to be another rounds of beatings. Then for the first time ever since I was violently made stand up after the initial beatings on the grounds, between my CCU #108 and ceel #107, supra ¶¶ 25, 35, my head was freed. The troops now were not aggressivelly holding and. pushing down my head as they have been doing previously, but still they scrounded me and scrounded my head with their criminal hands, as if I was using my head to attack them, something that never happened.

55- I estimate that: In the obs. cell alone, I was struck no less than 100-times, while the previous beatings on the ground might be at least 70-times beside those beatings I received through my way, from the first spot to the obs. cell... The discovery in this case I trust, will determine the time I was put under torture by the ADX's staff, but for now I strongly believe, I was torture for at least 15-long minutes.

56- Lt. Murton then gave an order to his officers to undress me by cutting my clothes off my body and the officers did so while making fun of my body. At the same time now I was put in ambbalotory restraints and some semblence of clothing which left me almost necked. for the coming several hours that I was left in the obs. cell.

57- It was only after the beatings stopped, that a camera was brought in to "conduct the" medical assessment" related to the above described torture & not the H.strike which was completelly egnored) (the assault "assessment" also wasn't real assessment, I allege so... I allege that the camera was intentionally brought late so to give Lt. Murton and the ADX's troops enough time to torture me, contrary to the policy which reavires camera presence immeadiately upon any use of "immediate force".

26-

58- The camera under supervision of Lt. Sukdeo, recorded, I believe, the short "medical assessment" performed by an ADX's nurse, mr. Jones

59- After the above said "assessment" I was left in the Obs. cell half nacked, full of pain and in chains till around 6:30 p.m when I was escorted back to my cell # 108.

60- As I was in the Obs. cell, officer Brush approached the Obs. cell, and he announced to be behind the door, that:
° I am not finish (or he said: I am not done) with you, I'm gonna kill you..., but first I'm gonna get you out of that fuckin cell...".... He also said at the same time "And I so your journals and manuscripts and other shits you have in your cell, trust me, every thing is gonna be in the trash..." or statements similar to those. Brush easly so my mentioned property because it's my usual behavior: once I declare a hunger strike: I organize all my property and mark them "legal work", "Religious...", "manuscripts....etc.)

61- Brush kept his words regarding my property...After the hunger strike I was only given few items non of them included my journals..(from 2001 through 8/2018) my three manuscripts including the Holy Qur'an translation, another manuscript that was also unfinished but already 900-pages long, and the third one, a complete manuscript and the shortest one in 450 pages long... nor my personal notes which were a summary of up to 150-books... Among other precious property that Brush had stollen from my cell. Brush even stole my clothes...and even food items from my cell. see supra ¶¶ 18.

62- Brush's stealing and distruction of my property is another sign and indication of his melicious intents against me. The BOP's policy do allow prisoners to keep journals and prepare manuscripts.

27                                    21

63- Brush also kept his words regarding removing me from my cell # 108, next evening of August 24,2018. I was moved to cell # 406 Range-B, upper in the same unit: C. There, I was forced to live for the next 40 days while I was sick and in H. strike in a dirty cell that was lighted 24/7 with a pair of khaki prison clothes, pair of socks, and for the first week with no toilet paper, tooth paste, soap ...etc... The ADX gave Brush too much power over me. He couldn't move me without the unit management and the ADX authority authorization.

64- Also in the observation cell, I had conversation with Lt. Armijo, mentioned earlier, supra ¶¶ 4, 9, 20, who enter in to the obs. and then asked me of what happened that day? I said: he already knew, because Brush told me that he, Lt. Armijo ordered me to be escorted to his office, supra 20. and also, as I was beaten toward the obs. cell, I so him and Lt. Murton standing together witnessing the torture, supra ¶¶ 41... But the Lt. kept denying that he told Brush any thing, that he knew any thing and that he was witnessing the assault against me. He claimed that: he just came a into the unit at that moment he was talking to me... Later, he told me that he takes my statement as "insult" to him. Later, in Sept 12, 2018. Armijo and another Lt. Alexander, came to my cell # 406, and spent much time to convince me that: he wasn't there that day and that: I was confusing him with Lt. Sukdeo...i which I said: not true, Armijo was actually there, and I didn't confuse him with no one, for I knew Sukdeo over 10-year prior since he was an officer at the H-Unit...

65- I don't know, why Armijo would tried so hard to exclude himself from that day's event... The discovery I assume will reveal more in this case and possibly, potential other defendants... But in that day, I never so nor heard Lt. Armijo assaulting me nor giving an order to anyone for that purpose. As a Lt, he could stop the crime had he chosen so, but he let it go on.

28-

66- Later that evening, after I was placed back into my cell, another Lieutenant came and gave me an incident report, which officer Brush fabricated against me... Brush and his ADX's superiors charged me with an attempting to assault him... He lied and I allege, everyone at the ADX knew and know that. Later, the Disciplinary Hearing officer (DHO) found me guilty for the charges.

67- Through DHO report, I found out that: the same officers who cooperated with Brush and Lt. Murton, such as officer Miller, became "witnesses" against me... The Disciplinary process at ADX, as at any other BOP prison is bias, and always against the prisoners. In that process, I was denied to have staff-representative of my choice, I chose two, one after another, both were rejected by the unit team. Those two staff are among very few ADX's officials that aren't corrupted, for that reason, I was not allowed to have their representation. Instead, the warden appointed me another staff, full of bias. who made sure to work against me and to twist my witnesses' statements so could be used against me and even them... I told her: I don't want the witnesses. but she went ahead anyway... I wanted to reject her represantation, but I feared retaliation from the DHO or/and the unit Team...

68- But even if every thing that was claimed against me; that I actually attempted to assault Brush... which never happened. there still can be no justification for beating and torturing me for approx. 15-minutes... and in the process, break my ankle, among many other injuries, and force me into wheelchair for morethan two months...All these took place, assuming were true, while I was, in full H-strike restrained, escorted with three massive officers...etc.

29-

### INJURIES, PHYSICAL.

69- My physical injuries includes that of my right ankle that suffered an "acute" fracture, ie.: it was seriously broken. It caused an immediate, extreme and excruciating pain which did not abate for more than two months. Also, I was never medicated until 8-months after diagnoses when doctor. Oba after examined me, prescribed for me on 04.23.2019. Sulindac 200 mg. tab. which I continued to take to reduce the pain for one year when it was replaced with another pain drugg; Meloxicam 7.5 mg. tab in 04.28.20 which I'am taking to this day due to the continuation of the pain. See Ex. b, Attach (A)

70- Thus, I was left for almost 8-months while I continued to suffer delibating pains even though I constantly complained to, and asked for help from, the medical staff at the ADX. (Note: I was given in December 6, 2018 12-Ibuprofen tablets, that lasted in few days and didn't really helped). Some times the medical staff told me to buy medication from... Commissary... I tried with those commissary pills, like Ibuprofen and Naproxen, but didn't reduce the pain and the medical refused to give me pain medication even after informing them that the commissary didn't help.

71- The pain still exists today and prohibit me from standing up for long periods of time and placing pressure on my right ankle. Also, I cannot jog or run and do any lower body exercises due to the continuing pain. I also cannot stand in my prayers for long periods of time as I have done my whole life prior to the assault. Now I'am forced to sit down praying or shortening my prayers. Islamically speaking, prayer is usually done standing. Altogether, the pain in those first    months was 9 or 10 out of 10. causing consequently serious emotional suffering.

30.                                    2c.

72- My physical injuries also includes my jaws, wrists, back, bleeding through my nose... and my left ankle. My jaws and wrists caused an extreme and excruciating pain in the first two months or so after the assault, and even though I was constantly asking for an x-ray and other medical helps including pain medication, the x-ray wasn't afforded to me until October 30, 2018; almost 70-days after the assault, when finally my jaw and wrist were x-rayed. I was then told that: the results were "normal..." I allege that: the reason the x-ray conducted in such delayed date was the ADX's efforts to minimize the injuries I sustained in the above described torture... Had I received an x-ray earlier, I believe the result would have been much different.

73- Due to the pain on my jaws, I couldn't sleep on them. The right side was even more in pain. Islamically, one is highly encouraged to sleep on the right-side jaw, because Prophet Muhammad, peace be upon Him and upon the Rest of the Prophets. slept in that way and we Muslims are encouraged to follow His footsteps and acts of worship... Due to the pain it was very difficult for me to wash my face for my 5-daily obligatory prayers, and so to talk initially, and even after I had resumed eating more than 6-months weeks after the assault it was hard for me to chew the food. I would rate the pain of my jaw at 7 or 8, out of 10. Up to this day, some times I have to avoid sleeping on my right jaw and I still feel pain whenever I open my mouth widely to its full extent or chewing hard stuff.

74- The pain on my wrists, especially right wrist, I would rate it at the same rate of my jaw. In the first 7 days or so, my wrists were both swollen and I could hardly use my right arm to write especially any long writing, and for the first 3-months I couldn't do hards-exercise such as push-ups. After speaking with another PA (not Osagie) once more, on about march 13, 2019, 7-months after the assault advised me not to use use my wrists aggressively, like long writings for 12-weeks. pain continues.

31                                    2

75- My left ankle too, was in pain but less than of that was in my right ankle. Initially, I though was also broken but the pain started to abate after one week or so. My back pain didn't go away untill after about 12-14 days. On my head and most of the body apart from the pain I was having there were alot of lumps, swellings, purple-black discolorations... due to being beaten so much. Note: the discolorations were not as visible as they sound because I am black man, not a white.

76- My nose also got hit very badly. Bled through my nose for over a week. Just as I had complained and asked for medical assistance with the rest of injuries and pains, I did so with relation to my nose bleeding and pains. I was told initially that will go away... And much later I was told to use the "hair dressing" grease that they sell for hair in the commissary... I was told: at Colorado is normal people to bleed through their nose because it's a dry region. Medical staff told me so even after I explained to them that the bleedings started when I was assaulted in August 23, 2018, and that I never bled through my nose before that, even though I have been housed here since 2001... To this day, my nose still periodically bleedings some times for periods of 7-10 consecutive days.

32 ½

26

## 77- INJURES: MENTAL AND EMOTIONAL

77- My mental and emotional injuries includes the intense fear of death that I experienced as the torture were taking place the day I was assaulted and the following days and weeks when I was still housed in the same unit: c-unit. Due to the multiple death threats on the day of the assault and after that along with harshes and cruel conditions I was forced to live in..etc for several weeks I was so fearful that the officers would storm my cell at any time and kill me or at least torture me again... Even though I was still in H-strike with full of excruciating physical pains all of my Body... I always hard to monitor the movements and noises in the range believing that: the troops were about to come and finish me up, as officer Brush had told me see supra ¶¶ 60. I strongly believed that I was surrounded by ADX's staff who were planning to murder me at any time after their previous efforts to do so had failed. For this, I was forced to live in that extreme fear of assault and death for several weeks. But my fear in the long run, never went away.

78- The ongoing and continuing mental and emotional injuries are also partially shaped by the fears and very possibly by some type of post-traumatic-stress dissorder (PTSD). This's more expressed when I'am interecting with officers, and the more I'am in vulnerable positions with them, the more intense the fear, anxiety gets. For example: whenever I'am subject to handcuffing or whenever officers more than officers escots or surrounds me for whatever legitimate penelogical purpose, my fears goes up, up, and up.

79- I'm now forced to live in a state of terror. Almost any interaction that involves officers to me now is an attempt to set me up so they can torture or torment me again. My heart and so my mind at these times, begin to race and I feel myself on the verge of losing them... Ever while I'am sleeping, the fears... and possibly the so PTSD keep hunting me.

33-

24

80 - My sleeping now is a kind of torture. I often dream seeing my self in the same kind of beatings, cursings and humiliations of August 23.2018, or another kind of attacks often committed by ADX's officers or other military-types personel. I can now hardly pass two nights without being tortured or even murdered in my sleepings... to extent that I have developed another fear of going to bed...On several occassion I so seeing murdered in my cell and then every one was let to believe that I committed suicide.

81 - For all these and other related reasons, I can't get any good sleep no more. Some times it takes me up to three long hours before I can fall asleep, only to be interrupted by one of those terrifying dreams sometimes as soon as I started to fall asleep whereupon, I wake up with heavy breathing and usvally sweating even if I am in the middle of winter season.

82- The fear along with other mental and emotional injuries have largelly affected my daily life and activities. For example: Apart from the fears and mistrust I am having even in my "secured" cell, often I cannot afford to go out of my cell, as once I used to do before August 23, 2018 attack or me. Since the start of the second half of the year 2018 up to the first quarter of this year, 2020, only few times I was able to force my self to go to Recreation yard or Indoor Recreation, not because: I didn't want, but because I am too fearful of the guards whom to me looks the same as those who broke my legg and destroyed my heart and dignity... I often tried to go to the Law library (note: this's before March 2020 when the Law library access was taken due to the COVID-19 restrictions) because I believe I have to try to combat the fears and get out of my cell...But that is always very hard; when-ever officers escorts me back to my cell, my mind and thoughts are transferred to August 23,2018 events which all started while I was escorted out of the law library, see Supra ¶¶ 22-26, and now I am struggle to be quiet.

34-

28.

83- Some times the cost is just too high and expensive; earlier this year, January 7. 2020 my fears from the staff forced me to refuse to co-obarate with medical people who came to my cell to perform an EKG related to my heart issues. Just before they and the escoting officers came into my cell that morning I was having another terrible dream with violents depictions from the officers including one of the officers who was on duty at the unit that morning... So, I thought that I'll be saffer if I avoid any direct contact with any one that day. I refised the EKG even though I deadly wanted it.

84- The fears, I am experiencing are a direct out come of the August 23. 2018 and attacks and their aftermath. I never feared any one before that moment. Many time prior to that, I stayed in and not always went out for recreation... but that was because of very different reasons not because of my fears from prison staff. Also, I have no fear from fellow prisoners whatsoever nor do I see them in my dream attacking me or trying to murder me as I often see the staff...

85- The events of August 23. 2018 and their aftermath brough back but in unprecidented level the depression I was diagosed with several years earlier. When I was assaulted in August 23. 2018 I was not at that time taking medication for the depression... I had stopped taking it at least two-years ealier even though I might still needed it... But in any case, my depression by August 2018 was in much better shape and clear improvement... That all changed after August 23. 2018.

86- After the assault, for the first time in my whole life I was now seriously thinking to take my own life. After the assault my life became void of any purpose or goodness. Apart from my few Religious-daily obligation. I so no joy in living. I wasn't and I still dont see no good in remaining alive.

35-

87- My serious Consideration of ending my own life. is due to that fact: I see no good nor pleasure or joy in it. I live in total hell. After August 2018 and moments that followed, the life had became no more than a pile of fecies punctuated by moments of happyness.

88- Before August 23, 2018 I used to take full pleasure in activities such as studying, researching, preparing and writing manuscripts and making translations ...etc.. These activities demanded at least some level of peace of mind and safety of thoughts. The events of August 23, 2018 and their aftermarth, destroyed that completely.

89- My moods, Concentration, memory...and other necessary elements required in those previous tasks mentioned above, are now and possibly forever, gone.

90- The only thing that has so far held me back from ending my life is the fact. I have yet to have an access to a reliable Religious (i.e. Islamic) authority or ruling that permitts me to take such step. I have tryed to seek that sort of ruling and currently I'am waiting response from outside sources. Being a muslim who always trys to take his Religion very seriously and put His Creator's and Lord's desires and wishes before his own, I'am forced by my own Conviction (- My Lord, not to take such step untill I have such authority. I hope and pray that I'll get one soon.

36-

91- The mental and emotional inj injuries also includes the following facts: I was born and raised in a small village in an eqvally small East African Island called Zanzibar. There, a very traditional Islamic culture pervade every part of my childhood and formation. My parents and so my siblings were very poor but we endeavared together to provide for our daily needs, even me, as a child, worked to such ends.

92- Owing to those reasons I became a capable independent and proud youth with no small sense of individual and familial honor who learned early on not to ask nor expect assistance beyond what I am able to achieve for myself and my family. But the torture of August 23, 2018 ripped those deeply rooted inner paradigms of self understanding out of the depths of my soul causing me to change to a person who must now acquiesce to living in a costant state of disgrace, humiliation, dishonor, shame and vulnerability over being made to scream again and again, being unable to protect myself, being tricked into submitting to restraints, and being unable to provide myself with any pain relief as I was forced to endure the "acute" fracture together with other painful injuries for months. Every time I asked the medical staff for pain relief or other medical assistances they egnored me or scoffed at my requests.

93- Those self-deprecating feelings are finding themselves mixed with hatred as time goes on, and I am on the verge of being eaten alive by them. These cancerous entities still exists today. Hoping that, that inner destruction would cease with time and out of an fundamental aversion of asking for psychological help; I tried to wait for several months while dealing with them on my own.

37-6

94- Finally, my worsening mental and emotional conditions forced me to look for psychological help some time in July 2019. But the medical staff as have always been with me especially after the August 23, 2018 assault, decided to delay every and any medical help until october 18, 2019, full three months from the time I requested the psychological and medical help.

95- I was first medicated with Citalopram 20mg. tabs and later increased to 40mg., for depression. I am still on that medication today. See Ex. 6, Attach. B

96- The medication I am taking didn't end my mental and emotional injuries even though some how and times helps to improve my moods... while I still have many different and difficult issues in my daily life. My life is still very very very far from where used to be before the August 23, 2018 attacks on me. My extreme fear from the officers, the nightmares, poor concentration, inability to sleep well, constant thoughts of the August 23, 2018 assault, feelings of shame and vurnability, lose of hope in life... and periodical suicidal thoughts are still some of my new realities that I was forced to live with as a direct results of that melicious and sadistic torture of August 23, 2018.

97- The psychology staff informed me that the psychologist who deals with PTSD who has not been available for some time now. But I am informed that my name is in the list. I have to wait for that Doctor and see from there what can be done. I have repeatedly requested all psychological assistances available, but I have to wait, I was so told.

38-                    32

## CLAIM ONE: BATTERY OF THE UNITED STATES

## II-CAUSE OF ACTION

98-The United states is liable under Colorado Assault And Battery tort law because several guards tortured me, breaking my leg and causing me to receive other injuries and did so for approximately 15-minutes. See supra 22-54. The guards intended to harm me because of the followings: they threatened, cursed and mocked me and spate or me while meliciously and sadistically beating me, supra ¶¶ 22, 28, 32, 37, 44, 47-49. I was beaten continually in a distance of approximately 50-miters ¶¶ 45 and received at least 170-beatings supra ¶¶ 34, 55, while I was in full restraints ¶¶ 28, 38, 54. These facts and many others are a clear indication of an intent to harm. And so the gravity of the injury, indication of the same intent. See Ex.1, attach.(A) (showing a acute fracture. That is serious injury), forced me to be put for a cast and on wheel chain until November 16, 2018. See Ex.1 attach.(B) (showing approval keeping a wheel chair and splint. The splint was later replaced with hard cost that remained with wheel chair till Nov-16-18 ¶¶ 22.14.

99-My access to state law is very limited therefore, I will use the Eighth Amendment's higher standard of malice to prove the element of "intent to harm" of Battery. I allege this court find that a properly alleged Eighth alleged Eighth Amendment's subjective component violation element of Colorado Battery. See generally White v. Muniz, 999 P.2d 814 (Colo. 2000) (containing elements)

100- In Pega v. Greffet, 108 F.Supp.3d 1030 n.8 (D.N.M 2015), the court said, "statements...made [during] the use of force, e.g. racial slurs or personal animus" can show malice." accord Bozeman v. Orum, 422 F.3d 1261, 71, n.11 (11th Cir.2005); Mann v. Falley, 57 F.Appx. 267, 72 (4th Cir. 2014.)

39:

101- Spitting shows malice under Giron because there was no legitimate penological interest in spitting on me. See Giron v. Corr. Corp. of Am. 191 F.3d 1281, 90 (10th Cir. 1999) ("where there is no [such] interest... the conduct itself is sufficient evidence [of] malice.")

102- The cases Hudson v. McMillin, 503 US at 7, Wilkison v. Gaddy, 130 S. Ct. at 1178-79, both say that the degree of injury is "one factor" in finding malice. My broken leg should suffice. As far as the other Hudson factors like the need for force, "the relation between that need and the amount of force used, the threat reasonably perceived... and efforts made to temper the severity of a forceful response" all are in my favour. Hudson, 503 US at 7. Beating a subdued prisoner violates the Eighth Amendment. Walton, 745 F.3d at 428; Mitchell v. Maynard, 80 F.3d 1440, 41 (10th Cir. 1996) (restrained prisoner beater by yelling racial epithets); Bafford v. Nelson, 241 F. Supp. 1192, 1205 (D. Kan. 2002) (same); Wilson v. Willcox, 2018 US Dist. LEXIS 41208 (D. Colo. Mon. 13, 2018) (same); Giles v. Kearny, 571 F.3d 318 (3d Cir. 2009) (same); Sketich v. Thorton, 280 F.3d at 1303, (same) Lewis v. Downs, 774 F.2d 711, 14 (6th Cir. 1985)(same); Bogan v. Stroud, 958 F.2d 180, 85 (7th Cir. 1992)(same even if guard was stabbed previously); See also Williams v. Burton, 945 F.2d 1572, 76 (11th Cir. 1991)(constitution violated "if prison officials continue to use force after the necessity for the coercive action has ceased"). Other indicators are my non-violent history of almost 20-years, See Supra ¶¶ 3, making the "threat reasonably perceived" run in my favour. Mitchell, 80 F.3d 1440, 41(10th Cir. 1996.)

103- Another indicator of malice is officers' violation of BOP's policy which must be construed to represent the "fundamental and penultimate expression of what constitutes penological interest; See Giron, 191 F.3d at 1290 ("where there is no legitimate penol. interest ...the conduct itself is a sufficient evidence of malice")(quot. Whitley 128...

40-                              -7

104- The following policies were violated such as, show of malice, Compare Ex. 2, A Attach (B) Parts 2(b) ("when force is used, it will be only the amount of force required to subdue an inmate", and Part 1 ("An employee may not use brutality, physical violence, or intimidation toward inmates") and Part 5(a) ("staff may immediately use force... when the behavior described in § 552.20 constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order."), and Part 5(b) ("Force may not be used to punish and inmate").

105- Under Colorado Battery Law, "[c]ircumstantial evidence can pinpoint the thought... of another" and whether or not one "appreciated the offensiveness of [his] conduct ... [the jury] necessarily had to consider... [his] age, infirmity, education, skill, or any other charastaristic as to which the jury had evidence." White v. Muniz, 999 P.2d 814, 16-18 (Colo. 2000.) Here i allege that because the proffession, and the guidlines of the proffession of the guards are highly relevant in determining the Batterers' state of mind, it qualifies for consideration in determining the "intent" element of Battery. As a final point in attempting to equote the subjective elements of my tort claims and constitutional claims, I'll offer the definition of malice in Colorado which requires, "a showing that the injury was inflicted without just cause or excuse". Polanco v. Roth, 2014 Bankr. LEXIS 703 (D. Colo. Feb. 21, 2014).

41

35

## CLAIM ONE : BATTERY (OF THE UNITED STATES

### iii - MISC.

106 - After the assault and battery a false incident report was written by Brush; the same officer who initiated the torture described earlier against me. accusing me of an attempting to assault him, in Brush's attempt to justify the torture against me. See Supra ¶¶. 66-68 (Facts related to an incident report...).

107 - There are two stationary "range cameras" on both sides of A-Range where the first several minutes of beatings occured and both of which captured the beatings on August 23, 2018. There is at least one camera outside A-upper viewing the corridor leading from A-Range to the Obs. cell. This camera also must have. captured my movement from A-Lower to the Obs. cell. There is a camera viewing the the Obs. cell's door, but not inside of it. This camera must have viewed my entering the cell along with that large group of officers that were torturing me. There is a footage from the hand-held medical assessment camera used on August 23, 2018 to record the post use of force (hereinafter UOF) evaluation.

108 - Shortly after this Battery, both Murton and Osagie were transferred and retired respectively, I allege as a result of an internal or external investigation into the nature of the incident by those authorities.

42-

CLAIM TWO: INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS (hereinafter IIED)(OF U.STATES)

IV.- FACTS:

109- In addition to incorporating the facts above, supra ¶¶ 15-97, I allege the followings: The fear, anxiety and PTSD are further exacerbated due to multiple of serious death threats that were made to me in several ocassion. After I was tortured. This include a death threat I received on August 24, 2018. a day after I was tortured, and after I was moved to cell # 406 B-Range. upper in the C-unit when through the intercome an officer called and said: you're a dead terrorist, we gonna kill you (or: we'll kill you). At another time, when I was in the Obs. cell waiting to be taken to the medical for the force feeding (or after I came back while I was waiting in the Obs. cell) an officer, or most likely a Lieutenant approached the cell's door and very aggressively told me: you gonna have hard time here, motherfucker, people gets killed here (or he said: people dies here) this's not H-unit we gonna kill you. Those are just some threats from officers, apart from Brush. Or another occassion on September 22, 2018 when I was in the same cell: officers led by Brush after making unnecessary noise and banging the door... while picking up the lunch trays at a time I was praying, one of the officers, very possibly Brush himself started to sing loudly after intering my cell, port: God bless America ...and then said: you're dead fuck'n terrorist, we kill terrorists. or statements similar to those. Those just a few that kept and increase my fears and anxiety... at a time immediately after I was brutaly tortured. I had no doubt that, at any time ADX's troups will storm my cell and murdered me. The staff intentionally created that state-of terror to terrorize me. Apart; my feared increased after receiving news while I was still in cell#406, just a week or so after I was torture that: my former neighbor at Range-A, lower, cell #104 an African American prisoner had been found dead in his cell... Brush was still active. some prisoners said: he was murdered. I don't know. But that increased my fears.

43- 42

110- These threats and events occured few moments, days and weeks right after I was badly beaten and injured and some ever before I was diagnosed with a broken legr since the medical staff were still refusing to look at my injury... Thus I was forced to believe that the attempts on my life were credible: When you live, as I do, surrounded by your aggrevated abusers who have absolute control over you, whom are given the benefit of doubt in any social or legal process, and whom you can in noway avoid due to being a prisoner; these threats becomes so palpable you can taste them, especially after the hucrendous assault just few days or week prior. But the threats never ended here: few weeks after I was turture, rather the threats and misstreatments are continuing as we speak; the ADX- perpertuates. this terror on me ever since the August 23, 2018 assault: Long after I was moved from that, the most brutal and cruel unit, the C-unit were I was tortured and move to this unit: D-unit; the threats continued: On Sept 20, 2019 another officer, with long history of misstreating me without no reason I know of rather than hatred against... On this day he again assured me: "we gonna make sure we'll kill you..." Again, most recently: In my most recent H-strike, in march-April 2018 here at the D-unit: ADX's staff almost repeated the August 23, 2018 assault: On April 15, 2018 when I was in my third week of H-strike, officers again used force; an accessive forces against me while escuting me to the medical room and within the medical room... As a result: my right wrist was injured and blooded... At the same time on that day: an officer again repeated the threat on my life and called me "durty muslim", that he likes° to kill terrorist: and he was "gonna get rid" with me... Apart: On that H-strike: the ADx authority knowingly and with intention to harm me: falsified my food-intake records... As a result: left me for about 14-days in H-strike without medically assessing me... Instaid getting assessment after missing 9-trays, I got it after 48- consecutive trays... All these renewed my fears of death and intended to harm or ever kill me with full knowledge of the highst Amx's staff.... The threats are real and fresh... I am now mentally and emotionally tortured.

44-13                          38

## CLAIM TWO: IIED (OF THE U.STATES)

## V. CAUSE OF ACTION:

111- The standard of law in Colorado is as follows; One must have, "engage in extreme and outrageous conduct... reclessly or with the intent of. causing... severe emotional distress". Hanye Lee v. Colo. Times Inc. 222 P.3d 957, 66-67 (Colo. App. 2009)

112- The "outrageousness" element is mate by the commission of the tort of Battery and the violation of my Eighth Amendment rights. See ¶¶ 98-105 (alleging Battery). also, infra ¶¶⁸⁹⁻²⁸,ᴬ (excessive force). cF. Kirk. v. Smith. 674 F. supp., 803 (D. colo. 1987) (stating a termination must be "combined with other wrong ful behavior such as physical assault, or extreme harrassment, ridicule, and humiliation to constitute an arguable claim of "outrageous conduct"); Wing v. Jmb Prop. management Corp., 714 P.2d 916,18 (Colo. App. 1985).

113- The "outrageousness" element is also met by the U.S's refusal to provide any pain relief medication for 8-months, supra at ¶¶ 69-70. after being diagnosed with an "acute" fracture. See Zalnis, 605 P.2d at 294 (Colo.App. 1984 ("while it is true that the courts are more likely to find outrageous. in a serious of incidents, or in a "course of conduct" than in a single incident, it the totality of conduct that must be evaluated to determine whether "outrageous conduct has occurred", and " conduct, otherwise permissable, may become extreme and outrageous if it is an abuse by the actor of a position in which he has actual or apparent authority over the other, or the power to effect the other's interests.); Restatement (second) of Torts § 46. comment e: See also infra ¶¶ 123-31, 163-68 (alleging deliberate indifference over over broker leg.)

45=

## CLAIM ONE AND TWO: BATTERY AND IIED

## VI- SOVERIEGN IMMUNITY:

114- The United States has waived immunity for intentional torts, via 28 USC § 2680(h), such Battery and claims "arising out of" Battery, ie., IIED claims. Further the tort feasors are "law enforcement officers", i.e. under the clause. See example, McCarthy v. Madigan 503 US 140, 155 n.6 (1992) (noting governments' concession); Reynolds v. US, 541 F.3d 1108, 14 (7th Cir. 2009)

46

## CLAIM THREE: DELIBERATE INDIFFENCE (OF JONES)

## VII- FACTS:

115- After the torture, on August 23, 2018, Jones arrived to do on camera medical assessment as required by policy, Ex.2, Attach.(B). Part B, but performed a superficial examination only. I complained about my ankle and extreme pain and inabity to walk and showed him my swollen ankle. The right ankle was swollen about ½ the size of an orange [hereinafter SOA Ora.] on either side. He noted the swelling verbally and said "I'll be back". Also, I complained to Jones about other issues and pain I was going through that time as a result of the assault.

116- Jones came back an hour or so later and after listening from me concerning my ankle and other injuries I received, see supra ¶ 69-76 (describing the physical injuries) that day with excruciating pain I was having, he looked at my ankle and other injuries but he didn't say any thing than those swellings will go away themselves." and then he refused to provide me any pain medication, x-ray or ever an ice despite my claims that I was going through an excruciating pain all over my body, especially on my right ankle and I couldn't walk. I then asked him to see the doctor or the P-A, but he said "no". I asked why I couldn't walk, and he said, "Muhamed you must take your trays, this'll be alot easier if you eat food" and he left.

117- I also asked Jones if he could assess me regarding my H-strike since I had already missed 11-trays at that time and the policy requires assessment after only 9-consecutive trays... and that I thought I needed the H-strike evaluation...He said 'I know that you have missed 11-trays, we know that you're in H-strike, but I wasn't told to conduct H-strike assessment today'. I allege that: the ADX denied me the assessment because, first: was trying cause more harm on me so I would eat. Second: avoided the assess. because didn't want records I was tortured in H-strike

47-0                         41.

118- On August 27, 2018, Jones led by his fellow nurse Huddleston conducted with him a H.strike mendated medical assessment [hereinafter med. ass.] involving general welfare checks, etc. see Ex. 3, pacts 7,8 (describing med. ass. procedures).

119- Jones with him defendant Huddleston, entered my cell and both saw me hobble and wince and grint my way to the cell bars. My right ankle was exposed and visable so I could show them the injury. Both sides of my right ankle had swollen to about 75% the size so a bra. by this time. Also my four small toes on the same foot were nearly black and swollen about ±50% their normal size. In addition, the top layer of skin on my right foot has swollen and risen about 3/4 of an inch above the surface of the non-inflamed tissue. I showed them this along with my other injuries, see infr supra ¶¶ 69-76. (desribing injuries) and explained the excruciating pains I was having and pleaded for an x-ray, pain pills or even ice to help diagnose and treat my ankle, etc. I said. "I can't walk, I think it's broken". And explained "I am so overcomed with pain, I can't sleep; It hurts so much, I want to kill myself." He and Huddleston refused any treatment or tests or even to examine it, and Jones said "once you eat, we'll examine you". They would not refer me to a physician nor to the P.A.

120- Before that med. ass. Jones was very much aware of my leg and other injury complains not only because he heard me complaining and so my injuries few days earlier, in August 23, 2018 the day I was assaulted supra ¶¶ 115-116, but also, defendant Huddleston who came with him to my cell for med. ass. in August 27, 2018. had one day earlier. August 26, 2018 conducted the med. ass. on me... Thus: Jones was more than informed on my conditions and needs.

121- Unrelated to Jones inaction, I received an x-ray on August 31, 2018.

48-

122- On September 3, 2018. Jones visited me for a med. ass., at my cell # 406 B-Range upper, C-Unit and he and other two medical staff tried to get me to drink a nutrition supplement willingly to avoid a force feeding. I still had my right ankle visable, fully visible and hobbled to the get to show him, leading nurse that day, how it got worse. By then, I had two lumps on each side of my right ankle 90%. The SOA Oran I again explained that "I couldnt walk no "sleep" and that the pain was so unbearable, consuming all my thoughts and never abating. I asked for pain medication but he refused. He said "the x-ray shows you have a twisted muscle". Jones and other medical staff that day also egnored my other injuries' releted complaints and requests. including requests for x-ray on my wrists and jaws... etc.

123- On Sept. 5, 2018. Jones visited me again for a med. ass. and again refused to provide me pain medication, nor any assistance for my leg or other injuries... including my wrists, jaws... and bleeding nose. Later that day, Jones came back with a "wheel chair" and applied a "splint". See Ex. 2, Attach. (B) (showing provision of items. Note: the splint was replaced by hard cast in Sept. 12, 2018. and cast remain along with weel chain with me until Nov. 16, 2018.) Jons now secured my leg with a splint and bandage, and said, "you have a fracture". I told him, "if I have a fracture give me some pain medication" but he again refused. That just as he refused to get me some one who could give me some pain medication. I asked to see the Doctor, but he said that the splint and wheel chain was treatment enough. Jones even refused to allow me to have a bag of ice for my leg and other swollen-injured areas of my body.

124- Jones did several more med-ass. and saw me when I was still in H-strike, including: Sept. 10, Sept. 17, Sept. 24, Sept. 26, and Sept. 28. 2018. Each time he refused to give me any pain medication or any medical assistance releted to my injuries and excruciating pains.

49-

125- I remained in wheel chair and on a cast, that replace the splint in sept.12,2018. until November 16,2018. when Doctor Oba placed the cast or me in Sept.12,2018, I asked him for pain medication for my broken leg and other excruciating pains I was in, but he also refused. I wasn't given pain medication, with exception of 1A-1 Suprofen tablets in Dec.16,2018, until April 23, 2019; i.e. full-8 months after I was maliciously and sadistically tortured.

126- On few occassions, medical staff used the fact that I was in H-strike and therefore I couldn't be priscribed with a pain medication... because my body couldn't handle the medication. But that argument cannot stand. Because: first: I started eating on October 2,2018... but even then and until April 23,2019 the medical staff refused to give me any pain medication. Second: In all of my previous H-strikes the staff allowed me to take medication that I happened to be taking prior to the H-strike. Forexample: In my recent H-strike of march-April 2020 the staff never took my medications from me... I was at the time taking at least two different medication: Sulindac 200mg. tab. for my ankle-pains and Citalopram 40 mg tabs for my depression. Third: Many times previously medical staff would give me some medication while I was in H-strike. Forexample: in each H-strike staff per my request, would give me milk of magnesia due to my cronic and long time constipation, especially on the day they feed me. Some time they would mix the magnesia with the Nutrition supplement and feed them into my stomach through feeding tube. Even in that H-strike of 2018, twice I was allowed to receive the milk of magnesia by the same staff who denied me pain medication for 8-months... And fourth: Even if it was correct to deny me such medication; they couldn't deny me an ice for my injuries which I often requested, nor could they deny or in some case delayed an x-rays I requested from the day I was injured...

127. Between Sept. 12, 2018 and Nov. 2018, several time an x-ray was conducted checking my ankle... and the medical staff decided to keep me on the cast and weel chair until Nov. 16, 2018, due to the fact that my leg was still in need of those two items and wasn't healed yet... One of those x-ray was that of sept. 26, 2018 after which the medical told me that no fracture was still there...

51-

CLAIM THREE: DELIBERATE INDIFFERENCE (OF JONES

VIII - CAUSE OF ACTION

128-The Eighth Amendment forbids the "infliction of wanton and unnecessary pain". Estelle, 429 U.S. at 104. Also, the "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain". Mitchell v. Maynard, 80 F.3d 1433, 44 (10th Cir. 1996), and, "a doctor could completely deny care even though he observe recognizable symptoms which could signal an emergency". ___ 439 F.3d at 1231 (10th Cir. 1999).

129- In terms of nurses, or guards for that matter, if guards deny or delay access to medical care for serious medical needs, a deliberate indifference claim is stated. Estelle 429 U.S. at 104-105. see also Mata v. Saiz, 427 F.3d 745, 56 (10th Cir. 2005) (nurses failure as a "gate keeper" to refer patient to doctor stated claim), Ramos v. Lamm, 639 F.2d 554, 75 (10th Cir. 1986) ("repeated examples of negligent acts which disclose a pattern of conduct by prison medical staff" may add up to deliberate indifference).

130- Further, my broken leg was a serious medical condition. see McBride v. Deer, 240 F.3d 1287, 90-91 (10th Cir. 2001) (loss of full function in leg was a "lifelong handicap or a permanent loss").

46

131. The refusal to provide ice, over the counter medication, which is within a nurse's power, or refer me to a doctor for that 'serious condition' caused me pain in the delay of diagnosis and utter lack of medication. See Kikumura v. Osagie, 461 F.3d 1269 (10th Cir. 2006) ("substantial harm" requirement if pain and suffering unnecessarily prolonged); accord scott v. Ambani, 575 F.3d 642 (6th Cir. 2009) (no pain medications for severe back and leg pain stated claim); McElligot v. Foley, 182 F.3d 1248, 56-57 (11th Cir. 1999) (failure to treat worsening pain stated claim); see also Robinson v. Moreland, 655 F.2d 887, 89-90 (8th Cir. 1981) (weekends delay in treating broken hand stated claim); Brown v. Hughes, 894 F.2d 1533, 38 (11th Cir. 1990 (same for four hour delay for broken foot); Loe v. Armistead, 582 F.2d 1291, 96 (4th Cir. 1978)(same for 22-hours delay for broken arm.).

132. Other than the pain stated above, see supra ¶¶ 69-71 (leg injury and pain), the delay in treatment and diagnosis also caused the injury to worsen because on August 29 and august 31, 2018, my broken leg was still undiagnosed; therefore, when being moved to medical for force feedings on those days, staff applied shackles on my legs and worsen the injury. In addition to this, when I was put in the "force feeding chair" or "five-point restraint chair" my legs were strapped very tightly to the chair and I was kept there for 90-120 minutes on each occassion while my right ankle was being crushed under the pressure of the straps. On at least two occassions; August 29, 2018 and August 31, 2018, I was forced to walk to aid digestion of nutritional supplement after the force feedings, per the PA's Osagie's order, even though I had already explained to him that: I can't walk, I was in full pain on my leg. This exacerbated my condition and caused even more excruciating pain and greater swelling.

53.

133 - Lastly, on August 31, 2018, I was forced to walk long distance possibly 300-400 meters back to my cell; i.e: from the medical unit to B-upper, cell #406, c-unit, inching along the intire way; this too caused excruciatingly severe and intense pain causing my injury to worsen. I spent that night and the following day crying in pain and wishing that they had killed me on August 23, 2018 assault... All with no pain medication whatsoever. Had I been x-rayed before August 31, 2018 I would have been diagnosed before Sept. 5, 2018, which caused Jones to tell me that day, Sept. 5, 2018.. "the doctor said you can't be put in shackles no more; your ankle is broke, we have told the staff already: Thus, I would have been able to avoid these incidents of shackling and walking (note: the diagnosis led to a wheel chair and splint on the same day, and a week later, a cast that remain with the wheelchair till Nov. 16, 2018). As for the strapp, after the delayed diagnosis came on Sept. 5, 2018, I was not strapped to the chair until a cast was placed on my leg; sept. 12, 2018 which nulified any harmful pressure the strapp preorly caused, i.e, the diagnosis caused restraint on using the strapp similer to the shackles. In conclusion, the delayed x-ray req directly caused me "substantial pain". The delayed x-ray was the result of Jones' and others' refusal to provide treatment and/or examine my leg, tying such treatment to my concession to end my hunger strike. I didn't.

CLAIM THREE: DELIBERATE INDEFFERANCE (OF JONES)

IX - QUALIFIED IMMUNITY

134 - Pursuant to the above cited cases, see Supra ¶¶128-31 Jones' conduct is not protected and was clearly established.

98

54-

CLAIM FOUR: DELIBERATE INDIFFERENCE (OF HUDDLESTON)

IX.- FACTS:

135- By August 26, 2018 Huddleston had been apprai-
sed of the use of force against me due to his review
of my medical records prior to conducting a med.Ass.
therein. In those records contained med.Ass. reports,
done post use of force, of Jones dated August 23, 2018.
See Supra ¶¶ 115-116. He had also been informed of
my leg and other complaints for the same reason; I compla-
ined to Jones on August 23, 2018 who filled out
those reports. See Ex. 2, Attach (B) Parts 12, 14
(a) (describing forms used for med.Ass).

136- With the knowledge of the use of force and my
complaints, Huddleston, on August 26, 2018 came to me
and saw me hobble to the gate with my leg fully ex-
posed to show him how each side of my right ankle
had swelled to approximately 75%, the SOA Dia, as well
as my four small toes being almost entirely black
and swollen to 150% their normal size and my foot's
inflamation. My foot, the top of it, was so inflamed
it was raised 3/4 of an inch off the surface of my foot's
non inflamed tissue.

137- I bagged him for an x-ray, pain pills and ice
or at least a referal to a doctor or P.A., telling him,
"my leg is broken", and "I can't walk or sleep". I explained
that the pain was so intense and unabating that
"I wanted to die". I also complained to him about other
injuries and pain I was going through. But Huddleston said
"I'am not here for that; I'm here to do a med.Ass.
for your hunger strike. Any treatment you want, will
come after you come off your H-strike, that's all we
care about right now". He made no examination of my leg
at all, nor of my other injuries, despite his responsibility to
do general physical checks. See Ex.3, parts 7, 8 (describing responsibily)

55-                          49

## LOGISTICAL INTERESTS:

138. Because of the convergence of the following logistical and personal interests of prison officials, I was denied treatment intentionally. First: BOP staffing issues and budget cuts have pressured prison officials to utilize many illegal methods such as beatings and denial of medical treatment on and to hunger strikers as medical assessments are logistically strenous on staff. The requirements are all of the use of force procedures and recording and review stipulations found in Ex.2, Attach.(B), parts 14,15 (policy describing stipulations), as required for hunger strikes in related policy; see Ex.3, part 1o(c) (referring to how a "use of force" procedures implemented to force feed. Use of force teams) often require 1o-staff to be pulled from various posts to constitute it for two-hours. This slows operations and often requires overtime pay. The custody staff who manage these "team" operations, i.e., guards and Lieutenants, exert pressure on medical staff to deny treatment in order to discourage prisoners from striking.

## PERSONAL INTERESTS:

139. The personal interests of officials causing them to deny treatments and or eject strikers like me are their hatred of "terrorists", as those bearing that label are the majority of hunger strikers at ADX. Also, part and parcel of their anti-Muslim sentiment is their disdain of how seriously hunger strikers' complaints are taken, at least at ADX. They feel that H-striking is a source of power and a right ascertaining mechanism inmates don't have deserve and shouldn't have because it divest them of absolute central and authority to arbitrarily adjucate our problems and constitutional rights because H-striking bring to bear the wardens', Regional and Central offices' inquiries, and at a times, the OIG. Obviously, it's difficult to descredit H-strikers' complaints who themselves are exposed to death by refusing food. Out of hatred, and for power, they denied me treatment after they almost killed me.

55-

140- On August 27, 2018 Huddleston returned with Jones, where I made the same request stated before, Supra ¶¶ 118-119, and I received the same response, Supra. Huddleston, also a nurse with Jones' power to give ice, over counter medication, a referral or an examination, and who was a party to my complaint to Jones, did nothing. He made no examinations or referrals, etc...

141- Huddleston saw me several other times after that including: August 31, 2018 (with Jones), Sept. 3, 2018 (with Osagi and Jones) and October 1, 2018, where I requested pain medication, other medical concerns and issues etc... But he refused to assist. I was in a wheelchair and cast at those times.

142- I remained in the wheelchair and cast until November 16, 2018, and I wasn't medicated until April 23, 2019 where medication for my pain was prescribed; I stayed 8-long and excruciating months without any pain relief (with exception of 14-15 Ibuprofen tablets given to me on December 6, 2018, that lasted in four days time and without any noticeable relief), after sustaining the "acute fracture".

CLAIM FOUR: DELIBERATE INDIFFERANCE (OF HUDDLESTON)

XI - CAUSE OF ACTION

143- I incorporate all legal and qualified immunity arguments cited before herein. See Supra ¶¶ 128-134 (Jones' argument).

57

51.

CLAIM FIVE: DELIBERATE INDIFFERANCE (OF OSAGIE)

## XII - FACTS:

144 On August 23, 2018, Osagie was present during my torture in the Obs. cell and very likely, he was witnessing the torture even before I was pushed into the Obs, because I believe I might have seen Osagie while I was violently escorted to the Obs. when I so the two Lieutenants mentioned earlier. see Supra: ¶¶ 50. also ¶¶ 41.

145- Osagie heard me scream that day while I was in Obs-cell, and very likely, before I was violently pushed into, saying that I never resisted any thing. He also heard troops death threats racial slurs, cursing's on me while at the same time they were torturing me at a time I was in my sec fourth day of H.strike with broken leg, and in a full restraints supra ¶¶ 50-51. Just as he very well knew me for almost 20-years before that moment without a single violent occassion against him other medical staff or any other staff at the ADX.

146- Osagi possibly is the most calpable because he personally witnessed the torture and cause of my injuries. as well as my instantaneous limpings. probably he saw Brush york and jerk my hands and ankles and toes against their normal ranges' of motion. All of these cosmic truths make the following facts more incriminating.

58

5L

147- On August 29, 2018 after reviewing my medical records per hunger strike assessment policy and general proffessional duty, such records like all prior medical assessments, see Ex. 3, parts 3(d), 8(c), and the post-use of force med. Asses. report of Jones, see Ex. 2, Attach. (B), parts 12, 14, having clearly complained of my continued leg troubles, and others, during each of those medical encounters, Osagie arrived, fully informed of such complaints, to do a med. Ass. and force feeding. (The exhibit parts reffering to record keeping and review standards)

148- I hobbled to the cell get to be "cuffed up" then, I hobbled down stairs, in clear pain, winsing with each step, to the medical office in C-unit. I had my leg exposed the intire time in preparation to show whatever medical staff were present in the office.

149- It is an established practice and procedure at ADX that an inmate who leaves his cell, for any reason, must wear shoes. My foot was as previously described above, Supra ¶¶ 119 (sumptoms). so I couldn't have worn shoes anyway. However, the important point here is that the lievtenant along with the guards who escoted me in that moment saw my foot and subsequently didn't ask me to put shoes because they knew that the foot needed to be examined by Osagie just a few meters away. My condition, essentially, was obvious in its need to be addressed. (note: up to that moment and since I was assaulted on August 23, 2018; I had no shoes, any kind of shoes... no anything else, since Brush had stolen everything from my cell... But: Had the Lt. and officers knew that I had no issue that prevented me from putting shoes, then would have not allowed me to go nowhere out side my cell without shoes... But because they knew and so themselves that I couln't put no shoe, they didn't even bother themselves to ask me whether I had any shoes in my cell...)

59.                                          53

150- Osagi saw me hobbling, assessed me for Hunger strike assessment and tried to convince me to to drink the nutritional supplement willingly instead of force feeding. I complained to him concerning my leg but he refused to examine and was only focussed on trying to avoid the logistical inconveniences of a force feeding. See supra ¶¶ 138 ( describing logistics) I refused to break my hunger strike and to drink the supplements.

151- I was later "cuffed up", strapped on a wheel chair with that excruciating pains, wheeled to the medical-unit 300-400 meters away and then force fed. Osagi who had just heard and saw me with my broker leg full of pain was the one who observed me strapped tightly on the solid-wheel chair and that black-solid chair during the forced feeding process. Osagi clearly saw that every one of those activity; being escorted down stair to see him in his medical room to be set on a wheel chair and strapped tightly to be wheeled to the medical unit, and to be shifted to the feeding spot... each of these moves, delivered me an excruciating pain... Osagi after me complaining to him; he superviced and witnessed and even approved those moves. since it's a medical staff's duty to monitor and check a prisoner after being strapped on a chair...

152- After the force feeding, Osagie ever after hearing and witnessing me in that excruciating pain supra ¶¶ 150-150, asked and ordered me to walk back and forth in order to order and digestion, I said to him that I was in pain. I can't walk... He insisted though. Because I was surrounded with force-team troops, I had to obey the order & due to my fear that I might be beaten again... I walk back and forth with obvious limping and almost crying fell on my face due to that excruciating and unbereable pain I was experiencing... I truly wished that I was dead before that... I was then put in obs. cell, tied tightly for almost 2-hours

60-

153- Two days later, on August 31, 2018, Jones and Huddleston assessed me... after refusing all my request in my cell... Eventually I was again strapped on that solid-black-wheel chair to the medical unit for force-feeding. Osagie force-fed me. On this day I said on camera about my leg and other problems... that I need an x-ray. I need to be examined... or "assessed"... Osagi first. repeated his previus statement: that I have been already assessed... I complained about the excruciating pain I was having... also the barbaric conditions I was forced to live in. Like: depravation of clothes. no shower shoes... nor any thing... I also said, in response to Osagi's statement. that: I may die for H. strike...; that: No. not due to H. strike but the officers have told me that they'll kill me ... and "wants to use H. strike as a reason or pretext of my death.

154- After the force feeding, Osagi again, as he had done on Se August 29, 2018, asked me to walk back and forth. I repeated again that: I was in excruciating pain. I can't walk... But he insisted. I walk due to my fear that the ADX's troops they may jump on me again in the presence of Osagi as they had done so on August 23, 2018, see Supra, ¶50.

155- After I was forced to walk in that excruciating pain with those legs and hands cuffs with black-box devices that each delivered terrable pains on my injured limbs... Osagi finally after long 8-days decided to briefly assess my leg which was much swollen and my toes already turned black... as a direct result of officer Brush's and his fellow ADX's troops to break and destroy my bones and limbs. See Supra, ¶30 (describes Brush's and others' efforts to break my bones...).

156- After assessing my leg, Osagi ordered an x-ray for me that afternoon. I was then put in Obs. Cell at medical unit and strapped on that solid chair for about two hours or so.

61

157- After being strapped tightely in one position for about 2-hours, I was escorted to the x-Ray room, walking, ever though the wheel chair was still outside the Oss. cell. After the x-ray, I was again ordered to walk back to c-units almost 300-400 miters away. I said to the officers that I can't walk I'am in excruciating pain on my legs and other parts of my body...etc. But the officers insisted and said that we'll walk slowly. Again out of my now intencive fears, I had to force my self to walk back to unit-c, limping and almost crying due to that excruciating and deadly pain. I still remember how difficult it was for me to climb those stairs when we reach my range B-c-upper.

158. The events of August 31,2018 are clear example of how Osagie, other medical staff and the Adx authority deliberate and indifferente were; After my complaining to Jones and Huddleston during the med.ass. of my deadly pain, need of x-Ray, pain relief...etc, I was still once more strapped through the same leg I complained about. After and before the feeding, I again cryed out, this time to Osagie. He finally assessed me after forcing me to walk, he ordered an x-ray, he let the officers strapped me again for about 2-hours via same leg I have been complaining whole day, but rather, whole week about. I'am then ordered to walk to the x-ray room, and there after, back to my cell almost 400-miters long... Osag. and the rest concerned were in total indiffecence. They never cared, I allege.

159- When I arrive to my cell I spent that night and the following day... in even more excruciating pain and the swelling increased...as a results of those harsh treatments I received on August 31, 2018... I can't forget being crying in pain that night.

62-

56.

160- On September 3, 2018 Osagie, Jones and another medical staff came to my cell for med. ass. and told me that: my x-ray pictures shows "twisted muscle". Also see Supra ¶¶ 122. Osagie and his collegues once more refused to get me any pain relief. But Osagie on this day allowed me to get a bag of ice for my leg... This was the only time I was offered the ice to help my injury. I was given the ice once and denied at dinner time and the trash bag I was given for ice confiscated.

161- On this day also, Osagie told me in my cell as he and other two medical staff spent almost two hours to convince me to drink the nutrional supplement willingly, that: If I have complaint or statement to make, concerning the medical treatments needs... or medical staff. I must make that statement when the medical staff come to assess me in my cell, but not infront a camera or in writing Complaints.... As I complained on Camera in August 31, 2018... He said: He didn't want to see me going through more or he said: other problems and told me therefore to avoid complaining on Camera. "For this reason, I avoided complaining on Camera after that for fear of more troubles.

162- On Sept. 5, 2018, finally I received diagnose that my ankle was fractured... and on that evening I was given a wheel chair for the first time and a splint was applied on my ankle for the first time. The splint was replaced with a hard cast that was applied to me on Sept. 12, 2018. See Supra ¶¶ 123. But ever after the discovery of "acute fracture" Osagi and his collegues kept refusing issuing me and pain medication... Supra ¶¶ 123.

63-                              X-57

**CLAIM FIVE: DELIBERATE INDIFFERENCE (OF OSAG.)**

**XIII - CAUSE OF ACTION**

163- In addition to the cases cited above, Supra ¶¶ 128-131 (siting cases), I cite the following to support Osagie's liability.

164- Osagie refused to examine my leg on August 29, 2018 causing me the pain priorly stated and the examination of my injury, which was most obvious to him because he su the inflinction of the injuries, " a claim is...actionable only in cases where the need for additional treatment...is obvious, [such as where] a medical proffessional fails to treat a condition so obvious that even a lay man would recognize the condition". Hunt, 199 F.3d 1220, 23-24 (10th Cir. 1999). On August 29, 2018, Osagie knew, based upon seeing the assault and my limping and ~~samictoms~~ symptoms, that my leg was broken. He should have examined me then.

165- To the point, he completely denied medical care, " a doctor could completely deny care even though he observes recognizable symptoms which could signal an emergency". Self v. Crum, 439 F.3d 1227, 31 (10th Cir. 2006).

166- Brown, 1899 F.2d 1533 (5th and 11th Cirs. 1990) is on point and is cited approvingly in Mata, 427 F.3d at 755 (10th Cir. 2005). See also Mandel v. Doe, 888 F.2d 783, 89-90 (11th Cir. 1989) (P.A. failed to diagnose hip that was broke and failed to order an x-ray.

64-

167- Osagie is deliberately indifferent for a second reason; He saw officers beating me and try to break my limbs just as he heard me screaming as a gang of guards beat me nearly to death and chose to avoid knowledge of my broken ankle by leaving the scene and ordering or allowing Jones to do the med. Ass. See supra ¶¶ 50-51 (Osagie being being there and then left) He can't avoid liability by shirking his medical duties. Deliberate indifference exists when a medical Proffessional " refused to veryfy underlying facts he strongly suspected to be true, or declined to Confirm infrences of risk that he strongly suspected to exist" Walton v. Gomez, 745 F 3d 405, 32 (10th Cir. 2014) (not doing Vitals on unconscious inmate doesn't save official from liability) (quoting Farmer, 511 U.S at 843 n.8.

168- Also; he is deliberately indifferent for refusing to provide pain medication and ice on August 29, 2018. August 31, 2018 and Sept. 3, 2018 and also after comming off my H. strike on October 2, 2018 cousing me continue to live in excruciating pains for 8-munths.

## XIV - QUALIFIED IMMUNITY:

169 - Pursvant to the cases cited above, see supra ¶¶ 128-131, and the following, Osagie violated clearly established law and is liable. See infra ¶¶ ███ 186

## XV - EVIDENCE/MISC.

170- On August 29, 2018 and August 31, 2018 there is footage recording my transfer to medical unit and force feedings and also, August 29 and then 31, 2018, force walking right after the force feedings for aiding digestion. also, the August 31, 2018, force walking from medical to c-unit. as well as August 31, 2018's ankle examination and surrounding conversation via handheld camera footage.

171- On August 29, 2018 and August 31, 2018 there are stationary cameras in c-unit which recorded my moving from my cell to the unit boundaries at the ADX hallway. There is also footage from ADX hallway stationary cameras recording my movement from c-unit to the medical unit and my return back to c-unit.

172- On August 29, 2018, there is stationary camera footage of myself being moved to and from c-unit's medical office.

66

CLAIMS: 3, 4, and 5: DELIBERATE INDIFFERANCE

XVI - GENERAL FACTS FOR ALL CLAIMS:

173- On August 23, 2018, my neighbor, prisoner Edward Molina, cell # 107, noticed me limping when I was returned to my cell, # 108, A-Range, Lower, C-unit. He sent cop-outs, staff requests, to the medical dept. and to ADX's internal affairs dept, describing the assault and trying to get me medical attention by describing me limping...etc.

174- On August 24, 2018 in the morning, I spoke with C-unit correctional counselor Ms. Torres, she saw me limping toward my cell's get, and there I showed her my swollen leg and told her I believe was broken and I need medical staff to assess me... I also talk to her and she saw me in that described state, when she came for the UDC hearing following the fabricated incident report Brush gave me on August 23, 2018 after he and his fellow troops tortured me. Torres said she didn't think that my leg was broken but will speak to the medical.

175- On August 28, 2018 I spoke with on ADX's psychologist, told her about the assault, showing her my swollen leg and ask to intervene by contacting the medical staff to get me help and treatment, if this was done, medical staff would have received this additional notification that will be reflected in my records...

67-{

J'

CLAIM SIX: EXCESSIVE FORCE (OF BRUSH).

CLAIM SEVEN: EXCESSIVE FORCE(OF ESPINOZA)

CLAIM EIGHT: EXCESSIVE FORCE(OF MILLER)

CLAIM NINE: FAILURE TO INTERVINE (OF OSAGIE)

CLAIM TEN: FAILURE TO INTERVINE (OF Lt. MURTON)

<u>XVII</u> - FACTS OF CLAIMS: 6-10

176- Brush and miller were two of the three officers who initiated the assault against me o- A- Lower C-mit. on August 23, 2018. Miller capacity was officer number one, while Brush was the one who took the leading role in the assault especially in its initial level. See supra ¶¶ 15-58. (FACTS on ASSAULT). also, supra ¶¶ 60-63 (addit. facts on Brush). Also, supra ¶¶ 46 (Describing some of Muller's activities).

177- Espinoza was one of the responding officers who cum into unit C- to torture me. He was one of the cruelt troops, worked with full coordination with Lt. Murtan. see supra ¶¶ 48 (Describing some of Espinoza actions).

178- Osagi and murton. were present probably from the start or near the start of the assault, and most definately were there in the obs' cell. Both failed and chose not to intervene and stop or prevent the assault. that continued for approximately 15-minutes. See supra ¶¶ 41-57 (details of murton's role.) also, ¶¶ 50-51 (Osagi's).

179- I incorporate all other facts stated priorly here in. See Supra ¶¶ 15-57 (FACTS in assault)(Battery facts)

CLAIM 6-10: EXCESSIVE FORCE/FAILURE TO INTERVENE

XVIII- CAUSE OF ACTION(s)

I 80- 1 incorporate my Eighth Amendment argument above, herein. See Supra ¶¶ 9.8-105 (Battery claim) to establish liability.

181- Bush's, Miller's and Espanoza's conducts are aggregated, because they all jointly participated in their using of excessive force.. They are all responsible for each others' conducts and for the conduct of all present. See Walton v. Gomez, 745 F.3d 405, 22 (10th Cir. 2014); Estate of Booker v. Gomez, 745 F.3d 405, 21,22 (10th Cir. 2014).

182= Osagie and Murton's liability are predicated on the liability of the Turner Three.

183- The objective component of the prior three's claims are met by their forcing me to fear death, i.e., psychological torture and torment by their un ending torture compare Supra ¶¶ 39, 77-90 with Benefield v. McDowall, 241 F.3d 1267, 72 (10th Cir. 2001 (Extreme psychological torment meets objective harm standard)

69.

## XIX- QUALIFIED IMMUNITY FOR CLAIMS: 6-10.

184- Brush, Miller, Espinoza, Osagie and Matt Murton, are not entitled to immunity. because the unconstitutionality of what they did, use force against a restrained prisoner who poses no threat and is not resisting, was clearly unconstitutional at the time of the torture according to 10th ciruct case law and concensus of case law from the other circuits, See Scall v. New Mexico. 236 F.3d 588, 95 (10th. Cir. 2000) (stating standard).

185- I incorporate the cases cited above. See Supra ¶¶ 100-103, and the following cases, to defeat qualified immunity. See Mitchell.v. Maynard. 80 F.3d, 1433, 40-41 (10th. Cir. 1996); Ali v. Duboise, 763 F. App x 645-51-52, (10th. 2019) (applying Wilkins v. Gaddy. 559 US 34 (2010) to find Ali's facts, which are identical to mine, sufficient to defeat qualified immunity), Sayed v. Virginia, 744 F. Appx. 542, 49-50 (10th. Cir. 2018) (denying immunity on identical facts to mine.

70-

## XX- QUALIFIED IMMUNITY FOR CLAIMS:3-5 DELIBERATE INDIFFERANCE

186- Jones, Huddleston and Osagie are not entitled to immunity, see Edward v. Snyder, 478 F.3d 827,31-32 (7th. Cir. 2006 (delay of two days in treating broken finger stated claim); Croft v. Hampton, 286 F. Appx. 455 (8th. Cir. 2007)(failure to splint or immobolize fractured limb, especially before movement, puts person at risk for future injury and increased pain so such as states claim); Fitzke v. Shappell, 468 F.2d 1072, 74-75 (6th. Cir. 1972)(a limping prisoner complaining of pain which is untreated for 12-hours stated claim); Perry v. Roy, 782 F.3d 73,78 (1st. Cir. 2015) (a prisoner un able to fully open jaw, except to say it was broken was obvious to even a lay person that the nurse should have examined the jaw, this stated claim); Perry, 782 F.3d at 80 (stating that non-thoughough examinations and with holding medical treatment to punish an inmate violates the Eighth Amendment); Nielsen v. Rabin, 746 F3d 58,63-64 (2nd. Cir. 2013)(doctors' failure to treat a broken collecbone, coupled with a minimal examination despite serious symptoms and complaints of pain stated claim where the doctor was punishing an inmate).

187- I was tortured and my leg was broken on August 23,2018 and wasn't examined untill August 31,2018 and wasn't diagnosed until Sept. 5,2018. i.e., I was forced to wait for two excruciating weeks before my leg was diagnosed with serious fracture... Only on Sept. 5,2018 evening splint was applied and wheel chair provided... Between August 23. to August 31,2018. the day I was examined for the first time, I have complained virtually every day to every one Icould see and talk to...

188-No pain relief was given to me untill 8-months had passed. See Supra 69-70.

71.

181- I have been struggling to prepare and write this complaint not only because my mental and emotional state is so Sad, but also my English, Grammer, my knowledge of using Electronic law library, the computer, are all very, very poor.

182. I am un educated prisoner in each of above mentioned field and subject... I often had to ask for help concerning English language and it's Grammer.... I never learned how to use the computer, and I can't really use it yet... to

183- Beside, in last several months due to the Covid-19 restrictions here, I couldn't go to law library since only prisoner who are given an access to it, are those who are currently have or going cases...

184- Due to my poor English, I some times had to prolong my statements in order to be able to express what I mean to say and write...

72-

### E.    PREVIOUS LAWSUITS

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you
were incarcerated? ___ Yes ___ No (*check one*).

*If your answer is "Yes," complete this section of the form. If you have filed more than one
previous lawsuit, use additional paper to provide the requested information for each previous
lawsuit. Please indicate that additional paper is attached and label the additional pages
regarding previous lawsuits as "E. PREVIOUS LAWSUITS."*

Name(s) of defendant(s):                    Eric Holder etc...

Docket number and court:                    07-cv-02697-msk- BNB.

Claims raised:                              Several of Constitutional claims.

Disposition: (is the case still pending?
has it been dismissed?; was relief granted?)    Trial, Relief granted partially.

Reasons for dismissal, if dismissed:        _____

Result on appeal, if appealed:              _____

### F.    ADMINISTRATIVE REMEDIES

*WARNING: Prisoners must exhaust administrative remedies before filing an action in federal
court regarding prison conditions. See 42 U.S.C. § 1997e(a). Your case may be dismissed or
judgment entered against you if you have not exhausted administrative remedies.*

Is there a formal grievance procedure at the institution in which you are confined?

        ✓Yes ___ No (*check one*)

Did you exhaust administrative remedies?

        ✓Yes ___ No (*check one*)

48

73-

## G.    REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "G. REQUEST FOR RELIEF."*

I am requesting that the Court give me these relief:

A- For the Tort claims: claim one and two, two million u.s. dollers in compesory demages.

B- For the rest of claims: claim three through claim ten: request momentory demages, compensatory demages, and pumtive demages, severally and jointly. Also nominal demages for all 10-claims:

C- Attorney fees when one appointed or voluntarily comes to assist, also my filing fees, mailing, time spent to learn and prepare this action...etc.

D- An injunction requiring the BOP to record with camera within 2-minutes all of immediate use of force.

E- All other reliefs the court deems appropriate.

## H.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

s/ Mohammed

(Plaintiff's signature)

August 14, 2020

(Date)

(Form Revised December 2017)

## EXHIBIT : 1

Attachment (A) MRI evewation showing "acute" fracture

Attachment (B) medical approval/authorization of keeping "wheel chair", and applied "splint", with 2-months expiration date. (total: 2-pages)

StatRad Exam Requisition

Page 1 of 1



**statrad**

Leading Teleradiology

## ADX Florence FLM

| | | | |
|---|---|---|---|
| Patient: | **MOHAMED, KHALFAN K. (Male)** | DOB: | 07/25/73 |
| Register#: | **44623-054** | Age: | 45 |
| Date: | 08/31/18 15:07 | Status: | OP |
| Slicecount: | 6 | | |
| History: | Painful, swollen right ankle | | |
| Priors: | | | |
| Exams: | FILM RIGHT ANKLE | | |
| Referring Phy: | A.Osagie_MLP | | |
| Ordering Phy: | A.Osagie MLP | | |

Ordering Phy #: 7197849464
Accession Numbers: 202#BOP031618610

### Final Report

**ADDENDUM - Added by Maurice Yu, MD on 9/5/2018 8:59 AM (-07:00)**
There is a slightly displaced acute fracture at the posterior cortex of the junction of the distal right fibula and lateral malleolus. There is an associated ankle joint effusion. Right ankle mortise is intact.

Findings were brought to my attention by Robert Higgins on September 5, 2018 at approximately 7:55 AM pacific standard time.

Exam: FILM RIGHT ANKLE

HISTORY: Pain and swelling.

TECHNIQUE: 6 views obtained

COMPARISON: No prior imaging available

FINDINGS: There is no radiographic evidence for acute fracture. There is no joint space malalignment. There is mild soft tissue swelling at the lateral right ankle. Bone mineralization is normal for age.

IMPRESSION:
Mild soft tissue swelling at the lateral right ankle without radiographic evidence for an acute fracture or joint space malalignment.

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

Radiologist:        Maurice Yu, MD

Study ready at 15:07 and initial results transmitted at 15:15

Critical Value Communications

| Clear Time | Type | Notes |
|---|---|---|
| 09/05/18 09:03 | Verify Receipt | Verified receipt with rad tech Higgins on 09/05 09:03 (-06:00) |

9/5/2018



# Bureau of Prisons
## Health Services
## Medical Duty Status

Reg #:  44623-054                    Inmate Name:   MOHAMED, KHALFAN KHAMIS

---

## Housing Status

___ confined to the living quarters except  ___meals  ___pill line  ___treatments   Exp. Date: _____

___ on complete bed rest:      ___bathroom privileges only                            Exp. Date: _____

___ cell:   ___cell on first floor  ___single cell  ___lower bunk  ___airborne infection isolation  Exp. Date: _____

___ other:  _____    Exp. Date: _____

## Physical Limitation/Restriction

___ all sports                                                   Exp. Date: _____

___ weightlifting:   ___upper body   ___lower body               Exp. Date: _____

___ cardiovascular exercise:   ___running  ___jogging  ___walking  ___softball   Exp. Date: _____
                   ___football  ___basketball  ___handball  ___stationary equipment

X  other:   Wheelchair.                                          Exp. Date: __11/05/2018__
            Left lower leg brace.  Ankle sprint.

## May have the following equipment in his / her possession:

| Equipment | Start Date | End Date | Return Date |
|---|---|---|---|
| Pillow | 02/13/2015 | 02/12/2016 | |

   Has one extra pillow.

## Work Restriction / Limitation:

Cleared for Food Service:   No_____

 X  No Restrictions

**Comments:**  N/A

_____  Jones, R. RN  _____     **09/05/2018**
Health Services Staff                                                      Date

Inmate Name:   **MOHAMED, KHALFAN KHAMIS**     Reg #:   **44623-054**   Quarters:   **C04**

*ALL EXPIRATION DATES ARE AT 24:00*

EXHIBIT : 2

Attachment (A) : 28 CFR §552.20-27 (CCFR use of force)

Attachment (B) : BOP program statement 5566.06 (use of force policy)





# SUBPART C -- USE OF FORCE AND APPLICATION OF RESTRAINTS ON INMATES

### § 552.20 Purpose and scope.

The Bureau of Prisons authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed. When authorized, staff must use only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff, and others, to prevent serious property damage and to ensure institution security and good order. Staff are authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate:

(a) Assaults another individual;

(b) Destroys government property;

(c) Attempts suicide;

(d) Inflicts injury upon self; or

(e) Becomes violent or displays signs of imminent violence.

This rule on application of restraints does not restrict the use of restraints in situations requiring precautionary restraints, particularly in the movement or transfer of inmates (e.g., the use of handcuffs in moving inmates to and from a cell in detention, escorting an inmate to a Special Housing Unit pending investigation, etc.).

[54 FR 21394, May 17, 1989; 59 FR 30469, June 13, 1994; 61 FR 39800, July 30, 1996]

[EFFECTIVE DATE NOTE: 61 FR 39800, July 30, 1996, which amended this section, became effective July 30, 1996.]

### § 552.21 Types of force.

© 2018 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement







(a) Immediate use of force. Staff may immediately use force and/or apply restraints when the behavior described in § 552.20 constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order.

(b) Calculated use of force and/or application of restraints. This occurs in situations where an inmate is in an area that can be isolated (e.g., a locked cell, a range) and where there is no immediate, direct threat to the inmate or others. When there is time for the calculated use of force or application of restraints, staff must first determine if the situation can be resolved without resorting to force (see § 552.23).

(c) Use of Force Team Technique. If use of force is determined to be necessary, and other means of gaining control of an inmate are deemed inappropriate or ineffective, then the Use of Force Team Technique shall be used to control the inmate and to apply soft restraints, to include ambulatory leg restraints. The Use of Force Team Technique ordinarily involves trained staff, clothed in protective gear, who enter the inmate's area in tandem, each with a coordinated responsibility for helping achieve immediate control of the inmate.

(d) Exceptions. Any exception to this rule is prohibited, except where the facts and circumstances known to the staff member would warrant a person using sound correctional judgment to reasonably believe other action is necessary (as a last resort) to prevent serious physical injury, or serious property damage which would immediately endanger the safety of staff, inmates, or others.

[59 FR 30469, June 13, 1994; 61 FR 39800, July 30, 1996]

[EFFECTIVE DATE NOTE: 61 FR 39800, July 30, 1996, which substituted "using sound correctional judgment" for "with correctional experience" in paragraph (d), became effective July 30, 1996.]

### § 552.22 Principles govering the use of force and application of restraints.

(a) Staff ordinarily shall first attempt to gain the inmate's voluntary cooperation before using force.

(b) Force may not be used to punish an inmate.

CFR                                                              2

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.







(i) Medication may not be used as a restraint solely for security purposes.

(j) All incidents involving the use of force and the application of restraints (as specified in § 552.27) must be carefully documented.

[54 FR 21394, May 17, 1989; redesignated at 59 FR 30469, June 13, 1994; 59 FR 30470, June 13, 1994; 61 FR 39800, July 30, 1996]

[EFFECTIVE DATE NOTE: 61 FR 39800, July 30, 1996, which revised paragraph (c), and substituted "Except when" for "Except where" in paragraph (g), became effective July 30, 1996.]

### § 552.23 Confrontation avoidance procedures.

Prior to any calculated use of force, the ranking custodial official (ordinarily the Captain or shift Lieutenant), a designated mental health professional, and others shall confer and gather pertinent information about the inmate and the immediate situation. Based on their assessment of that information, they shall identify a staff member(s) to attempt to obtain the inmate's voluntary cooperation and, using the knowledge they have gained about the inmate and the incident, determine if use of force is necessary.

[54 FR 21394, May 17, 1989; redesignated at 59 FR 30469, June 13, 1994; 59 FR 30470, June 13, 1994]

### § 552.24 Use of four-point restraints.

When the Warden determines that four-point restraints are the only means available to obtain and maintain control over an inmate, the following procedures must be followed:

(a) Soft restraints (e.g., vinyl) must be used to restrain an inmate, unless:

(1) Such restraints previously have proven ineffective with respect to that inmate, or

CFR                                                     4

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

80882280





(2) Such restraints are proven ineffective during the initial application procedure.

(b) Inmates will be dressed in clothing appropriate to the temperature.

(c) Beds will be covered with a mattress, and a blanket/sheet will be provided to the inmate.

(d) Staff shall check the inmate at least every 15 minutes, both to ensure that the restraints are not hampering circulation and for the general welfare of the inmate. When an inmate is restrained to a bed, staff shall periodically rotate the inmate's position to avoid soreness or stiffness.

(e) A review of the inmate's placement in four-point restraints shall be made by a Lieutenant every two hours to determine if the use of restraints has had the required calming effect and so that the inmate may be released from these restraints (completely or to lesser restraints) as soon as possible. At every two-hour review, the inmate will be afforded the opportunity to use the toilet, unless the inmate is continuing to actively resist or becomes violent while being released from the restraints for this purpose.

(f) When the inmate is placed in four-point restraints, qualified health personnel shall initially assess the inmate to ensure appropriate breathing and response (physical or verbal). Staff shall also ensure that the restraints have not restricted or impaired the inmate's circulation. When inmates are so restrained, qualified health personnel ordinarily are to visit the inmate at least twice during each eight hour shift. Use of four-point restraints beyond eight hours requires the supervision of qualified health personnel. Mental health and qualified health personnel may be asked for advice regarding the appropriate time for removal of the restraints.

(g) When it is necessary to restrain an inmate for longer than eight hours, the Warden (or designee) or institution administrative duty officer shall notify the Regional Director or Regional Duty Officer by telephone.

[54 FR 21394, May 17, 1989; redesignated at 59 FR 30469, June 13, 1994; 59 FR 30470, June 13, 1994; 61 FR 39800, July 30, 1996]

[EFFECTIVE DATE NOTE: 61 FR 39800, July 30, 1996, which revised the introductory text, paragraph (a), the first sentence of paragraph (d), and paragraphs (f) and (g), became effective July 30, 1996.]

CFR                                            5

© 2018 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

80882280





### § 552.25 Use of less-than-lethal weapons, including chemical agents.

(a) The Warden may authorize the use of less-than-lethal weapons, including those containing chemical agents, only when the situation is such that the inmate:

(1) Is armed and/or barricaded; or

(2) Cannot be approached without danger to self or others; and

(3) It is determined that a delay in bringing the situation under control would constitute a serious hazard to the inmate or others, or would result in a major disturbance or serious property damage.

(b) The Warden may delegate the authority under this regulation to one or more supervisors on duty and physically present, but not below the position of Lieutenant.

[54 FR 21394, May 17, 1989; redesignated at 59 FR 30469, June 13, 1994; 59 FR 30470, June 13, 1994; 76 FR 6054, 6056, Feb. 3, 2011]

[EFFECTIVE DATE NOTE: 76 FR 6054, 6056, Feb. 3, 2011, revised this section, effective Mar. 7, 2011.]

### § 552.26 Medical attention in use of force and application of restraints incidents.

(a) In immediate use of force situations, staff shall seek the assistance of mental health or qualified health personnel upon gaining physical control of the inmate. When possible, staff shall seek such assistance at the onset of the violent behavior. In calculated use of force situations, the use of force team leader shall seek the guidance of qualified health personnel (based upon a review of the inmate's medical record) to identify physical or mental problems. When mental health staff or qualified health personnel determine that an inmate requires continuing care, and particularly when the inmate to be restrained is pregnant, the deciding staff shall assume responsibility for the inmate's care, to include possible admission to the institution hospital, or, in the case of a pregnant inmate, restraining her in other than face down four-point restraints.

(b) After any use of force or forcible application of restraints, the inmate shall be examined by qualified health personnel, and any injuries noted, immediately treated.

CFR    6

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

80882280





[54 FR 21394, May 17, 1989; redesignated at 59 FR 30469, June 13, 1994; 59 FR 30470, June 13, 1994; 61 FR 39801, July 30, 1996]

[EFFECTIVE DATE NOTE: 61 FR 39800, 39801, July 30, 1996, which revised this section, became effective July 30, 1996.]

### § 552.27 Documentation of use of force and application of restraints incidents.

Staff shall appropriately document all incidents involving the use of force, chemical agents, or less-than-lethal weapons. Staff shall also document, in writing, the use of restraints on an inmate who becomes violent or displays signs of imminent violence. A copy of the report shall be placed in the inmate's central file.

[54 FR 21394, May 17, 1989; redesignated at 59 FR 30469, June 13, 1994; 59 FR 30470, June 13, 1994; 76 FR 6054, 6056, Feb. 3, 2011]

[EFFECTIVE DATE NOTE: 76 FR 6054, 6056, Feb. 3, 2011, amended this section, effective Mar. 7, 2011.]

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

80882280

OPI:        **CPD/CPB**
**NUMBER:**   **5566.06, CN-1**
**DATE:**     **8/29/14**
**SUBJECT:**    <u>**Use of Force**</u> **and Application of Restraints**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program

# Statement

OPI:    CPD/CPB

NUMBER:    5566.06, CN-1

DATE:    August 29, 2014

# <u>Use of Force</u> and Application of Restraints

/s/

*Approved*:  Charles E. Samuels, Jr.

Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following change to Program Statement 5566.06, <u>**Use of Force**</u> **and Application of Restraints**, dated November 30, 2005:

proj

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

**Section 6d.**

An inmate who is pregnant should not be placed in restraints unless there are reasonable grounds to believe the inmate presents an immediate, serious threat of hurting herself, staff, or others, or that she presents an immediate credible risk of escape that cannot be reasonably contained through other methods. For additional guidance refer to Section 13.



# Program

# Statement

**U.S. Department of Justice**

Federal Bureau of Prisons

**OPI:**   CPD/CSB

**NUMBER:**   P5566.06

**DATE:**   11/30/2005

**SUBJECT:**   **Use of Force** and Application of Restraints

1.      [**PURPOSE AND SCOPE** §552.20.      The Bureau of Prisons authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed. When authorized, staff must use only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff and others, to prevent serious property damage,

and to ensure institution security and good order.      Staff are

proↄ

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

**authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate:**

**a.      Assaults another individual; b.      Destroys government property; c.    Attempts suicide;**

**d.    Inflicts injury upon self; or**

**e.    Becomes violent or displays signs of imminent violence.**

**This rule on application of restraints does not restrict the use of restraints in situations requiring precautionary restraints, particularly in the movement or transfer of inmates (e.g., the use of handcuffs in moving inmates to and from a cell in detention, escorting an inmate to a Special Housing Unit pending investigation, etc.).]**

Under this rule precautionary restraints may also be used as prescribed by medical staff for medical purposes in accordance with procedures set forth in the Health Services Manual.

The use of restraints on inmates due to mental illness (e.g., to prevent suicide or infliction of self-injury) is subject to this Program Statement's provisions and the Program Statement on

**[Bracketed Bold - Rules]**

Regular Type – Implementing Information

Suicide Prevention Program.    This includes the placement, reviews, and release of inmates from restraints at all Bureau facilities, including medical referral centers.

This policy's purpose is not to discourage employees from using the amount of force necessary to protect themselves from assault, bodily harm, and/or loss of life.    This policy will provide guidance and instruction on appropriate procedures when

confronted with situations that may require the **use of force** to gain control of an inmate.

An employee may not use brutality, physical violence, or intimidation toward inmates, or use any force beyond that which is reasonably necessary to subdue an inmate.

2.    **PROGRAM OBJECTIVES**.  The expected results of this program

pro

**3**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

are:

a.    Force will ordinarily be used only when attempts to gain voluntary cooperation from the inmate have not been successful.

b.    When force is used, it will be only the amount of force required to subdue an inmate, or preserve or restore institution security and good order.

c.    Confrontation avoidance techniques will be used when feasible to avoid calculated **use of force** situations.

d.    When an inmate must be subdued, the **use-of-force** team technique will be used when feasible.

e.    Any inmate restrained to a bed will be checked every 15 minutes.

f.    Chemical agents will be used as specified and, to the extent practicable, only after a review of the inmate's medical file, unless such a delay would endanger the safety of the inmate, other inmates, staff and the community, result in severe property damage, or effectuate an escape.

g.    Restraints will be applied only for purposes outlined in policy and in authorized methods.

h.    Staff will be trained in confrontation avoidance, **use of force** team technique, use of chemical agents, and application of restraints.

i.    Each **use of force** incident will be documented, reported, and reviewed.

3.    **DIRECTIVES AFFECTED**

a.    **Directive Rescinded**

P5566.05    **Use of Force** and Application of Restraints on

Inmates (12/31/96)

b.    **Directives Referenced**

P1380.05    Special Investigative Supervisors Manual  (8/1/95)
P3420.09    Standards of Employee Conduct (2/5/99)

proj

4

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

P5214.04    HIV, Handling of Inmates Testing Positive (2/4/98)

P5324.03    Suicide Prevention Program (5/3/95)

P5500.11    Correctional Services Manual (10/10/03)

P5500.12    Correctional Services Procedures Manual (10/10/03)

P6031.01    Patient Care (1/15/05)

P6190.03    Infectious Disease Management (6/28/05)

c.    Rules cited in this Program Statement are contained in 28 CFR 552.20-27 and 29 CFR 1910.

4.    **STANDARDS REFERENCED**

a.    American Correctional Association 4th Edition Standards for Adult Correctional Institutions: 4-4190, 4-4191, 4-4202, 4-4203, 4-4206, 4-4281**(M)**, and 4-4405

b. American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-3A-17, 3-ALDF-3A-17-1, 3-ALDF-3A-28, 3-ALDF-3A-29, 3-ALDF-3A-31, and 3-ALDF-4E-32

c.    American Correctional Association 2nd Edition Standards for the Administration of Correctional Agencies:    2-CO-3A-01

5.    [**TYPES OF FORCE** §552.21.]    Since inmates occasionally become violent or display signs of imminent violence, it is sometimes necessary for staff to use force and restraints to prevent them from hurting themselves, staff, or others, and/or from destroying property.

[a.    Immediate Use of Force.    S**taff may immediately use force and/or apply restraints when the behavior described in §552.20 constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order.**]

Section 552.20 refers to Section 1 of this Program Statement.

In an immediate **use of force** situation, staff may respond with or without the presence or direction of a supervisor.

pro

**5**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

**[b.    Calculated Use of Force and/or Application of Restraints.
This occurs in situations where an inmate is in an area that can
be isolated (e.g., a locked cell, a range) and where there is no
immediate, direct threat to the inmate or others.    When there is
time for the calculated use of force or application of
restraints, staff must first determine if the situation can be
resolved without resorting to force (see §552.23).]**

Section 552.23 refers to Section 7 of this Program Statement. (1)
**Circumstances**. Calculated rather than immediate use of

force is desirable in all instances corrections workers

encounter.    Although this is not always possible, staff must use

common sense and good correctional judgment in each incident to

determine whether the situation allows for the implementation of

calculated or immediate **use of force** procedures.

The safety of all persons is a major concern and Bureau of
Prisons staff are required by laws, rules, and regulations,
related to the Bureau of Prisons, to protect others from the
hostile actions of inmates.    Immediate or unplanned **use of force**
by staff is required when an inmate is trying to self-inflict
injuries which may be life-threatening or is assaulting any other
person to include other inmates.    The destruction of government
property may require the immediate **use of force** by staff in some
circumstances.    If the above circumstances are not present,
staff should, if possible, employ the principles of calculated
**use of force**.'

Calculated **use of force** is appropriate, for example, if the
inmate is in a secure area or in an area where doors/grills may
be secured, including cases when the inmate is making verbal
threats or brandishing a weapon, provided staff believe there is
no immediate danger of the inmate inflicting injury or harm to
himself or herself or others.    Calculated **use of force** permits

the use of other staff (e.g., psychologists, counselors, etc.) to
attempt to resolve the situation non-confrontationally.

(2)    **Documentation.**    The entire interaction must be
documented in writing and placed in the FOI Exempt section of the

proj

**6**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

44623054

inmate's central file.   The documentation will reflect the actions and responses of each staff member participating in the confrontation avoidance process.

The entire process must be videotaped, including the introduction of all staff participating in the confrontation avoidance process.   The tape and documentation will be part of the investigation package for the After Action Review (see Sections 14 and 15).   Additionally, the Warden must forward a copy of each video tape to the Regional Director within four working days of the incident.

**[c.   Use of Force Team Technique.   If use of force is**

**determined to be necessary, and other means of gaining control of an inmate are deemed inappropriate or ineffective, then the Use**

**of Force Team Technique shall be used to control the inmate and to apply to include ambulatory leg restraints.   The Use of Force Team Technique ordinarily involves trained staff, clothed in protective gear, who enter the inmate's area in tandem, each with a coordinated responsibility for helping achieve immediate**

**control of the inmate.]**

See the Correctional Services Manual section on **Use of Force**

Team Techniques.

**[d.   Exceptions.   Any exception to procedures outlined in this rule is prohibited, except where the facts and circumstances known to the staff member would warrant a person using sound correctional judgment to reasonably believe other action is necessary (as a last resort) to prevent serious physical injury, or serious property damage which would immediately endanger the safety of staff, inmates, or others.]**

The reviews are conducted to determine compliance with the provisions of this Program Statement.   As the team reviews the **use of force** incident, care should be taken in making a determination whether sound correctional judgement was used in any calculated or immediate **use of force** given the circumstances at the time of the incident.       The team's findings will be

proj

7

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

documented in writing.

The Warden or Acting Warden, Associate Warden (Correctional Services), Captain, and Health Services Administrator or designee will comprise the After-Action Review Team.   Each review must be conducted on the next work day following the incident (see

Section 15).   A representative of the Council of Prison Locals at the appropriate level will be provided a copy of the After-Action report in accordance with appropriate laws, rules, and regulations.

The Warden must provide documentation to the Regional Director within two work days after the inmate has been released from

restraints (if applicable).   The report will confirm the review was conducted and the **use of force** was either appropriate or inappropriate.   This requirement applies to all instances involving the **use of force**, excluding the use of firearms (see the Program Statements on the Correctional Services Manual and the Correctional Services Procedures Manual for additional information on **Use of Force** Team Techniques).

6.   [**PRINCIPLES GOVERNING THE USE OF FORCE AND APPLICATION OF RESTRAINTS** §552.22

   a.   **Staff ordinarily shall first attempt to gain the inmate's voluntary cooperation before using force.**]

See Section 7 of this Program Statement for confrontation avoidance procedures prior to any calculated **use of force**.

[b.   **Force may not be used to punish an inmate.**

   c.   **Staff shall use only that amount of force necessary to gain control of the inmate.   Situations when an appropriate**

**amount of force may be warranted include, but are not limited to: (1)   Defense or protection of self or others;**

**(2)   Enforcement of institutional regulations; and**

   **(3)   The prevention of a crime or apprehension of one who has committed a crime.**

   d.   **When immediate use of restraints is indicated, staff may**

pro{

**8**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

**temporarily apply such restraints to an inmate to prevent that inmate from hurting self, staff, or others, and/or to prevent serious property damage.    When the temporary application of restraints is determined necessary, and after staff have gained control of the inmate, the Warden or designee is to be notified immediately for a decision on whether the use of restraints should continue.]**

Restraints should be used only when other effective means of control have failed or are impractical.

Designee refers to the Acting Warden or Administrative Duty

Officer.

An inmate who is pregnant should not be placed in restraints unless there are reasonable grounds to believe the inmate presents an immediate, serious threat of hurting herself, staff, or others, or that she presents an immediate credible risk of escape that cannot be reasonably contained through other methods. For additional guidance refer to Section 13.

**[e.    Staff may apply restraints (for example, handcuffs) to the inmate who continues to resist after staff achieve physical control of that inmate, and may apply restraints to any inmate who is placed under control by the Use of Force Team Technique.**

**If an inmate in a forcible restraint situation refuses to move to another area on his own, staff may physically move that inmate by lifting and carrying the inmate to the appropriate destination.]**

Staff are cautioned not to use the restraints for lifting or carrying an inmate.

**[f.    Restraints should remain on the inmate until self-control is regained.**

If the inmate was placed in restraints because of an assault on staff, the assaulted employee must not be involved in deciding whether the inmate has regained self-control.

**g.    Except when the immediate use of restraints is required for control of the inmate, staff may apply restraints to, or continue the use of progressive restraints on, an inmate while in a cell**

**in administrative detention or disciplinary segregation only with**

pro

**9**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

approval of the Warden or designee.

h.    Restraint equipment or devices (e.g., handcuffs) may not be used in any of the following ways:

(1)    As a method of punishing an inmate;

(2)    About an inmate's neck or face, or in any manner which restricts blood circulation or obstructs the inmate's airways;]

Tape shall not be placed around an inmate's mouth, nose, or neck.    Staff protective equipment must be sufficient to insulate staff from an inmate's spitting or biting, and conform with

29 CFR 1910.1030 and the Program Statement on Infectious Disease Management.    Staff will not use any item or device (e.g., towels, sheets, blankets, hosiery, masks) in **use of force** situations.

[(3)    In a manner that causes unnecessary physical pain or extreme discomfort;]

In general, when applying restraints, staff will use sound correctional judgement to ensure unnecessary pressure is not applied to the inmate.

Although the proper application of restraints may result in some discomfort, prohibited uses of restraints include, but are not limited to: "hogtying", unnecessarily tightness, or improperly applied restraints.    All inmates placed in restraints should be closely monitored.

When it is necessary to use continued restraints after any **use of force** incident, hard restraints (i.e., steel handcuffs and leg irons) are to be used only after soft restraints have proven ineffective, or a past history of ineffectiveness exists.

[(4)    To secure an inmate to a fixed object, such as a cell door or cell grill, except as provided in §552.24.]

Section 552.24 refers to Section 10 of this Program

Statement.

[i.    Medication may not be used as a restraint solely for security purposes.

proj

**10**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

**j.    All incidents involving the use of force and the application of restraints (as specified in § 552.27) must be carefully documented.]**

Section 552.27 refers to Section 14 of this Program Statement. This documentation includes, whenever practicable, filming the incident and a formal review by the institution's After-Action Review Committee.   Reports and videotapes of the incident must be reviewed, audited, and monitored by Regional and Central Office.

All **use of force** incidents must be reported and investigated to protect staff from unfounded allegations and eliminate the unwarranted **use of force**.

7.    **[CONFRONTATION AVOIDANCE PROCEDURES §552.23.    Prior to any calculated use of force, the ranking custodial official (ordinarily the Captain or shift Lieutenant), a designated mental health professional, and others shall confer and gather pertinent information about the inmate and the immediate situation.    Based on their assessment of that information, they shall identify a staff member(s) to attempt to obtain the inmate's voluntary cooperation and, using the knowledge they have gained about the inmate and the incident, determine if use of force is necessary.]**

Ordinarily, in calculated **use of force** situations, there is time for the Captain or Shift Lieutenant, Mental Health professional, Health Services staff, Chaplain, or other staff such as the inmate's Unit Manager, Case Manager, or Counselor, to confer and assess the situation.

This discussion may be accomplished by telephone or in person. The purpose is to gather relevant information concerning the inmate's medical/mental history (e.g., hypoglycemia, diabetes, etc.), any recent incident reports or situations which may contribute to the inmate's present condition (e.g., pending criminal prosecution or sentencing, recent death of a loved one, divorce, etc.).

This assessment should include discussions with staff who are familiar with the inmate's background or present status.    This information may provide insight into the cause of the inmate's immediate agitation.

Additionally, it may identify other staff who may have a rapport

proj

**11**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

with the inmate, and can possibly resolve the incident peacefully without the **use of force**.

8.    **USE OF FORCE SAFEGUARDS**. To prevent injury and exposure to communicable disease in calculated **use of force** situations, the following must occur.

   a.    Staff participating in any calculated **use of force**, including those participating in the **Use of Force** Team technique, must:

   (1)    Wear appropriate protective gear in accordance with the circumstances.    A list of protective gear to be used, depending upon the circumstances, may be found in 29 CFR 1910 and the Program Statements on Correctional Services Manual and Infectious Disease Management.

   (2) Personnel with documented injuries or diseases have an obligation to inform management that they are unable to participate in calculated **use of force** situations.    Staff members will also be asked during their introduction on camera if they

are willing to participate in this action and have no injuries or diseases that would prohibit their participation.    The agency

will comply with the hepatitis B vaccination procedures as outlined in 29 CFR 1910.1030.

   b.    Personnel with a skin disease or skin injury shall not be permitted to participate in a calculated **use of force** action.

   c.    Recognizing that a rapid response is imperative in an immediate **use of force** situation, responding staff must use sound correctional judgment in determining if time is available to obtain readily available protective equipment when responding (shields, helmets with face shields, pads, jumpsuits, etc.). Often, circumstances will not permit the time to carry this out.

   If an emergency situation results in a **use of force**, precautions, such as protective clothing and equipment, impede the transmission of infectious diseases.

   d.    Staff members will treat every calculated **use of force** as if blood and bodily fluids are present.    Sufficient protective equipment and clothing must be available for all staff

pro

**12**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

participating in a calculated **use of force**.    Employees must report any exposure to bodily fluids, or other contagious diseases, that occur during the course of their duties.

Employees must report these exposures via the injury assessment form or through other written methods to the Health Services Department, as soon as practicable, and appropriate OWCP form(s). The employee should also immediately inform his or her

supervisor.

If it is possible that an inmate could have transmitted a disease such as human immunodeficiency virus (HIV), the exposed employee may request the inmate to be tested promptly.    The employer recognizes this is an extremely important concern, and due diligence will be exercised testing the inmate and processing the test.    The employer will notify the employee of the test results immediately upon receipt in accordance with the Correctional Officers Health & Safety Act of 1998.

(1)    After all **use of force** incidents, areas where there is spillage of blood, or other body fluids, must be sanitized immediately upon the authorization of the Special Investigative Supervisor (SIS) or Shift Supervisor, who must first determine whether there is a need to preserve evidence.    Procedures for the cleaning of blood spillage or bodily fluids must be made

available to staff responsible for such cleaning.

(2)    All blood and body secretions will be removed immediately in the appropriate waste disposal container.    The area must be washed with an antiseptic solution, pursuant to the Program Statements on Procedures for Handling of HIV Positive Inmates Who Pose a Danger to Others and Infectious Disease Management.

(3)    Sanitation measures, in compliance with 29 CFR 1910 and Safety directives (i.e., local exposure control plan) must be implemented following **use of force** incidents where there is a possibility of exposure to bodily fluids or potentially

infectious materials.    Such measures may not take place until the scene has been released from the investigatory process.    Any clothing, including staff's or inmate's clothing, as well as

personal protective equipment which has been exposed to blood

pro{

**13**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

borne pathogens or other potentially infectious diseases must be disinfected or destroyed immediately.

9.    **PROGRESSIVE AND AMBULATORY RESTRAINTS.** For this PS's purposes, progressive restraints are defined as the process of using the least restrictive restraint method to control the inmate as deemed necessary for the situation. Based on the inmate's behavior, more restrictive and secure restraints may be used.

Ambulatory restraints are defined as approved soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basic human needs without staff intervention.

The policies and procedures described in Sections 10 and 13 of this Program Statement will be followed for inmates placed in restraints under this section (ambulatory restraints) including:

  conditions of confinement,

  scheduled checks,

  documentation, and

  24 and 48 hour reviews by the Warden and staff.

Ambulatory restraints should initially be used to restrain an inmate if deemed appropriate for the situation. An example of such situations is when an assaultive incident occurred quickly and ended, and the inmate is no longer displaying signs of violence or aggressiveness. Using ambulatory restraints for a period of time may be appropriate for protecting staff and others, pending an assessment by staff to determine whether the inmate has regained self-control.

Staff should look for a pattern of non-disruptive behavior over a period of time as an indication the inmate has regained self-control and is no longer a disruptive threat. Additionally, the

15 minute and two-hour logs should be reviewed to support any decision concerning the release of an inmate in restraints. Inmates asleep at the time of two-hour review will be awakened to assess their condition.

If the situation dictates the need for more restrictive or secure restraints, i.e., the inmate's behavior becomes increasingly

pro⌐

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

aggressive and disruptive, staff must determine the type of progressive restraints to be used (hard restraints with or

without waist chain or waist belt, four-point soft restraints with hard restraints used for securing the inmate to the bed, or four-point hard restraints).

In situations involving highly assaultive and aggressive inmates, progressive restraints should be used only as an intermediate measure in placing the inmate in or removing an inmate from four-point restraints.

When it is necessary to restrain an inmate under this section (ambulatory restraints) for longer than eight hours, the Regional Director or Regional Duty Officer must be notified telephonically by the Warden or designee or the Institution Administrative Duty Officer.

10.    [USE OF FOUR-POINT RESTRAINTS §552.24.    When the Warden determines that four-point restraints are the only means available to obtain and maintain control over an inmate, the following procedures must be followed:

   a.    Soft restraints (e.g., vinyl) must be used to restrain an inmate, unless:

      (1)    Such restraints previously have proven ineffective with respect to that inmate, or

      (2)    Such restraints are proven ineffective during the initial application procedure.]

This may not be delegated below the Warden's level.

   [b.    Inmates will be dressed in clothing appropriate to the temperature.

   c.    Beds will be covered with a mattress, and a blanket/sheet will be provided to the inmate.]

Under no circumstance shall an inmate be allowed to remain naked or without bed covering placed over the inmate's body unless determined necessary by qualified health personnel.

   [d.    Staff shall check the inmate at least every fifteen minutes, both to ensure that the restraints are not hampering

pro

**15**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

**circulation and for the general welfare of the inmate.   When an inmate is restrained to a bed, staff shall periodically rotate the inmate's position to avoid soreness or stiffness.]**

Qualified health personnel shall evaluate the inmate to be restrained to a bed to determine the position the inmate should be placed in.   When qualified health personnel are not immediately available, the inmate shall be placed in a "face-up"

position until evaluated by qualified health personnel.   Inmates must be checked every 15 minutes and this information shall be documented.

Inmates will be checked every 15 minutes and this information must be documented.   See Section 14.b., **Use of Restraints Reporting Requirements** for detailed information on documenting 15 minute checks.

**[e.     A review of the inmate's placement in four-point restraints shall be made by a Lieutenant every two hours to determine if the use of restraints has had the required calming effect and so that the inmate may be released from these restraints (completely or to lesser restraints) as soon as possible.   At every two-hour review, the inmate will be afforded the opportunity to use the toilet, unless the inmate is continuing to actively resist or becomes violent while being released from the restraints for this purpose.]**

Based on the particular nature of the situation, the Lieutenant who has offered the inmate a bathroom break will determine how many staff are needed to release the inmate from restraints and provide the inmate a bathroom break.   The Lieutenant will

assemble the staff and visually observe and direct staff as they complete this task.   The Lieutenant will determine what protective equipment is needed, if any, for the staff assisting with the inmates bathroom break.

The goal of the two-hour reviews is to determine, as soon as possible, that the inmate has regained self-control and may be placed in lesser restraints.   See Section 9, **Progressive and Ambulatory Restraints.**   Staff should look for a pattern of non-disruptive behavior over a period of time indicating the inmate has regained self-control and is no longer a disruptive threat. Additionally, the 15 minute and two-hour check logs must be

proj

**16**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

reviewed to support any decision for lesser measures or the removal of restraints.    Inmates asleep at the time of the two-hour reviews should be awakened to assess their condition.

If an inmate is released temporarily from four-point restraints for any reason, e.g., to use the toilet, consumption of food or beverage, etc., without continuing disruptive or aggressive behavior, the Lieutenant must consider authorizing lesser restraints or removing the restraints.    See Section 9,

**Progressive and Ambulatory Restraints.**    If an inmate is returned to four-point restraints after a non-disruptive break, the Lieutenant, must document the reasons for the action.

Ordinarily, the Operations Lieutenant makes the decision to release an inmate or apply lesser restraints.    This authority must not be delegated below the Lieutenant level.    If the Lieutenant needs to consult with mental health staff before making the decision on whether to release an inmate from restraints, it will be sought without delay.

**[f.    When the inmate is placed in four-point restraints, qualified health personnel shall initially assess the inmate to ensure appropriate breathing and response (physical or verbal). Staff shall also ensure that the restraints have not restricted or impaired the inmate's circulation.    When inmates are so restrained, qualified health personnel ordinarily are to visit the inmate at least twice during each eight-hour shift.    Use of**

**four-point restraints beyond eight hours requires the supervision of qualified health personnel.    Mental health and qualified**

**health personnel may be asked for advice regarding the appropriate time for removal of the restraints.]**

Health Services staff, perform initial and subsequent required checks, must examine and document the following:

Date and time of examination;

Examining staff member;

Body position;

Restraints (adequate circulation);

proj

**17**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

Vital signs (blood pressure, pulse, respiration, and temperature);

Medication;

Injuries;

The inmate's intake, output, hydration, etc.;

Possible medical reasons for behavior;

Deterioration of inmate's health; and

Any other significant findings and comments.

In institutions without 24-hour medical coverage, medical staff must report to the institution twice during each eight-hour shift that an inmate remains in four-point restraints.    Such staff will be compensated (overtime, compensatory hire, etc.) in accordance with the regulations.    Under no circumstances will non-medical staff perform a medical assessment of an inmate.

Psychology Services staff will examine inmates in four-point restraints at least once during every 24 hour period that the inmate is restrained.    Psychology staff examinations will include the following:

(1)    A review of the inmate's psychological history;

(2)    A description of the interview conducted with the inmate;

(3)    A review of the 15 minute, two-hour, and health services review logs;

(4)    A description of the inmate's current mental health status;

(5)    Recommendations; and

(6)    Whether the inmate is being referred for mental health institution placement and an explanation.

See Section 14.b., **Use of Restraints Reporting Requirements**, for detailed information on documenting Health and Psychology Services Staff reviews.

[g.    **When it is necessary to restrain an inmate for longer**

proj

**18**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

**than eight hours, the Warden (or designee) or institution administrative duty officer shall notify the Regional Director or Regional Duty Officer by telephone.]**

The above notification will be made for each consecutive eight-hour period the inmate remains in restraints. Documentation detailing the reasons for the placement of each inmate in

four-point restraints, regardless of the duration, must be provided to the Regional Director or Regional Duty Officer on the following work day.

Additionally, within 24 hours of placement in restraints, a review of the inmate's status will be conducted and a behavior management plan prepared. The Warden, Associate Warden, Captain, Unit Manager, Health Services Administrator, and Chief Psychologist will conduct this review. All relevant information will be reviewed, including the 15-minute, Lieutenant, medical staff, and psychology service checks logs.

Evidence indicating the inmate's inability to be placed in lesser restraints or released from restraints must support the Warden's decision to continue restraints beyond the initial 24 hour period. In making this decision, the Warden should look for a pattern of non-disruptive behavior over a period time

indicating the inmate has regained self-control and is no longer a disruptive threat.

Additionally, the Warden's documentation must indicate specifically what considerations are being made for mental health treatment, including possible referral to a mental health institution.

The Warden's review should be documented in memorandum format to the file, with a copy faxed to the Regional Director immediately upon completion. The memorandum should summarize the reports of each participant, followed by the Warden's decision

and justification. Group reviews of this type must be conducted within every 48-hour period following the initial 24-hour review. See Section 14.b., Use of Restraints Reporting Requirements, for detailed information on documenting the initial 24-hour, and subsequent 48-hour, reviews.

proj

**19**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group All rights reserved Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

11.    **[USE OF CHEMICAL AGENTS OR NON-LETHAL WEAPONS** §552.25.
**The Warden may authorize the use of chemical agents or non-lethal
weapons only when the situation is such that the inmate:**

**a.    Is armed and/or barricaded; or,**

**b.    Cannot be approached without danger to self or others; and,**
**c.    It is determined that a delay in bringing the situation**

**under control would constitute a serious hazard to the inmate or
others, or would result in a major disturbance or serious
property damage.]**

Qualified health personnel (Physician, Physician's Assistant,

or nurse) shall be consulted prior to staff using chemical agents

unless the circumstances require an immediate response.

Ordinarily, in a calculated **use of force** situation, the inmate's

medical file must be reviewed by these personnel to determine

whether the inmate has any diseases or conditions which would be

dangerously affected if chemical agents or non-lethal weapons are

used.    This includes, but is not limited to: asthma, emphysema,

bronchitis, tuberculosis, obstructive pulmonary disease, angina

pectoris, cardiac myopathy, or congestive heart failure.    Local

procedures will be developed where 24 hour medical coverage is

unavailable.

12.    **[MEDICAL ATTENTION IN USE OF FORCE AND APPLICATION OF
RESTRAINTS INCIDENTS** §552.26

  **a.    In immediate use of force situations, staff shall seek the
assistance of mental health or qualified health personnel upon
gaining physical control of the inmate.    When possible, staff
shall seek such assistance at the onset of the violent behavior.
In calculated use of force situations, the use of force team
leader shall seek the guidance of qualified health
personnel(based on a review of the inmate's medical record) to**

proj

**20**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group All rights reserved Use of this product is subject to the restrictions
and terms and conditions of the Matthew Bender Master Agreement.

44623054

identify physical or mental problems.    When mental health staff or qualified health personnel determine that an inmate requires continuing care, and particularly when the inmate to be restrained is pregnant, the deciding staff shall assume responsibility for the inmate's care, to include possible admission to the institution hospital, or, in the case of a pregnant inmate, restraining her in other than face down four-point restraints.

b.    After any **use of force** or forcible application of restraints, the inmate shall be examined by qualified health personnel, and any injuries noted, immediately treated.]

If any staff involved in a **use of force** reports an injury, Health Services personnel should provide an immediate examination and initial emergency treatment as required.    Staff may also seek treatment from their personal physician.

13.    **USE OF FORCE IN SPECIAL CIRCUMSTANCES**.    In certain extenuating circumstances, and after confrontation avoidance has failed or has proven to be impractical, staff may be forced to make a decision, such as whether to use force on a pregnant inmate or an aggressive inmate with open cuts, sores, or lesions.

Special cases such as mentally ill, disabled, or pregnant inmates, after consultation with the Clinical Director, must be assessed carefully to determine whether the situation is grave enough to require the use of physical force.

a.    **Pregnant Inmates**.    When pregnant inmates have to be restrained, necessary precautions must be taken to ensure the fetus is unharmed.    Health Services personnel must prescribe the necessary precautions, including decisions about the manner in which the inmate is to be restrained, i.e., whether medical personnel should be present during the application of restraints, whether the inmate should be restrained at the institutional hospital or a local medical facility, etc.

b.    **Inmates with Wounds or Cuts**. Aggressive inmates with open cuts or wounds who have attempted to harm themselves or others should be carefully approached by staff in the prescribed protective clothing/gear.    A full body shield should also be

proj

**21**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

used during these encounters to protect staff.    Aggressive inmates, after placement in restraints, should be placed in administrative detention and separated from other inmates.

Ordinarily, inmates of this status must remain in administrative detention until cleared to return to the general population by the Captain, Chief Psychologist, and the Clinical Director with the Warden's approval.

14.    **[DOCUMENTATION OF USE OF FORCE AND APPLICATION OF RESTRAINTS INCIDENTS §552.27**. **Staff shall appropriately document all incidents involving the use of force, chemical agents, or**

**non-lethal weapons.    Staff shall also document, in writing, the use of restraints on an inmate who becomes violent or displays signs of imminent violence.    A copy of the report shall be placed in the inmate's central file.]**

a.    **Report of Incident**. A **Use of Force** Report (BP-E583) will be prepared on the **use of force**, chemical agents/pepper mace, progressive restraints, and non-lethal weapons.    This reporting requirement includes the application of progressive restraints on an inmate who complies with the placement of the restraints.

The report must establish the identity of all involved in the incident; inmates, staff, and others.    It must provide a vivid, detailed description of the incident.    The report, including mental health/medical reports must be submitted to the Warden or designee no later than the end of the tour of duty.    A copy of the report is to be placed in the inmate's central file.    Copies are also to be sent within two work days to:

(1)    Assistant Director, Correctional Programs Division; (2) Assistant Director, Health Services Division;

(3)    Central Office Correctional Services Administrator; (4) Regional Director; and,

(5)    Regional Correctional Services Administrator.

A report is not necessary for the general use of restraints

(for example, the routine movement or transfer of inmates).

pro{

22

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

b. **Use of Restraints Reporting Requirements**

**Documented Reviews.** The following reviews will be documented as indicated:

(a) Fifteen-minute check - **fifteen-Minute Restraints Check Form (24 Hours)** (BP-S0717.055);

(b) Two-hour Lieutenant check - **Two-Hour Lieutenant Restraints Check Form (24 Hours)** (BP-S0718.055);

(c) Health Services Staff Review  - **Health Services Restraint Review Form (24 Hours)** (BP-S0719.055); and

(d) Psychology Staff Check  - **Psychology Services Restraint Review Form (24 Hours)** (BP-S0720.055).

Staff must complete all forms until the inmate is released from restraints.    The forms will be submitted to the Warden as required for periodic reviews of an inmate's placement in restraints.    After release from restraints, these forms must be compiled and maintained in the Inmate's Central File and Special Investigative Supervisor's file.

c.    **Videotape of Use of Force Incidents**. Staff must obtain a video camera immediately and record any **use of force** incident, unless it is determined that a delay in resolving the situation would endanger the inmate, staff, or others, or would result in a major disturbance or serious property damage.

The video recording will also include any medical examination conducted after:

the application of restraints,

use of chemical agents,

use of pepper mace, and/or

use of non-lethal weapons.

Calculated **use of force** shall be videotaped following the sequential guidelines presented in the Correctional Services

pro|

23

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

Manual.     The original videotape must be maintained and secured as evidence in the SIS Office.   A copy of every videotape, after review by the Warden (within four work days of the incident), unless requested sooner by the Regional Director, will be

provided immediately to the Regional Director for review.

The Regional Director shall forward videotapes of questionable or inappropriate cases immediately to the Assistant Director, Correctional Programs Division, Central Office, for review.

When a threat to the safety of the inmate, staff or others, or property, requires an immediate response, staff are obligated to obtain a camera and begin recording the event as soon as feasible.   As soon as control of the situation has been obtained staff must record information on:

injuries;

circumstances that required the need for immediate **use of force**; and

identifications of the inmates, staff, and others involved.

d.     **Documentation Maintenance**.  The Captain must maintain all documentation, including the videotape and the original BP-E583, for a minimum of 2½ years.   A separate file must be established on each **use of force** incident.

15.     **AFTER-ACTION REVIEW OF USE OF FORCE AND APPLICATION OF RESTRAINTS INCIDENTS**. Following any incident involving the **use of force** (calculated or immediate) and the application of restraints, the Warden, Associate Warden (responsible for Correctional Services), Health Services Administrator, and Captain must meet and review the incident.   The review is conducted to assess the rationale of the actions taken (e.g., if the force was appropriate and in proportion to the inmate's actions).

The review team should gather relevant information to determine if policy was adhered, and complete the standard After-Action Report (BP-E586), indicating the nature of the review and findings.   The BP-E586 should be submitted within two working days after the inmate is released from restraints.

a.     **Videotape Review**.  The After-Action Review Team should

pro[

**24**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

review the actions of the staff for compliance with the Correctional Services Manual and this policy. At a minimum, this review should include the following:

The Lieutenant displayed professional behavior during the Forced Cell Team technique.

The Lieutenant ensured only the force necessary to control the inmate is used, based on the nature of the incident.

The Lieutenant monitored the actions of the inmate and team members; and was not involved in subduing the inmate unless it is deemed necessary to prevent staff or inmate injury.

The **Use of Force** Team members were wearing the proper protective gear.

Unauthorized items such as towels, tape, surgical mask, hosiery, etc., was not being used.

Introductions were made by the Lieutenant, Use if Force Team members, medical staff, and staff involved in the confrontation avoidance technique as well as

identifying all staff present, including those observing.

**Use of Force** Team members used sound correctional judgment to ensure unnecessary pressure is not applied to the inmate.

**Use of Force** Team members used only the amount of force necessary to gain control of the inmate.

Inabilities to effectively gain control of the inmate are assessed and may indicate that additional training is necessary.

There was continuous operation of the video and breaks were documented and appropriately justified.

Prompt examination of the inmate followed the move and findings were noted on the video tape.

The method of chemical agents used was predetermined and use of devices was in accordance with the Correctional Services Manual.

The inmate was given the opportunity to voluntarily submit to

pro

**25**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

the placement of restraints.

Conversations were appropriate and necessary between team members and individuals during the **use of force**.

b.    **Report Completion**. When this review is completed, an After-Action Review Report (BP-E586) must be completed, as soon as possible, not later than two working days after the inmate has been removed from restraints.    This will ensure that staff with relevant information will be available and any necessary medical follow-up can be immediately provided to ascertain the nature of any injuries involved.

The Warden or designee will attest by his or her signature that the review was conducted and the **use of force** was appropriate or inappropriate.

c.    **Further Investigation**. The reviewers should also decide if the matter requires further investigation.    If deemed appropriate, the Warden will refer the matter for further investigation to the Office of Inspector General, Office of Internal Affairs, or Federal Bureau of Investigation.    Copies of the report must be forwarded to the Regional Director and Assistant Director, Correctional Programs Division, Central Office.

d.    **Report on Restraints Use**.     A report is not necessary for the general use of restraints.    For example, a report is not required in the routine movement or transfer of inmates.

16.    **TRAINING IN THE CONFRONTATION AVOIDANCE/USE OF FORCE TECHNIQUE**. In order to control any potential situation involving aggressive inmates, all staff must be made aware of their responsibilities through ongoing training.    At a minimum, training must cover:

communication techniques,

pro

**26**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

cultural diversity,

dealing with the mentally ill,

confrontation avoidance procedures,

the application of restraints (progressive and hard), and

reporting procedures.

a.    **Training Topics**.   The Warden of each institution shall determine how many staff should be trained in confrontation avoidance procedures and forced cell move techniques.    At a minimum, these staff shall be trained on an annual basis.    Each staff 'member participating in a calculated forced cell move must have documented proof of annual training in these areas.

Training should also include specific information pertaining to special situations.

b.    **Restraints Training**. Staff should be trained thoroughly in the use of both soft and hard restraints on an annual basis. The application of soft restraints to an inmate can be cumbersome if proper training is not provided.

Soft restraints such as vinyl or leather should be used prior to applying hard restraints.    For pregnant inmates, the approved vinyl or leather restraint belt should be used instead of a metal waist chain, whenever possible, to prevent injury to the inmate or fetus.

/s/

Harley G. Lappin

Director

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

proj

44623054

EXHIBIT: 3

BOP - Program statement 5562.05 (Hunger strike)

OPI:       **HSD/HSS**
NUMBER:    **P5562.05**
DATE:      **7/29/2005**
SUBJECT:   **Hunger Strikes**



**U.S. Department of Justice**

Federal Bureau of Prisons

# Program Statement

OPI:   HSD/HSS

NUMBER:   P5562.05

DATE:   7/29/2005

SUBJECT:   Hunger Strikes

1.   [**PURPOSE AND SCOPE** §549.60.   The Bureau of Prisons provides guidelines for the medical and administrative management of inmates who engage in hunger strikes.   It is the responsibility of the Bureau of Prisons to monitor the health and welfare of individual inmates, and to ensure that procedures are pursued to preserve life.]

2.   **SUMMARY OF CHANGES.**   Section 6 has been expanded to include

proj

1

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

pretrial and holdover inmates and ICE detainees.

Section 9 identifies Health Services staff and Food Service staff as those who may offer alternative beverages and nutritional supplements, if authorized by the physician.   This section also indicates food and toothpaste may be left in the inmate's cell.

Section 10 describes procedures for notifying the Regional Counsel when an inmate refuses treatment and the initiation of involuntary treatment.

3.   **PROGRAM OBJECTIVES.**   The expected results of this program are:

  a.   The health and welfare of any inmate on a **hunger strike** will be monitored.

b.   Food and beverages will be offered to inmates regularly.

  c.   When an inmate's life or health is threatened, involuntary medical treatment will be administered.

**[Bracketed Bold - Rules]**

Regular Type - Implementing Information

  d.   Every incident of an inmate on a **hunger strike** will be properly reviewed, documented, and reported.

4.   **DIRECTIVES AFFECTED**

a.   **Directive Rescinded**

P5562.04   Hunger Strikes, Inmate (6/20/94)

b.   **Directives Referenced**

P5566.05   Use of Force and Application of Restraints on

Inmates (7/25/96)

P6031.01   Patient Care (1/15/05)

P6090.01   Health Information Management (1/15/05)

c.   Rules cited in this Program Statement are contained in

proj

**2**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

28 CFR § 549.60-66.

5.   **STANDARDS REFERENCED**

a.   American Correctional Association 4th

Edition Standards for

Adult Correctional Institutions: 4-4257 and 4-4397 **(M)**

b.   American Correctional Association 4th

Edition Standards for

Adult Local Detention Facilities: 4-ALDF-4D-15 **(M)** and

4-ALDF-2A-52

6. [**DEFINITION** §549.61.    As defined in this rule, an inmate is on a **hunger strike**:

   **a.    When he or she communicates that fact to staff and is observed by staff to be refraining from eating for a period of time, ordinarily in excess of 72 hours; or**

   **b.    When staff observe the inmate to be refraining from eating for a period in excess of 72 hours.    When staff consider it prudent to do so, a referral for medical evaluation may be made without waiting 72 hours.]**

A **hunger strike** may be announced by the inmate, or observed by staff, even though the inmate may be taking liquids.

**#**    At times, an inmate may not actually engage in a **hunger strike**, but merely make a bid to gain attention.

Other types of inmates (not on inpatient status in a Bureau of Prisons Medical Referral Center or hospitalized in the community) who should be monitored according to this policy include:

**#**    Inmates who are observed to be unable to eat or drink by virtue of mental illness or acute medical conditions.    Although not intentionally on a hunger

strike, these inmates are either unwilling or unable to eat or drink sufficiently to prevent complications.

pro[

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

\#    Inmates with metabolic disorders or certain other illnesses, who deviate from normal eating habits or intake of fluid, could experience an immediate, significant hazard to their health and well-being.

In any case, it is also recognized that after long-term deprivation of food and shorter term deprivation of fluid, serious irreversible changes can occur, and sudden death can occur.

Procedures required in this Program Statement apply to pretrial and holdover inmates and ICE detainees.

7. [**INITIAL REFERRAL    §549.62**

   **a.    Staff shall refer an inmate who is observed to be on a hunger strike to medical or mental health staff for evaluation and, when appropriate, for treatment.]**

Each Warden shall establish referral arrangements for the institution.    In addition, staff may consult Health Services anytime they observe an inmate refraining from consuming food and/or liquids prior to 72 hours.

   **[b.    Medical staff ordinarily shall place the inmate in a medically appropriate locked room for close monitoring.]**

Ordinarily, placement in the medically appropriate room is a determination the institution physician makes.    This room will be a single cell observation room (i.e., dry cell or cell with water shut-off capabilities), where no other inmate contact is possible (i.e., other inmates can't pass food or liquid items to the

inmate on **hunger strike** status).

Inmates in Administrative Detention or Disciplinary Segregation may be retained in this status and remain in the SHU unless the physician determines movement to other quarters is medically necessary.

The Warden is to determine the type of observation for **hunger strike** inmates (e.g. continuous, 15 minute checks, routine).

\#    Under no circumstances will inmate companions be used to

pro<sub></sub>

**4**

© 2020 Matthew Bender & Company, Inc , a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

monitor **hunger strike** inmates.

8. [**INITIAL MEDICAL EVALUATION AND MANAGEMENT** §549.63

a.    Medical  staff  shall  ordinarily  perform  the  following procedures  upon  initial  referral  of  an  inmate  on  a  **hunger strike**:

(1)    Measure  and  record  height  and  weight;  (2)    Take  and  record vital  signs;

(3)    Urinalysis;

(4)    Psychological  and/or  psychiatric  evaluation;  (5)    General medical  evaluation;

(6)    Radiographs  as  clinically  indicated;

(7)    Laboratory  studies  as  clinically  indicated.]

If  an  inmate  refuses  the  initial  medical  evaluation,  a  signed Refusal  of  Treatment  form  (BP-A358)  must  be  obtained  and  also documented  in  the  Progress  Notes  (SF-600)  of  the  Inmate's  Health Record.    (Refer  to  the  Program  Statement  on  Patient  Care)

[b.    Medical  staff  shall  take  and  record  weight  and  vital  signs at  least  once  every  24  hours  while  the  inmate  is  on  a  **hunger strike**.    Other  procedures  identified  in  paragraph  (a)  of  this section  shall  be  repeated  as  medically  indicated.

c.    When  valid  medical  reasons  exist,  the  physician  may  modify, discontinue,  or  expand  any  of  the  medical  procedures  described  in paragraphs  (a)  and  (b)  of  this  section.

d.    When  medical  staff  consider  it  medically  mandatory,  an inmate  on  a  **hunger  strike**  will  be  transferred  to  a  Medical Referral  Center  or  to  another  Bureau  institution  considered medically  appropriate,  or  to  a  community  hospital.]

The  decision  to  transfer  an  inmate  on  a  **hunger  strike**  for medical  reasons  should  only  be  made  after  consultation  with  a physician.

#    The  inmate  should  be  admitted  to  a  community  hospital  if  his medical  condition  warrants  continuous  enteral  (oral)  or intravenous  support.

proj

5

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

**#**    Local  institutions  need  not  transfer  an  inmate  on  a  **hunger strike**  to  a  Medical  Referral  Center  (MRC)  unless  an  MRC's specific services are required.

**#**    Mentally  ill  inmates  who  do  not  eat  or  drink  for  more  than  30 days,  regardless  of  the  apparent  reason,  should  be  referred  to  an MRC  for  evaluation  and  treatment  of  the  underlying  mental illness.

e.    Medical  staff  shall  record  in  the  appropriate  section  of the  inmate's  Health  Record,  entries  for  all  the  medical procedures  described  in  this  section.    (Refer  to  the  Program Statement on Health Information Management.)

9.    **[FOOD/LIQUID INTAKE/OUTPUT §549.64**

**a.    Staff shall prepare and deliver to the inmate's room three meals per day or as otherwise authorized by the physician.]**

A verbal  offer  of  a  meal  will  not  suffice.    Food  from  the  food tray  may  be  left  in  the  inmate's  cell.    Ordinarily,  when  the food  tray  is  left  in  the  inmate's  cell,  perishable  food  items will not be left for more than two hours.

**[b.    Staff  shall  provide  the  inmate  an  adequate  supply  of drinking water.    Other beverages shall also be offered.**

**c.    Staff  shall  remove  any  commissary  food  items  and  private food  supplies  of  the  inmate  while  the  inmate  is  on  a  hunger strike.    An  inmate  may  not  make  commissary  food  purchases  while under hunger strike management.]**

An  inmate  under  **hunger strike**  management  may  still  purchase

non-food  items,  such  as  stamps,  from  the  commissary.    The  inmate

is allowed to have toothpaste in the dry cell.

d.    All  food  and  water  intake  and  output  will  be  monitored  and recorded  as  needed  or  to  the  extent  possible.    The  Warden  shall make  this  determination  after  consultation  with  the  physician. This procedure is to continue until ended by a physician.

**#**    This  means  a  dry  cell  must  be  available  for  housing  **hunger strike** inmates.

proj

**6**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

Health Services and Food Service staff may offer alternative beverages, including liquid nutritional supplements, if authorized by the physicians. Any beverages other than drinking water must be documented (e.g. BP-S292) and that information relayed to Health Services staff. Acceptance of liquids alone should not be documented as accepting a meal.

10. **[REFUSAL TO ACCEPT TREATMENT §549.65**

**a. When, as a result of inadequate intake or abnormal output, a physician determines that the inmate's life or health will be threatened if treatment is not initiated immediately, the physician shall give consideration to involuntary medical treatment of the inmate.]**

The decision to force treatment upon the inmate is a medical decision, preferably by a written physician's order, with potential legal implications.

When it appears to medical staff that the inmate's condition is deteriorating to the extent that intervention may soon be required, the Regional Counsel must be notified so any legal issues may be addressed. Although legal counsel has been notified, medical staff should not suspend or delay involuntary treatment if the physician is convinced to a reasonable medical certainty that there is an immediate threat to the inmate's life, or permanent damage to the inmate's health.

Regional Counsel will determine whether it is appropriate to contact the local U.S. Attorney's Office.

**#** In the case of potential involuntary treatment of a pretrial inmate, institution legal staff or the

Regional Counsel must be notified that intervention may be required, in order to determine whether the court should be notified.

**#** In all such situations, the Regional Counsel will inform the Regional Director.

**[b. Prior to medical treatment being administered against the inmate's will, staff shall make reasonable efforts to convince the inmate to voluntarily accept treatment. Medical risks faced by the inmate if treatment is not accepted shall also be**

proj

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group All rights reserved Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement

44623054

**explained to the inmate.    Staff shall document their treatment efforts in the medical record of the inmate.**

**c.        When, after reasonable efforts, or in an emergency preventing such efforts, a medical necessity for immediate treatment of a life or health threatening situation exists, the physician may order that treatment be administered without the consent of the inmate.    Staff shall document their treatment efforts in the medical record of the inmates.]**

Written reports of such treatment shall be submitted to the Medical Director and Regional Director.    The Warden shall provide prompt notification and any involuntary treatment under this Program Statement to the sentencing judge, with an explanation of the background of and the reasons for the treatment.    The outcome of the **hunger strike** and the treatment administered shall also be reported.

When a physician orders involuntary medical treatment, to include placing a nasogastric tube for feeding, and the inmate refuses to comply, as with any other use-of-force, these events should be videotaped.

All staff involved in the use of force shall wear appropriate protective clothing as outlined in the Use of Force Program Statement.

Only the physician may order involuntary medical treatment.

**#**    Normally, this is to consist of a nasogastric tube for feeding.

**#**    If unsuccessful or medically inappropriate, then intravenous fluids and hyperalimentations intravenously may be necessary.

**#**    As a last report, gastrostomy and tube feeding through the stomach may be required, however, review by the appropriate court should first be sought before attempting this treatment.

**#**  Simple IVs may be performed in the institution,

however, hyperalimentations or gastrostomy tube feeding

must be performed in a hospital or an MRC (see Clinical

pro

**8**

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved  Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44623054

Treatment Guidelines or Medical Management of Inmates).

**[d.    Staff shall continue clinical and laboratory monitoring as necessary until the inmate's life or permanent health is no longer threatened.]**

Normally, treatment must continue until adequate oral intake of food and liquid is achieved.  Medical monitoring for severe or life-threatening complications of malnutrition may continue, at the physician's discretion, beyond the point at which the inmate resumes adequate oral intake.

**[e.    Staff shall continue medical, psychiatric and/or psychological follow-up as long as necessary.]**

11.  [**RELEASE FROM TREATMENT** §549.66.    **Only the physician may order that an inmate be released from hunger strike evaluation and treatment.    This order shall be documented in the medical record of the inmate.**]

Documentation is to be made in the Progress Notes section of the

Inmate's Health Record.

12.    **MEDICAL JUDGMENT.** None of the procedures or guidelines in this Program Statement are meant to limit or override the exercise of sound medical judgment by the physician responsible for medical care.

**#**  Each case must be evaluated on its own merits and individual circumstances.

**#**   Treatment is to be given and documented in accordance with accepted medical practice.

/s/

Harley G. Lappin

Director

Director

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT : 4

Attachment (A) B P - 11 Complaint and denial
on Assault of August 23, 2018.

Attachment (B) Admn. Tort claim complaint and Denial
on Assault ---- of August 23, 2018.

**U.S. Department of Justice**

Federal Bureau of Prisons

Recived  A-29-19

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: MOHAMED KHALFAN K        44623-054        D        ADX
          LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

**Part A - REASON FOR APPEAL** I'm asking the expunge of Inc. report# 224 issued by C.O BRUSH on 8-23-18. Also asking that C.O BRUSH and his associates be held criminally responsible for their crimes against me. The ADX-authority also responsible. The Reg. Director failed to respond.
- C.O BRUSH lied in the Inc. report, claiming that he asked me to be moved to the holding cell. In fact, all what he said was to move me to my cell # 108, C-unit, after I declined to go to see Lt Armilio, as he first asked me to. This claim was then rejected by the Lt him self, who said to me: he didn't know anything about that.
(See part # 1. The Reg. Director wrote that I must appeal to the warden the DHO finding, but I became combat until now I never received the DHO Report. Also, in the meantime, the appeal was used to punish me even more.
- C.O BRUSH also lied when he claimed that I turned from him, and became combat, but I'm forced not to
- I'm asking also that, BRUSH and his collegues including Lt. MURTON, C.O ESPANOLA and C.O MULLER, among other, be held responsible along with the top Adx-authority.
- On 8-23-18 C.O BRUSH, Lt MURTON, C.O ESPANOLA, C.O MULLER etc, committed a serious crimes against me without any provocation. C.O BRUSH, possibly with help from others broke my right ankle intentionally and without any provocation. I also received many other injuries.
- LT MURTON, supervised and led the assault and beating on me. He was there to give orders in these crimes, especially in the holding cell.
- I have never assaulted or harmed no one that day. Only I refused to go to Lt office.
- The ADX and BOP in general can't be an investigative and authority in these crimes and each damage I was made to receive in privacatly.

    12-19-18                                    Mohamed
        DATE                                SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

JAN 2 8 2019

[illegible] Section
Federal Bureau of Prisons

_____        _____
    DATE                            GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE        CASE NUMBER: _955144·A1_

**Part C - RECEIPT**                    CASE NUMBER: _____

Return to: _____
        LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

**Administrative Remedy No. 955144-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal where you allege on August 23, 2018, staff members at the ADX physically assaulted you without provocation. You also claim a false incident report was prepared to cover staff's actions. You request the incident report be expunged and the responsible staff members held criminally responsible for their alleged actions.

As indicated by the Warden and Regional Director, your allegation of physical assault by staff members at the ADX was forwarded to the appropriate authority for review. A thorough review will be conducted and proper action will be taken as deemed necessary. However, a decision to personally press criminal charges is one which is yours to make. You may contact whichever prosecutorial entity or legal advisor you believe is appropriate to assist you with this matter.

In addition, you have the ability to file a remedy appealing any sustained disciplinary action. Therefore, the incident report you received on August 23, 2018, will not be addressed in this response.

This response is provided for informational purposes.

_____
Date

_____
Ian Connors, Administrator
National Inmate Appeals

RECEIVED
APR 24 2019
ADX Warden's Office

page1

1. Submit to Appropriate Fed Ag. TO: The Regional Director, Federal Bureau Of Prisons. North Central Regional Office Gateway Complex, Tower II, 8th Floor 400 State Avenue, Kansas City, Kansas 66101-2492.

2. Name, Address of claimant, etc...
Khayfer Khonus Mohamed Reg#44623-054, U.S. Penitentiary max, P.O. Box 8500 Florence, CO 81226-8500

| 3. TYPE OF EMPLOY. | 4. DATE OF BIRTH | 5. MARITAL STAT. | 6. DATE AND DAY OF ACCIDENT | 7. TIME. |
|---|---|---|---|---|
| N/A | 7.25.1973 | | 8.23.2018, C-unit ADx Floor | 12:30 P.M. |

8. BASIS OF CLAIM?...
by large number of officers/prison guards in retaliation for my hunger strike. The beatings took place when I was already restrained and handcuffed and while I was weak in hunger strike. I was severely beaten, punched, kicked. Over the course of the beating my ankle was fractured and my other limbs more aggressively twisted in attempt to break them and I received bruces in my entere upper body. My face, head, hands and legs all were swollen. Eventually I had to be put in leg cast and on wheelchair for more than 2 months. Over the next several months I was given neglected medical treatments, this includes the delay examination on my injuries and delay of diagnoses. CONTINUE

9.                                   PROPERTY DAMAGE
NAME AND ADDRESS OF OWNER...
N/A

BRIEFLY DESCRIBE THE PROPERTY...
N/A

PERSONAL INJURY/WRONGFUL DEATH
STATE NATURE AND EXTENT OF EACH INJ...
Severely fractured ankle and in several pains on my right leg especially when standing and walking, also insibility to walk normally and total insibility of exercising. The pain on my ankle and my right wrist preventing up to this day to pray normally while my wrist is producing pains while writing= CONTINUE

| 11.   NAME | WITNESSES   ADDRESS |
|---|---|
| mr. X. Ossugic | N/A |

| 12-a Property DAMAGE | 12-b PERSONAL INJURY | 12-c WRONGFUL DEATH | 12-d. TOTAL |
|---|---|---|---|
| N/A | 2,000,000 Two millions dollars | N/A | 2,000,000 Two millions dollars |

| 13a. SIGNATURE OF CLAIMANT | 13b. Phone number. | 14. DATE OF CLAIM |
|---|---|---|
| M Jhamel | N/A | April 8. 2019 |

Page 2.

**8. BASIS OF CLAM (CONTINUES)**

diagnoses, refusal to provide treatment, pain medication and even an icebag, ackept on one occation.

I still cant work normally today, 7+ moths after I was attacked and I may never walk properly again. At the some time, I still have reguler pain on my ankle, writs, back and on my jaws.

The staff intentionally broke my byores and then refused me proper medical treatmen

**10.                    PERSONAL INJURY - CONTINUES**

writing and I cant write continuessly at a single seating as I used to do before I was attacked. I have to stop in every few minutes.

Also I still have pains on other parts of my body including on my Jaws, back and my left wrist.

Also till this day I have imofiond and mental distress including the fear of being beaten again and being killed, as the officers had told me that they will kill me... I have dreams and strange nightmere of being attacked ...etc.



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

---

*Office of the Regional Counsel*

400 State Avenue
Tower II, Suite 800
*Kansas City, KS  66101*

NOV 2 0 2019

Khalfan Mohamed
Register No. 44623-054
Florence ADMAX USP
P.O. Box 8500
Florence, CO   81226

Dear Mr. Mohamed:

This is in response to your correspondence received in our office on November 12, 2019, wherein you request reconsideration of your Administrative Tort Claim, TRT-NCR-2019-04561.

Pursuant to 28 C.F.R. §14.9(b), …"a claimant, his duly authorized agent, or legal representative, may file a written request with the agency for reconsideration of a final denial of a claim under paragraph (a) of this section." Please be advised that the investigation of your claim is still ongoing. Therefore, your request for reconsideration is premature and not ripe for consideration at this time. If your claim is denied, you may resubmit your request for reconsideration no later than six months after you receive a final denial of your claim.

Sincerely,

Richard M. Winter
Regional Counsel

From: Khalfan Kh. Mohamed, Reg # 44623-054

Florence ADMAX USP. P.O.Box 8500

Florence, CO 81226-8500

February 24, 2020

To: The Office of the Regional Counsel, North Central Regional Office,

400 State Avenue, Tower II, Suite 800 Kansas City, KS 66101.

ADM. TORT CLAIM : TRT-NCR-2019-04561

RE: INQUERING IF THE FINAL DENIAL (OR DECISION) HAS
BEEN REACHED REGARDING MY ADM.TORT CLAIM:TRT-NCR-2019-0456.

Dear the Regional Counsel :

This's the second letter inquiring this matter. My previous letter was dated : January 6, 2020, I never received no response on that one. For that reason, I am writing again for the same goal: to ask if your office has decided on my above referenced claim.

As I have stated in my Jan.6,2020 letter, In your Nov.20,2019 letter to me you stated that "...be advised that the investigation of your claim is still ongoing..." That was the last letter/response I received from your office, almost 4-months have passed since you wrote those statement. Please be kind to inform me the status of my claim.

As I have also stated in my Jan.6,2020 letter: Many of my incoming and outgoing correspondence...etc get lost or sent back where they are comming from without me be notified...So there is no way of knowing if you have decided or

* I don't mean to harass you, but I simply want to know the status of my claim.

Thank you very much.



**U.S. Department of Justice**

Federal Bureau of Prisons

*North Central Regional Office*

---

*Office of Regional Counsel*

400 State Avenue
Tower II, Suite 800
*Kansas City, KS   66101*

MAR 0 4 2020

Khalfan Mohamed
Register No. 44623-054
Florence ADMAX USP
P.O. Box 8500
Florence, CO   81226

Re:   Administrative Claim TRT-NCR-2019-04561; Status Request

Dear Mr. Mohamed:

This is in response to your correspondence received in this office on January 13, 2020, in which you inquire about the status of the above-referenced administrative claim. Please be advised the investigation of your claim is still ongoing. Once a determination has been made, we will promptly notify you. However, you may consider the absence of a response to be a denial of your administrative claim.

We trust this addresses your concerns.

Sincerely,

Richard M. Winter
Regional Counsel

EXHIBIT: 5

BP 11- Complaint and Response . on Medical Treatment deprivation.../delay... (2-pages)

**Administrative Remedy No. 958295-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal wherein you allege your medical negligence with regard to
various injuries.  For relief, you request to receive adequate
medical treatment.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the manner in which the
Warden and Regional Director responded to your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal.  Most recently, you were evaluated by the physician on
December 6, 2018, at which time the ankle fracture was noted to
be healed and x-rays of your right wrist were noted to be
normal.  You were prescribed Ibuprofen and counseled on
safety/accident prevention.  There is no evidence to suggest
medical negligence.

The record reflects you have received medical care and treatment
in accordance with evidence based standard of care and within
the scope of services of the Federal Bureau of Prisons.  You are
encouraged to comply with proposed medical treatment so Health
Services can continue to provide essential care and to contact
medical personnel through routine sick call procedures should
your condition change.

Considering the foregoing, this response is provided for
informational purposes only.


_2 (11)19_
Date

_JC_
· Ian Connors, Administrator
National Inmate Appeals

**U.S. Department of Justice**

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: MIHAMED KHAFAN K    44673-054    D    ADX
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

Part A - REASON FOR APPEAL The Reg. director failed to respond. I'm asking that my const./prisoner rights including adeavete medical needs be respected, and holding the ADX (BOP, CH respons. for all damages. - ADX medical intentionally reglected and ignores my medical needs. Examples:
1- The medical ignored my beeing in H. strike even though I informed them and other staff. I started H. strike in 8/21/18, but I was assessed only in 8/26/18. A c/o broke my right ankle, but medica refused to assess my ankle and gitte me an x-ray till 8/31/18.
2- While my onkle was broke and in H. strike, medical staff forced me to work with legg cuff chains and black box and I was chained on a solid black chair at least twice.. causing deadly pain and possibly increased the fracture. Only in 9/5/18 I was given a wheelchair.
3- Since 8/26/18 up to 10/2/18, I have been complaining about the pain in my legs, wrists, jaws, backs at least 3-time per week during the H. strike assesment. And my first complaint, was in the day I was brutally assaulted by a group of officers in C-vnit, in 8/23/18.
4- I didn't have to put a sick call req; but I put it multiple times, incl. 9/25/18, 10/14/18 .. etc.
5- Only in 10/30/18 I got x-ray on my wrist and jaws, almost 70-days after I was assaulted.
6- Today, as of 1.3.19, my ankle, wrist .. etc still full of pain. Fice In recent weeks I put 2 sick call Ct. 18, and another one after that but no medical treatment I receive but few tablets.
※ I'm asking that my const. and prison rights be kept. All above violat misviolates my rights...
And I am holding the ADX /BOP responsic for all and each damages I'm receiving

1/3/19
DATE

Mihamed
SIGNATURE OF REQUESTER

Part B - RESPONSE

RECEIVED

JAN 2 8 2019

Administrative Remedy Section
Federal Bureau of Prisons

DATE

ORIGINAL: RETURN TO INMATE

GENERAL COUNSEL

CASE NUMBER: 958295·A1

Part C - RECEIPT

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

EXHIBIT: 6

Attachment (A) Medication prescription stickers
showing *Svlindac 200mg. tab. for
onkle/leg pain. And, meloxican 7.5mg.

Attachment (B) medication prscription stickers
showing citalopram 20mg. tab.
(for depression). (total 4 pages)



**FLORENCE FCC**   FLM-D06208L
5880 State Highway 67  Florence, CO 81226

275426-FLX    Sterett, Justin MD    11/01/2019
                                     44623-054
MOHAMED, KHALFAN KHAMIS
Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

Sulindac 200 MG Tab

(5) Refills    11/04/2019   JXW   Refill Until: 04/29/2020
#60  CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.  Don't Confiscate Before: 02/02/2020

Avoid alcoholic beverages.
Take with food
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine
Oval Yellow E 11

**FLORENCE FCC**   FLM-D06209L
5880 State Highway 67  Florence, CO 81226

275426-FLX    Sterett, Justin MD    11/01/2019
                                     44623-054
MOHAMED, KHALFAN KHAMIS
Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

Sulindac 200 MG Tab

(4) Refills    12/05/2019   KSK   Refill Until: 04/29/2020
#60  CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.  Don't Confiscate Before: 03/04/2020

Avoid alcoholic beverages.
Take with food.
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine
Oval Yellow E

**FLORENCE FCC**   FLM-D06210L
5880 State Highway 67  Florence, CO 81226

275426-FLX    Sterett, Justin MD    11/01/2019
                                     44623-054
MOHAMED, KHALFAN KHAMIS
Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

Sulindac 200 MG Tab

(3) Refills    01/06/2020   KVR   Refill Until: 04/29/2020
#60  CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.  Don't Confiscate Before: 04/05/2020

Avoid alcoholic beverages
Take with food.
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine
Oval Yellow E 11

**FLORENCE FCC**   FLM-D06210L
5880 State Highway 67  Florence, CO 81226

275426-FLX    Sterett, Justin MD    11/01/2019
                                     44623-054
MOHAMED, KHALFAN KHAMIS
Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

Sulindac 200 MG Tab

(2) Refills    02/06/2020   KSK   Refill Until: 04/29/2020
#60  CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.  Don't Confiscate Before: 05/06/2020

Avoid alcoholic beverages
Take with food.
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine
Oval Yellow E 11

**FLORENCE FCC**   FLM-D06210L
5880 State Highway 67  Florence, CO 81226

275426-FLX    Sterett, Justin MD    11/01/2019
                                     44623-054
MOHAMED, KHALFAN KHAMIS
Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

Sulindac 200 MG Tab

(1) Refills    03/09/2020   JXW   Refill Until 04/29/2020
#60  CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.  Don't Confiscate Before 06/07/2020

Avoid alcoholic beverages.
Take with food.
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine
Oval Yellow E 11

**FLORENCE FCC**   FLM-D02204L
5880 State Highway 67  Florence, CO 81226

275426-FLX    Sterett, Justin MD    11/01/2019
                                     44623-054
MOHAMED, KHALFAN KHAMIS
Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

Sulindac 200 MG Tab

(0) Refills    04/13/2020   JXW   Refill Until: 04/29/2020
#32  CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.  Don't Confiscate Before: 07/12/2020

Avoid alcoholic beverages.
Take with food.
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine.
Oval Yellow E 11

**FLORENCE FCC**          FLM-D06206L
5880 State Highway 67  Florence, CO 81226          93

263843-FLX          Oba, D MD          04/23/2019
44623-054
MOHAMED, KHALFAN KHAMIS

# Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

**Sulindac 200 MG Tab**
(5) Refills          04/23/2019   PNA   Refill Until: 10/20/2019
#60                              Don't Confiscate Before: 07/22/2019
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

Avoid alcoholic beverages

Take with food.

→ Do not take aspirin or aspirin containing products without knowledge and consent of your doctor

→ Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine

Oval Yellow  E 11

---

**FLORENCE FCC**          FLM-D06206L
5880 State Highway 67  Florence, CO 81226          82

263843-FLX          Oba, D. MD          04/23/2019
44623-054
MOHAMED, KHALFAN KHAMIS

# Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

**Sulindac 200 MG Tab**
(4) Refills          05/21/2019   PNA   Refill Until: 10/20/2019
#60                              Don't Confiscate Before: 08/19/2019
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

Avoid alcoholic beverages.

Take with food

→ Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.

→ Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine

Oval Yellow  E 11

---

**FLORENCE FCC**          FLM-D06206L
5880 State Highway 67  Florence, CO 81226          11

263843-FLX          Oba, D MD          04/23/2019
44623-054
MOHAMED, KHALFAN KHAMIS

# Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

**Sulindac 200 MG Tab**
(3) Refills          06/19/2019   KSK   Refill Until: 10/20/2019
#60                              Don't Confiscate Before: 09/17/2019
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

Avoid alcoholic beverages.

Take with food.

→ Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.

→ Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine

Oval Yellow  E 11

---

**FLORENCE FCC**          FLM-D06207L
5880 State Highway 67  Florence, CO 81226          J

263843-FLX          Oba, D  MD          04/23/2019
44623-054
MOHAMED, KHALFAN KHAMIS

# Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

**Sulindac 200 MG Tab**
(2) Refills          07/17/2019   PNA   Refill Until: 10/20/2019
#60                              Don't Confiscate Before: 10/15/2019
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

Avoid alcoholic beverages

Take with food.

→ Do not take aspirin or aspirin containing products without knowledge and consent of your doctor

→ Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine

Oval Yellow  E 11

---

**FLORENCE FCC**          FLM-D0620
5880 State Highway 67  Florence, CO 81226          80

263843-FLX          Oba, D. MD, CD          04/23/2019
44623-054
MOHAMED, KHALFAN KHAMIS

# Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

**Sulindac 200 MG Tab**
(1) Refills          08/19/2019   KSK   Refill Until 10/20/2019
#60                              Don't Confiscate Before: 11/17/2019
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

Avoid alcoholic beverages.

Take with food

→ Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.

→ Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine

Oval Yellow  E 11

---

**FLORENCE FCC**          FLM-D06207L
5880 State Highway 67  Florence, CO 81226          80

263843-FLX          Oba, D. MD, CD          04/23/2019
44623-054
MOHAMED, KHALFAN KHAMIS

# Take one tablet (200 MG) by mouth twice daily for right ankle/leg pain

**Sulindac 200 MG Tab**
(0) Refills          09/23/2019   PNA   Refill Until: 10/20/2019
#54                              Don't Confiscate Before: 12/22/2019
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

Avoid alcoholic beverages

Take with food.

→ Do not take aspirin or aspirin containing products without knowledge and consent of your doctor

→ Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine

Oval Yellow  E 11










**FLORENCE FCC**
5880 State Highway 67  Florence, CO 81226    FLM-D05112L

285047-FLX          Conroy, S DO          04/28/2020
MOHAMED, KHALFAN KHAMIS          44623-054

**Take one tablet (7.5 MG) by mouth with food each day AS NEEDED**

**Meloxicam 7.5 MG Tab**
(5) Refills          04/28/2020    JXW    Refill Until: 10/25/2020
#30
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.
Don't Confiscate Before: 07/27/2020

May cause dizziness.
Take with food.
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine
Round Lt. Yellow 152/T
(52)

---

**FLORENCE FCC**
5880 State Highway 67  Florence, CO 81226    FLM-D05112L

285047-FLX          Conroy, S DO          04/28/2020
MOHAMED, KHALFAN KHAMIS          44623-054

**Take one tablet (7.5 MG) by mouth with food each day AS NEEDED**

**Meloxicam 7.5 MG Tab**
(4) Refills          06/01/2020    JXW    Refill Until: 10/25/2020
#30
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.
Don't Confiscate Before: 08/30/2020

May cause dizziness.
Take with food.
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine.
Round Lt. Yellow 152/T
(152)

---

**FLORENCE FCC**
5880 State Highway 67  Florence, CO 81226    FLM-D05102L

285047-FLX          Conroy, S DO          04/28/2020
MOHAMED, KHALFAN KHAMIS          44623-054

**Take one tablet (7.5 MG) by mouth with food each day AS NEEDED**

**Meloxicam 7.5 MG Tab**
(3) Refills          07/01/2020    KVR    Refill Until: 10/25/2020
#30
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.
Don't Confiscate Before: 09/29/2020

May cause dizziness
Take with food
Do not take aspirin or aspirin containing products without knowledge and consent of your doctor.
Avoid prolonged or excessive exposure to direct and/or artificial sunlight while taking this medicine.
Round Lt. Yellow 152/T
(152)

**FLORENCE FCC**    FLM-D06208L
5880 State Highway 67  Florence, CO 81226    12

274705-FLX    Sterett, Justin MD    10/18/2019
44623-054
MOHAMED, KHALFAN KHAMIS
Take one tablet (20 MG)
by mouth each day
*consent form on file *

Citalopram 20 MG Tab
(5) Refills    10/18/2019   JXW   Refill Until: 04/15/2020
#30    Don't Confiscate Before: 01/16/2020
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

⇒ Do not drink alcoholic beverages when taking this medicine
⇒ Medicine may impair your ability to drive or operate machinery.  Use care until you know how it affects you
Do not take other medicines without checking with your doctor or pharmacist.
⇒ May cause drowsiness. Alcohol may intensify this effect. Use care when operating a car or dangerous machinery.
Round Pink 207/I G
(207)

---

**FLORENCE FCC**    FLM-D06209L
5880 State Highway 67  Florence, CO 81226    65

274705-FLX    Sterett, Justin MD    10/18/2019
44623-054
MOHAMED, KHALFAN KHAMIS
Take one tablet (20 MG)
by mouth each day
*consent form on file *

Citalopram 20 MG Tab
(4) Refills    11/19/2019   KSK   Refill Until: 04/15/2020
#30    Don't Confiscate Before: 02/17/2020
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

⇒ Do not drink alcohol beverages when taking this medicine
⇒ Medicine may impair your ability to drive or operate machinery.  Use care until know how it affects you
Do not take other medicines without checking with your doctor or pharma
⇒ May cause drowsiness. Alcohol may intensify this. Use care when operating or dangerous machinery.
Round Pink
(207)

---

**FLORENCE FCC**   *recieved 12-10-19*   FLM-D06209L
5880 State Highway 67  Florence, CO 81226    53

277649-FLX    Sterett, Justin MD    12/17/2019
44623-054
MOHAMED, KHALFAN KHAMIS
Take two tablets (40 MG) by
mouth each day ***note
increased dose*** *consent
form on file *
Citalopram 20 MG Tab
(5) Refills    12/17/2019   PNA   Refill Until: 06/14/2020
#60    Don't Confiscate Before: 03/16/2020
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

⇒ Do not drink alcoholic beverages when taking this medicine
⇒ Medicine may impair your ability to drive or operate machinery  Use care until you know how it affects you
Do not take other medicines without checking with your doctor or pharmacist
⇒ May cause drowsiness. Alcohol may intensify this effect. Use care when operating a car or dangerous machinery
Round Pink 207/I G
(207)

---

**FLORENCE FCC**    FLM-D06210L
5880 State Highway 67  Florence, CO 81226    22

277649-FLX    Sterett, Justin MD    12/17/2019
44623-054
MOHAMED, KHALFAN KHAMIS
Take two tablets (40 MG) by
mouth each day ***note
increased dose*** *consent
form on file *
Citalopram 20 MG Tab
(4) Refills    01/21/2020   KSK   Refill Until: 06/14/2020
#60    Don't Confiscate Before: 04/20/2020
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

⇒ Do not drink alco beverages when taking this medici
⇒ Medicine may impair ability to drive or opera machinery  Use care u know how it affects you
Do not take ot medicines with checking with doctor or phar
⇒ May cause drowsine Alcohol may intensify th Use care when operating, or dangerous machinery
Round Pin
(207)

---

**FLORENCE FCC**    FLM-D06210L
5880 State Highway 67  Florence, CO 81226    91

277649-FLX    Sterett, Justin MD    12/17/2019
44623-054
MOHAMED, KHALFAN KHAMIS
Take two tablets (40 MG) by
mouth each day ***note
increased dose*** *consent
form on file *
Citalopram 20 MG Tab
(3) Refills    02/25/2020   KVR   Refill Until: 06/14/2020
#60    Don't Confiscate Before: 05/25/2020
CAUTION: Federa /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

⇒ Do not drink alcoholic beverages when taking this medicine.
⇒ Medicine may impair your ability to drive or operate machinery  Use care until you know how it affects you
Do not take other medicines without checking with your doctor or pharmacist.
⇒ May cause drowsiness. Alcohol may intensify this effect. Use care when operating a car or dangerous machinery
Round Pink 207/I G
(207)

---

**FLORENCE FCC**    FLM-D06211L
5880 State Highway 67  Florence, CO 81226    1

277649-FLX    Sterett, Justin MD    12/17/2019
44623-054
MOHAMED, KHALFAN KHAMIS
Take two tablets (40 MG) by
mouth each day ***note
increased dose*** *consent
form on file *
Citalopram 20 MG Tab
(2) Refills    03/26/2020   KSK   Refill Until: 06/14/2020
$0    Don't Confiscate Before: 06/24/2020
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

⇒ Do not drink alcoholic beverages when taking this medicine.
⇒ Medicine may impair your ability to drive or operate machinery.  Use care until yo know how it affects you.
Do not take other medicines without checking with your doctor or pharmacis
⇒ May cause drowsiness. Alcohol may intensify this eff Use care when operating a ca or dangerous machinery.
Round Pink 20
(207)

---

**FLORENCE FCC**    FLM-D05112L
5880 State Highway 67  Florence, CO 81226

285049-FLX    Conroy S DO    04/28/2020
44623-054
MOHAMED, KHALFAN KHAMIS
Take two tablets (40 MG) by
mouth each day ***note
increased dose*** *consent
form on file *
Citalopram 20 MG Tab
(1) Refills    04/28/2020   JXW   Refill Until: 10/25/2020
#120    Don't Confiscate Before: 07/27/2020
CAUTION: Federal /State law prohibits transfer of this drug to any person other than patient for whom prescribed.

⇒ Do not drink alcoholic beverages when taking this medicine
⇒ Medicine may impair your ability to drive or operate machinery  Use care until you know how it affects you
Do not take other medicines without checking with your doctor or pharmacist
⇒ May cause drowsiness. Alcohol may intensify this effect. Use care when operating a car or dangerous machinery.
Round Pink 207/I G
(207)

A

# TABLE OF CONTENTS

| SUBJECT | PAGE NUMBER(S) |
|---|---|
| Claim One: Battery | |
| I. Facts | 12-28 |
| Physical Injuries | 29-31 |
| Mental & Emotional Injuries | 32-37 |
| II. Cause of Action | 38-40 |
| III. Misc. | 41 |
| Claim Two: Intentional Infliction of Emotional Distress: | |
| IV. Facts | 42-43 |
| V. Cause of Action | 44 |
| Claims One & Two: Battery and IIED | |
| VI. Sovereign Immunity | 45 |
| Claim Three: Deliberate Indifference of Jones | |
| VII. Facts | 46-50 |
| VIII. Cause of Action | 51-53 |
| IX. Qualified Immunity | 53,70 |
| Claim Four: Deliberate Indifference of Huddleston | |
| X. Facts | 54-56 |
| XI. Cause of Action | 56 |

B

Claim Five: Deliberate Indifference of Osagie, P.A.

XII. Facts                                             57-62

XIII. Cause of Action                                  63-64

XIV. Qualified Immunity                                64,70

XV. Evidence / Misc.                                   65


Claims Three - Five: Deliberate Indifference

XVI. General Facts For All Claims                       66


Claims Six - Ten: Excessive Force/ Failure to Intervene

  Claim Six: Excessive Force of Brush, C.O.

  Claim Seven: Excessive Force of Espinoza, C.O.

  Claim Eight: Excessive Force of Miller, C.O.

  Claim Nine: Failure to Intervene of Osagie, P.A.

  Claim Ten: Failure to Intervene of Murton, Lt.

XVII. Facts of Claims Six-Ten                            67

XVIII. Cause of Action                                   68

XIX. Qualified Immunity For Claims Six-Ten               69


Exhibit 1: MRI record; Wheelchair, Splint record

Exhibit 2: Use of Force Regulations, 28 CFR 552.20-27, etc.

Exhibit 3: Hunger Strike Policy, 5562.05

Exhibit 4: Assault Grievance; Assault Tort

Exhibit 5: Deliberate Indifference Grievance

Exhibit 6: Medication Records For Ankle, Leg pain; Depression

DECLARATION OF SERVICE AND MAILING:

I, Khalfan Kh. Mohamed DECLARE under penalty of perjury that the following is true:

On 08·14·2020 mailed my complaint as civil suit Khalfa Mohamed v. Jones ell along with with the attached documents with accordance to current legal mail procedures by submitting it as a legal mail with the fa necessary postage to L.O-unit correctional counselor here at the ADX. The address posted on the envelope was as follow:

Office of the clerk
United States District Court
901-19th Street, Room A105
Denver, Co - 80294-3589

U.S. Penitentiary Mex
P. Box 8500
Florence, Co 81226

S/khalfan kh. mohamed
Mohamed

Executed: 08·14·2020