**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-02516-RBJ-KMT

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
LT. MURTON, and
LT. ARMIJO[1],

      Defendants.

---

**MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

---

      Plaintiff Khalfan Khamis Mohamed, a convicted terrorist who also schemed to maim a

correctional officer while in BOP custody, claims violations of the First and Eighth

Amendments. The Amended Complaint, ECF No. 9, should be dismissed in its entirety. There

is no *Bivens* remedy for Plaintiff's excessive force, failure-to-intervene, and First Amendment

damages claims. Moreover, Defendant Brush is entitled to qualified immunity on Plaintiff's

First Amendment claim. In addition, Defendants Jones, Huddleston, and Osagie are entitled to

qualified immunity on Plaintiff's deliberate indifference damages claims. Finally, Plaintiff's

---

[1] Plaintiff refers to Lieutenant Armijo as "Armiho" in the Amended Complaint. *See* ECF No. 9 at 2. Defendants use the correct spelling of Lieutenant Armijo's name.

official-capacity claims should also be dismissed.

## BACKGROUND

Plaintiff, an ADX inmate, was convicted of terrorist activities that culminated in the al Qaeda-directed bombings of the United States Embassies in Tanzania and Kenya in August 1998. *See United States v. Bin Laden*, 156 F. Supp. 2d 359, 360 (S.D.N.Y. 2001). While in BOP custody, Plaintiff helped a co-conspirator in the bombings attack a correctional officer, which resulted in a shank being driven into the officer's eye, penetrating his brain. *United States v. Salim*, 287 F. Supp. 2d 250, 294-95, 355 (S.D.N.Y. 2003). Here, Plaintiff claims that ADX officers used excessive force, violated his First Amendment rights, and were deliberately indifferent to his medical needs. *See generally* ECF No. 9.

***Excessive Force/Failure to Intervene Allegations.*** Plaintiff alleges that he declared his intent to go on hunger strike on August 20, 2018. *Id.* at 6, 7 n.2. Three days later, Plaintiff was moved to the law library while Officer Brush removed commissary food items from his cell. *Id.* at ¶ 13-14, 19. Afterwards, Brush allegedly came to the law library to take Plaintiff to Lieutenant Armijo's office. *Id.* at ¶¶ 20-21. Plaintiff refused, and Brush put handcuffs on Plaintiff to allegedly escort him to his cell along with two other officers. *Id.* at ¶¶ 21-22. Plaintiff decided to stop at his cell as they passed it—apparently without telling the officers in advance or seeking their approval for that unexpected move. *See id.* at ¶ 25. At that point, Brush allegedly threw Plaintiff against the wall and smashed his head. *Id.* at ¶¶ 25-27. Officer Brush shouted at Plaintiff to stop resisting, but Plaintiff denies that he was resisting. *Id.* at ¶¶ 27-28.

Officer Brush allegedly threw Plaintiff to the ground while another officer punched him, kicked him, and spit on him. *Id.* at ¶ 31. Leg restraints were placed on Plaintiff, and ten or more

unidentified officers allegedly began punching and kicking Plaintiff, as well as verbally insulting him.  *Id.* at ¶¶ 32-39.  Plaintiff alleges that his right ankle was broken at some point during this incident.  *Id.* at ¶ 43.  He also alleges that Lieutenants Armijo and Murton witnessed and/or supervised the beating but failed to intervene.  *See, e.g.*, *id.* at ¶¶ 54-57.  Plaintiff was then moved to an observation cell, and the officers allegedly continued to attack him as they transported him.  *Id.* at ¶¶ 41-44.  He contends that Officers Miller and Espinoza continued to beat him in the observation cell.  *Id.* at ¶¶ 68-70, 84, 92, 94-98.  He also alleges that Osagie, a physician's assistant, failed to intervene at that point.  *Id.* at ¶¶ 102-114.

Plaintiff acknowledges that he was found guilty by a Discipline Hearing Officer of attempting to assault Brush.  *Id.* at ¶¶ 144-145.

***First Amendment Allegations.***  While Plaintiff was in the observation cell, Brush allegedly told Plaintiff that his books, manuscripts, and other items would be put in the trash. *Id.* at ¶¶ 120, 132.  When Plaintiff was escorted back to his cell, it was "virtually empty[.]"  *Id.* at ¶¶ 121-136.  Although Plaintiff acknowledges that some items were returned to him after his hunger strike was over, he alleges that some items have not been returned.  *Id.* at ¶ 137.  He does not specify which items were returned and which were not.  *See id.* at ¶¶ 134, 137.

***Deliberate Indifference Allegations.***  Plaintiff alleges that, as a result of the August 2018 alleged excessive force, he suffered a fracture of his right ankle, pain in his wrist and jaw, a bleeding nose, and various lacerations and bruises.  *Id.* at ¶¶ 148, 153.  Immediately after the use of force, Defendant Jones, a nurse, examined Plaintiff in what Plaintiff contends was a "superficial" examination.  *Id.* at ¶ 166.  Jones returned later that day and told Plaintiff that the swelling in his ankle would go away on its own.  *Id.* at ¶ 168.  Plaintiff alleges that Jones refused

to let Plaintiff see a doctor or physician's assistant during that timeframe.  *Id.* at ¶ 169.  However,

Plaintiff subsequently "saw medical staff at least 3-times a week for almost 40 days," *id.* at

¶ 214, including receiving the following treatment and/or examinations:

- August 26, 2018 – Plaintiff examined by Huddleston, a nurse. *Id.* at ¶ 190.

- August 27, 2018 – Plaintiff examined by Jones and Huddleston.  *Id.* at ¶ 173.

- August 29, 2018 – Plaintiff seen in the medical unit by Osagie, which included an involuntary feeding because of the ongoing hunger strike.  *Id.* at ¶¶ 198, 201.

- August 31, 2018 – Osagie examined Plaintiff's ankle and ordered an x-ray.  *Id.* at ¶¶ 176, 206; *see also id.* at ¶¶ 203-204 (Plaintiff also fed again).

- September 3, 2018 – Plaintiff examined by Jones, Huddleston, and Osagie.  *Id.* at ¶¶ 177, 194.  Jones told Plaintiff the x-ray showed "twisted muscles" in the ankle.  *Id.* at ¶ 178.

- September 5, 2018 – Plaintiff seen twice by Jones, who told him that the x-ray showed a fracture in the ankle.  *Id.* at ¶¶ 177, 179.  Jones splinted Plaintiff's ankle and gave him a wheelchair.  *Id.*  Sometime thereafter, the splint was replaced by a hard cast.  *Id.* at ¶ 180.

- September 10, 24, and 28, 2018 – Plaintiff examined by Jones.  *Id.* at ¶ 177.

- October 1, 2018 – Plaintiff examined by Huddleston.  *Id.* at ¶ 194.

- October 18, 2018 – Plaintiff's wrists and jaw x-rayed.  *Id.* at ¶ 155.

- November 16, 2018 – Plaintiff's cast removed.  *Id.* at ¶ 180.

Plaintiff claims not to have been given pain medication for eight months, though he

admits that he was told that he could not have pain medication while he was on a hunger strike.

*Id.* at ¶ 212.  He was provided Ibuprofen in December 2018—presumably after he chose to end

his hunger strike—and also received ice on at least one occasion.  *Id.* at ¶¶ 152, 178, 211.  He

claims that he did not receive physical therapy for two months after the injury, but that was

during the period when his ankle was in a hard cast.  *Id.* at ¶ 151; *see also id.* at ¶ 180 (Plaintiff

in hard cast from approximately September 5 to November 16, 2018).  He claims that the ankle

fracture caused him "excruciating" pain, made him limp for six months, and that he sometimes is

"forced" to limp now.  *Id.* at ¶¶ 148-150.  He alleges a variety of emotional and mental impacts.

*Id.* at ¶¶ 157-164.  He has been prescribed an antidepressant and purportedly has been told that

he may have PTSD.  *Id.* at ¶ 165.

**_Summary of claims and grounds for dismissal._**  Each of Plaintiff's claims should be

dismissed, as summarized in this chart:

| Basis | Claim Number | Defendant | Capacity | Bases for dismissal |
|---|---|---|---|---|
| Excessive Force | One | Brush | Individual | No *Bivens* remedy |
| | Three | Miller | Individual | No *Bivens* remedy |
| | Five | Espinoza | Individual | No *Bivens* remedy |
| Failure-to-intervene | Two | Armijo | Individual | No *Bivens* remedy |
| | Four | Murton | Individual | No *Bivens* remedy |
| | Six | Osagie | Individual | No *Bivens* remedy; qualified immunity |
| Freedom of Speech | Seven | Brush | Individual and official[2] | No *Bivens* remedy; qualified immunity; failure to state a claim for injunctive relief |
| Deliberate Indifference | Eight | Jones | Individual and official[3] | Qualified immunity; failure to state a claim for injunctive relief |
| | Nine | Huddleston | Individual and official | Qualified immunity; failure to state a claim for injunctive relief |
| | Ten | Osagie | Individual and official | Qualified immunity; failure to state a claim for injunctive relief |

## LEGAL STANDARD

To state a claim on which relief can be granted, Plaintiff's complaint "must contain

---

[2] In addition to money damages, Plaintiff seeks an order that the confiscated materials be returned to him.  *Id.* at 30.
[3] Plaintiff seeks an order that he be evaluated by outside specialists and a psychiatrist.  *Id.* at 30.

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Conclusory allegations are not presumed true, *id.*,
nor are allegations contradicted by exhibits or documents incorporated into the complaint.  *See,
e.g.*, *Estate of Ronquillo v. City and County of Denver*, 720 F. App'x 434, 437 (10th Cir. 2017)
(allegations accepted as true "except when directly contra[di]cted by the attached exhibits").
Because of the "limited" role of the Constitution in prisons, "a prisoner claim will often not be
plausible unless it recites facts that might well be unnecessary in other contexts," including
"facts that explain why the usual justifications for the complained-of acts do not apply."  *Gee v.
Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010).

## ARGUMENT

### I.      Excessive Force and Failure-to-Intervene Claims (Claims 1-6)

Plaintiff claims that Brush, Miller, and Espinoza used excessive force, ECF No. 9 at ¶¶ 1-
52, 67-75, 93-100, and that Armijo, Murton, and Osagie failed to intervene, *id.* at ¶¶ 53-66, 76-
92, 101-112.  There is no *Bivens* remedy for such claims, and Osagie is also entitled to qualified
immunity.[4]

#### A.      There is no *Bivens* remedy.

In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388
(1971), the Supreme Court recognized a limited "implied private action for damages against
federal officers alleged to have violated a citizen's constitutional rights" in a case involving a
Fourth Amendment claim for an unreasonable search and seizure.  *Corr. Servs. Corp. v.*

---

[4] Defendants Brush, Miller, Espinoza, Armijo, and Murton do not waive their right to assert
qualified immunity on a full record, but do not raise that defense on a motion to dismiss where
Plaintiff's allegations—even if false—are presumed true.

*Malesko*, 534 U.S. 61, 66 (2001).  The Supreme Court subsequently recognized a *Bivens* remedy in two additional contexts: a Fifth Amendment equal-protection violation in connection with gender discrimination, *Davis v. Passman*, 442 U.S. 228 (1979), and an Eighth Amendment failure to provide adequate medical treatment, *Carlson v. Green*, 446 U.S. 14 (1980).  Since recognizing a *Bivens* remedy in these three limited contexts, the Supreme Court "has consistently refused to extend *Bivens* to any new context."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).  Indeed, the Supreme Court has recognized that "expanding the *Bivens* remedy is now a disfavored judicial activity," and that "*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy."  *Id*. at 1855, 1857.

Accordingly, when a plaintiff asserts a *Bivens* claim, a court must first determine whether it arises in a context that is different from *Bivens*, *Davis*, and *Carlson*.  *See Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (citing *Malesko*, 534 U.S. at 68).  If the context is new, then the court must assess: (1) whether there is any alternative remedial process; and (2) whether any special factors counsel hesitation in implying a damages remedy.  *See Abbasi*, 137 S. Ct. at 1858.  Either consideration alone is sufficient to prevent devising a new remedy.  *See id*.

## 1.  *The claims present a new context.*

Whenever a "case is different in a meaningful way from previous *Bivens* cases decided by th[e Supreme] Court, then the context is new."  *Id.* at 1859.  A case presents a new *Bivens* context if it differs from previous cases because of:

> [T]he constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id*. at 1860.

Here, allegations that an ADX inmate decided to stop midstream during an escort and was then allegedly assaulted bears "little resemblance to the three *Bivens* claims the Court has approved in the past." *Id.* (new context in conditions-of-confinement claims). Consistent with this principle, Courts within this district have held that excessive force claims brought by prisoners against correctional officers, and failure-to-intervene claims arising out of such claims, differ in meaningful ways from previous *Bivens* contexts. *See, e.g.*, *Abdo v. Balsick*, No. 18-cv-01622-KMT, 2019 WL 6726230, at *6 (D. Colo. Dec. 11, 2019) (holding that "there is no question" that excessive force and failure-to-intervene claims brought by prisoner constituted new *Bivens* contexts)[5]; *but see McCullon v. Parry*, No. 18-cv-00469-NYW, 2021 WL 877718, at *4-7 (D. Colo. March 9, 2021) (extending *Bivens* to excessive force claim brought by prisoner and finding that the claim was not a new context despite recognizing that it was not identical to the Eighth Amendment claim in *Carlson*). The claims thus present new *Bivens* contexts.

  2. *Special factors counsel against extending Bivens to these claims.*

There are alternative remedies. In determining whether to allow an unprecedented extension of *Bivens* to Plaintiff's excessive force and failure-to-intervene claims, the Court

---

[5] *See also, e.g.*, *Silva v. U.S.*, No. 19-cv-02563-CMA-MEH, 2020 WL 7706785, at *5 (D. Colo. Dec. 29, 2020) (holding that excessive force claim alleging that correctional officer assaulted prisoner while prisoner was in restraints constituted a new *Bivens* context); *Millbrook v. Spitz*, No. 18-cv-01962-RM-KMT, 2019 WL 4594275, at *3-4 (D. Colo. Sept. 23, 2019) (excessive force claims alleging correctional officers slammed prisoner's head and shoulders against bars while he was handcuffed and stuck finger in prisoner's anus were new context); *Huerta v. Oliver*, No. 17-cv-00988-RBJ-KLM, 2019 WL 399229, at *15 (D. Colo. Jan. 31, 2019) (excessive force claim alleging injuries from use of handcuffs with blackbox restraints was new context), *report and recommendation adopted*, 2019 WL 954771 (D. Colo. Feb. 27, 2019).

should first consider the availability of alternative remedial processes. *Abbasi*, 137 S. Ct. at 1858. In considering whether alternative remedies are available, it is irrelevant whether such remedies ultimately prove successful. *See Bowman v. Sawyer*, No. 19-cv-1411-WJM-KMT, 2020 WL 6390992, at *5 (D. Colo. Nov. 2, 2020) ("[S]imply because the alternative remedies may not be successful is irrelevant to the issue of whether *Bivens* should be extended[.]"). It is also irrelevant whether such remedies award monetary damages. *Huerta*, 2019 WL 399229, at *15 (citations omitted) ("the existence of a monetary remedy is simply not required by applicable precedent or American jurisprudential principles to foreclose *Bivens* relief."); *Ajaj v. Fed. Bureau of Prisons*, No. 15-cv-00992-RBJ-KLM, 2017 WL 219343, at *4 n.10 (D. Colo. Jan. 17, 2017), *appeal docketed*, No. 19-2150 (July 16, 2019) (citations omitted) (rejecting argument that alternative remedy is only adequate if it affords monetary relief).

Here, Plaintiff can bring an action under the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(h) (recognizing remedy for assault or battery by federal law enforcement officers). Since *Abbasi*, courts have routinely acknowledged that the FTCA is an alternative remedy to a *Bivens* claim. *See, e.g.*, *Turkmen v. Ashcroft*, No. 02CV2307, 2018 WL 4026734, at *10 (E.D.N.Y. Aug. 13, 2018) (finding that the suggestion in *Carlson* that the FTCA "should not be considered an alternative remedy precluding a *Bivens*-type claim . . . cannot survive *Ziglar* . . . . *Ziglar* takes a far broader view of those alternative remedies that foreclose assertion of a claim under *Bivens*") (collecting post-*Abbasi* cases holding that FTCA remedy supports not extending *Bivens*); *see also Silva*, 2020 WL 7706785, at *6 (finding that FTCA was alternative remedy for inmate's excessive force claim); *Abdo*, 2019 WL 6726230, at *7 (same). Indeed, Plaintiff states that he will file an FTCA claim based on the August 23, 2018 incident once he has fulfilled the

exhaustion requirements.  *See* ECF No. 9 at 2 fn. 1.

Second, Plaintiff can seek a remedy under the mandamus statute.  *See* 28 U.S.C. § 1361; *see also Millbrook*, 2019 WL 4594275, at *4 (finding that mandamus was available alternative remedy); *Huerta*, 2019 WL 399229, at *15 (same).  Third, Plaintiff can seek injunctive relief, which the Tenth Circuit has recognized is "the proper means for preventing entities from acting unconstitutionally."  *Malesko*, 534 U.S. at 74 (recognizing availability of injunctive relief as an alternative remedy available to federal prisoners that counsels against extension of *Bivens*); *see also K.B. v. Perez*, 664 F. App'x 756, 759 (10th Cir. 2016) (same); *Ajaj*, 2017 WL 219343, at *2 (same).  Fourth, Plaintiff can seek a remedy under the prison grievance system.  *See* 28 C.F.R. § 542.10; *see also Malesko*, 534 U.S. at 74 (recognizing the prison grievance system pursuant to 28 C.F.R. § 542.10 as an available alternative remedy counseling against extension of *Bivens*); *K.B.*, 664 F. App'x. at 759 (same); *Ajaj*, 2017 WL 219343, at *2 (same).

There are additional special factors.  "[T]he Supreme Court has acknowledged that fears concerning an 'onslaught of litigation' counsel against expanding *Bivens*."  *Ajaj*, 2017 WL 219343, at *5 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 562 (2007)); *cf. K.B.*, 664 F. App'x at 759 (declining to extend *Bivens* in part because doing so "could lead to unintended, unpredictable, and far-reaching consequences, including inviting a wide range of actions by family members of prisoners.").  These concerns are on full display here.  If *Bivens* were extended to such claims, there is nothing to stop Plaintiff from making wholly fabricated allegations that preclude the assertion of qualified immunity on a motion to dismiss.  Subjecting the officers who must physically interact with this dangerous inmate, who previously participated in assaulting a correctional officer, to individual liability will likely cause them to

hesitate to respond to his threatening behavior—indeed, Plaintiff admits that he took an unannounced detour by "stopping" at his cell during an escort, *see* ECF No. 9 at ¶ 25—for fear of damages lawsuits. This is precisely the compromise to institutional security and other critical management decisions that the Supreme Court envisaged in limiting *Bivens*. *See Abbasi*, 137 S. Ct. at 1863 (costs and difficulties of damages litigation "might . . . interfere with the proper exercise of their office").

An additional factor counseling against expanding *Bivens* is congressional silence, including in "the enactment of the [Prison Litigation Reform Act]," which "made comprehensive changes to the way prisoner abuse cases may be brought in federal court" but did not provide for a damages remedy, suggesting "that Congress does not want to provide federal inmates with a damages remedy." *Abdo*, 2019 WL 6726230, at *7; *see also Bowman*, 2020 WL 6390992, at *4 (enactment of PLRA counseled against expansion of *Bivens* to conditions-of-confinement claims). Finally, this Court has recognized that a "special factor counseling hesitation is that extending *Bivens* would be contrary to the strong trend of limiting its reach." *Ajaj*, 2017 WL 219343, at *5 (internal quotations omitted) (citing *K.B.*, 664 F. App'x at 758).

Plaintiff's excessive force and failure-to-intervene claims should therefore be dismissed under Rule 12(b)(6) because both alternative remedies and special factors counsel against creating a *Bivens* remedy for such claims.

### B. Defendant Osagie is entitled to qualified immunity (Claim 6).

Plaintiff's sixth claim (failure-to-intervene) warrants dismissal for the additional reason that Osagie is entitled to qualified immunity. Government officials are generally shielded from liability for damages when their conduct does not violate "clearly established" constitutional

rights of which every reasonable officer would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity represents "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1986). To overcome qualified immunity, Plaintiff must satisfy a heavy, two-part burden. He must show: (1) that each defendant's own conduct violated a constitutional right; and (2) the right allegedly violated was clearly established at the time of the conduct. *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017). Unless the record "clearly demonstrate[s]" that the plaintiff has satisfied this burden, a defendant is entitled to qualified immunity. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

> 1. *Plaintiff has failed to allege that Osagie violated his Eighth Amendment rights.*

In order to establish liability on a failure-to-intervene claim, a plaintiff must plausibly allege that the officer observed or had reason to know of a constitutional violation, and had a realistic opportunity to intervene to stop the violation. *See Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (citing *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)).

With respect to the first prong, the only non-conclusory facts alleged by Plaintiff regarding Osagie's involvement in the August 23, 2018, incident are: (1) while Plaintiff was allegedly being beaten in the observation cell, Plaintiff "heard Osagie saying approvingly 'is he still resisting?'" and (2) that Plaintiff called out to Osagie to ask whether he was witnessing the beating, but Osagie never responded. *Id.* at ¶¶ 102-103. There are no allegations that Osagie actually observed any constitutional violations, and all that can be inferred from Plaintiff's allegations is that Osagie was told that he had been resisting. Plaintiff simply has not established that Osagie *personally* observed, or had reason to know of, a constitutional violation. *See, e.g.*, *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013) (emphasizing the importance of

identifying specific actions taken by particular defendants in order to overcome qualified immunity); *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (in a *Bivens* claim, "it is particularly important … that the complaint make clear exactly *who* is alleged to have done *what* to *whom*").

With respect to the second prong, Plaintiff has not plausibly alleged that Osagie had a realistic opportunity to intervene because Plaintiff identifies Osagie as a physician's assistant. *Id.* at 1; *see also id.* at ¶ 112 (identifying Osagie as a "medical professional"). Plaintiff has not alleged that a member of the medical staff had the authority or ability to order correctional officers to stop a constitutional violation that occurred while the officers were escorting Plaintiff within ADX.

### 2. There is no clearly established law.

In addition, Plaintiff has not alleged a violation of clearly established law that is "particularized to the facts of the case." *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2013). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal citation omitted).

Here, Defendants are aware of no particularized law that would have made it clear to a physician's assistant that he had a duty to intervene to prevent a constitutional violation that he

did not personally observe.  Therefore, Osagie did not have "fair and clear warning" that a failure to intervene would violate Plaintiff's constitutional rights.  *See White*, 137 S. Ct. at 552 (citations omitted) (requiring identification of a case where an officer acting under similar circumstances committed a constitutional violation).

Osagie is thus entitled to qualified immunity for Plaintiff's failure-to-intervene claim.

## II.     First Amendment Claim (Claim 7)

Plaintiff claims that Officer Brush violated his First Amendment rights by confiscating certain materials from Plaintiff's cell.  ECF No. 9 at ¶¶ 115-137.  Plaintiff seeks both damages and the return of the materials.  *Id.* at 30.  As will be explained further below, Plaintiff's claim appears to arise under the Due Process Clause rather than the First Amendment.  Nevertheless, there is no *Bivens* remedy, Officer Brush is entitled to qualified immunity, and Plaintiff has failed to state a claim for injunctive relief.

### A.     There is no *Bivens* remedy.

#### 1.   *The First Amendment claim presents a new context.*

Regardless of whether Plaintiff's claim is construed under the First Amendment or the Due Process Clause, the claim presents a new context because it involves an entirely different constitutional right and factual context than the claims at issue in *Bivens*, *Carlson*, and *Green*. The Supreme Court has repeatedly emphasized that it has never found that *Bivens* extends to First Amendment claims.  *See, e.g.*, *Minneci v. Pollard*, 565 U.S. 118, 124 (2012) (recognizing that the Court has not found that a *Bivens* action existed for violations of First Amendment); *Iqbal*, 556 U.S. at 675 (citing *Bush v. Lucas*, 462 U.S. 367 (1983)) (same).  Plaintiff's claim for allegedly improper removal of manuscripts and books from his cell bears "little resemblance to

the three *Bivens* claims the [Supreme] Court has approved in the past [.]"  *Abbasi*, 137 S. Ct. at 1860 (citations omitted).

### 2.  *Special factors counsel against extending* Bivens.

Plaintiff has alternative remedies for the alleged violation, most notably the Small Claims Act, which allows "[t]he head of an agency" to "settle a claim for not more than $1,000 for damage to, or loss of, privately owned property that is caused by the negligence of an officer or employee of the United States Government acting within the scope of employment . . ."  31 U.S.C. § 3723(a).  Congress did not choose to impose individual liability on government employees through the Small Claims Act.

In addition, the BOP's administrative-remedy program is an alternative remedy.  *See*, *e.g.*, *K.B.*, 664 F. App'x at 759; see also ECF No. 9 at 35-36 (administrative remedy documents related to this claim).  And Plaintiff can seek either injunctive relief, which he attempts to do in this litigation, or a remedy under the mandamus statute.  *See, e.g.*, *Shepard*, 2014 WL 7366662, at *17 (declining to extend *Bivens* to inmate's First Amendment claim because alternative remedies were available, including injunctive relief, mandamus, and prisoner grievance system).  Accordingly, courts within this district have declined to extend *Bivens* to First Amendment claims brought by prisoners.  *See, e.g.*, *Millbrook*, 2019 WL 4594275, at *4; *Hale v. Fed. Bureau of Prisons*, No. 14-cv-00245-MSK-MJW, 2015 WL 13730087, at *5 (D. Colo. April 16, 2015).

Moreover, the special factors set forth in Section I.A.2, *supra*, also counsel against extending *Bivens* to Plaintiff's First Amendment claim.  Therefore, Plaintiff's First Amendment *Bivens* claim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### B.     Brush is entitled to qualified immunity.

#### 1.   *Plaintiff has not established a violation of his rights.*

As a threshold matter, Plaintiff has not adequately pleaded that he has a First Amendment right to keep the allegedly confiscated materials in his cell.  To the contrary, the Tenth Circuit has upheld limitations on the number of books an inmate may keep in his cell.  *See Neal v. Lewis*, 414 F.3d 1244, 1249 (10th Cir. 2005).  If anything, Plaintiff's right to maintain the allegedly confiscated materials in his cell would appear to arise under the Due Process Clause. However, the Tenth Circuit has recognized that "[w]hile an inmate's ownership of property is a protected property interest that may not be infringed . . . there is a difference between the right to own property and the right to possess property while in prison."  *Hatten v. White*, 275 F.3d 1208, 1210 (10th Cir. 2002) (citations omitted).  So long as an inmate is "allowed to send the property he could not possess in prison to a place of his choosing," he is not unconstitutionally deprived of the property.  *See id.* (citations omitted).

Moreover, documents attached to the Amended Complaint undermine Plaintiff's claim that there was any violation of due process.  *See* ECF No. 9 at 35-36; *see also Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001) (on a motion to dismiss, court may consider documents attached to the complaint).  A response from the National Inmate Appeals Administrator concerning the allegedly confiscated materials states:

> Your property was taken while you were on a hunger strike.  Once you declared your hunger strike was over, authorized property was returned.  Staff members have made attempts for you to show proof of ownership for some items and have provided you with a confiscation form.

*Id.* at 36.  This is consistent with BOP policy, which provides that following confiscation of items of personal property, staff are to provide the inmate with a copy of the inventory.  *See* BOP

Program Statement 5580.08 (Aug. 22, 2011), at § 553.13(b)(2)(i), *available at*

www.bop.gov/policy/progstat/5580_008.pdf (last visited April 12, 2021).[6]  An inmate then has

seven days to provide staff with evidence of ownership of the listed items.  *Id.* at

§553.13(b)(2)(ii).  If ownership is established, staff shall mail such items to a destination of the

inmate's choice.  *Id.* at §553.13(b)(2)(iii).

 Here, Plaintiff does not allege that he showed proof of ownership as requested by staff.

Nor does he allege that, having complied with the proof-of-ownership requirement, his items

continued to be improperly withheld (or that Brush personally made a decision to continue to

withhold the items).  Accordingly, Plaintiff has not adequately alleged that Brush violated his

First Amendment rights.

 Finally, even if the claim were properly construed as a First Amendment claim, Plaintiff

has not adequately alleged a First Amendment violation.  Plaintiff claims that Brush removed

from Plaintiff's cell a large number of books and manuscripts.  ECF No. 9 at ¶¶ 122, 125-127,

131-133 (describing confiscated items as "12 notebooks," hundreds of pages of manuscripts in

multiple volumes, and numerous books).  But ADX policy limits inmates to a maximum of eight

books in their cells at a particular time.  *See* Ex. 1, FLM 5580.08B, Inmate Personal Property

(Nov. 28, 2019), at 10.  Plaintiff has not alleged the absence of a rational connection between

that policy and the BOP's legitimate penological interests.  *Turner v. Safley*, 482 U.S. 78, 89

(1986) (holding that "when a prison regulation impinges on inmates' constitutional rights, the

regulation is valid if it is reasonably related to legitimate penological interests"); *see also Al-*

---

[6] The Court may take judicial notice of BOP policies.  *Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010).

*Owhali v. Holder*, 687 F.3d 1236, 1242 (10th Cir. 2012) (upholding dismissal of inmate's First Amendment claim where restrictions at issue were common in the prison setting and there were no plausible allegations that the restrictions were unconstitutional in the circumstances).  Indeed, the Tenth Circuit has recognized the "legitimate administrative and penological objectives" in limitations on the number of books that inmates may have in their cells, including "fire safety, institutional security, control of the source and flow of property within the prison . . . ."  *Neal*, 414 F.3d at 1248.  Plaintiff includes no allegations that would attempt to refute the government's anticipated "usual justifications" for applying this policy to him.  *See Gee*, 627 F.3d at 1186 (because "Government conduct that would be unacceptable, even outrageous, in another setting may be acceptable, even necessary, in a prison," a complaint must show why the government's anticipated "usual justifications" lack a rational connection to the challenged action).

In sum, Plaintiff alleges nothing more than that he wanted to keep the books that were taken from him, then proclaims a First Amendment violation.  That falls far short of pleading a violation of the First Amendment under *Turner* and *Al-Owhali*.

### 2.  *There is no clearly established law.*

There is no particularized law that would have made it clear to Brush that he was committing a constitutional violation by removing materials from Plaintiff's cell.  To the contrary, the Tenth Circuit has held that an inmate does not have a right to possess property while in prison, and that so long as an inmate is "allowed to send the property he could not possess in prison to a place of his choosing," there is no constitutional violation.  *See Hatten*, 275 F.3d at 1210 (citations omitted).  Moreover, Plaintiff has not alleged that Brush's actions in adhering to the ADX book-limitation policy amounted to a violation of clearly established law.  There is no particularized law that would have made it clear, "beyond debate," to "*every*

reasonable official" in Brush's position that removing materials in excess of those allowed by policy violated an inmate's constitutional rights. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011).

Brush is thus entitled to qualified immunity.

### C.     Plaintiff's official capacity claim should be dismissed.

As explained above in Section II.B.1, *supra*, Plaintiff has failed to plausibly plead a constitutional violation with respect to the allegedly confiscated materials, and the official-capacity claim should be dismissed for that reason.  Moreover, to the extent Plaintiff seeks monetary damages in his official-capacity claim, he may not pursue monetary damages against Defendant Brush in his official capacity.  *See Matthews*, 744 F.Supp.2d at 1167 (holding that "claims for money damages against [d]efendants in their official capacities are barred by sovereign immunity and thus properly dismissed with prejudice[.]").

### III.     Deliberate Indifference Claims (Claims 8-10)

Plaintiff asserts that Jones, Huddleston, and Osagie were deliberately indifferent to his medical needs, and seeks monetary damages and injunctive relief.  Each Defendant is entitled to qualified immunity on the individual capacity claims, and the official capacity claims fail because Plaintiff has not adequately pled a violation of the Eighth Amendment.

### A.     Jones, Huddleston, and Osagie are entitled to qualified immunity.

#### 1.   *Plaintiff has not alleged an Eighth Amendment violation.*

In order to plead a deliberate indifference claim under the Eighth Amendment, Plaintiff must allege: (1) an objectively serious deprivation of care for a serious medical need (the objective component); and (2) that Defendants knew of and disregard an excessive risk of serious harm to Plaintiff (the subjective component).  *See Farmer v. Brennan*, 511 U.S. 825, 834, 837

(1994).  An assertion that medical treatment did not meet the standard of care is insufficient. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Instead, each defendant must have acted with a criminally reckless state of mind.  *Farmer*, 511 U.S. at 839; *see also Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992) (only "extreme deprivations" taken with a sufficiently culpable mental state violate the Eighth Amendment).

a.    <u>No allegations of an objectively serious deprivation</u>

The objective prong of the Eighth Amendment requires that the alleged deprivation have resulted "in the denial of the 'minimal civilized measure of life's necessities.'"  *Farmer*, 511 U.S. at 834.  First, the medical need must be sufficiently serious, which is met if a "'condition has been diagnosed by a physician as mandating treatment[.].'"  *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1991)).  Second, the allegedly deficient care must be below minimal standards of decency, not merely a matter of medical judgment.  *See Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).  Third, the court must analyze causation to determine if the facts plausibly show that harm "was caused by any government actor."  *Id.* at 753; *see also Oxendine*, 241 F.3d at 1276-77.  And, finally, a plaintiff must allege that he suffered a serious harm as a result of any allegedly deficient treatment.  *See Stafford v. Stewart*, 461 F. App'x 767, 769 (10th Cir. 2012) ("[I]t is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely the symptoms presented at the time the prison employee has contact with the prisoner." (internal citation and quotation marks omitted)).

Following the August 23, 2018 incident, Plaintiff claims: (1) the medical staff ignored his complaints about his ankle and refused to examine or treat it; (2) the medical staff denied him

pain medication; and (3) he was denied an x-ray of his jaw and wrists until October 18, 2018,

     ***Broken ankle***.  The allegations in the Amended Complaint demonstrate that Plaintiff received medical care to treat his broken ankle.  Although Plaintiff conclusorily alleges that Defendants Jones, Huddleston, and Osagie each refused to examine or treat his ankle, the well-pleaded facts belie these conclusory allegations.

     Plaintiff alleges that Jones saw him twice on August 23, 2018, following the alleged excessive force incident, and that Jones opined that the swelling on his ankle would resolve on its own.  ECF No. 9 at ¶¶ 166, 168-71.  Although Plaintiff alleges that Jones refused to allow him to see a physician's assistant or doctor, Plaintiff also alleges that Osagie, a physician's assistant, saw him on August 29, 2018, August 31, 2018, and September 3, 2018.  *See id.* at ¶¶ 176-77, 194, 201, 206.  An x-ray of Plaintiff's ankle was performed on August 31, 2018.  *Id.* at ¶ 176.  Plaintiff alleges that Jones, Huddleston, and Osagie all examined him on September 3, 2018.  *Id.* at ¶¶ 177, 194.  On that day, he alleges that he was informed that the x-ray showed "'twisted muscles,'" which was allegedly causing the swelling and pain in his ankle.  *Id.* at ¶ 178.  On September 5, 2018, Jones allegedly informed Plaintiff that the x-ray showed a fracture.  *Id.* at ¶ 179.  As a result, Plaintiff alleges that a splint was applied to his ankle and he was provided with the use of a wheelchair.  *Id.*  The splint was later replaced with a hard cast.  *Id.* at ¶ 180.  Plaintiff remained in the cast and continued to use the wheelchair until November 16, 2018.  *Id.*

     Plaintiff also generally alleges that he was denied ice, but he also contradictorily acknowledges that he was provided ice on at least one occasion.  *See, e.g., id.* at ¶ 212.  Finally, Plaintiff alleges that he was denied physical therapy for the first two months after his injury.  *Id.* at ¶ 151.  However, that is the time period that he was in a hard cast.  *See id.* at ¶ 180 (alleging

that splint was replaced by cast sometime around September 5, 2018, which was removed on November 16, 2018).

Thus, the well-pleaded facts demonstrate that this is not a case in which medical staff entirely ignored or refused to treat a serious medical need. *See Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) (recognizing that "[a] claim of total denial of medical care differs from a claim of inadequacy of medical care."). At most, Plaintiff demonstrates a difference of opinion as to whether he should have received an x-ray earlier than August 31, 2018, and whether he should have received ice and/or physical therapy. Such a difference of opinion regarding diagnosis or treatment does not state a constitutional violation. *See, e.g.*, *Benning v. Webster*, No. 08-cv-00399-PAB-CAS, 2009 WL 798861, at *6 (D. Colo. March 24, 2009) (holding that inmate's claim that he should have received surgery for his hernia raised "only a question of medical judgment and not deliberate indifference."). Indeed, even allegations of medical malpractice do not give rise to a constitutional violation. *See Callahan v. Poppell*, 471 F.3d 1155 (10th Cir. 2006) (citing *Estelle*, 420 U.S. at 107) (holding that "[a]t worst, the defendants may have committed malpractice, but the Eighth Amendment does not redress such a claim.").

In *Estelle v. Gamble*, the Supreme Court held that the plaintiff had not established a cognizable Eighth Amendment claim where the plaintiff alleged that prison medical staff failed to appropriately treat a lower back injury. *Estelle*, 429 U.S. at 99. The Court noted that the plaintiff was seen by medical personnel on 17 occasions spanning a 3-month period, and that the medical staff had treated his back injury, high blood pressure, and heart problems. *Id.* at 107. Although the plaintiff asserted that more should have been done in terms of diagnosis and treatment, and the Court of Appeals found that an x-ray of the plaintiff's back and/or other

diagnostic techniques might have led to an appropriate diagnosis, the Court held that "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Id.* at 107; *see also Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (citing *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992)) ("[m]atters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing").  The Court further held that "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice . . . ."  *Estelle*, 429 U.S. at 107.

Here, Plaintiff alleges even more frequent medical attention than the plaintiff in *Estelle*, and similarly alleges that the medical staff did in fact treat the fracture in his ankle.  Thus, Plaintiff's complaints regarding the treatment of his fractured ankle amount at most to "a complaint that a physician has been negligent in diagnosing or treating a medical condition," and therefore are insufficient to establish the objective component of an Eighth Amendment claim. *See id.* at 106.  Whether an x-ray should have been ordered sooner, and whether ice and physical therapy were indicated are classic examples of medical judgments.  *Id.* at 107; *see also Irons v. Samu*, No. 06-cv-02254-PAB-BNB, 2010 WL 749797, at *10 (D. Colo. March 2, 2010) (finding that "the application of ice is within the discretion of the health care provider.").

Moreover, the Tenth Circuit has held that "[d]elay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm.'"  *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000).  "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata*, 427 F.3d at 751 (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).  The

only harm that Plaintiff specifically attributes to the alleged delay in care is that he was in pain during the delay. *See* AC at ¶¶ 185 (alleging that if he had an x-ray earlier, "then I would have received the diagnosis and therefore the wheel chair. . .and cast much earlier, avoiding thereby an extra excruciating pain"), 196 (same). Plaintiff's allegations concerning Defendants' failure to treat his pain will be addressed next.

     ***Failure to treat pain***. Plaintiff generally alleges that Defendants refused to provide him with pain medication for eight months. *See, e.g.*, *id.* at ¶ 152. However, Plaintiff only makes specific allegations concerning Defendants' failure to treat his pain from August 23, 2018, through September 5, 2018. *See, e.g.*, ECF No. 9 ¶¶ 166-179, 190-194, 197-212. This overlaps with Plaintiff's hunger strike, as he also alleges being force fed during this time period. *See, e.g.*, *id.* at ¶¶ 201, 203-04 (identifying forced feedings on August 29, 2018, and August 31, 2018). Outside of this time period, Plaintiff does not make any specific allegations concerning an ongoing need for pain medication, does not specifically identify any requests that he made for pain medication after September 5, 2018, and does not identify which Defendants refused such requests.[7] Accordingly, Plaintiff has not plausibly alleged a failure to treat his pain beyond September 5, 2018. *See Iqbal*, 556 U.S. at 678 ("[t]he plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.").

     With respect to the alleged failure to treat his pain prior to September 5, 2018, Plaintiff alleges that the medical staff told him that he could not have pain medication due to the fact that

---

[7] Pursuant to BOP policy, Plaintiff could have obtained over-the-counter medications from either the commissary or the pharmacy. *See* BOP Program Statement P6541.02 (Nov. 17, 2014) (providing procedures for purchasing OTC medications from the commissary, as well as procedures permitting indigent inmates to obtain OTC medications), *available at* https://www.bop.gov/policy/progstat/6541_002.pdf (last visited April 9, 2021).

he was on a hunger strike. *Id.* at ¶ 212. He also alleges that he experienced pain during this time period because Osagie asked him to walk back and forth after force feedings in order to aid with digestion. *See, e.g.*, ECF No. 9 at ¶ 201. However, Plaintiff cannot satisfy the causation requirement of the objective standard because the well-pleaded allegations show that any failure to treat his pain, or any exacerbation of his pain due to force feedings, was the result of Plaintiff's own actions (refusing to eat). Indeed, courts have held that denial of pain medication due to a hunger strike does not give rise to an Eighth Amendment claim. *See, e.g.*, *Lucio v. Santos*, 600 F. App'x 480, 481-82 (7th Cir. 2015) (upholding grant of summary judgment in favor of prison medical staff in part because evidence showed that doctor had refused to prescribe acetaminophen because inmate was on hunger strike, which was a legitimate medical reason); *Lewis v. UTMB Medical Staff*, No. 2:19-cv-223, 2019 WL 8012672, at *7 (S.D. Tex. Dec. 13, 2019) (recommending dismissal of deliberate indifference claims against medical staff for failure to treat pain because plaintiff alleged that the defendants denied him pain medication because he was on hunger strike), *report and recommendation adopted*, No. 2:19-CV-223, 2020 WL 838537 (S.D. Tex. Feb. 20, 2020). And even if Plaintiff could establish the causation requirement, whether to prescribe pain medication to a prisoner on a hunger strike, similar to the decision of whether to order an x-ray, is properly a matter of medical judgment. *See Self*, 439 F.3d at 1232.

**Wrists and jaw**. Finally, Plaintiff alleges that he was denied x-rays of his wrists and jaw until October 18, 2018. ECF No. 9 at ¶ 155. However, Plaintiff does not make any allegations concerning the underlying need for the x-rays, what the x-rays showed with respect to his wrists and jaw, or whether he suffered any harm from the alleged delay. Therefore, he has failed to

plausibly allege an Eighth Amendment violation as a result of the alleged delay.

        b. <u>No allegations giving rise to an inference of subjective culpable intent.</u>

Plaintiff has failed to show that any defendant acted with deliberate indifference. To satisfy the subjective prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 828. The evidence must show the official's mental state was criminally culpable, "akin to 'recklessness in the criminal law.'" *Self*, 439 F.3d at 1231. To this end, "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Id.* at 1232.

Plaintiff makes conclusory and contradictory allegations that Defendants Jones, Huddleston, and Osagie "individually and sometimes collectively chose to treat me and my medical needs indifferently, recklessly and unreasonably." *See, e.g.*, ECF No. 9 at ¶ 183. He alleges at times that Defendant Jones refused to allow Plaintiff to see a physician's assistant or doctor, but also acknowledges that he was examined by Osagie on several occasions following the alleged excessive use of force, including on August 29, 2018, August 31, 2018, and September 3, 2018. *Id.* at ¶¶ 176-77, 194, 198, 206. Despite his allegations that all three defendants refused to examine him or treat his injuries, he acknowledges that he received a variety of medical treatment and examinations. *See* Section III.A.1, *supra*.

Setting aside Plaintiff's conclusory allegations concerning Defendants Jones, Huddleston, and Osagie's intent, the well-pleaded factual allegations do not give rise to an inference that any of the medical staff acted with a criminally culpable mental state. *See Iqbal*, 556 U.S. at 687 (rejecting plaintiff's argument that the Federal Rules allow him to allege defendants'

discriminatory intent "generally").  Plaintiff's allegations concerning the care provided by Defendants is strong evidence that they were not acting with deliberate indifference.  *See, e.g., Self*, 439 F.3d at 1232-33 ("[w]here a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted"); *see also Farmer*, 511 U.S. at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."); *Bergerud v. Fortunato*, No. 07-cv-02319, 2010 WL 3307612, at *5 (D. Colo. Aug. 18, 2010) (citation omitted) ("[T]he fact Defendants saw Plaintiff on numerous occasions demonstrates that they were not disregarding a risk to Plaintiff's health.").

With respect to his allegations concerning Defendants' failure to treat his pain, Plaintiff has failed to make allegations that support an inference that Jones, Huddleston, and Osagie acted *deliberately* to inflict pain on Plaintiff.  To the contrary, Plaintiff acknowledges that Jones, Osagie, and Huddleston expressed a legitimate medical reason for denying Plaintiff pain medication (i.e. Plaintiff's hunger strike), and thus the allegations do not demonstrate criminal recklessness.  *See Black v. Thalken*, No. 11-cv-02457-PAB-KMT, 2013 WL 878713, at *5 (D. Colo. Feb. 8, 2013) (dismissing failure-to-treat-pain claim because the plaintiff failed to allege that defendant "acted deliberately to inflict pain on Plaintiff unnecessarily or wantonly"); *cf. Henderson v. Fisher*, 767 F. App'x 670, 674 (10th Cir. 2019) (noting that plaintiff had "a hard row to hoe to show deliberate indifference" where staff discontinued his access to narcotics because of plaintiff's alleged abuse of the medication).

Accordingly, the well-pleaded allegations do not demonstrate that Jones, Osagie, and

Huddleston acted with culpable intent.

> 2. *Plaintiff has not alleged a violation of a clearly established right.*

Plaintiff cannot establish that any rights that were allegedly violated were clearly established. As the Supreme Court has explained, for a right to be clearly established, it must be "sufficiently clear that *every reasonable officer* would have understood that what he is doing violates that right" and "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Al-Kidd*, 131 S. Ct. at 2083 (quotations omitted; emphasis added); *see also Malley v. Briggs*, 475 U.S. 335, 343 (1986) (qualified immunity allows "ample room for mistaken judgments.").

Here, the bases of Plaintiff's deliberate indifference claims are that Defendants should have given him an x-ray earlier, should have treated his ankle with ice, should have provided for physical therapy while Plaintiff was still in a hard cast, and should have given him pain medication despite his ongoing hunger strike. However, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107. Similarly, there is no clearly established right to pain medication while an inmate is on hunger strike. *See, e.g.*, *Lucio*, 600 F. App'x at 481-82. And, perhaps most importantly, Tenth Circuit case law establishes that the types of decisions of which Plaintiff complains are matters of medical judgment. *See, e.g.*, *Self*, 439 F.3d at 1232 (citations omitted) ("Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing."); *cf. Irons*, 2010 WL 749797, at *10 ("the application of ice is within the discretion of the health care provider.").

**B. Plaintiff's official capacity claims should be dismissed.**

Plaintiff states that his deliberate indifference claims against Defendants Jones,

Huddleston, and Osagie are brought in both their individual and official capacities.  ECF No. 9 at

2 n.1.  As explained above in Section III.A.1, *supra*, Plaintiff has failed to plausibly plead a

deliberate indifference claim, and the official-capacity claims also should be dismissed for that

reason.  Moreover, to the extent Plaintiff seeks monetary damages in his official-capacity claims,

monetary damages are not available for official capacity claims.  *See Matthews*, 744 F.Supp.2d at

1167.

**CONCLUSION**

For the reasons set forth herein, the Court should dismiss the Amended Complaint, ECF

No. 9, in its entirety.

Respectfully submitted on this 12th day of April, 2021.

MATTHEW T. KIRSCH
Acting United States Attorney

*s/ Jennifer R. Lake*
Jennifer R. Lake
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite1600
Denver, CO 80202
Telephone: 303-454-0100
E-mail: jennifer.lake@usdoj.gov
Counsel for Defendants

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on April 12, 2021, I served the foregoing document, including copies of any unpublished decisions cited therein, on the following non-CM/ECF participant in the manner indicated:

Khalfan Khamis Mohamed (U.S. mail)
Reg. No. 44623-054
ADX – Florence
P.O. Box 8500
Florence, CO  81226

s/ *Jennifer R. Lake*
Jennifer R. Lake
United States Attorney's Office