**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-02516-RBJ-NYW

KHALFAN KHAMIS MOHAMED,

      Plaintiff,

v.

JONES, in his individual and official capacities,
HUDDLESTON, in his individual and official capacities,
OSAGIE, in his individual and official capacities,
BRUSH, in his individual and official capacities,
ESPINOZA, in his individual capacity,
MILLER, in his individual capacity,
LT. MURTON, in his individual capacity,
LT. ARMIJO, in his individual capacity, and
UNITED STATES OF AMERICA,

      Defendants.

---

## ORDER AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Nina Y. Wang

    This matter is before the court on four Motions:

(1)    The Motion to Dismiss Second Amended Complaint in Part Pursuant to Rules 12(b)(6) and 12(b)(1) (the "First Motion to Dismiss") [Doc. 71, filed July 27, 2021];

(2)    Defendant United States' Motion to Dismiss Claim Fifteen in the Second Amended Complaint (the "Second Motion to Dismiss") [Doc. 81, filed September 9, 2021] (collectively, the "Motions to Dismiss");

(3)    Plaintiff's Motion to File Surreply to Defendants' Motion to Dismiss (the "Motion to File a Surreply") [Doc. 94, filed November 4, 2021]; and

(4)    The Prisoner Motion for Appointment of Counsel (the "Motion to Appoint Counsel") [Doc. 98, filed November 8, 2021] (collectively, the "Motions").

The court considers the Motions pursuant to 28 U.S.C. § 636(b), the Order Referring Case dated November 16, 2020, [Doc. 13],[1] and the Memoranda dated July 27, 2021 [Doc. 72]; September 9, 2021 [Doc. 82]; November 5, 2021 [Doc. 95] and November 9, 2021 [Doc. 99].  The court finds that oral argument will not materially assist in the resolution of these matters.  For the following reasons, I respectfully **RECOMMEND** that: (1) the First Motion to Dismiss be **GRANTED** in part and **DENIED** in part and (2) the Second Motion to Dismiss be **GRANTED**.  In addition, it is **ORDERED** that the Motion to File Surreply is **DENIED** and the Motion to Appoint Counsel is **DENIED without prejudice**.

## BACKGROUND

This court draws the following facts from the Second Amended Complaint [Doc. 64] and presumes they are true for purposes of the Motions to Dismiss.  Plaintiff Khalfan Khamis Mohamed ("Plaintiff" or "Mr. Mohamed") is currently incarcerated at the United States Penitentiary Florence ADMAX in Florence, Colorado ("ADX Florence") within the Federal Bureau of Prisons ("BOP").  *See* [Doc. 64 at 2].  On August 20, 2018, Plaintiff declared a hunger strike.  [*Id.* at ¶ 2].  Mr. Mohamed gave notice of his hunger strike to "some senior staff members" at ADX Florence, so as to ensure that he could "be afforded all necessary medical attentions [in] accordance to the BOP's Program Statements."  [*Id.* at ¶¶ 3-4].  According to Plaintiff, BOP policies require that, when an inmate has missed nine consecutive meals, medical staff are required to perform a "medical assessment" of the inmate.  [*Id.* at ¶ 7].  Plaintiff missed his ninth consecutive meal on August 22, 2018, but no such medical assessment was performed on Plaintiff. [*Id.*].  On August 23, 2018, Mr. Mohamed woke up feeling weak, dizzy, and tired.  [*Id.* at ¶ 9].

---

[1] This case was originally referred to Magistrate Judge Kathleen M. Tafoya.  *See* [Doc. 13].  Upon Judge Tafoya's retirement, the case was re-assigned to the undersigned Magistrate Judge on February 1, 2022.  *See* [Doc. 102].

BOP policies also require the removal of food items and drinks from an inmate's cell once the inmate has refused his ninth consecutive meal. [*Id.* at ¶ 11]. Unit Officers Baca, Miller ("Defendant Miller"), and Brush ("Defendant Brush") arrived at Plaintiff's cell on August 23, 2018 to remove food items from Plaintiff's cell. [*Id.* at ¶ 10]. Mr. Mohamed submitted to handcuffing and was taken to the law library; because he was too weak to put on training shoes, Mr. Mohamed was escorted wearing socks and shower shoes. [*Id.* at ¶¶ 10, 12, 14]. Observing Plaintiff's weakened state, Officer Baca asked Plaintiff if he was okay; when Plaintiff responded "no," Officer Baca replied, "I can see that," and told Plaintiff he needed to eat. [*Id.* at ¶ 15].

The law library was located approximately 30 feet from Mr. Mohamed's cell. [*Id.* at ¶ 12]. From the law library, Plaintiff observed Defendant Brush "removing almost [everything] from [his] cell." [*Id.* at ¶ 17]. Defendant Brush then informed Plaintiff that Lieutenant Armijo ("Defendant Armijo") wanted Plaintiff to take off his personal clothes and put on BOP-provided clothes. [*Id.* at ¶ 18]. Mr. Mohamed asked if he could speak with Defendant Armijo in his cell or in the law library; Defendant Brush agreed to take Plaintiff back to his cell. [*Id.* at ¶¶ 19-20].

***Use of Force***. As Plaintiff was escorted back, he stopped when they reached his cell, "thinking that the officers ha[d] missed [his] cell," and reminded the officers that he was told he would be brought back to his cell. [*Id.* at ¶ 23]. Defendant Brush, "immediate[ly] without any warning nor any need," threw Plaintiff against the wall and smashed Plaintiff's head multiple times against the wall while shouting, "stop resisting, stop resisting." [*Id.* at ¶ 25]. Plaintiff was not resisting and never resisted. [*Id.* at ¶¶ 25, 27]. Mr. Mohamed was then "crushed on to the ground, face-down, while [Defendant] Brush and another officer," who Plaintiff asserts was "most likely [Defendant] Miller," punched, kicked and spit on Plaintiff. [*Id.* at ¶ 29]. Officers restrained Plaintiff's legs with leg cuffs before "many officers, possibly 10 or more," began punching,

kicking, and spitting on Plaintiff. [*Id.* at ¶¶ 30-31]. Defendant Brush, "with help from other officers," attempted to break Mr. Mohamed's arms, legs, feet, and toes by "twisting and manipulating them aggressively." [*Id.* at ¶ 34]. Defendant Brush and other officers also made verbal threats to Plaintiff, threatening to "kill" Plaintiff, taunting Plaintiff that no one would believe him, and telling Plaintiff that "this [is] America, not an Iraq or Afghanistan." [*Id.* at ¶ 36]. While Plaintiff was being struck during this incident and "in the following beatings," the officers forced his upper body and head down so that Plaintiff could not "identify most of the officers who were torturing and abusing [him]." [*Id.* at ¶ 39].

Plaintiff was then "violently made to stand up" and walk through the hallway, as officers continued to beat him. [*Id.* at ¶ 40]. When Plaintiff and the officers "reached the end of the range-A," Mr. Mohamed was able to look up and see Defendant Armijo and Lieutenant Murton ("Defendant Murton") watching Plaintiff limp in pain "while the officers continue[d] to maliciously and sadistically attack and abuse [him]." [*Id.* at ¶ 46]. Mr. Mohamed cried for help, but despite Defendants Armijo and Murton witnessing the use of force, they did not intervene; instead, Defendant Murton gave instructions to the officers "on how to beat [Plaintiff]." [*Id.* at ¶¶ 47-49, 60]. At the time, Defendant Armijo was the unit's lieutenant and was in charge "of the unit's daily operations and its officers." [*Id.* at ¶ 50].

Defendant Murton ordered the officers to place Mr. Mohamed in the observation cell. [*Id.* at ¶¶ 60-61]. Mr. Mohamed was then "pushed into the [observation cell]," where Defendant Miller hit Plaintiff in the face with his knee multiple times. [*Id.* at ¶¶ 54-55]. Defendant Murton continued to instruct the officers who were using physical force on Mr. Mohamed, instructing them to "put him against the wall," "bend him over," and "place him on the bed." [*Id.* at ¶ 65]. In addition, while Officer Espinoza ("Defendant Espinoza") hit plaintiff in the face and aggressively

pulled his beard and ears up and down, Defendant Murton told him to "keep it to the body," which Plaintiff asserts suggests an effort to avoid creating evidence of the beating.  [*Id.* at ¶¶ 66, 73]. Defendant Espinoza threatened Plaintiff by stating: "stupid little terrorist, . . . we got your Leader, Bin Laden, we soon gonna send you where he is . . . hell." [*Id.* at ¶ 74].  Plaintiff states that, on information and belief, Defendants Murton, Brush, and Espinoza "all have [a] long history and reputation in abusing prisoners at the ADX including using . . . excessive force against them and then fabricating incident reports against those prisoners." [*Id.* at ¶ 67].

While Plaintiff was being beaten in the observation, he heard P.A. Osagie ("Defendant Osagie") "from the cell's door, very close to where [Plaintiff] was being beaten, saying approvingly 'is he still resisting,'" even though Plaintiff was not resisting and was in full restraints. [*Id.* at ¶ 76].  Plaintiff states that he knows Defendant Osagie "from at least early 2002 and his voice and accent are obviously identifiable to [Plaintiff] and to anyone who [knows] him." [*Id.* at ¶ 79].  Plaintiff alleges that, because he had been placed on a concrete bed which is "several feet high," Defendant Osagie "must have seen [him] and the beating very [easily] and without any efforts" and Defendant Osagie must have heard Mr. Mohamed's repeated insistence that he was not resisting.  [*Id.* at ¶ 78].  According to Plaintiff, Defendant Osagie is both a fully trained prison guard and a medical professional, and "could have used either of these two positions he hold[s] to stop the abuses," but did not.  [*Id.* at ¶ 83].  Plaintiff was later given an incident report for "attempting assault" against Defendant Brush; Plaintiff alleges Defendants Brush, Miller, and Office Baca fabricated reports to justify the beating of Plaintiff.  [*Id.* at ¶¶ 107-08].  Plaintiff was found "guilty" of attempted assault by the ADX Florence's disciplinary officer.  [*Id.* at ¶ 108]. Plaintiff still lives with excessive anxiety, a fear of prison guards, poor sleeping, and nightmares due to the August 23, 2018 use of force.  [*Id.* at ¶ 126].

*The Confiscation of Plaintiff's Materials*.  Mr. Mohamed was left in the observation cell for several hours after the beatings.  [*Id.* at ¶ 86].  Defendant Brush approached Plaintiff and stated: "I am not finished . . . with you, I'm gonna kill you, and I saw your journals, and manuscripts and other shit[] in your cell, trust me, everything is gonna be in the trash," or "some statements with [similar] meanings."  [*Id.*].  When Mr. Mohamed was taken back to his cell, his cell was "virtually empty."  [*Id.* at ¶ 87].  Plaintiff alleges that Defendant Brush removed almost everything from his cell, including (1) his daily journals or diaries, comprising 12 notebooks with entries from 2001 through August 2018; (2) three manuscripts written by Plaintiff, which included (a) a 900-page unfinished manuscript about peace and tolerance between the religions of Islam, Christianity, and Judaism; (b) a 500-page manuscript of the Qur'an translated by Plaintiff into Swahili, Plaintiff's native language; and (c) a 450-page manuscript about slavery throughout history; (3) Plaintiff's notes about "important books that [he had] read previously;" (4) seven of Plaintiff's books.  [*Id.* at ¶¶ 88-94].  Defendant Brush also took a "few short works/researches" [sic], legal and religious materials, cosmetic items, writing and postage materials, toiletries, and the cup Plaintiff used to drink water.  [*Id.* at ¶ 102].  Plaintiff submitted a written request to a correctional counselor, insisting that his written materials be kept for him, or that he be permitted to send them outside the prison.  [*Id.* at ¶ 96].  The counselor responded that everything would be kept for Plaintiff in storage until he came off of his hunger strike.  [*Id.*].

After Plaintiff ended his hunger strike, he was told that his materials could not be found. [*Id.* at ¶ 99].  Plaintiff sent several written requests asking for help locating his materials, including to the warden of ADX Florence, the unit team, the property officer, a lieutenant, and an "SIS staff member."  [*Id.*].  He also "filed an Administrative Remedy on the above materials."  [*Id.* at ¶ 100]. A few items were returned to Plaintiff: two volumes of an Arabic Bible, an English dictionary, a

"bunch of old Admin. Remedies," three or four religious books, a photo album, a prayer rug, a pair of shoes, shower shoes, a shirt, and some packages of soup. [*Id.* at ¶ 101]. Plaintiff alleges that the materials taken by Defendant Brush, including his journals, manuscripts, and notes, had "previously survived all [hunger strikes] and shake-downs." [*Id.* at ¶ 103]. Plaintiff alleges that the loss of his materials left him with a "high level" of depression and the feeling of failure due to "the huge loss of everything that [he had] worked [on] for almost 20 years," which has caused Plaintiff to experience suicidal ideation. [*Id.* at ¶¶ 126-27]. Plaintiff was prescribed medication for his depression and was told that he is suffering from post-traumatic stress disorder ("PTSD"). [*Id.* at ¶ 128].

*Injuries and Medical Attention*. Plaintiff alleges that he suffered numerous physical injuries in the beatings, including but not limited to lacerations, bruises, abrasions, scars on his left wrist, swollen ankles and wrists, nose bleeds that lasted two or three days, jaw pain that lasted two months, ankle and wrist pain that continues "to this day," and an acute right ankle fracture. [*Id.* at ¶¶ 114-18]. Nurse Jones ("Defendant Jones") performed a medical assessment following the beatings. [*Id.* at ¶ 130]. Plaintiff complained to Defendant Jones that he believed his ankle was broken and that he could not walk due to the "excruciating" amount of pain he was in, and requested an x-ray to check his jaw, wrists, and ankles. [*Id.* at ¶ 132]. Defendant Jones refused to provide an x-ray, pain medication, or ice, refused Plaintiff's request to see a doctor, and told Plaintiff that the swelling would go away on its own. [*Id.*]. Defendant Jones also refused Plaintiff's request for examination of the symptoms caused by Plaintiff's hunger strike, despite being such examination required by the BOP's Program Statement, stating that he was "only asked to assess [Plaintiff] for the use of force incident." [*Id.* at ¶¶ 134, 136]. Defendant Jones saw Plaintiff "several more time[s]" for a hunger strike medical assessment, including on August 27,

2018 and September 3 and 5, 2018, but continued to refuse to assess or treat Plaintiff's physical injuries, even though Plaintiff's ankle was "swollen to about 75% of an orange size." [*Id.* at ¶ 137]. Defendant Jones told Plaintiff: "once you eat, we'll [examine] you." [*Id.*]. According to Mr. Mohamed, Defendant Jones "wanted to punish [him]" for being on his hunger strike. [*Id.* at ¶ 136].

Nurse Huddleston ("Defendant Huddleston") performed the first medical assessment related to Mr. Mohamed's hunger strike on August 26, 2018. [*Id.* at ¶ 141]. Plaintiff was in excruciating pain and had a swollen ankle, and informed Defendant Huddleston that he could not walk or sleep. [*Id.*]. Mr. Mohamed "begged" Defendant Huddleston for an x-ray, pain medication, or ice, or to be seen by a doctor, but Defendant Huddleston refused these requests on the basis that he was only there to perform a hunger-strike assessment. [*Id.*]. Defendant Huddleston told Plaintiff that he was "here to do the [hunger strike] assessment" and that "[a]ny treatment for your injuries that you want[,] that will come . . . after you come off your [hunger strike]." [*Id.* (ellipses in original)]. Defendant Huddleston saw Plaintiff on several occasions, including August 27 and 31, 2018 and September 3, 2018, but continually refused to treat Plaintiff's injuries. [*Id.* at ¶ 143].

In addition, Defendant Osagie witnessed Mr. Mohamed's "uncovered, obvious and substantially swollen right ankle," observed that he was in pain, and heard Plaintiff's complaints of excruciating pain. [*Id.* at ¶ 146]. Mr. Mohamed informed Defendant Osagie that he could not sleep, walk, or pray due to his pain. [*Id.*]. Defendant Osagie performed only a hunger strike assessment and declined to look at Plaintiff's obvious injuries. [*Id.*]. According to Plaintiff, Defendant Osagie "wanted [Plaintiff] to come off [the hunger strike] in order to get treatments, including an x-ray," and "said 'everything will be [alright] if you eat.'" [*Id.*]. Plaintiff was then "tightly strapped and tied with leg cuffs right on [his] broken ankle on the wheelchair and then pushed to the medical unit for . . . force feeding." [*Id.* at ¶ 147]. After Plaintiff ate, Defendant

Osagie ordered Plaintiff to walk back and forth with heavy leg cuffs on Plaintiff's ankle, despite the fact that Plaintiff was obviously in pain. [*Id.*]. Plaintiff was assessed again by Defendants Osagie and Huddleston on August 31, 2018, and these Defendants refused Plaintiff's "previous requests," even though his ankle was swollen to "90% of an orange size." [*Id.* at ¶ 149]. On September 3, 2018, Defendant Osagie warned Plaintiff to not complain on camera or write to superior staff about his pain and refused to give Plaintiff pain medication. [*Id.* at ¶ 157].

Plaintiff received an ankle x-ray on August 31, 2018. [*Id.* at ¶ 139]. Defendant Jones informed Plaintiff on September 3, 2018 that his ankle x-rays showed "twisted muscles," [*id.* at ¶ 119], and on September 5, 2018, informed Plaintiff that the x-ray showed a fracture. [*Id.* at ¶ 139]. Defendant Jones supplied Plaintiff with a splint and a wheelchair and told Plaintiff that he would be seen by an orthopedist "in the coming few days," [*id.* at ¶ 119], but denied Plaintiff's requests for medication or ice. [*Id.* at ¶ 139]. Non-party Dr. Oba replaced the split with a hard cast on September 12, 2018, informing Plaintiff that the orthopedist had looked at Plaintiff's x-rays and instructed Dr. Oba to put the cast on Plaintiff, which was to remain in place for three weeks. [*Id.* at ¶ 119]. After Plaintiff was x-rayed again on September 25, 2018, Defendant Jones informed him that the fracture had not yet healed. [*Id.* at ¶ 120]. A second x-ray was taken on October 23, 2018, at which time the x-ray technician informed Plaintiff that the previous x-ray had "missed some details." [*Id.*]. On November 16, 2018, Defendant Osagie took off Plaintiff's case, which revealed a swollen and very painful ankle. [*Id.* at ¶ 122]. Plaintiff asked Defendant Osagie for "physical therapy[,] follow up, or any other help," but Defendant Osagie said the requested treatment was not needed. [*Id.*]. On December 6, 2018, Plaintiff was given ibuprofen tablets, the first pain medication given to Plaintiff since he was injured in August. [*Id.*]. On December 23, 2018, Plaintiff sent a request to Dr. Oba complaining about his pain. [*Id.* at ¶ 123]. After additional

request for treatment were refused by non-parties to this action, *see, e.g.*, [*id.* at ¶ 123], Mr. Mohamed was seen by Dr. Oba on April 23, 2019, at which time Plaintiff was prescribed a pain medication and issued a compression sock to address swelling. [*Id.* at ¶ 125]. According to Plaintiff, the use of force on August 23, 2018 left him with "several serious and [permanent] injuries." [*Id.* at ¶ 114]. To this day, his right ankle remains painful and swollen. [*Id.* at ¶ 116]. In addition, he continues to have pain in his wrists, jaws, and periodic heavy nose bleeds. [*Id.*].

Believing Defendants violated his constitutional and related federal rights, Mr. Mohamed initiated this action by filing his pro se prisoner Complaint on August 20, 2020. [Doc. 1]. Following orders from the Honorable Gordon P. Gallagher, Plaintiff filed an Amended Prisoner Complaint on October 5, 2020. [Doc. 9]. Judge Gallagher determined that Plaintiff's claims were not appropriate for summary dismissal, [Doc. 12], and the case was assigned to the presiding judge, the Honorable R. Brooke Jackson, and referred to the Honorable Kathleen M. Tafoya. [Doc. 12; Doc. 13]. Upon motion from Plaintiff, *see* [Doc. 56], Judge Tafoya granted Plaintiff leave to amend his Amended Prisoner Complaint on June 22, 2021, [Doc. 63], and the Second Amended Prisoner Complaint (the "Second Amended Complaint") remains the operative pleading in this action. [Doc. 64].

The Second Amended Complaint raises fifteen claims, many of which are raised pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*") and the Federal Tort Claims Act ("FTCA"). *See generally* [*id.*]. Specifically, Mr. Mohammed asserts the following claims under *Bivens*: (1) an Eighth Amendment excessive force claim against Defendant Brush ("Claim One"); (2) a failure-to-intervene claim against Defendant Armijo ("Claim Two"); (3) an Eighth Amendment excessive force claim against Defendant Miller ("Claim Three"); (4) a failure-to-intervene claim against Defendant Murton ("Claim Four"); (5) an

Eighth Amendment excessive force claim against Defendant Espinoza ("Claim Five"); (6) an Eighth Amendment failure-to-intervene claim against Defendant Osagie ("Claim Six"); (7) a First Amendment claim against Defendant Brush ("Claim Seven"); (8) an Eighth Amendment deliberate indifference claim against Defendant Jones ("Claim Eight"); (9) an Eighth Amendment deliberate indifference claim against Defendant Huddleston ("Claim Nine"); and (10) an Eighth Amendment deliberate indifference claim against Defendant Osagie ("Claim Ten").   In addition, Mr. Mohamed asserts five claims against the United Status under the FTCA: (1) three claims of battery ("Claim Eleven," "Claim Twelve," and "Claim Thirteen"); (2) negligent supervision ("Claim Fourteen"); and (3) a claim of "negligent performance" ("Claim Fifteen").   *See generally* [*id.*].

Defendants filed their First Motion to Dismiss on July 27, 2021, arguing that (1) Plaintiff's excessive-force, failure-to-intervene, and First Amendment claims should be dismissed for lack of a *Bivens* remedy; (2) certain individual Defendants are entitled to qualified immunity; (3) all of Plaintiff's official-capacity claims fail to state a claim; and (4) the FTCA claim for negligent supervision fails to state a claim and has not been exhausted.   *See* [Doc. 71 at 1].   Defendants then filed the Second Motion to Dismiss,[2] seeking to dismiss only Claim Fifteen for failure to file a certificate of review as required by Colorado law.   [Doc. 81 at 1].[3]   Mr. Mohamed has responded to both Motions to Dismiss, *see* [Doc. 83; Doc. 88], and Defendants have since replied.   [Doc. 89; Doc. 90].   Also pending before the court is Plaintiff's Motion to File a Surreply, *see* [Doc. 94],

---

[2] Defendants sought leave to file a 34-page motion to dismiss.   [Doc. 69].   Judge Jackson denied this request, but permitted Defendants leave to file a 20-page motion to dismiss.   [Doc. 70].   After filing the 20-page First Motion to Dismiss, Defendants then filed the 4-page Second Motion to Dismiss, asserting a defense that, according to Defendants, was not available at the time it filed the First Motion to Dismiss.   *See* [Doc. 81 at 1 n.1].   While the combined Motions to Dismiss exceed 20 pages, the court does not pass on the propriety of the Second Motion to Dismiss, leaving any such determination to the presiding judge.

[3] Thus, Defendants do not seek dismissal of Plaintiff's Claims Eleven, Twelve, or Thirteen.   *See generally* [Doc. 71; Doc. 81].

which is opposed by Defendants.   [Doc. 100].   Because these Motions are ripe for recommendation, I consider the Parties' arguments below.

<u>**MOTIONS TO DISMISS**</u>

**LEGAL STANDARDS**

## I.      Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. Under Article III of the United States Constitution, federal courts only have jurisdiction to hear certain "cases" and "controversies." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014).  As such, courts "are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction." *Wilderness Soc. v. Kane Cty.*, 632 F.3d 1162, 1179 n.3 (10th Cir. 2011) (Gorsuch, J., concurring).  Indeed, courts have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party.  *1mage Software, Inc. v. Reynolds & Reynolds, Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)).

## II.      Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that pro se litigants cannot rely on

conclusory, unsubstantiated allegations to survive a 12(b)(6) motion).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible").  The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## III.    Pro Se Pleadings

In applying the above principles, this court is mindful that Mr. Mohamed proceeds pro se and the court thus affords his papers and filings a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).  But the court cannot and does not act as his advocate, *Hall*, 935 F.2d at 1110, and applies the same procedural rules and substantive law to Plaintiff as to a represented party. *See Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.2 (10th Cir. 2008); *Dodson v. Bd. of Cty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012).

## ANALYSIS

As set forth above, Defendants raise various arguments for dismissal of several of Plaintiff's claims.  *See* [Doc. 71; Doc. 81].  The court first considers whether Plaintiff should be granted leave to file a surreply to the First Motion to Dismiss before turning to Defendants' arguments that Claims One, Two, Three, Four, Five, Six, and Seven should be dismissed pursuant to Rule 12(b)(6) for lack of a viable *Bivens* remedy.  Then, the court turns to the doctrine of qualified immunity, which Defendants suggest bars Plaintiff's Claims Six, Seven, Eight, Nine, and

Ten.  Finally, the court addresses Claim Fourteen, which Defendants argue should be dismissed for failure to exhaust administrative remedies and failure to state a claim, and Claim Fifteen, which Defendants assert should be dismissed for failure to file a certificate of review.

## I.      Plaintiff's Motion to File a Surreply

Because Plaintiff's Motion to File a Surreply implicates the documents the court may consider in issuing its Recommendation on the First Motion to Dismiss, the court considers this Motion first.  On November 4, 2021, Plaintiff sought leave of court to file a surreply to the First Motion to Dismiss,[4] arguing that Defendants "included several new legal arguments for the first time" in their Reply to the First Motion to Dismiss.  [Doc. 94 at 1]; *see also* [Doc. 89 (the Reply)]. Defendants oppose the Motion to File a Surreply, arguing that the arguments identified by Plaintiff are not new legal arguments but are rather responsive assertions to the points raised by Plaintiff in his Response.  [Doc. 100 at 3].

The court respectfully agrees with Defendants.  The court has reviewed the Reply and does not find that the arguments highlighted by Mr. Mohamed constitute "new" arguments, as each of the arguments cited by Plaintiff is simply an expansion of an argument raised in the First Motion to Dismiss made in response to an assertion made by Plaintiff in his Response.  For example, Plaintiff argues that Defendants' focus on the allegations in the Second Amended Complaint that several of Plaintiff's confiscated items were returned to him constitutes a new argument.  [Doc. 94 at 2].  However, this statement was made in the course of arguing that Plaintiff failed to state a First Amendment claim, an argument made in the First Motion to Dismiss, *see* [Doc. 71 at 10],

---

[4] Although Mr. Mohamed references the document number associated with the Second Motion to Dismiss, *see* [Doc. 94 at 1], he also references the document numbers associated with the Response and Reply to the First Motion to Dismiss.  *See* [*id.*].  Because Mr. Mohamed's arguments are directed to Defendants' Response to the First Motion to Dismiss, the court believes Mr. Mohamed seeks to file a surreply to the First Motion to Dismiss.

and was specifically asserted to counter Plaintiff's argument that he had stated a First Amendment claim because Defendant Brush told him that his confiscated materials would be thrown away. *See* [Doc. 89 at 9]; *see also* [Doc. 83 at 7].  In addition, in their First Motion to Dismiss, Defendants argue that Plaintiff failed to exhaust his negligent supervision claim because Plaintiff's administrative claim failed to mention negligent supervision or allege facts suggesting negligent supervision.  [Doc. 71 at 18].  After Plaintiff argued that because two lieutenants—Defendants Murton and Armijo—were involved in the use of force, there was adequate notice of the negligent supervision claim, *see* [Doc. 83 at 18], Defendants then countered that "the fact that the . . . BOP may have known who was involved in the use of force is insufficient to put the BOP on notice that Plaintiff was alleging a failure to supervise."  [Doc. 94 at 3].  These are not new arguments, but rather assertions made in response to the arguments in the Response.  The court reaches the same conclusion with respect to Defendants' legal argument in their Reply that Defendants Murton and Armijo, who were present when the force was used against Plaintiff, cannot be relied upon to show the BOP's knowledge of a risk of harm to Plaintiff.  *See* [Doc. 89 at 12].  This assertion is not a new argument, but is rather an expansion of their original argument that Plaintiff failed to state a negligent supervision claim, *see* [Doc. 71 at 19], stated in response to Plaintiff's arguments in opposition.  *See* [Doc. 83 at 19].

While the court does not pass on the merits of any arguments made in the Reply, the court finds they are not new.  "[R]eply briefs reply to arguments made in the response brief," *Home Design Servs., Inc. v. B & B Custom Homes, LLC*, 509 F. Supp. 2d 968, 971 (D. Colo. 2007), and the arguments raised in the Reply are properly before the court.  For this reason, I respectfully **DENY** the Motion to File a Surreply.  *Cf. United States v. Ridley's Fam. Markets, Inc.*, No. 1:20-

cv-173-TS-JCB, 2021 WL 2141740, at *1 (D. Utah May 26, 2021) (denying motion to strike where arguments made in reply were not new, but merely responded to the opposition to the motion).

## II.    The *Bivens* Claims

### A.    Applicable Law

Defendants move to dismiss Mr. Mohamed's first seven claims for relief on the basis that no *Bivens* remedy exists for these claims.  *See* [Doc. 71 at 3-8].  In *Bivens*, 403 U.S. 388, the Supreme Court of the United States established that an individual may seek monetary damages from a federal official in his or her individual capacity for an alleged violation of the Fourth Amendment's prohibition on unreasonable search and seizure, even in the absence of statutory authority.  *Id.* at 396-97.  Though not the focus of the opinion, *Bivens* also included allegations of unreasonable force.  *See id.* at 389; *see also Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001) (interpreting *Bivens* as holding "that officers may be held liable in damages for violating persons' Fourth Amendment rights, including the use of unreasonable force.").  The *Bivens* Court rejected the proposition that the Fourth Amendment was not an independent limitation upon the exercise of federal power, observing that "damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly *see*m a surprising proposition."  *Id.* at 394, 395.  In doing so, the Supreme Court found that the case presented no special factors counseling hesitation in the absence of affirmative action by Congress.  *Id.* at 396.

As jurisprudence developed, it became clear that *Bivens* was not co-extensive to 42 U.S.C. § 1983, which provides an avenue for a plaintiff to address constitutional violations perpetuated by state actors.[5]  The Supreme Court has limited the applicability of *Bivens* to only a handful of

---

[5] Section 1983 has been extended to private actors in certain circumstances as well.  *See, e.g.*, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 934 (1982) (holding that private actors may be liable

constitutional violations. *See, e.g.*, *Bivens*, 403 U.S. at 396 (providing a *Bivens* remedy for violations under the Fourth Amendment); *Davis v. Passman*, 442 U.S. 228, 248-49 (1979) (providing a *Bivens* remedy for gender discrimination under the Fifth Amendment Due Process Clause; *Carlson v. Green*, 446 U.S. 14, 18-21 (1980) (providing a *Bivens* remedy for failure to provide adequate medical treatment under the Eighth Amendment Cruel and Unusual Punishments Clause). Given concerns regarding the separation of powers between the legislative and judicial branches of government, the Supreme Court has cautioned lower courts not to imply causes of action under *Bivens* where no statutory authority exists, explaining such a task is better fit for Congress. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856-57 (2017) ("[T]he Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity.").

In exercising this caution, the Supreme Court has articulated two questions that the court must address before implying a *Bivens* remedy for a claim not captured by *Bivens*, *Davis*, or *Carlson*. First, the court must determine whether the claim arises in a new context, which broadly encompasses any claims "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (internal quotations omitted). If so, the court must then determine whether "there are special factors counselling hesitation in the absence of affirmative action by Congress." *Ziglar*, 137 S. Ct. at 1857 (internal quotations omitted). In resolving these two questions, the court must be mindful of whether an alternative remedy exists that could protect the constitutional interests at stake such that implying

---

under § 1983 when the action is fairly attributable to the State); *Wittner v. Banner Health,* 720 F.3d 770, 777 (10th Cir. 2013) (observing that a private actor can be transformed into a state actor under the "joint action" test, in which a court inquires whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights).

a damages remedy under *Bivens* may interfere with the powers of Congress.  *See Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 860-61 (10th Cir. 2016).

Here, Defendants argue that the court "should not imply a *Bivens* remedy for the excessive force, failure-to-intervene, and First Amendment claims," [Doc. 71 at 3], asserting that each of these claims arises in a "new context" and that, for each of these claims, there are alternative processes available to Plaintiff and special factors caution against recognizing a *Bivens* remedy. [*Id.* at 4-8].  The court addresses these arguments in turn.

## B.  First Amendment Claim – Claim Seven

First, Defendants argue that the court should not recognize a *Bivens* remedy with respect to Plaintiff's First Amendment claim against Defendant Brush—Claim Seven.  [*Id.* at 4].  They assert that Claim Seven presents a new context not previously found applicable to *Bivens* claims— the removal of manuscripts and books from Plaintiff's cell.  [*Id.*].  In addition, they argue that there are alternative processes available to Mr. Mohamed because he "can pursue a claim under [31 U.S.C. § 3723], which allows '[t]he head of an agency' to 'settle a claim for not more than $1,000 for damage to, or loss of, privately owned property that is caused by the negligence of an officer or employee of the United States Government acting within the scope of employment.'"  [*Id.* (quoting 31 U.S.C. § 3723(a))].  Finally, Defendants assert that the court should not find an implied *Bivens* remedy here because special factors caution against it.  [*Id.* at 4-6].

### 1.  New Context

Defendants argue that Mr. Mohamed's First Amendment claim presents a new context for *Bivens* purposes because "the Supreme Court has never found that *Bivens* extends to First Amendment claims."  [*Id.* at 4].  Indeed, the Supreme Court has "declined to extend *Bivens* to a claim sounding in the First Amendment."  *Iqbal*, 556 U.S. at 675 (citing *Bush v. Lucas*, 462 U.S.

367 (1983)); *see also Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."). In the years since *Iqbal* and *Reichle*, several Circuit courts have too determined that a First Amendment claim presents a new *Bivens* context, most often in the context of First Amendment retaliation. *See, e.g.*, *Earle v. Shreves*, 990 F.3d 774, 779 (4th Cir.), *cert. denied*, 142 S. Ct. 358 (2021) (First Amendment retaliation claim presented new context); *Bistrian v. Levi*, 912 F.3d 79, 95 (3d Cir. 2018) (same); *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir.), *cert. denied*, 141 S. Ct. 180 (2020) (same). Most similar to the facts presently before the court, the Sixth Circuit recently found that a First Amendment cause of action in which the plaintiff alleged that prison guards had unconstitutionally seized his paintings on the basis that they violated the prison's rules against possessing sexually explicit materials presented a "new context for purposes of *Bivens*." *See Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 522, 524 (6th Cir. 2020).

The court is persuaded by the weight of this Circuit authority. "The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Ziglar*, 137 S. Ct. at 1859. Here, the pertinent facts and legal theories—the confiscation of Plaintiff's books and personally drafted manuscripts, which Plaintiff alleges violated his First Amendment rights—differ from both the facts and the constitutional rights asserted in *Bivens*, *Davis*, and *Carlson*. *See Shepard v. Rangel*, No. 12-cv-01108-RM-KLM, 2014 WL 7366662, at *15 (D. Colo. Dec. 24, 2014) (First Amendment claim based on confiscation of plaintiff's belongings presented new context); *cf. Barrett v. GEO Grp., Inc.*, No. 21-cv-1603-CAB (JLB), 2021 WL 5741448, at *4 (S.D. Cal. Dec. 2, 2021) (noting that it was "unlikely that *Bivens* can be extended to reach Plaintiff's First Amendment" claim for confiscation of his religious items but

ultimately declining to decide the issue); *Callahan*, 965 F.3d at 524.  Accordingly, the court finds that this case presents a new context; thus, the court must next consider whether any special factors counsel against recognizing a *Bivens* claim here.[6]

### 2. Special Factors

Next, the court must discuss whether special factors counsel against recognizing a *Bivens* cause of action.  "The focus of the special-factors inquiry is 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative.'"  *Earle*, 990 F.3d 774, 779 (quoting *Ziglar*, 137 S. Ct. at 1857).  One special factor the court must consider is whether there is "an alternative remedial structure present," which "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."  *Ziglar*, 137 S. Ct. at 1858.  In addition, the court considers "separation-of-powers principles, including the risk of interfering with the authority of the other branches and whether the judiciary can competently weigh the costs and benefits at stake."  *Callahan*, 965 F.3d at 524.  "[L]egislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation."  *Ziglar*, 137 S. Ct. at 1865.

---

[6] To the extent that Mr. Mohamed argues that "[t]he Tenth Circuit has implied [a similar] remedy on non-prison context cases," citing to *Big Cats*, 843 F.3d 853, *see* [Doc. 83 at 3], the court respectfully is unpersuaded by this argument.  In *Big Cats*, the Tenth Circuit was faced with a Fourth Amendment unreasonable search and seizure claim arising out of the Department of Agriculture's alleged breaking into the plaintiff's facility housing exotic animals and performing an unannounced inspection of two tiger cubs.  843 F.3d at 856.  The Tenth Circuit, finding that the plaintiff had alleged "a garden-variety constitutional violation" which was "hardly a new context," ultimately determined that the *Bivens* claim could proceed.  *Id.* at 864.  *Big Cats* is factually distinct from Plaintiff's First Amendment claim and does not contain any analysis with respect to the "new context" determination which might alter this court's analysis on the issue here.

As set forth above, Defendants assert that Plaintiff possesses alternative remedies to address the confiscation of his property because he can bring a claim under the 31 U.S.C. § 3723. [Doc. 71 at 4].  In addition, they argue that Plaintiff "can seek a remedy under the prison grievance system."  [*Id.*].  In response, Mr. Mohamed argues that he "completed both before he filed this case with the court" and that both remedies "never worked."  [Doc. 83 at 3].  First, Mr. Mohamed asserts that § 3723 "only covers up to $1000.00 and does not apply to most of Plaintiff's materials allegedly stolen or destroyed by [Defendant] Brush."  [*Id.*].  He asserts that his "small claim was still denied."  [*Id.* at 4].  Moreover, Plaintiff argues that he completed the BOP administrative remedy process but the "final response contained untruthful statements, based on ADX's fabricated records."  [*Id.*].  Defendants argue in their Reply that "whether alternative processes are ultimately successful is irrelevant in considering whether to extend *Bivens*."  [Doc. 89 at 3].

"Both the Tenth Circuit and the Supreme Court have recognized that . . . grievances filed through the BOP's Administrative Remedy Program constitute alternative means of preventing unconstitutional conduct in the prison context."  *Lovett v. Ruda*, No. 17-cv-02010-PAB-KLM, 2018 WL 4659111, at *8 (D. Colo. Sept. 28, 2018).  The Supreme Court has explained that the BOP administrative remedy process provides a "means through which allegedly unconstitutional actions and policies [by BOP officials] can be brought to the attention of the BOP and prevented from recurring."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001).  An alternative remedial mechanism "need not be perfectly congruent" with a potential *Bivens* remedy and may be "adequate" even if it does not "provide complete relief."  *Minneci v. Pollard*, 565 U.S. 118, 129 (2012).  Relevant here, courts have found that the BOP's administrative grievance process provides an alternative remedy for an inmate to seek relief where the inmate's possessions have been confiscated by BOP personnel.  *See, e.g.*, *Callahan*, 965 F.3d at 524; *White v. Inch*, No. 3:17-cv-

21

01059-JPG-DGW, 2018 WL 6584899, at *2 (S.D. Ill. Dec. 14, 2018), *aff'd sub nom. White v. Sloop*, 772 F. App'x 334 (7th Cir. 2019).

However, Defendants do not suggest that the administrative grievance process permits money damages. *See Nyhuis v. Reno*, 204 F.3d 65, 70 (3d Cir. 2000) (money damages are not available through BOP grievance process). "While there is no need for congruent remedies or even money damages to deny a *Bivens* remedy, there must be more than nothing." *Big Cats*, 843 F.3d at 862-63. In determining whether alternative remedies are available, "the appropriate consideration is whether an alternate, existing process demonstrates Congress's *intent* to exclude a damages remedy. *Id.* at 862. "Evidence of that intent would be a scheme that provides adequate deterrence of constitutional violations and at least *some* form of relief for the harm." *Id.* The operative question is "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

Here, Plaintiff alleges that many of his personal belongings were taken from his cell by Defendant Brush. *See* [Doc. 64 at ¶ 96]. His allegations, however, are imprecise as to what he alleges happened to his property. Plaintiff states that he was told that his property would be kept in storage until he came off of his hunger strike, [*id.* at ¶ 98], but that, when he asked for his materials back, he only received some items. [*Id.* at ¶ 101]. Mr. Mohamed asserts that it is "apparent" that Defendant Brush has "destroy[ed]" his materials. [*Id.* at ¶¶ 105-06].

If Mr. Mohamed's belongings were indeed destroyed by Defendant Brush, it is unclear whether the administrative grievance process could afford Plaintiff any relief. The administrative grievance process provides prospective injunctive relief, and if Plaintiff's belongings are indeed destroyed, the grievance process seemingly could do nothing to provide a remedy for the alleged

violation of Plaintiff's First Amendment rights. *Cf. Bistrian v. Levi*, 912 F.3d 79, 92 (3d Cir. 2018) (administrative grievance process was not an alternative remedy to address the beating of an inmate because it did not redress the harm, "which could only be remedied by money damages"); *Big Cats*, 843 F.3d at 862 (statute permitting administrative challenge to an adverse inspection report would not provide alternative relief where the plaintiff challenged an inspection based on an alleged violation of the constitutional right to be free from an unreasonable search); *Callahan*, 965 F.3d at 532 (Moore, J., dissenting) (opining that administrative remedy program was insufficient to remedy the loss of the plaintiff's painting, which could be remedied only by money damages). But if Plaintiff's belongings were, alternatively, "kept in storage," *see* [Doc. 64 at ¶ 98], it is possible that the BOP's grievance procedures could ensure the return of Plaintiff's items. *Cf. Louis-El v. Ebbert*, 448 F. Supp. 3d 428, 440 (M.D. Pa. 2020) (BOP grievance process could be utilized "to seek relief for the <u>withholding</u> of [the plaintiff's] personal property") (emphasis added).

Because the court must construe Mr. Mohamed's filings liberally, the court construes the Second Amended Complaint as asserting that Defendant Brush destroyed a significant portion of Mr. Mohamed's confiscated property and assumes, without deciding, that the BOP's administrative remedy cannot provide relief for this alleged constitutional violation. But even operating under this assumption, the court finds that Mr. Mohamed has an alternative remedy available in the form of an action filed under 31 U.S.C. § 3723.

Section 3723 of Title 31 of the United States Code permits small claims up to $1,000 "for damage to, or loss of, privately owned property" that is caused by the negligent acts of a federal officer. 31 U.S.C. § 3723(a). Thus, Mr. Mohamed could bring a claim under this statute challenging the destruction of his property at the hands of Defendant Brush. Courts across the

country have found that § 3723 provides an alternative remedy where an inmate has alleged that his personal property has been stolen or destroyed by federal officials.  *See, e.g.*, *Bossio v. Spaulding*, No. 4:20-cv-1777, 2021 WL 4123975, at *4 (M.D. Pa. Sept. 9, 2021); *White v. Sloop*, 2018 WL 6977336, at *3 (S.D. Ill. Aug. 31, 2018), *report and recommendation adopted sub nom. White v. Inch*, 2018 WL 6584899 (S.D. Ill. Dec. 14, 2018); *Adeyi v. FC Ft. Dix Health Servs.*, No. CIV. 09-5316 JBS/JS, 2012 WL 2076520, at *2 (D.N.J. June 7, 2012).[7]

While Mr. Mohamed asserts that § 3723 cannot constitute an alternative remedy because the statute "covers [only] up to $1000.00 and does not apply to most of [his] materials allegedly stolen or destroyed . . . because [it] requires [documentation] such as receipts of the stolen materials for the showing of the ownership," *see* [Doc. 83 at 3-4], "[t]hat a plaintiff might not be able to recover under these remedies the full amount the plaintiff could recover under a *Bivens*-type remedy is not determinative of the adequacy of the remedy."  *Ochoa v. Bratton*, No. 16-cv-2852 (JGK), 2017 WL 5900552, at *7 (S.D.N.Y. Nov. 28, 2017); *see also Minneci*, 565 U.S. at 129. Moreover, to the extent Plaintiff asserts that he sought a remedy under § 3723 and was unsuccessful, "[t]he fact that some alternative remedies . . . ultimately do not prove successful, is irrelevant."  *Bowman v. Sawyer*, No. 19-cv-01411-WJM-KMT, 2020 WL 7249089, at *7 (D. Colo. Aug. 31, 2020), *report and recommendation adopted*, 2020 WL 6390992 (D. Colo. Nov. 2, 2020) (citing *Ziglar*, 137 S. Ct. at 1865; *Vega v. United States*, 881 F.3d 1146, 1155 (9th Cir. 2018)).

---

[7] Other courts have also identified an alternative remedy in 31 U.S.C. § 3724, which allows the Attorney General of the United States to settle claims for losses of personal property caused by employees of the Department of Justice.  *See, e.g.*, *Bossio*, 2021 WL 4123975, at *4 (noting that BOP employees "likely" are covered by § 3724); *White*, 2018 WL 6977336, at *3; *Ochoa v. Bratton*, No. 16-cv-2852 (JGK), 2017 WL 5900552, at *7 (S.D.N.Y. Nov. 28, 2017).  Because this issue is not raised or briefed by the Parties, the court does not pass on whether § 3724 constitutes a second alternative remedy.

Thus, the fact that Mr. Mohamed's attempts to seek relief through § 3723 were unsuccessful does not mean that these alternative processes were not available to him.  *See id.*

"Courts owe substantial deference to the professional judgment of prison administrators, and absent concerns that prison inmates will be otherwise unable to redress their claims, courts should hesitate to create a new cause of action that may be brought against prison officials for monetary damages."  *Richardson v. United States*, No. CIV-18-763-D, 2019 WL 4038223, at *6 (W.D. Okla. June 28, 2019), *report and recommendation adopted*, 2019 WL 4017616 (W.D. Okla. Aug. 26, 2019).  And as set forth above, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation."  *Ziglar*, 137 S. Ct. at 1865.  In light of the alternative remedy available to Mr. Mohamed, which counsels against implying a *Bivens* remedy here, the court respectfully finds that an extension of *Bivens* is not appropriate here.  I therefore respectfully **RECOMMEND** that the First Motion to Dismiss be **GRANTED** insofar as it seeks dismissal of Claim Seven against Defendant Brush in his individual capacity and that such claim be **DISMISSED without prejudice**.  *See Sabbath v. Hicks*, No. 20-cv-00893-PAB-KMT, 2021 WL 1300602, at *3 (D. Colo. Feb. 19, 2021), *report and recommendation adopted*, 2021 WL 1015986 (D. Colo. Mar. 17, 2021) ("A *Bivens* action permits a person deprived of federal constitutional rights by a federal actor to maintain an action for monetary damages against that actor in an individual capacity."); *see also* [Doc. 64 at 30 (Mr. Mohamed requesting that the court "Award the damage against Brush for 1st. Amend violation (Claim 7, individual capacity).")].

## C.    Eighth Amendment Excessive Force Claims – Claims One, Three, and Five

Next, Defendants contend that Plaintiff's excessive force claims should be dismissed for lack of an available *Bivens* remedy.  [Doc. 71 at 6].  Defendants argue that this case presents a new context, wherein "an inmate stopped unexpectedly during an escort and was then subjected to a

use of force in order to bring him under control," where the inmate was "subsequently convicted by a Disciplinary Hearing Officer of attempted assault." [*Id.*].[8] Moreover, Defendants argue that Plaintiff has an alternative remedy under the prison grievance system, under the Federal Tort Claims Act ("FTCA"), and under the mandamus statute, 28 U.S.C. § 1361. [*Id.* at 7-8]. Mr. Mohamed disagrees, arguing that his claims "do[] not differ in [a] meaningful way from the previously decided" *Bivens* cases, and even if his excessive force claims do present a new context, there are no special factors counseling against recognizing a *Bivens* remedy here because he "sues individual officials who are not among executive branch, policy makers, nor does he challenge any formal policy." [Doc. 83 at 9]. Further, Mr. Mohamed asserts that the administrative grievance program is not a viable alternative remedy because he already completed that process and his grievance was denied, and he argues that the Supreme Court and the Tenth Circuit have "repeatedly rejected" an argument that the FTCA provides an alternative remedy. [*Id.* at 10].

### 1. New Context

Defendants first argue that this case presents a new context, arguing that even where, as here, a claim is asserted under the same constitutional provision under which a *Bivens* remedy has already been recognized, a claim may still arise in a new context if presented in different factual circumstances. [Doc. 71 at 6-7].

This court has previously discussed the propriety of a *Bivens* remedy for an excessive force claim under the Eighth Amendment in great detail. *See Smith v. Trujillo*, No. 20-cv-00877-RBJ-NYW, 2021 WL 1799400, at *4 (D. Colo. Mar. 26, 2021), *report and recommendation adopted*,

---

[8] The court notes that Mr. Mohamed consistently alleges in his Second Amended Complaint that he was not resisting and was complying with officers' orders, *see, e.g.*, [Doc. 64 at ¶¶ 25, 27, 30], and that his "conviction" of attempted assault was based on reports fabricated by certain Defendants. [*Id.* at ¶¶ 107-08]. The court takes these facts as true at the motion-to-dismiss stage, and thus, Defendants' framing of this context is not relevant to the court's *Bivens* analysis.

2021 WL 1608829 (D. Colo. Apr. 26, 2021). In *Smith*, the plaintiff alleged that he was physically assaulted by BOP officials while in federal custody and asserted a *Bivens* claim for a violation of his Eighth Amendment rights. *Id.* at *1-2. The court concluded that, in light of extensive precedent implicitly recognizing a *Bivens* claim challenging the use of excessive force, and because an Eighth Amendment excessive force claim is not materially different from an Eighth Amendment deliberate indifference claim, there was "no meaningful difference between the deliberate indifference claim in *Carlson* and [the] excessive force claim—both arising under the Eighth Amendment." *Id.* at *5. The court finds the same here.

First, the court is respectfully unpersuaded by Defendants' argument that this case presents a new context due to its "allegations that an inmate stopped unexpectedly during an escort and was then subjected to a use of force." *See* [Doc. 71 at 6]. Defendants do not clearly articulate why the factual allegations concerning the events immediately *preceding* the alleged use of force are material to this court's analysis, wherein the court must determine if a claim challenging the alleged excessive use of force presents a new context. *See* [*id.* at 6-7]; *see also Jacobs v. Alam*, 915 F.3d 1028, 1038 (6th Cir. 2019) ("In arguing plaintiff's *Bivens* claims are 'new,' defendants make much out of factual differences between *Bivens* . . . and this case. Yet at no point do defendants articulate why this case 'differ[s] in a meaningful way' under *Ziglar*'s rubric. Jacobs's action presents no such novel circumstances identified in *Ziglar*."); *Ziglar*, 137 S. Ct. at 1865 ("trivial" differences "will not suffice to create a new *Bivens* context").

Second, the absence of a Supreme Court, Tenth Circuit, or a published District of Colorado opinion extending a *Bivens* remedy to Eighth Amendment excessive force claims does not alone foreclose this court from doing so here. *See Lanuza v. Love*, 899 F.3d 1019, 1026-27 (9th Cir. 2018) (explaining that the Supreme Court in *Ziglar* did not broadly prohibit the extension of a

*Bivens* remedy to claims not already recognized under *Bivens* and its progeny, but rather that the court must consider the specific facts and claims presented in making its determination). Indeed, other Tenth Circuit cases—while not expressly passing on the issue of whether courts may extend *Bivens* to excessive force claims brought by inmates against federal actors—do not preclude such a cause of action. *See Jones v. Theodoroff*, 104 F. App'x 141, 143 (10th Cir. 2004) (affirming dismissal of a *Bivens* action arising from alleged excessive force brought by an inmate against federal correctional officers without passing on whether such a claim under *Bivens* is cognizable). And the Supreme Court has implicitly recognized that a prisoner can pursue a *Bivens* claim for failure to protect under the Eighth Amendment if prison officials know that the inmate faces a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it. *See Farmer v. Brennan*, 511 U.S. 825, 834-45 (1994). Similarly, in the context of § 1983 excessive force claims arising under the Fourth Amendment, the Supreme Court implicitly acknowledged the viability of a *Bivens* action. *See Graham v. Connor*, 490 U.S. 386, 394 n.9 (1989) (in articulating the applicable standard, acknowledging that "[t]he same analysis applies to excessive force claims brought against federal law enforcement and correctional officials under [*Bivens*].").

Third, although the court is mindful of the concerns regarding the separation of powers articulated by the Supreme Court in extending *Bivens* remedies to new contexts, *see Hernandez*, 140 S. Ct. at 742 (discussing the development of *Bivens* jurisprudence and reluctance to create new causes of action), this court disagrees with Defendants' suggestion that divergent legal theories or factual scenarios create a meaningful difference between Mr. Mohamed's excessive force claims and the deliberate indifference claim in *Carlson*. *Cf. Jacobs v. Alam*, 915 F.3d at 1038. As with *Carlson*, Mr. Mohamed's excessive force claim arises under the Eighth Amendment

Cruel and Unusual Punishment Clause, *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014), which places strict scrutiny on an inmate's treatment and conditions of confinement and not only requires the provision of adequate medical treatment, but also prohibits the use of excessive force.  *Contreras on behalf of A.L. v. Dona Ana Cty. Bd. of Cty. Comm'rs*, 965 F.3d 1114, 1116-17 (10th Cir. 2020) (Tymkovich, J., concurring).  Under either theory of a violation of the Eighth Amendment's prohibition of cruel and unusual punishment—deliberate indifference or excessive force—an inmate must establish both an objective and subjective component.  *See Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018) (outlining the two prongs of an excessive force claim as requiring a showing that the force "was objectively harmful enough to establish a constitutional violation" and done so "maliciously and sadistically for the very purpose of causing harm[.]"); *Wilson v. Falk*, 877 F.3d 1204, 1209 (10th Cir. 2017) (outlining the two prongs of a deliberate indifference claim as requiring a showing the defendant was "subjectively aware" of an objectively serious medical need and "recklessly disregarded that risk.").  Thus, as with *Carlson*, Mr. Mohamed's excessive force claim seeks damages based on the Eighth Amendment's proscription of prisoner mistreatment while within the custody of federal actors. *See Reid v. United States*, 825 F. App'x 442, 444 (9th Cir. 2020) (unpublished) (finding no meaningful difference between *Carlson* and the plaintiff's excessive force claim in concluding that *Bivens* includes an implied right of action for Eighth Amendment excessive force violations).

Nor does this court interpret *Ziglar* as precluding "run-of-the-mill challenges to 'standard law enforcement operations' that fall well within *Bivens* itself."  *Jacobs*, 915 F.3d at 1038; *cf. Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 708 (S.D.N.Y. 2020) (concluding that the plaintiff's Fourth Amendment excessive force claim did not arise in a "new context" because it was a basic challenge to standard law enforcement operations and there existed substantial judicial guidance

regarding the unconstitutionality of excessive force).  Indeed, "[a] claim for damages based on individualized mistreatment by rank-and-file federal officers is exactly what *Bivens* was meant to address," and recognizing an implied *Bivens* remedy for Eighth Amendment excessive force claims "will not require courts to plow new ground because there is extensive case law establishing conditions of confinement claims and the standard for circumstances that constitute cruel and unusual punishment." *Reid*, 825 F. App'x at 444-45; *accord Ullery v. Bradley*, 949 F.3d 1282, 1290 (10th Cir. 2020) ("The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment;" "among unnecessary and wanton inflictions of pain are those that are totally without penological justification." (internal quotations omitted)).

With this understanding, the court finds no meaningful difference between the deliberate indifference claim raised in *Carlson* and Mr. Mohamed's excessive force claims, which all arise under the Eighth Amendment.  Notably, the Tenth Circuit has permitted an Eighth Amendment conditions-of-confinement claim to proceed under *Bivens*.  *See Smith v. United States*, 561 F.3d 1090, 1103 (10th Cir. 2009); *see also Peraza v. Martinez*, No. 14-cv-03056-MJW, 2017 WL 11486456, at *4 (D. Colo. Nov. 29, 2017) ("Eighth Amendment *Bivens* claims have long been recognized by the Tenth Circuit.") (citing *Smith*, 561 F.3d 1090; *Big Cats*, 843 F.3d at 860).  In addition, it appears that the Tenth Circuit has recognized, at least implicitly, the extension of *Bivens* to a claim of excessive force arising in the Fourth Amendment context.  *See, e.g.*, *Holland*, 268 F.3d at 1195; *Serrano v. United States*, 766 F. App'x 561, 565-70 (10th Cir. 2019) (considering whether qualified immunity shielded a deputy United States Marshal from liability on the plaintiff's Fourth Amendment excessive force claim brought pursuant to *Bivens*); *Thomas v.*

*Durastanti,* 607 F.3d 655, 663 (10th Cir. 2010) (considering *Bivens* excessive force claim arising under the Fourth Amendment against federal agents).

"The Eighth Amendment protects against the imposition of cruel and usual punishment on a prisoner. That the cruel and unusual punishment takes the form of an allegedly brutal assault by a correctional officer on an inmate rather than another form of punishment should make no difference in the inmate's right to seek redress." *Smith,* 2021 WL 1608829, at *2. Indeed, to find that Mr. Mohamed cannot seek redress for the alleged constitutional violations here would allow individual federal officials to escape liability for the alleged unconstitutional use of force so long as officials provide adequate medical care afterwards—even with dire consequences. This court is not convinced that the Supreme Court, in cautioning against extending *Bivens* remedies to new contexts, intended for such a result. Accordingly, I find that the circumstances presented in the instant case do not present a new context for purposes of the *Bivens* analysis.

### 2.   Special Factors

Even if Mr. Mohamed's excessive force claim arose in a new context, the court finds no special factors counseling against extending a *Bivens* remedy here. Defendants assert that special factors weigh against recognizing a *Bivens* remedy for an Eighth Amendment excessive-force claim because (1) Mr. Mohamed has alternative processes available to seek redress in the form of the BOP's administrative grievance procedure, the FTCA, a suit for injunctive relief, or a suit under the mandamus statute, *see* 28 U.S.C. § 1361; and (2) separation-of-powers principles should preclude a *Bivens* remedy. [Doc. 71 at 7-8]. I respectfully disagree.

***First***, the court is not convinced that the BOP's administrative grievance program provides a remedy amounting to "more than nothing." *Big Cats,* 843 F.3d at 863. Plaintiff has alleged that he was beaten by BOP officials, and "[t]he administrative grievance process is not an alternative

because it does not redress [Mr. Mohamed's] harm, which could only be remedied by money damages." *Bistrian*, 912 F.3d at 92.  Indeed, similar to *Bivens*, when it comes to relief arising out of the alleged violation of Plaintiff's right to be free from excessive force, "it is damages or nothing." *Bivens*, 403 U.S. at 410 (Harlan, J., concurring).  While Defendants state that Plaintiff "can seek a remedy under the prison grievance system," they fail to identify what remedy Mr. Mohamed could obtain through the grievance process which would actually address the past alleged constitutional violation.  [Doc. 71 at 7]; *cf. Big Cats*, 843 F.3d at 862 (finding no alternative remedy where alleged remedy would not address the alleged constitutional violation).

*Second*, the court is not persuaded by Defendants' argument that the FTCA provides an adequate alternative remedy to preclude a *Bivens* claim here.   *See* [Doc. 71 at 7].  The FTCA provides a federal cause of action against the United States for torts arising under state law and requires courts to apply the substantive law of the state where the event occurred.  28 U.S.C. § 1346(b)(1).  As the Tenth Circuit has explained, the Supreme Court in *Carlson* held that the FTCA did not preclude a *Bivens* claim because the FTCA imposes liability on the United States, not individual federal actors, and thus does not have the same deterrent effect as a *Bivens* remedy. *Smith*, 561 F.3d at 1101.  This is because a *Bivens* claim allows for the possibility of punitive damages and a jury trial—neither of which is available under the FTCA.  *See id.*  Stated another way, the Supreme Court has said it is "crystal clear that Congress intended the FTCA and *Bivens* to serve as parallel and complementary sources of liability."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).

*Third*, while Defendants assert that Plaintiff can "seek injunctive relief," suggesting that this avenue could "prevent[] entities from acting unconstitutionally," and can "invoke the mandamus statute to [compel Defendants to] address [Plaintiff's] alleged injuries," *see* [Doc. 71

at 8], the court is again not convinced that these vehicles would provide any actual relief to Plaintiff with respect to the *alleged harms* arising out of the *alleged Eighth Amendment violation*. Prospective injunctive relief will simply not remedy the alleged harms previously inflicted on Plaintiff. *Cf. Bistrian*, 912 F.3d at 92 (finding that a habeas petition would not address harms arising out of physical attack "because it too gives no retrospective relief"). Moreover, while Defendants assert that the mandamus statute would permit Plaintiff to compel Defendants to "address his . . . injuries," the court is respectfully unable to ascertain how compelling Defendants to "address" Plaintiff's injuries would provide any actual relief to Plaintiff. As previously stated, "[w]hile there is no need for congruent remedies or even money damages to deny a *Bivens* remedy, there must be more than nothing." *Big Cats*, 843 F.3d at 862–63. While the court acknowledges that an alternative remedy need not be successful in order to be available, the court does find that an alternative remedy must provide *some potential* for relief in order to be "available." *See id.* In sum, the court finds that Defendants have not identified any alternative remedies that would counsel hesitation in extending a *Bivens* remedy to Mr. Mohamed's excessive force claims. *Cf. Reid*, 825 F. App'x at 445 (finding no special factors weighed against a *Bivens* remedy for the plaintiff's Eighth Amendment excessive force claim because the defendant failed to identify other alternative remedies).[9]

Additionally, this court is not convinced that extending a *Bivens* remedy to Mr. Mohamed's excessive force claims would interfere with the BOP's operation of its federal prisons. To be sure, courts are "mindful of the primary management role of prison officials who should be free from

---

[9] While Defendants cite non-binding cases reaching opposite conclusions, *see* [Doc. 71 at 7-8], the court respectfully declines to rely on these cases given the Tenth Circuit's directive that an alternative remedy must provide some sort of potential redress for the alleged constitutional violation. *See Big Cats*, 843 F.3d at 862–63.

second-guessing or micro-management from the federal courts." *Est. of DiMarco v. Wyo. Dep't of Corr., Div. of Prisons*, 473 F.3d 1334, 1342 (10th Cir. 2007).   But Mr. Mohamed's claims concern the conduct of individual federal actors—something *Bivens* set out to address.  *Reid*, 825 F. App'x at 444-45 ("A claim for damages based on individualized mistreatment by rank-and-file federal officers is exactly what *Bivens* was meant to address"); *cf. Smith*, 561 F.3d at 1101 (explaining that the FTCA is not an adequate alternative remedy to a *Bivens* claim because the FTCA lacks the same deterrent on an individual federal actor as *Bivens*).   Indeed, Mr. Mohamed seeks redress from Defendants Brush, Miller, and Espinoza in their individual capacities, and such cases, "due to their very nature[,] are difficult to address except by way of damages actions after the fact."  *Ziglar*, 137 S. Ct. at 1862 (categorizing such cases as "damages or nothing").

Moreover, the court cannot conclude that the alleged unconstitutional use of excessive force—the basis of Mr. Mohamed's claims—could readily be deemed part of the proper functioning of BOP facilities.  *See Cuevas v. United States*, No. 16-cv-00299-MSK-KMT, 2018 WL 1399910, at *4 (D. Colo. Mar. 19, 2018) (where there was there "law clearly establishing that the [challenged conduct] is unconstitutional," finding "no risk that this litigation will tread on complex matters of BOP policymaking."); *cf. Williams v. Baker*, 487 F. Supp. 3d 918, 925 (E.D. Cal. 2020) (finding no risk of interference in operation of prisons where "few legitimate objectives could be served by resisting deterrents to the alleged behavior."); *Sutter v. United States*, No. CV17-07245-SVW (DFM), 2019 WL 1841905, at *7 (C.D. Cal. Mar. 12, 2019) ("[E]xcessive force is a 'quintessential civil rights claim' that involves an individual instance of misconduct."); *Reid*, 825 F. App'x at 445 ("[W]e conclude that allowing Reid's [excessive-force] claims to proceed would not result in inappropriate judicial intrusion into [BOP] policy.").   Indeed, Defendants do not argue that these claims implicate any official BOP policy or necessary practice.

*See generally* [Doc. 71]; *see also Williams*, 487 F. Supp. 3d at 925 (finding "no reason to hesitate" where the plaintiff "challenge[d] no policy, nor even a pattern of behavior that could be construed as a policy" and  the "defendant identifie[d] no policy put at risk.").

Ultimately, Mr. Mohamed's excessive force claims are not the sort which implicate important BOP policies that counsel against extending a *Bivens* remedy.  *Cf. Ziglar*, 137 S. Ct. at 1860-62 (declining to extend a *Bivens* remedy where the plaintiffs sought to challenge the implementation of an executive policy regarding the confinement of inmates deemed a national security risk, because doing so raises the possibility of judicial interference into "matters committed to the other branches.").[10]  For all of these reasons, this court concludes that an implied right arising under the Eighth Amendment for excessive force claims is appropriate under *Bivens*.

### D.      Eighth Amendment Failure-to-Intervene Claims – Claims Two, Four, and Six

Finally, Defendants argue that Plaintiff's failure-to-intervene claims should be dismissed for lack of a *Bivens* remedy.  In so doing, they raise the same arguments directed to the excessive force claims, asserting that these claims present a new *Bivens* context and that special factors— including the availability of alternative remedies—counsel against recognizing a *Bivens* claim. *See* [Doc. 71 at 6-8].

#### 1.      New Context

First, Defendants argue that "allegations that officers failed to intervene to stop the use of force after an inmate stopped unexpectedly at his cell differ in meaningful ways from *Bivens*, *Carlson*, and *Green*," and for this reason, this case presents a new *Bivens* context.  [Doc. 71 at 7].

---

[10] In contrast to Plaintiff's First Amendment claim, where the confiscation of an inmate's materials may, in some circumstances, be for appropriate penological or safety purposes, the court cannot conclude that the alleged prolonged beating of a restrained, non-resisting inmate carries similar legitimate purposes.

In *Farmer*, the Supreme Court recognized that the Constitution does not permit inhumane prison conditions, holding that the Eighth Amendment's prohibition on cruel and unusual punishments imposes a duty on prison officials to "provide humane conditions of confinement," "ensure that inmates receive adequate food, clothing, shelter, and medical care," "take reasonable measures to guarantee the safety of the inmates," and "protect prisoners from violence at the hands of other prisoners."  511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *Cortes-Quinones v. Jiminez-Nettleship*, 842 F.2d 556, 558 (1988)).  Thus, a failure to intervene is one of several factual theories under which an Eighth Amendment claim may be brought.  *See Hooks v. Bethany Police Dep't*, No. CIV-17-658-M, 2018 WL 11266782, at *6 (W.D. Okla. Mar. 19, 2018), *report and recommendation adopted*, 2018 WL 11266754 (W.D. Okla. Apr. 16, 2018) ("The law is well established that failure to intervene in an inmate assault may sustain an Eighth Amendment failure to protect claim."); *cf. Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008) (a plaintiff need not plead a separate failure-to-intervene claim where the allegations are sufficiently clear to put the defendant on notice that the alleged constitutional violations were at least partly predicated on alleged failure to intervene).  Courts similarly  recognize that claimants may bring an Eighth Amendment excessive force claim based on a failure to protect the claimant from the violence of other inmates.  *See, e.g.*, *Pollis v. Bd. of Chosen Freeholders of Cty. of Sussex*, 523 F. App'x 187, 189 (3d Cir. 2013).

In *Bistrian*, the Third Circuit concluded that "an inmate's claim that prison officials violated his Fifth Amendment rights by failing to protect him against a known risk of substantial harm does not present a new *Bivens* context." 912 F.3d at 90.  In so ruling, the Third Circuit relied on *Farmer*, noting that although the *Farmer* Court "did not explicitly state that it was recognizing a *Bivens* claim, it not only vacated the grant of summary judgment in favor of the prison officials

but also discussed at length 'deliberate indifference' as the legal standard to assess a *Bivens* claim, the standard by which all subsequent prisoner safety claims have been assessed."  *Id.* at 90-91 (citing *Farmer*, 511 U.S. at 832-49).  Moreover, the Third Circuit found that, while *Ziglar* did not specifically identify *Farmer* as recognizing a *Bivens* cause of action, it would be improper to conclude that the Supreme Court overruled earlier precedent by implication, finding that the lack of direct reference to *Farmer* may be because "the Court simply viewed the failure-to-protect claim as not distinct from the Eighth Amendment deliberate indifference claim in the medical context." *Id.* at 91.

Other courts have similarly concluded, based on *Farmer* and *Carlson*, that a failure-to-protect claim did not present a new *Bivens* context.  *See, e.g.*, *Doty v. Hollingsworth*, No. CV 15-3016 (NLH), 2018 WL 1509082, at *3 (D.N.J. Mar. 27, 2018) ("The claim in *Carlson* involved deliberate indifference to a prisoner's medical needs, and the claim here involves deliberate indifference to a prisoner's safety, both of which use the same sort of deliberate indifference analysis and both of which arise under the Eighth Amendment's Cruel and Unusual Punishment Clause."); *Shorter v. United States*, 12 F.4th 366, 373 (3d Cir. 2021) (finding no meaningful difference between *Farmer* and the *Shorter* case, wherein plaintiff alleged a failure to protect from inmate violence, and holding that the case did not present a new *Bivens* context); *Shaw v. Humphries*, No. 20-cv-00327-RBJ-KMT, 2021 WL 4149626, at *5 (D. Colo. Sept. 13, 2021) ("I find that the duty of ADX staff with respect to protection of inmates from assaults by other inmates does not differ in a meaningful way from [*Farmer*]."); *Smith v. Shartle*, No. CV-18-00323-TUC-RCC, 2021 WL 842144, at *8 (D. Ariz. Mar. 5, 2021) ("Both *Carlson* and *Farmer* involved direct Eighth Amendment allegations against individual prison officials for their specific actions failing to protect an inmate from an ongoing safety threat.  In *Farmer*, that threat specifically came from

fellow inmates.  The Court believes Plaintiffs' [failure-to-protect] allegations in this case are equivalent.").

The court finds these cases persuasive in the context of Mr. Mohamed's Eighth Amendment claim based on a failure to intervene.  Notably, "[a] failure to intervene claim is essentially the same as a failure to protect claim, translated from a threat to an active situation." *Meskauskas v. Cowan*, No. 18-cv-1446-DWD, 2021 WL 2075863, at *4 (S.D. Ill. May 24, 2021). Indeed, the theories are readily interchangeable, generally differing only based on the source of the excessive force (i.e., other inmates or prison officials).  *See, e.g.*, *Harris v. City of New York*, No. 16-CV-1214 (PKC)(JO), 2018 WL 4471631, at *9 n.16 (E.D.N.Y. Sept. 18, 2018) ("Although Plaintiff pleads failure to intervene and failure to protect as separate causes of action, the Court construes them to be identical."); *Miller v. Boone*, No. 16-cv-00585-SMY, 2016 WL 4501818, at *2 (S.D. Ill. Aug. 29, 2016) ("The same legal standard applies to failure to protect and failure to intervene claims.").

The court sees no material distinction between the failure to protect an inmate from violence at the hands of another inmate and the failure to intervene in violence at the hands of a correctional officer for purposes of *Bivens*.  Both theories involve a prison official's alleged failure to "provide humane conditions of confinement," "take reasonable measures to guarantee the safety of the inmates," and "protect prisoners from violence."  *Farmer*, 511 U.S. at 832.  As set forth above, in *Farmer*, the Supreme Court discussed the standard for an Eighth Amendment claim based on a failure to intervene in the context of *Bivens*, stating that a "prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. A number of courts, even post-*Ziglar*, recognize *Farmer* as identifying an established *Bivens* context. *See, e.g.*, *Bistrian*, 912 F.3d at 90-91; *Garraway v. Cuifo*, No. 1:17-cv-00533-DAD-GSA (PC), 2020 WL 860028, at *2 (E.D. Cal. Feb. 21, 2020) ("Though the majority in *Abbasi* did not acknowledge that the Court had explicitly 'approved of an implied damages remedy' in *Farmer*, neither did it reject that it had recognized the availability of a *Bivens* remedy in the context presented by *Farmer*."); *Walker v. Schult*, 463 F. Supp. 3d 323, 330 (N.D.N.Y. 2020) ("This Court is not empowered to presume that simply because *Abbasi* does not reference *Farmer* that the case has been somehow impliedly overruled.").

At bottom, Mr. Mohamed alleges that his right to be free from cruel and unusual punishment was violated when Defendants Armijo, Murton, and Osagie failed to intervene when they witnessed other prison officials beating Plaintiff. For the reasons set forth above, the court does not find a meaningful difference between this Eighth Amendment claim and the one asserted in *Carlson*, which each challenge allegedly unconstitutional conditions of confinement. For all of these reasons, the court finds that the Eighth Amendment claims asserted on a failure-to-intervene theory do not present a due *Bivens* context.

### 2.  Special Factors

Notwithstanding the above conclusion, the court further concludes that even if the Eighth Amendment claims presented a new context, there are no special factors counseling against extending a *Bivens* remedy. As stated above, Defendants' *Bivens*-related arguments are identical with respect to all of Mr. Mohamed's Eighth Amendment claims, *see* [Doc. 71 at 6-8], and thus, as detailed above, Defendants argue that special factors caution hesitating in finding a *Bivens* remedy because (1) Plaintiff has alternative remedies in the form of the prison grievance system,

the FTCA, a claim for injunctive relief, or the mandamus statute, [*id.* at 7-8]; and (2) additional special factors counsel against a *Bivens* remedy, namely, separation-of-powers principles and the threat of interference with the proper functioning of BOP facilities.  [*Id.* at 4-5, 7-8].

The court has addressed these arguments above and finds them equally applicable here: the alternative remedies proposed by Defendants providing prospective injunctive relief would not actually provide any sort of relief to Mr. Mohamed for the alleged past harms inflicted upon him. *See Big Cats*, 843 F.3d at 862-63.  Moreover, a challenge to the allegedly unconstitutional failure to intervene does not create a "risk that this litigation will tread on complex matters of BOP policymaking."  *Cuevas*, 2018 WL 1399910, at *4; *Reid*, 825 F. App'x at 445.  For these reasons, the court finds that special factors do not caution against a *Bivens* remedy here, and concludes that a *Bivens* right exists for Mr. Mohamed's Eighth Amendment claims under this theory.

## III.   Qualified Immunity

In the alternative, Defendants argue that Defendant Osagie is entitled to qualified immunity on the Eighth Amendment claim based on a failure to intervene (Claim Six) and Defendants Jones, Huddleston, and Osagie are entitled to qualified immunity on the Eighth Amendment deliberate-indifference claims (Claims Eight, Nine, and Ten).  [Doc. 71 at 8, 10, 12].[11]

---

[11] Defendants do not appear to argue that qualified immunity applies to any Eighth Amendment claim based on excessive force should a *Bivens* remedy be recognized.  *See generally* [Doc. 71]. But Defendants do argue that Defendant Brush is entitled to qualified immunity on Claim Seven, Plaintiff's First Amendment claim.  *See* [*id.* at 8].  The court does not address this argument in detail, as qualified immunity applies only to individual-capacity claims seeking money damages, *see Bowman*, 2020 WL 6390992, at *8, and the court has already concluded that Mr. Mohamed does not have a viable *Bivens* claim against Defendant Brush with respect to his request for damages against Defendant Brush in his individual capacity.  *See supra* Section II.B.  The court has addressed the sufficiency of Plaintiff's allegations with respect to stating a claim for a constitutional violation, *see infra* Section IV.B.  If the presiding judge disagrees with this Recommendation with respect to a *Bivens* remedy for the alleged First Amendment violation, this court is prepared to issue a supplemental Recommendation addressing the second prong of the qualified immunity analysis.

The doctrine of qualified immunity protects government officials from individual liability for actions carried out while performing their official duties so long as their conduct does not violate clearly established constitutional or statutory rights. *Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). To facilitate the efficient administration of public services, the doctrine functions to protect government officials performing discretionary actions and acts as a "shield from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that "(1) the public official violated the plaintiff's constitutional rights; and (2) these rights were clearly established at the time of the alleged violation." *Big Cats*, 843 F.3d at 864.

A right is clearly established if there is a Supreme Court or Tenth Circuit decision on point or if the weight of authority in other courts provides that the right is clearly established. *Washington*, 847 F.3d at 1197 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted)); *DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001). The Second Amended Complaint need not contain all the necessary factual allegations to sustain a conclusion that Defendants violated clearly established law. *See Robbins*, 519 F.3d at 1249 (recognizing that a heightened pleading standard is not required). Rather, Plaintiff must satisfy only the minimum pleading requirements articulated in Twombly and discussed above. *Id.*

### A.      Eighth Amendment Failure to Intervene – Claim Six

With respect to the application of qualified immunity to Claim Six, Defendants first assert that Mr. Mohamed has failed to allege Defendant Osagie's personal participation in any failure to intervene—which the court construes as an assertion that Mr. Mohamed cannot plead facts

sufficient to establish the first prong of the qualified-immunity analysis, i.e., the existence of a constitutional violation as to him, "[b]ecause vicarious liability is inapplicable to *Bivens* [] suits, [so] a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. [Doc. 71 at 10-11]. In the alternative, Defendants contend that even if there was a constitutional violation, Mr. Mohamed's "conclusory allegations do not plausibly suggest that [Defendant] Osagie had 'fair and clear warning' that a failure to intervene in a constitutional violation that he did not personally observe would violate Plaintiff's constitutional rights." [*Id.* at 11]. The court addresses these arguments in turn.

### 1.    Personal Participation

"In this Circuit, an officer can be liable for a failure to intervene when he (1) observed a constitutional violation and (2) had a realistic opportunity to intervene." *Mullins v. City of Colo. Spring*s, No. 21-cv-00589-WJM-KMT, --- F. Supp. 3d. ----, 2021 WL 5919201, at *8 (D. Colo. Dec. 15, 2021) (citing *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015)). Defendants argue that Plaintiff's allegations are insufficient to allege that Defendant Osagie participated in a constitutional violation as an observer. [Doc. 71 at 11]. Namely, Defendants assert that, beyond Mr. Mohamed alleging that he heard Defendant Osagie asking if Mr. Mohamed was still resisting, and that Plaintiff called out to Defendant Osagie but received no response, Mr. Mohamed states no non-conclusory allegations that plausibly allege Defendant Osagie actually observed any constitutional violation. [*Id.* at 10-11]. According to Defendants, "all that can plausibly be inferred is that [Defendant] Osagie was standing near the observation cell and had been told that Plaintiff had been resisting." [*Id.* at 11].

The court respectfully disagrees.  Mr. Mohamed alleges that Defendant Osagie "witnessed the beatings against [him] and chose not to stop them."  [Doc. 64 at ¶ 76].  Plaintiff alleges that during the physical attack, he heard Defendant Osagie, "very close to where [he] was being beaten," asking whether Plaintiff was still resisting.  [*Id.*].  Mr. Mohamed states that he has known Defendant Osagie since 2002 and "his voice and accent are obviously identifiable to" Plaintiff. [*Id.* at ¶ 79].  Additionally, Plaintiff asserts that while he was being beaten in the observation cell, he was situated on a concrete bed that was "several feet high," from which Defendant Osagie "must have seen [Plaintiff] and the beatings very [easily] and without any efforts."  [*Id.* at ¶ 78].

Construing these allegations liberally and in favor of Plaintiff, the court finds these allegations sufficient, at the pleading stage, to allege that Defendant Osagie observed the alleged constitutional violation in such a manner that he personally failed to intervene.   While Mr. Mohamed does not specifically state that he saw Defendant Osagie witnessing the attack, he asserts that certain officers pushed his head and upper body down so as to prevent him from identifying who was on the scene.  *See* [Doc. 64 at ¶ 39 ("When I was on the ground and <u>then in the following beatings, to the end of the beatings in the observation cell</u> . . ., the officers always forced my upper body and head down. . .") (emphasis added).  *Cf. Bark v. Chacon*, No. 10-cv-1570-WYD-MJW, 2011 WL 1884691, at *5 (D. Colo. May 18, 2011) (holding that, in certain circumstances where a plaintiff alleges that the individual defendants all participated in a single incident and acted in concert together, it would be inequitable to require a plaintiff to articulate which specific defendant committed which specific act during the incident in question).

Moreover, the Tenth Circuit has instructed that an official may be liable for a failure to intervene where the official "observes or *has reason to know*" that a constitutional violation is being committed and fails to intercede.  *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th

Cir. 2008) (emphasis added) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  Here, Mr. Mohamed alleges that, while Defendant Osagie was "very close" to the cell, Mr. Mohamed called out to Defendant Osagie that he was not resisting, had never resisted, and asked if Defendant Osagie could see how he was being beaten.  [Doc. 64 at ¶¶ 76-78].  Thus, even if the allegations do not show that Defendant Osagie conclusively saw Mr. Mohamed being beaten, the Second Amended Complaint nevertheless alleges that Defendant Osagie was present at the scene and had reason to know that a constitutional violation was occurring.  *See Reid v. Wren*, 57 F.3d 1081 (10th Cir. 1995) ("These two officers were present and heard the conversation between plaintiff and Wade; yet they did not act to stop the allegedly unconstitutional action.") (emphasis added); *Pittman v. King*, No. 20-cv-03371-PAB-NRN, 2021 WL 2514629, at *7 (D. Colo. June 17, 2021), *report and recommendation adopted*, No. 20-cv-03371-RMR-NRN, ECF No. 68 (D. Colo. Jan 6, 2022) ("Here, Mr. Pittman alleges that Defendants Perez, Nixon, and Mahr were present at the scene, and it is plausible that they saw and heard what the officers were saying to each other and to Mr. Pittman.").

Taking these allegations as true, the court finds that a reasonable, plausible inference may be drawn from Plaintiff's allegations that either Defendant Osagie observed the use of force, *cf. Smith v. State Farm Fire and Casualty Co.*, No. 21-cv-00866-CMA-NYW, 2021 WL 5195326, at *6 (D. Colo. Nov. 9, 2021) ("[T]he *Twombly* plausibility standard, which applies to all civil actions . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where . . . the belief is based on factual information that makes the inference of culpability plausible.") (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2nd Cir. 2010)),[12] or had reason to

---

[12] The court respectfully disagrees with Defendants' suggestion that Plaintiff's allegations that Defendant Osagie was very close to the cell and, due to the relevant vantage point, "must have seen" the alleged constitutional violation, "is conclusory and not entitled to a presumption of truth."  *See* [Doc. 71 at 11].  Given Mr. Mohamed's allegations that his head was being forced

know of the constitutional violation but failed to intervene.  Because this is the only argument submitted by Defendants with respect to the existence of a constitutional violation, *see* [Doc. 71 at 10-11], the court turns to Defendants' argument as to the existence of clearly established law.

### 2.    Clearly Established Law

In the alternative, Defendants contend that Mr. Mohamed cannot show that Defendant Osagie violated clearly established law.  In so arguing, they simply state: "Plaintiff's conclusory allegations do not plausibly suggest that Osagie had 'fair and clear warning' that a failure to intervene in a constitutional violation that he did not personally observe would violate Plaintiff's constitutional rights."  [Doc. 71 at 11].  But as set forth above, Mr. Mohamed *has* sufficiently alleged that Defendant Osagie personally observed the use of force against Plaintiff, who was restrained and not resisting, or was otherwise contemporaneously aware of the alleged excessive use of force against Plaintiff at the time that the force was employed.  Thus, the court is respectfully unpersuaded by this argument.

Because Defendants' argument is based exclusively on their conclusion that Defendant Osagie "did not personally observe" the beatings—which arises from a too-narrow reading of the Second Amended Complaint—the court declines to address qualified immunity beyond the argument asserted in the First Motion to Dismiss.  While the plaintiff generally bears the burden to satisfy the two-prong qualified immunity test once the defendant has asserted the defense, *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015),  the court cannot conclude that Defendants' cursory argument, based on a factual framing rejected by the court, is sufficient to create that burden here. *See Halik v. Darbyshire*, No. 20-cv-01643-PAB-KMT, 2021 WL 4305011, at *4-*5 (D. Colo.

---

down such that he could not lift his head to see who might be witnessing the attack, and because no discovery has been conducted in this case, the court finds that Mr. Mohamed has sufficiently alleged non-conclusory facts which are entitled to the presumption of truth here.

Sept. 22, 2021) (explaining that the burden arises only when the qualified-immunity doctrine has been "adequately presented"); *see also Tillmon v. Cty. of Douglas*, No. 18-cv-00492-RBJ-KLM, 2019 WL 1375678, at *12 (D. Colo. Mar. 27, 2019) (where the defendants "offer[ed] no arguments and no law" to support a qualified-immunity defense, declining to rule on qualified immunity "without any briefing from defendants"), *aff'd*, 817 F. App'x 586 (10th Cir. 2020) (unpublished) (declining to address qualified immunity on appeal because the argument was not properly preserved for appeal, as the "analysis of qualified immunity in [the motion to dismiss] was cursory at best" and "consisted of a single paragraph briefly discussing the law of qualified immunity"). I am respectfully not persuaded that Defendants have invoked, at this juncture, a viable qualified-immunity defense. I therefore **RECOMMEND** that the First Motion to Dismiss be **DENIED** insofar as it seeks dismissal of Claim Six.[13]

## B.    Eighth Amendment Deliberate Indifference – Claims Eight, Nine, and Ten

Next, Defendants argue that Defendants Huddleston, Jones, and Osagie are entitled to qualified immunity against Plaintiff's Eighth Amendment claims alleging deliberate indifference to Plaintiff's serious medical needs. [Doc. 71 at 12]. The Eighth Amendment protects against the government's infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005); *see also Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985) ("Failure to provide adequate medical care is a violation of the Eighth Amendment if it is a result of deliberate indifference to a prisoner's serious medical needs."). To establish a prison official's

---

[13] Defendants do not argue that Claim Six should be dismissed for failure to state a claim. *See generally* [Doc. 71].

constitutional liability based on that official's deliberate indifference, a plaintiff must satisfy both objective and subjective components of the deliberate-indifference test. *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The objective component requires Plaintiff to allege objective facts that demonstrate that the constitutional deprivation was "sufficiently serious." *Mata*, 427 F.3d at 751 (citing *Farmer*, 511 U.S. at 834). The subjective component requires Plaintiff to sufficiently allege Defendants' culpable state of mind, i.e., to establish that Defendants Jones, Huddleston, and Osagie knew that Mr. Mohamed faced a substantial risk of harm, yet disregarded that risk. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted).

Deliberate indifference requires more than mere negligence. *Sealock*, 218 F.3d at 1211; *Est. of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016) (comparing the subjective component to recklessness in criminal law, where, to act recklessly, a person must "consciously disregard a substantial risk of serious harm."). Whether a defendant had the requisite knowledge of a substantial risk of serious harm may be inferred from circumstantial evidence, which may be satisfied upon a showing that the serious medical need was "obvious." *See DeSpain*, 264 F.3d at 975 (quotations and citations omitted).

Defendants argue that with respect to each of Mr. Mohamed's injuries, he has failed to sufficiently allege facts establishing an Eighth Amendment violation; specifically, they argue: (1) with respect to Mr. Mohamed's broken ankle, he has failed to plead facts showing a subjectively culpable mental state or an objectively serious medical need; (2) with respect to the alleged failure to treat Mr. Mohamed's pain, he has failed to establish the personal participation of the named Defendants or the requisite subjective mental stage; and (3) as to Mr. Mohamed's wrist and jaw injuries, Mr. Mohamed has not alleged "an objective deprivation resulting in the denial of

the 'minimal civilized measure of life's necessities.'" [Doc. 71 at 13-17 (quoting *Farmer*, 511 U.S. at 834)].   In addition, they assert that even if Plaintiff has sufficiently alleged a constitutional violation with respect to any of the above-referenced medical needs, Mr. Mohamed cannot show that the constitutional right at issue was clearly established at the time of the events in question. [*Id.* at 14, 16].   For these reasons, they argue that qualified immunity bars Plaintiff's deliberate indifference claims.   *See generally* [*id.*].

### 1.   The Violation of a Constitutional Right

Because Defendants Jones, Huddleston, and Osagie raise a defense of qualified immunity with respect to Plaintiff's deliberate indifference claims, Plaintiff must show that (1) these Defendants violated a constitutional right; and (2) the right was clearly established at the time of the violation.   *Puller*, 781 F.3d at 1196.   As set forth above, to sufficiently allege a violation of Mr. Mohamed's Eighth Amendment rights, he must allege both an objective component—that the medical need was sufficiently serious—and a subjective component—that Defendants knew that Mr. Mohamed faced a substantial risk of harm, and yet disregarded that risk.   *Mata*, 427 F.3d at 751; *Estelle*, 429 U.S. at 106.

#### a.   The Objective Component

First, Defendants argue that insofar as Mr. Mohamed's claim is based on his broken ankle, he has failed to allege that his medical need was sufficiently objectively serious.   [Doc. 71 at 14]. They contend that Mr. Mohamed "must allege that he suffered a serious harm as a result of any allegedly deficient treatment," and because "Plaintiff received the proper casting upon discovery of his ankle fracture, and his ankle healed," he cannot do so.   [*Id.*].

The court respectfully disagrees with Defendants' assertion.   While it is true that where a plaintiff asserts an Eighth Amendment claim based on a delay in treatment, the objective

component may be met by showing that the delay resulted in substantial harm, *see Vigil v. Laurence*, 524 F. Supp. 3d 1120, 1128 (D. Colo. 2021), a delay in treatment is not the only potential basis for a deliberate indifference claim; a plaintiff may also assert such a claim based on a serious medical need that "has been diagnosed as a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209. Here, Mr. Mohamed alleges in his Second Amended Complaint that when he was seen by Defendants after the attack, he complained that he was in excruciating pain, his ankle was significantly swollen, and he could not walk. [Doc. 64 at ¶ 131-32 (Defendant Jones); *id.* at ¶¶ 141-42 (Defendant Huddleston); *id.* at ¶¶ 151, 153 (Defendant Osagie)]. Courts have concluded that similar injuries to inmates constitute obvious, objectively serious medical needs. *See, e.g.*, *Kirkland v. O'Brien*, No. 12-cv-02083-WJM-KLM, 2014 WL 1224564, at *3 (D. Colo. Mar. 25, 2014) (finding objective prong satisfied where the plaintiff's "leg was injured, causing such pain that he was unable to walk, and was later diagnosed as a bone fracture likely to produce significant arthritis"); *Trujillo v. Mgmt. & Training Corp.*, No. CV 15-00544 WJ-SMV, 2016 WL 10538651, at *5 (D.N.M. Apr. 15, 2016) (broken hand that was "swollen and raised" and showed "obvious deformity" was sufficient to create a dispute of fact as to obviousness of medical need); *Escobar v. Reid*, 668 F. Supp. 2d 1260, 1299 (D. Colo. 2009) (where the plaintiff had severely swollen legs, was in severe pain, and could not walk, symptoms were so obvious that a lay person could recognize the need for medical attention). As such, I find that Mr. Mohamed has sufficiently alleged an objectively serious medical need.[14]

---

[14] Defendants do not argue that Plaintiff has failed to sufficiently allege an objectively serious medical need with respect to the alleged failure to treat his pain. [Doc. 71 at 15 n.12]. Additionally, due to this finding, the court declines to address Defendants' contention that Mr. Mohamed's wrist and jaw injuries do not constitute a sufficiently serious medical need.

### b.  The Subjective Component

Next, Defendants assert that Mr. Mohamed has failed to allege that they were subjectively indifferent to Mr. Mohamed's serious medical needs, i.e., that Defendants Jones, Huddleston, and Osagie knew of a substantial risk of harm to Mr. Mohamed and disregarded that risk.  With respect to the ankle fracture, they argue that while they did not "immediately recognize[]" the fracture, "it was ultimately diagnosed and treated with a split, followed by a hard cast . . ., and by providing Plaintiff a wheelchair."  [Doc. 71 at 13].  According to Defendants, even if their medical treatment was sub-par, it does not amount to unconstitutional deliberate indifference.  [*Id.*].  Further, they argue that Mr. Mohamed fails to allege a culpable state of mind with respect to the treatment of Plaintiff's pain, asserting that Mr. Mohamed's allegations reveal nothing more than a difference of opinion and that, when Mr. Mohamed ended his hunger strike—during which "pain medications may be legitimately refused," *see* [*id.* at 16]—"he was able to get pain medication from the commissary."  [*Id.* at 15].  In response, Plaintiff argues that (1) Defendant Jones refused Plaintiff's requests for pain medication, an x-ray, and a referral to a doctor, [Doc. 83 at 14]; (2) Defendant Huddleston witnessed obvious injuries but refused to provide treatment or even assess Plaintiff's injuries, [*id.* at 15]; and (3) Defendant Osagie knew that Plaintiff was injured and in pain but refused to assess his injuries or "help in any way."  [*Id.*].

Generally, a claimant cannot state a deliberate indifference claim solely due to a disagreement with the medical professional's exercise of medical judgment.  *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).  Indeed, "[t]he subjective part of the [deliberate indifference] test is not satisfied when a physician evaluates a patient's symptoms and provides care consistent with those symptoms, but still misdiagnoses the patient, . . . particularly where there is evidence of a good faith effort to treat and diagnose the condition."  *Oakley v. Phillips*, No. 15-cv-01004-

CMA, 2015 WL 5728734, at *7 (D. Colo. Sept. 30, 2015). Additionally, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999). However, the subjective prong may be met "if prison officials intentionally deny or delay access to medical care," *Redmond*, 882 F.3d at 940 (brackets and quotation omitted), or where a treatment decision is "significantly influenced by non-medical factors." *Delker v. Maass*, 843 F. Supp. 1390, 1401 (D. Or. 1994). With this framework in mind, the court considers Mr. Mohamed's allegations as to each individual Defendant.

**Defendant Huddleston**. Mr. Mohamed asserts that Defendant Huddleston performed a medical assessment on Plaintiff related to his hunger strike symptoms after the physical attack. [Doc. 64 at ¶ 141]. Although Defendant Huddleston witnessed Mr. Mohamed hobbling in "excruciating pain" with an obviously and substantially swollen ankle, heard Mr. Mohamed's complaints that he could not walk or sleep due to his pain, and received requests from Mr. Mohamed for pain medication, x-rays, ice, or a referral to a doctor, [*id.*], and knew that "force was used against" Plaintiff, [*id.* at ¶ 142], Defendant Huddleston refused to look at Plaintiff's injuries, informing Plaintiff that he was only there to perform a hunger-strike assessment and that "any treatment for your injuries that you want, that will come . . . after you come off your [hunger strike]. That's all we care about right now." [*Id.* at ¶ 141 (ellipses in original)].

The court finds that Mr. Mohamed has sufficiently alleged facts amounting to a conscious disregard of his serious medical needs on the part of Defendant Huddleston. To be sure, an inmate does not have a constitutional right to a particular course of treatment. *See Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006). Nor is a mere disagreement with treatment enough to demonstrate a medical provider's deliberate indifference, even if the rendered treatment is subpar.

*Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018).  But the allegations here go beyond a desire for a particular treatment or a disagreement with treatment.  First, Plaintiff alleges that Defendant Huddleston knew of Mr. Mohamed's excruciating pain and did nothing to abate it.  *See Medina v. Samuels*, No. 20-cv-01443-NYW, 2020 WL 7398772, at *6 (D. Colo. Dec. 17, 2020) (finding allegations were sufficient to allege deliberate indifference where the inmate's pain and discomfort were obvious to the defendant, but the defendant "did nothing to abate [her] continued complaints of pain and discomfort"); *Est. of Booker*, 745 F.3d at 431-32 (explaining that a defendant can be deliberately indifferent when the plaintiff's symptoms reveal an obvious need for treatment, especially when the defendant's training should alert her to the need for treatment); *Al-Turki v. Robinson*, 762 F.3d 1188, 1190 (10th Cir. 2014) (finding cognizable deliberate indifference claim based on the failure to evaluate and treat pain "for several hours").

Moreover, Plaintiff sufficiently alleges that the refusal to treat Plaintiff did *not* arise out of the exercise of medical opinion or judgment and, thus, raises allegations suggesting more than a mere disagreement in treatment.  Indeed, Mr. Mohamed alleges that Defendant Huddleston's refusal to treat Mr. Mohamed's obvious pain and symptoms arose not out of the Defendant's medical judgment or medical opinion, but out of an effort to induce Mr. Mohamed to cease his hunger strike.  [Doc. 64 at ¶ 141].  For this reason, the court finds Plaintiff has alleged sufficient facts demonstrating Defendant Huddleston's subjective deliberate indifference to a serious medical need.  *See Delker*, 843 F. Supp. at 1401; *Jackson v. Corizon Health Inc.*, No. 2:19-cv-13382-TGB, 2020 WL 3529542, at *3 (E.D. Mich. June 30, 2020) (allegations that medical treatment was denied for non-medical reasons were sufficiently allege deliberate indifference); *cf. Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266-67 (11th Cir. 2020) ("[R]esponding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even

to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'").[15]   For this same reason, the court is respectfully unpersuaded by Defendants' suggestion that, in the context of a hunger strike, the withholding of pain medication simply constitutes an exercise in medical judgment, *see* [Doc. 71 at 16]; here, Mr. Mohamed has sufficiently alleged that the refusal to provide pain medication was driven by non-medical motivations.   I find that Mr. Mohamed has sufficiently alleged that Defendant Huddleston was subjectively deliberately indifferent to his serious medical needs.

***Defendant Jones***.   Mr. Mohamed alleges that after he was physically attacked, Defendant Jones performed a "superficial" medical assessment of his injuries.   [Doc. 64 at ¶ 130].   During this assessment, Mr. Mohamed complained that he was in "substantial and excruciating pain all over [his] body, and especially [his] right ankle" and informed Defendant Jones that he believed his ankle was broken.   [*Id.* at ¶ 132].   At the time, Mr. Mohamed's right ankle was "obviously swollen."   [*Id.*].   Defendant Jones refused Mr. Mohamed's requests for an x-ray, pain medication, ice, and to see a doctor or the physician's assistant.   [*Id.*].   According to Plaintiff, Defendant Jones stated, "Mohamed, you must take your trays, this would be a lot easier if you eat."   [*Id.* at ¶ 133].   Plaintiff alleges that Defendant Jones "wanted to punish [him]" for his hunger strike, [*id.* at ¶ 136], and that Defendant Jones knew that he was in pain and that his ankle was swollen, that Plaintiff

---

[15] For this same reason, the court is respectfully unpersuaded by Defendants' suggestion that, in the context of a hunger strike, the withholding of pain medication simply constitutes an exercise in medical judgment, *see* [Doc. 71 at 16]; here, Mr. Mohamed has sufficiently alleged that the refusal to provide pain medication was driven by non-medical motivations.  And in any event, the court finds this argument is better suited for summary judgment.  *Postawko v. Mo. Dep't of Corr.*, No. 2:16-cv-04219-NKL, 2017 WL 1968317, at *9 (W.D. Mo. May 11, 2017) ("[W]hether the medical 'care' Plaintiffs receive is constitutionally adequate is a merits issue and accordingly, a determination more appropriate for summary judgment or trial, not a motion to dismiss.").

could not sleep, pray, or walk, and yet Defendant Jones refused to provide any ice, medication, or an x-ray, telling Plaintiff that staff would examine him once he ate. [*Id.* at ¶ 137].

For the reasons set forth above, these allegations, liberally construed, are sufficient to allege that Defendant Jones consciously disregarded Mr. Mohamed's serious medical needs: with knowledge that Mr. Mohamed was in extreme pain and could not walk or sleep, Defendant Jones refused to treat Mr. Mohamed's pain or examine him based not on medical judgment, but based on Plaintiff's continued hunger strike. [*Id.* at ¶¶ 132, 136-37]. This is sufficient, at the pleading stage, to state a claim of Eighth Amendment deliberate indifference. *Jackson*, 2020 WL 3529542, at *3.

***Defendant Osagie***. Finally, with respect to Defendant Osagie, Plaintiff asserts that he witnessed Plaintiff's obviously and substantially swollen ankle, observed Plaintiff's "crying-in-pain face," and heard Plaintiff's complaints of "excruciating and substantial pains [in his] ankle, wrists, jaws and other areas of [his] body" and that Plaintiff could not walk, pray, or sleep due to the pain. [Doc. 64 at ¶ 146]. But Defendant Osagie refused to look at Plaintiff's injuries, electing to only perform a hunger strike assessment, telling Plaintiff that "everything will be [alright] if you eat." [*Id.*]. In addition, Defendant Osagie denied Plaintiff's requests for pain medication, x-rays, or ice "even though [Plaintiff's] ankle . . . was almost swollen to 90% of an orange size." [*Id.* at ¶ 149]. Because Mr. Mohamed has sufficiently alleged that Defendant Osagie refused to treat Mr. Mohamed's pain for non-medical reasons, I conclude that Plaintiff has met the requirements of the subjective prong of a deliberate-indifference claim. *Jackson*, 2020 WL 3529542, at *3.[16]

---

[16] Defendants alternatively argue that Plaintiff has failed to plead facts showing the personal participation of Defendants Huddleston, Jones, or Osagie insofar as "his requests for pain medication were not filled by the commissary during his hunger strike" because "Plaintiff has not alleged that Jones, Huddleston, or Osagie were responsible for any decision to not allow him to obtain medication from the commissary." [Doc. 71 at 14-15]. The court does not pass on this argument. Even if Defendants are correct that Mr. Mohamed's allegations do not tie these

## 2.   Clearly Established Law

In the alternative, Defendants argue that even if Mr. Mohamed has sufficiently alleged a constitutional violation, "[t]here is no clearly established law demonstrating that every reasonable officer would have known, beyond debate, that the management of Plaintiff's complaints of pain amounted to a constitutional violation" and that there is "no precedent finding that prison medical providers violate the Constitution when they examine an inmate, order and review x-rays, and confer with an outside orthopedic specialist about the course of care to be administered." [Doc. 71 at 14, 16].

Consideration of a qualified immunity defense includes not only whether the defendant violated a constitutional right, but whether that constitutional right was clearly established at the time of the alleged violation. *Puller*, 781 F.3d at 1196. "For a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013) (brackets, citation, and internal quotation marks omitted). The purpose of the clearly established prong is to establish that a prison official had sufficient notice such that he knows, or should know, what conduct will violate a constitutional right. *See Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2012). This is a particularized, fact-specific analysis, as it presents an inquiry into whether a reasonable official would have known, under the then-prevailing conditions, that his conduct violated the plaintiff's rights, and thus a court must take care not to define the right in too general of terms. *Leiser v. Moore*, 903 F.3d 1137, 1140 (10th Cir. 2018). Although a "precise factual correlation between the then-existing law and the case at hand" is not

---

Defendants to the denial of commissary medication, this does not change the fact that Mr. Mohamed has sufficiently alleged that each of these Defendants denied him pain medication when directly requested by Plaintiff. [Doc. 64 at ¶¶ 132, 141, 146].

necessary, *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir. 1992) (citation and internal quotation marks omitted), "there must be a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Duncan v. Gunter*, 15 F.3d 989, 992 (10th Cir. 1994) (quotation omitted).

But a plaintiff need not provide case law that is factually identical to its case if the constitutional violation is "obviously egregious . . . in light of prevailing constitutional principles," *A.M. v. Holmes*, 830 F.3d 1123, 1135-36 (10th Cir. 2016), and the Tenth Circuit has noted that a defendant may be on notice that certain conduct violates clearly established law even in novel factual circumstances. *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). At bottom, "[t]he clearly-established inquiry focuses on whether the contours of the constitutional right were so well-settled in the context of the particular circumstances that a 'reasonable official would have understood that what he is doing violates that right.'" *Est. of Carrigan v. Park Cty. Sheriff's Off.*, 381 F. Supp. 3d 1316, 1327 (D. Colo. 2019) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)).

Defendants frame the relevant issue as a question of whether there is "precedent finding that prison medical providers violate the Constitution when they examine an inmate, order and review x-rays, and confer with an outside orthopedic specialist about the course of care to be administered" or whether "every reasonable officer would have known, beyond debate, that the management of Plaintiff's complaints of pain amounted to a constitutional violation." [Doc. 71 at 14]. The court respectfully disagrees that such an approach is appropriate here. *Accord Est. of Kowalski v. Shrader*, No. 21-cv-00827-NYW, 2022 WL 19422, at *12 (D. Colo. Jan. 3, 2022) ("While the court must not define a constitutional right too generally, . . . it must also take care to not define the constitutional right too narrowly."). "[O]fficials can still be on notice that their

conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  "And in some cases, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.'" *Stewart*, 701 F.3d at 1330 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

In *Al-Turki*, 762 F.3d 1188, the Tenth Circuit addressed a similar argument to the one raised by Defendants here.  In that case, the defendant argued that it was not clearly established that her decision to ignore the plaintiff's complaints of pain could amount to a constitutional violation because "previous Tenth Circuit cases upholding deliberate indifference claims all involved longer periods of pain and more serious underlying health conditions than the five hours of pain" experienced by the plaintiff.  *Id.* at 1194.  The Tenth Circuit rejected this argument.  Specifically, it concluded: "A medical professional may not ignore an inmate's complaints of severe pain and then escape liability because later-discovered facts about the actual cause and ultimate duration of the inmate's pain, while serious enough to give rise to an Eighth Amendment claim, do not precisely correspond with the facts of previous Tenth Circuit cases."  *Id.* at 1194-95.  Similarly here, at this juncture, Defendants Jones, Huddleston, and Osagie cannot escape liability for their failure to treat Plaintiff's pain because he was eventually given pain medication and because they eventually treated Plaintiff's ankle fracture.  *See id.* at 1195 ("Taking the facts in the light most favorable to Plaintiff, Defendant violated clearly established law by choosing to ignore Plaintiff's repeated complaints of severe abdominal pain and requests for medical assistance.").

Tenth Circuit case law consistently instructs that "when [an inmate] has obvious and serious medical needs, ignoring those needs necessarily violates the [inmate's] constitutional rights."  *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020); *see*

*also Vigil v. Raemish*, No. 18-cv-01499-WJM-NRN, 2019 WL 1429281, at \*7 (D. Colo. Mar. 29, 2019), *report and recommendation accepted*, ECF No. 65 ("It cannot be questioned that the government has an obligation to provide medical care for the incarcerated.").  These constitutional principles have been clearly established in the Tenth Circuit for quite some time.  *See, e.g.*, *Al-Turki*, 763 F.3d at 1195; *Patterson v. Santini*, No. 11-cv-01899-RM-KLM, 2016 WL 11642452, at \*5 (D. Colo. Nov. 28, 2016) ("[In 2012] it was clearly established that a prison official's decision to ignore a prisoner's repeated complaints of severe pain, or requests for medical treatment, meet this [unconstitutional] threshold."); *cf. Savage v. Troutt*, No. CIV-15-670-HE, 2016 WL 8711398, at \*9 (W.D. Okla. Aug. 12, 2016), *report and recommendation adopted as modified*, 2016 WL 5107068 (W.D. Okla. Sept. 20, 2016), *aff'd*, 780 F. App'x 574 (10th Cir. 2019) ("In 2015, any reasonable prison doctor in this circuit would have known that he could not simply ignore Plaintiff's repeated complaints of severe, persistent constipation and abdominal pain, particularly when those complaints were supposed by a specialist's recommendations."); *cf. Est. of Booker*, 745 F.3d at 433 (holding that the "right to timely medical care" was clearly established in 2010).

In light of the robust case law establishing that the denial of treatment to an inmate with an obviously serious medical need may violate that inmate's constitutional rights, the court finds that it was clearly established in 2018—the year in which the relevant conduct allegedly occurred— that the denial of medical treatment to Plaintiff in an effort to induce him to end his hunger strike may violate his clearly established rights.  Accordingly, the court finds that qualified immunity does not bar Plaintiff's Claims Eight, Nine, and Ten and thus, respectfully **RECOMMENDS** that the First Motion to Dismiss be **DENIED** as to these claims brought against the Defendants in their respective individual capacities.

## IV.    Failure to State a Claim

Finally, Defendants argue that some of Mr. Mohamed's official-capacity claims should be dismissed for failure to state a claim.  *See* [Doc. 71 at 17].

### A.    Eighth Amendment Deliberate Indifference – Claims Eight, Nine, and Ten

Defendants argue that "Plaintiff's failure to allege deliberate indifference . . . requires dismissal of his [Eighth Amendment deliberate indifference] official-capacity claims" against Defendants Jones, Huddleston, and Osagie.  [Doc. 71 at 17].  Beyond this bare statement, Defendant offer no arguments in addition to those raised with respect to the application of qualified immunity, which the court has declined to adopt.  *See* [*id.*].  Because the court has concluded that Mr. Mohamed does sufficiently state Eighth Amendment claims against these Defendants, the court does not find that dismissal is warranted.  Accordingly, I respectfully **RECOMMEND** that the First Motion to Dismiss be **DENIED** insofar as it seeks dismissal of Plaintiff's Claims Eight, Nine, and Ten brought against Defendants in their official capacities.[17]

### B.    First Amendment – Claim Seven

Defendants next assert that Mr. Mohamed has failed to state a First Amendment claim under Rule 12(b)(6) and thus, the official-capacity claim against Defendant Brush should be dismissed.  [Doc. 71 at 10].[18]   Defendants argue that Mr. Mohamed has failed to plausibly allege

---

[17] Defendants also argue that "[t]o the extent Plaintiff may seek money damages for his official-capacity claims, such damages are not available," citing *Matthews v. Wiley*, 744 F Supp. 2d 1159 (D. Colo. 2010).  [Doc. 71 at 17].  Even construing Plaintiff's Second Amended Complaint liberally, the court concludes that Mr. Mohamed does not seek money damages for the official capacity claims against Defendants Huddleston, Jones, or Osagie.  *See* [Doc. 64 at 3, 30].

[18] The court has already concluded that no *Bivens* remedy exists for the alleged First Amendment violation.  *See supra* Section II.B.  However, *Bivens* applies only to individual-capacity claims seeking money damages, and Mr. Mohamed purports to assert a claim for injunctive relief against Defendant Brush in his official capacity.  *See* [Doc. 64 at 30 (requestion an injunction "ordering Brush (claim 7, offic. capacity) to immediately locate the material[s] he confiscated from my cell, and submit them to me")].  "[A]lthough '*Bivens* suits are limited to damages, . . . equitable relief

a violation of his First Amendment rights because he has not pled facts showing that the alleged conduct was not reasonably related to a legitimate penological interest.  [Doc. 71 at 8-10].

As a preliminary matter, the court notes that Mr. Mohamed does not expressly invoke any particular theory of relief in asserting his First Amendment claim.  Generally, he asserts that Defendant Brush violated his First Amendment rights when he removed and destroyed Mr. Mohamed's written materials, including writings on religious topics.  *See* [Doc. 64 at ¶¶ 86-95]. Liberally construing Mr. Mohamed's Second Amended Complaint, the court finds his allegations could be construed as asserting First Amendment claims for a violation of the right to free speech, *see Sabbath v. Hicks*, No. 20-cv-00893-PAB-KMT, 2021 WL 1300602, at *6 (D. Colo. Feb. 19, 2021), *report and recommendation adopted*, 2021 WL 1015986 (D. Colo. Mar. 17, 2021) (analyzing First Amendment free speech claim where the plaintiff alleged that religious books and notes were removed from his cell); a violation of the right to freely exercise his religion, *see Neal v. Lewis*, 325 F. Supp. 2d 1231, 1236 (D. Kan. 2004), *aff'd*, 414 F.3d 1244 (10th Cir. 2005) (analyzing First Amendment free exercise claim where the plaintiff alleged his rights were infringed by the removal of religious texts from his cell); or First Amendment retaliation, *see*

is available in the nature of injunction and/or mandamus under 28 U.S.C. §§ 1331 and/or 1361." *Gess v. USMS*, No. 20-cv-01790-PAB-STV, 2020 WL 8838280, at *11 (D. Colo. Dec. 10, 2020), *report and recommendation adopted in relevant part sub nom. Gess v. USMS & 10th Cir. Dist. Ct.*, 2021 WL 423436 (D. Colo. Feb. 5, 2021); *see also Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231 (10th Cir. 2005) ("Federal courts have long exercised the traditional powers of equity, in cases within their jurisdiction, to prevent violations of constitutional rights.").  In his Second Amended Complaint, Mr. Mohamed stations that this court has jurisdiction under, *inter alia*, 28 U.S.C. § 1331.  *See* [Doc. 64 at 4].  For these reasons, and because Defendants do not seek dismissal of Claim Seven under Rule 12(b)(1), *see* [Doc. 71 at 10], the court proceeds in analyzing the sufficiency of Plaintiff's First Amendment claim, only insofar as Mr. Mohamed seeks injunctive relief against Defendant Brush in his official capacity.

*Rocha v. Zavaras*, No. 10-cv-00357-CMA-MEH, 2011 WL 1158003, at *5 (D. Colo. Feb. 23, 2011), *report and recommendation adopted*, 2011 WL 1154636 (D. Colo. Mar. 29, 2011).[19]

However, the lack of specificity in the Second Amended Complaint does not hinder the court's analysis, because regardless of the theory furthered by Plaintiff, he nevertheless must allege facts showing that the challenged action is not reasonably related to a legitimate penological interest. *See Sabbath*, 2021 WL 1300602, at *5, *6 (noting that a plaintiff must allege a lack of legitimate penological interest for both a free exercise and a free speech claim); *Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018) ("[C]laims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule.").

Defendants' argument is premised on a prison policy which "limits inmates to a maximum of eight books and two personal compositions," not exceeding one cubic foot of material. [Doc. 71 at 9 (citing [Doc. 71-2 at 3, 9])].[20] Defendants state that the allegations "demonstrate that Plaintiff's materials far exceeded these limits," and thus, he has not set forth allegations suggesting that the removal of materials from his cell was not related to a penological purpose. [*Id.* at 9-10].

---

[19] Defendants assert in their Reply to the First Motion to Dismiss that, in his Response, Mr. Mohamed "attempts to re-cast his freedom of speech claim as a First Amendment retaliation claim by relying on allegations that were not included in the Second Amended Complaint." [Doc. 89 at 7]. The court respectfully disagrees. In the Second Amended Complaint, Mr. Mohamed alleges that after Defendant Brush confiscated his property, he was later informed by a correctional counselor that his materials would not be returned until Plaintiff ended his hunger strike. [Doc. 64 at ¶ 98]. Construing Plaintiff's allegations liberally, the court finds that Mr. Mohamed has sufficiently invoked a retaliation theory in the Second Amended Complaint, asserting that Defendant Brush confiscated his materials in retaliation for Mr. Mohamed's hunger strike. And while Defendants do not argue that a hunger strike is not a protected activity and the issue is not before the court, the court simply notes that some courts have held that a hunger strike is a protected activity, although courts appear divided on this issue. *See Dumbrique v. Brunner*, No. 14-cv-02598-HSG, 2016 WL 3268875, at *15 (N.D. Cal. June 15, 2016) (citing cases).

[20] The court may take judicial notice of BOP policies, *Bowman*, 2020 WL 7249089, at *10 n.4, and matters subject to judicial notice may be considered at the motion-to-dismiss stage. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

In response, Mr. Mohamed argues that he has sufficiently alleged facts showing that Defendant Brush "lacked any legitimate penological objective when [he] confiscated the materials" because "several staff . . . told Plaintiff that Brush lacked any rational reason in removing the materials." [Doc. 83 at 5 (citing [Doc. 64 at ¶ 105])].

The court respectfully disagrees with Plaintiff that the Second Amended Complaint contains allegations sufficient to allege that Defendant Brush lacked a legitimate penological interest in removing the items from Plaintiff's cell. The Supreme Court and the Tenth Circuit have each acknowledged that restrictions that may "raise grave First Amendment concerns outside the prison context" may be permissible within a prison. *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010) (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)). Thus, to determine whether a prison restriction is constitutional, a court must determine not "only whether the restriction impinges on a constitutional right, but also whether the restriction is 'reasonably related to legitimate penological interests' given the unique security and administrative challenges that operating a prison presents." *Sabbath*, 2021 WL 1300602, at *4 (quoting *Gee*, 627 F.3d at 1187). "The burden is on the prisoner to disprove the validity of the prison regulations at issue." *Toevs v. Reid*, No. 06-cv-01620-CBS-KMT, 2009 WL 598258, at *11 (D. Colo. Mar. 6, 2009). Relevant here, the Tenth Circuit has ruled that a defendant "[does] not violate [an inmate's] First Amendment rights simply by enforcing a prison regulation limiting the number of books he could keep in his cell," particularly in light of "the prison's legitimate administrative and penological objectives, including fire safety, institutional security, [and] control of the source and flow of property within the prison." *Neal v. Lewis*, 414 F.3d 1244, 1248 (10th Cir. 2005).

Here, Mr. Mohamed alleges that Defendant Brush removed several of his written materials, including twelve notebooks, two "large" manuscripts, a third manuscript that was 550 pages in

length, his "shorter works" and notes, and six books.  [Doc. 64 at ¶¶ 88-94].  However, Mr. Mohamed also alleges that several of his materials were returned to him, including two volumes of the Arabic Bible, an English dictionary, and "[three] or [four] religious books."  [*Id.* at ¶ 101]. Defendants argue that the removal of these items was pursuant to a BOP policy, which limits the number and size of inmates' personal compositions, manuscripts, and books.  *See* [Doc. 71-2 at 3, 9].

Mr. Mohamed does not allege facts showing that Defendant Brush's removal of his items exceeded the bounds of or failed to comply with this BOP policy, so as to suggest that the removal was not related to a legitimate penological purpose.  *Compare Sabbath*, 2021 WL 1300602, at *6 (where the plaintiff alleged that the defendant removed his books from his cell, "falsely claiming the religious property . . . belonged to another inmate and was nuisance contraband," finding that the plaintiff had stated a First Amendment claim where the applicable BOP policy "[did] not allow a defendant to *falsely claim* materials are contraband in order to remove the materials from a prisoner's cell, as Plaintiff alleges.") (emphasis in original).  At best, Mr. Mohamed alleges that "several [BOP] staff" told Plaintiff that Defendant Brush "lacked any rational reason" to remove his items, including "the case manager who led the shakedown of [his] cell."  [Doc. 64 at ¶ 105]. He states that the case manager "saw the materials but did not touch[] them, because [they] posed no threat, and there was no legitimate [penological] interest in confiscating them."  [*Id.*].  But Mr. Mohamed does not specifically identify any of these staff members or allege facts supporting an inference of a retaliatory motive on the part of Defendant Brush.  *See generally* [*id.*].  Indeed, Mr. Mohamed's allegations, construed liberally, suggest only that the unnamed staff member personally believed the materials "posed no threat"—not that *Defendant Brush* acted outside of the BOP policy or in the absence of a legitimate penological purpose.  [*Id.*].  The court cannot

conclude that Mr. Mohamed has sufficiently alleged facts supporting an inference that Defendant Brush lacked a legitimate penological purpose in removing the materials from Plaintiff's cell. *Cf. Toevs*, 2009 WL 598258, at *11 (concluding that the plaintiff failed to state a First Amendment claim based on a limitation of the number of books and magazines he was permitted where the plaintiff had failed to allege facts showing that the limitation was not related to a legitimate penological purpose).

While the court must construe Mr. Mohamed's allegations liberally, the court "may not assume that [he] can prove facts that he has not alleged." *Mostafa v. Barr*, No. 20-cv-00694-PAB-NYW, 2021 WL 330167, at *1 n.1 (D. Colo. Jan. 30, 2021). To state a claim, Mr. Mohamed must "plead facts from which a *plausible inference* can be drawn that the [challenged] action was not reasonably related to a legitimate penological interest." *Gee*, 627 F.3d at 1188 (emphasis added). Here, the court respectfully finds that the Second Amended Complaint lacks factual allegations to create such a plausible inference, and for this reason, the court concludes that Mr. Mohamed has failed to state a First Amendment Claim. The court thus respectfully **RECOMMENDS** that Plaintiff's First Amendment claim against Defendant Brush in his official capacity be **DISMISSED without prejudice** for failure to state a claim.[21]

---

[21] Dismissal without prejudice to allow amendment of the complaint is appropriate where the plaintiff is "close to stating a claim but [is] missing some element that may not have occurred to him." *Gee*, 627 F.3d at 1195; *see also Reynoldson v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990) ("If it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief, the court should dismiss with leave to amend."). Given the length of time this action has been pending and the number of amendments already permitted, and because there is presently no request by Plaintiff to amend his Second Amended Complaint or any articulation of proposed amendments, the court declines to preemptively recommend that Mr. Mohamed be granted leave to amend, reserving the issue of whether to *sua sponte* grant leave or to require a motion to amend for the presiding judge.

## V.     Negligent Supervision Under the FTCA – Claim Fourteen

Next, Defendants seek dismissal of Mr. Mohamed's negligent supervision claim, which arises under the FTCA.  [Doc. 71 at 17].  Generally, sovereign immunity shields the United States and its agencies from suit and deprives federal courts of jurisdiction to consider such claims.  *San Juan Cty. v. United States*, 754 F.3d 787, 792 (10th Cir. 2014).  This is so unless "Congress unequivocally expresses its intention to waive the government's sovereign immunity in the statutory text."  *Governor of Kan. v. Kempthorne*, 516 F.3d 833, 841 (10th Cir. 2008) (internal quotation marks omitted).  The FTCA is one such statute, and "provides a limited waiver of sovereign immunity" when the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment" would establish liability for a private person under the laws where the conduct occurred.  *Ball v. United States*, 967 F.3d 1072, 1075 (10th Cir. 2020) (citing 28 U.S.C. § 1346(b)).

The FTCA requires a plaintiff to exhaust his administrative remedies as a jurisdictional precedent to suit.  *Duplan v. Harper*, 188 F.3d 1195, 1199 (10th Cir. 1999) ("As a jurisdictional prerequisite, the FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies.").  To do so, a plaintiff must provide (1) a written notice of the claim and alleged injury to the appropriate federal agency, with (2) a sum certain damages.  *Est. of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 852 (10th Cir. 2005) (explaining that the "notice requirements established by the FTCA must be strictly construed.").  A claim is properly presented to a federal agency if it "serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct."  *Staggs v. United States*, 425 F.3d 881, 884 (10th Cir. 2005) (quotation omitted).  But a "statement of legal theories" is not required, and the "claim" asserted "encompasses any cause of action fairly implicit in the facts."  *Lopez v. United*

*States*, 823 F.3d 970, 976 (10th Cir. 2016) (quoting *Murrey v. United States*, 73 F.3d 1448, 1452 (7th Cir. 1996)).

Because the exhaustion requirement is jurisdictional, it cannot be waived, and it "bars would-be tort plaintiffs from bringing suit against the government unless the claimant has previously submitted a claim for damages to the offending agency, because Congress wants agencies to have an opportunity to settle disputes before defending against litigation in court." *Id.* (internal quotations omitted).

Here, Defendants argue that Plaintiff failed to exhaust his administrative remedies because the administrative claim provided to whomever lacked "critical facts related to [his] claim." [Doc. 71 at 18].  More specifically, Defendants assert that, while the administrative claim includes allegations that Mr. Mohamed was beaten and denied adequate medical treatment, the claim "makes no mention of the possibility that either the alleged beatings or Plaintiff's injuries were the result of negligence by persons in the officers' supervisory chain." [*Id.*].  According to Defendants, had Plaintiff alleged facts suggesting a failure to supervise, the claim would have required an investigation "into completely different aspects of the incident and BOP's operations."  [*Id.*]. Defendants argue that because the BOP was not able to properly investigate the claim with respect to any supervisory liability, the claim should be dismissed under Rule 12(b)(1) for failure to exhaust.  [*Id.*].  In response, Plaintiff argues that he provided sufficient notice of his claim because he stated that he was severely beaten "by [a] large number of officers/prison guards," and because "officers" includes not only regular prison guards, but also lieutenants and "any prison official who might be at the scene."  [Doc. 83 at 18]; *see also* [Doc. 71-3 at 11 (Plaintiff's Claim for Damage, Injury, or Death)].[22]  And even if the claim lacked necessary information, Mr. Mohamed

_____

[22] Insofar as Plaintiff asserts in his Response that he intended to file additional claims but was "inhibited from filing . . . any additional claims" because he was threatened by prison staff, *see*

nevertheless asserts that the BOP had enough information to be on notice of his claim.  [Doc. 83 at 19].

> Mr. Mohamed's claim states, in full:
>
> I was [severely] beaten, punched . . kicked, by large number of officers/prison guards in retaliation for my hunger strike.  The beatings took place when I was already restrained and handcuffed and while I was weak in hunger strike.  Over the course of the beating my ankle was fractured and my [other] limbs were aggressively twist in [an] attempt to [break] them and I received [bruises] in my [entire] upper body.  My face, head, hands and legs all were swollen.  Eventually I had to be put in leg cast and on wheelchair for more than 2 months.  Over the next several months I was given [negligent] medical treatments, this includes the delay examination on my injuries and delay of diagnoses, . . . refusal to provide treatment, pain medication and even an ice bag, [except] on one [occasion].  I still cant [sic] walk normally today, 7+ months after I was attacked and I may never walk properly again.  At the same time, I still have regular pain on my ankle, [wrists], back and on my jaws.  The staff intentionally broke my bones and then refused me proper medical treatment.

[Doc. 71-3 at 11, 12].

To succeed on a claim of negligent supervision under Colorado law, a plaintiff must establish "(1) the defendant owed the plaintiff a legal duty to supervise others; (2) the defendant breached that duty; and (3) the breach of the duty caused the harm that resulted in damages to the plaintiff."  *Settle v. Basinger*, 411 P.3d 717, 723 (Colo. App. 2013).  "The duty to supervise an agent or employee arises when the principal or employer has reason to know that the agent or employee is likely to harm others because of his or her qualities and the work or instrumentalities entrusted to him or her."  *Id.* (quotation and alteration marks omitted).

While the FTCA's notice requirements "should not be interpreted inflexibly," *Est. of Trentadue*, 397 F.3d at 853, the court respectfully finds that Plaintiff's claim does not sufficiently

---

[Doc. 83 at 18-19], the court cannot consider these new facts in issuing this Recommendation.  *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020) (the court can "only consider facts alleged in the complaint itself in evaluating the sufficiency of the complaint.").

provide to the BOP notice of a potential negligent supervision claim such that the BOP knew that it should investigate the possibility of tortious conduct by supervisory employees. *Staggs*, 425 F.3d at 884. While the claim sets forth facts detailing the beatings of Plaintiff and subsequent inadequate medical care, Mr. Mohamed does not set forth any facts suggesting negligent supervision, such as the presence of supervisory employees during the events alleged in the claim or any suggestion that any of the involved individuals were acting at the direction of their supervisor(s). *See, e.g.*, *Begay v. United States*, 188 F. Supp. 3d 1047, 1095 (D.N.M. 2016) (where administrative claim "revolve[d] entirely around the details of the alleged negligent [medical] treatment" but failed to discuss any alleged failure of the defendant medical center's administrator or management to supervise its staff, finding that the claim did not provide notice of potential negligent supervision or negligent credentialing claims); *Bradley By & Through King v. United States*, No. 16-1435-EFM-TJJ, 2017 WL 4310224, at *6 (D. Kan. Sept. 28, 2017) (finding failure to exhaust where the claim did not indicate that the defendants "failed to instruct, supervise, train, or control correctional officers" and "nothing in the [claim] mention[ed] the possibility that [the plaintiff's] injuries were caused by inadequate training and supervision of USP Leavenworth staff").

As set forth above, to succeed on his negligent supervision claim against the United States, Plaintiff would need to establish a breach of a legal duty to supervise others. *Settle*, 411 P.3d at 723. Absent any facts suggesting or implying that this duty could have been breached when Plaintiff was beaten or provided substandard medical care, the claim does not put the BOP on notice that it must investigate whether any supervisory officials were at the scene of or were involved in the beatings or were otherwise involved in the substandard medical care of Plaintiff. As a result, the court finds that Plaintiff failed to exhaust his administrative remedies with respect

to his negligent supervision claim. *See Lopez*, 823 F.3d at 977 (where the plaintiff's administrative claim detailed only substandard medical care, the claim failed to put the government on notice of a potential negligent credentialing claim, which requires proof that the defendant breached a legal duty, such that the defendant was "deprived of any opportunity to settle this potential claim without litigation."); *cf. Barnes v. United States*, 707 F. App'x 512, 516 (10th Cir. 2017) (unpublished) (affirming dismissal of FTCA claim for negligent supervision where the claim "lack[ed] even a cursory mention of . . . training or supervision").

While Plaintiff argues that the general reference to "officers" suggests the presence of lieutenants or "any [other] prison official," the court cannot conclude that this broad reference to "officials" is alone sufficient to imply a negligent supervision cause of action, as Plaintiff concedes that "officials" includes "regular prison guards" and does not, on its face, imply any particular rank. *See* [Doc. 83 at 18]. Moreover, the court acknowledges that, in his Second Amended Complaint, Plaintiff alleges that while he was being beaten, his head was forced down so he could not identify "most of the officers who were torturing and abusing [him]." [Doc. 64 at ¶ 39]. But Plaintiff also asserts in the Second Amended Complaint that was able to see that Defendant Armijo witnessed the beating, that Defendant Armijo was the unit's lieutenant at the time of the beating, and that Defendant Armijo failed to intervene in the beating, [*id.* at ¶¶ 46-50], and also alleges that he heard Defendant Murton, also a lieutenant, continually giving his subordinates instructions as to how to beat Plaintiff. *See, e.g.*, [*id.* at ¶¶ 60, 65-66]. Thus, it appears that Defendant Armijo's presence and Defendant Murton's instructions were known to Plaintiff at the time of the physical attack, and Plaintiff could have included these facts in his administrative claim to alert the BOP of a potential supervisory liability claim. Because he did not do so, the court respectfully finds that he did not exhaust his administrative remedies with respect to his negligent supervision claim—

Claim Fourteen.  Accordingly, I respectfully **RECOMMEND** that Plaintiff's Claim Fourteen be **DISMISSED without prejudice** for lack of jurisdiction based on the failure to exhaust administrative remedies.[23]  *See Webb v. Smith*, 632 F. App'x 957, 960 (10th Cir. 2015) (dismissal of FTCA claim for failure to exhaust should be without prejudice).

## VI.    Medical Negligence Under the FTCA – Claim Fifteen

### A.    Applicable Law

As set forth above, the FTCA provides a limited waiver of sovereign immunity from suits against the United States.  Notably, "[s]tate substantive law applies to suits brought against the United States under the FTCA."  *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004).  Relevant here, Colorado law requires plaintiffs to file a certificate of review to pursue claims alleging professional negligence by a licensed professional:

> In every action for damages or indemnity based upon the alleged professional negligence of . . . a licensed professional, the plaintiff's or complainant's attorney shall file with the court a certificate of review for each . . . licensed professional named as a party, as specified in subsection (3) of this section, within sixty days after the service of the complaint . . . against such person unless the court determines that a longer period is necessary for good cause shown.

Colo. Rev. Stat. § 13-20-602(1)(a); *see also id.* § 13-20-602(3)(a) (describing the contents of a sufficient certificate of review).  The Tenth Circuit has held that Colorado's certificate of review requirement constitutes state substantive law and therefore applies to FTCA claims based on medical negligence.  *See Hill*, 393 F.3d at 1117.  Failure to file a certificate of review necessitates the dismissal of the claim, *see Colo. Tr. for Prot. & Benefits v. Souder, Miller & Assocs., Inc.*, 870 F. Supp. 2d 1173, 1179 (D. Colo. 2012) (quoting Colo. Rev. Stat. § 13-20-602(4)), and this

---

[23] Due to this recommendation, the court does not pass on Defendants' argument that Plaintiff failed to state a claim of negligent supervision.  [Doc. 71 at 19].  Should the presiding judge disagree with this recommendation, the undersigned Magistrate Judge is prepared to issue a supplemental recommendation addressing the merits of this alternative argument.

requirement applies to all plaintiffs, even those proceeding pro se. *See Yadon v. Southward*, 64 P.3d 909, 912 (Colo. App. 2002).

A certificate of review is only necessary, however, if "(1) the plaintiff brings a claim of alleged professional negligence against a licensed professional, *and* (2) expert testimony is necessary to substantiate the claim." *Sherman v. Klenke*, 653 F. App'x 580, 595 (10th Cir. 2016) (emphasis in original). "A court has discretion to determine whether a claim requires expert testimony, and therefore whether the certificate of review requirement is applicable." *Burns v. Ted Laurence, P.A.*, No. 10-cv-02691-WJM-CBS, 2013 WL 3771280, at *2 (D. Colo. July 17, 2013).

### B.    Application

Mr. Mohamed's medical negligence claim has two separate bases: (1) the intentional failure to diagnose his ankle injury for two weeks; and (2) the intentional deprivation of pain medication. *See* [Doc. 64 at 25]. Defendants move to dismiss Mr. Mohamed's FTCA claim predicated on medical negligence on the basis that expert testimony is required to substantiate claims arising both out of a delay in diagnosis and a failure to provide pain medication. [Doc. 81 at 3]. Because Plaintiff did not file a certificate of review, Defendants argue that the court must dismiss Claim Fifteen. *See* [*id.*]. In response, Mr. Mohamed argues that he has "come forward . . . with enough factual allegations, which at this stage must be accepted as true, to render the certificate of review unnecessary." [Doc. 88 at 1].

In Colorado, medical malpractice actions are a subset of negligence actions and thus require a plaintiff to "show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury." *Day v. Johnson*, 255 P.3d 1064, 1068-69 (Colo. 2011). "In general, expert testimony in medical negligence actions is

'necessary to determine the standards of professional care and competence which define the concept of reasonableness appropriate to adjudication of such disputes.'" *Abdo v. Balsick*, No. 18-cv-01622-KMT, 2019 WL 6726230, at *12 (D. Colo. Dec. 11, 2019) (quoting *Gorab v. Zook*, 943 P.2d 423, 427 (Colo. 1997)).  Expert testimony is required to establish professional negligence "in the great majority of cases," *Williams v. Boyle*, 72 P.3d 392, 397 (Colo. App. 2003), as "[t]he question of whether a medical professional's conduct meets the professional standard of care is not within the ambit of common knowledge under Colorado law." *Shinn v. Melberg*, No. 12-cv-01180-LTB-BNB, 2014 WL 334662, at *3 (D. Colo. Jan. 30, 2014).

"A physician possessing ordinary skill and exercising ordinary care in applying it is not responsible for a mistake of judgment." *Basanti v. Metcalf*, No. 11-cv-02765-PAB-NYW, 2015 WL 868758, at *27 (D. Colo. Feb. 26, 2015) (citing *Bonnet v. Foote*, 107 P. 252, 254 (Colo. 1910)). Indeed, a poor outcome is insufficient to prove negligence. *See Day*, 255 P.3d at 1069.  Mr. Mohamed must instead prove a breach of the duty of care, "measured by whether a reasonably careful physician of the same school of medicine as the defendant would have acted in the same manner as did the defendant in treating and caring for the patient." *Gallardo v. United States*, 752 F.3d 865, 871 (10th Cir. 2014) (quoting *Day*, 255 P.3d at 1069)).

Mr. Smith's medical negligence claim is based on the failure to diagnose his ankle fracture—i.e., the failure to order an x-ray and failure to examine Plaintiff's ankle, *see* [Doc. 64 at ¶ 162]—and the failure to provide Plaintiff pain medication—i.e., the failure to give Plaintiff medicine stronger than ibuprofen or other medications in the commissary prior to April 2019. [*Id.* at ¶¶ 163, 165].  While there may be instances where a medical malpractice claim "lies within the ambit of common knowledge or experience of ordinary persons," matters "relating to medical diagnosis and treatment ordinarily involve a level of technical knowledge and skill beyond the

realm of lay knowledge and experience," requiring expert opinion testimony. *Melville v. Southward*, 791 P.2d 383, 387 (Colo. 1990). Here, the court finds that Plaintiff's claims require expert testimony, as they involve medical diagnosis and treatment for which expert testimony is necessary to establish the standards of professional care and competence. *See Hooper v. Yampa Valley Med. Ctr.*, No. 18-cv-01863-NYW, 2019 WL 1098968, at *3 (D. Colo. Mar. 8, 2019) (certificate of review was required where negligence claim was based on the failure to conduct an x-ray of the plaintiff's leg and diagnose a leg fracture); *cf. Smith*, 2021 WL 1799400, at *11 (medical negligence claim based on the denial of an MRI required expert testimony); *cf. Gonzales v. Corr. Health Partners*, LLC, No. 14-CV-03084-RM-KLM, 2019 WL 2173833, at *10 (D. Colo. May 20, 2019) (in Eighth Amendment context, recognizing that "the appropriateness of using" certain pain medications is a matter of medical judgment, especially where the plaintiff "was receiving other forms of pain medication").

In his Response, Plaintiff asserts that, pursuant to the doctrine of *res ipsa loquitur*, no certificate of review is required here. *See* [Doc. 88 at 3-4]. The court respectfully disagrees. "Res ipsa loquitur applies to a malpractice claim only when it is judicially determined that a particular unexplained occurrence creates a prima facie case of negligence without proof of specific misconduct." *Shelton v. Penrose/St. Francis Healthcare Sys.*, 984 P.2d 623, 625 n.2 (Colo. 1999) (internal quotation marks omitted). This occurs "only in unusual circumstances," *see id.* at 627, and requires "a plaintiff present evidence that the event is the kind which ordinarily does not occur in the absence of negligence; responsible causes other than the defendant's negligence are sufficiently eliminated by the evidence; and the presumed negligence is within the scope of the defendant's duty to the plaintiff." *Williams v. Boyle*, 72 P.3d 392, 398 (Colo. App. 2003). While Mr. Mohamed need not specifically reference *res ipsa loquitur* in his Second Amended Complaint,

he fails to make the requisite showing at this juncture as to the applicability of the doctrine, as he fails to identify an "unexplained occurrence" that gives rise to a prima facie case of negligence. The court concludes that Mr. Mohamed's claim requires expert testimony to establish a prima facie medical malpractice claim, rendering a certificate of review necessary. Accordingly, the court finds that Claim Fifteen is properly dismissed for failure to file a certificate of review. Because no certificate of review was filed, the court respectfully **RECOMMENDS** that the Second Motion to Dismiss be **GRANTED** and that Plaintiff's Claim Fifteen be **DISMISSED**.[24]

## <u>MOTION TO APPOINT COUNSEL</u>

Having addressed the arguments concerning the sufficiency of Mr. Mohamed's allegations, the court next turns to his Motion to Appoint Counsel. [Doc. 98]. The determination of whether to seek appointment of pro bono counsel in a civil case is left to the sound discretion of the trial court. *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995). But the court cannot appoint counsel; instead, the court can only ask an attorney to take the case. *Moaz v. Denver Int'l Airport*, 747 F. App'x 708, 711 (10th Cir. 2018) (unpublished) (citing *Rachel v. Troutt*, 820 F.3d 390, 396-97 (10th Cir. 2016)). In deciding whether to request counsel for a civil litigant, the district court should evaluate "the merits of a [litigant's] claims, the nature and complexity of the factual issues, and the [litigant's] ability to investigate the facts and present his claims." *Hill v. Smithkline*

---

[24] Defendants do not seek dismissal of this Claim with or without prejudice. *See generally* [Doc. 81]. "[W]hether the failure to file a Certificate of Review results in the dismissal of claims with or without prejudice is not an entirely settled question." *Sherman v. Klenke*, No. 11-cv-03091-PAB-CBS, 2014 WL 12939925, at *1 n.1 (D. Colo. Feb. 20, 2014) (citing cases). Because the court is mindful that parties sometimes raise issues in objecting to a Recommendation that might inform Judge Jackson's determination of whether amendment would be futile, *see Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (explaining that dismissal without leave to amend and with prejudice is appropriate where no amendment could cure the defect), the court declines to make a recommendation as to whether dismissal of Claim Fifteen should be with or without prejudice, reserving such decision to the presiding judge.

*Beecham Corp.*, 393 F.3d 1111, 1115 (10th Cir. 2004) (citations omitted).  "The burden is on the applicant to convince the court that there is sufficient merit to his claim to warrant the appointment of counsel."  *Id.*  "Only in those extreme cases where the lack of counsel results in fundamental unfairness will the district court's decision be overturned."  *Id.*

In deciding whether to appoint counsel, the court considers all relevant circumstances, including but not limited to: (1) the nature and complexity of the action; (2) the potential merit of the claims or defenses of the unrepresented party; (3) the demonstrated inability of the unrepresented party to retain an attorney by other means; and (4) the degree to which the interests of justice, including the benefits to the court, will be served by appointment of counsel. D.C.COLO.LAttyR 15(f)(1)(B)(i)-(iv).

In the Motion, Plaintiff seeks appointment of counsel for the general representation of this civil action.  [Doc. 98 at 3].  In the alternative, if general representation is not possible, Mr. Mohamed seeks limited representation in the form of assistance in obtaining expert witnesses, conducting depositions, and collecting prisoner declarations.  [*Id.*].  Mr. Mohamed argues that this action is complex in nature because it is a "seriously contested case" involving constitutional claims, for which he needs "declarations from prisoner[] witnesses," whose whereabouts are unknown, as well as expert witnesses.  [*Id.* at 2].  He further states that he is indigent and unable to hire an attorney or any experts, and that he has contacted seven law firms and/or attorneys but has been unable to secure representation.  [*Id.*].  At bottom, he asserts that the court will benefit from having attorneys on both sides of the case.  [*Id.* at 3].

Upon review of the Motion, Mr. Mohamed's filings, and the D.C.COLO.LAttyR 15(f) factors, the court respectfully concludes that appointment of counsel is not warranted at this time. First, this court is not convinced that the substantive issues in this case are so uniquely complex so

as to warrant appointment of counsel at this juncture. *See Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) (explaining appointment of counsel is appropriate in "extreme case[s] where the lack of counsel results in fundamental unfairness."). Indeed, this court has recommended that the First Motion to Dismiss be denied with respect to several of Mr. Mohamed's claims, which suggests that Mr. Mohamed has sufficiently articulated the basis of his causes of action. Further, the court reminds Mr. Mohamed that, because he proceeds pro se, the court will afford his filings liberal construction. The Tenth Circuit has explained that "liberal construction of pro se pleadings 'means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.'" *United States v. $9,020.00 In U.S. Currency*, 30 F. App'x 855, 858 (10th Cir. 2002) (quoting *Hall*, 935 F.2d at 1110).

While the court acknowledges Mr. Mohamed's concerns about identifying and retaining expert witnesses and locating witnesses, such circumstances are unfortunately not unique. *See Rucks*, 57 F.3d at 979 ("While we do not quarrel with [Plaintiff's] assertion that having counsel appointed would have assisted him in presenting his strongest possible case, the same could be said in any case."); *see also Walker v. Meyer*, No. 08-cv-01911-REB-KLM, 2008 WL 4787569, at *1 (D. Colo. Oct. 30, 2008) (explaining that the fact that a plaintiff is incarcerated does not itself warrant the need for volunteer counsel, as "incarceration is a normal . . . circumstance in this type of case before this court, and therefore, does not provide special circumstances to consider in determining whether to *see*k volunteer counsel."). And although Mr. Mohamed asserts that appointment of counsel is warranted because he is indigent, [Doc. 98 at 2], a person's financial status does not guarantee the right to counsel in civil cases. *See Jones v. Pizza Hut, Inc.*, No. 10-

cv-00442-WYD-KMT, 2010 WL 1268048, at *1 (D. Colo. Mar. 30, 2010) ("Unlike a criminal

defendant, a plaintiff in a civil case has no constitutional or statutory right to appointed counsel.");

*see also Vasquez v. U.S. Off. of Pers. Mgmt.*, 847 F. Supp. 848, 849 (D. Colo. 1994) ("There is no

constitutional right to counsel simply because a litigant is indigent.").   Accordingly, Mr.

Mohamed's economic status does not provide a basis for appointment of counsel here.

Finally, the court finds the Motion to Appoint Counsel premature.  While the undersigned

Magistrate Judge is, along with this Order, issuing a Recommendation on the Motions to Dismiss,

such dispositive motions will remain pending until the Parties have been given an opportunity to

file objections and after the presiding judge has issued a final order ruling on the Recommendation.

This case is still in its early stages, with pending dispositive motions and yet-to-be commenced

discovery, and the court thus finds that the Motion to Appoint Counsel is premature.  *Weeks v.*

*Barkman*, No. 20-cv-00544-PAB-NYW, 2020 WL 7385711, at *2 (D. Colo. Dec. 16, 2020)

("Given the early procedural posture of this case and the fully briefed Motions to Dismiss . . ., this

court finds Plaintiff's Motion premature.").   Should the circumstances of this case change, Mr.

Mohamed may renew his request for appointment of counsel at a later date.  *See McCullon v.*

*Parry*, No. 18-cv-00469-NYW, 2019 WL 4645436, at *5 (D. Colo. Sept. 24, 2019) (appointing

pro bono counsel under the factors of D.C.COLO.LAttyR 15(f)(1)(B)(i)-(iv) "given that this matter

is now moving to trial." (emphasis added)).   For these reasons, the Motion to Appoint Counsel

will be **DENIED without prejudice**.

## CONCLUSION

For the reasons stated herein, this court respectfully **RECOMMENDS** that:

(1)    The Motion to Dismiss Second Amended Complaint in Part Pursuant to Rules

12(b)(6) and 12(b)(1) [Doc. 71] be **GRANTED in part** and **DENIED in part**;

(2)   Defendant United States' Motion to Dismiss Claim Fifteen in the Second Amended

Complaint [Doc. 81] be **GRANTED**;

(3)   Plaintiff's Claims Seven and Fourteen be **DISMISSED without prejudice**;

(4)   Plaintiff's Claim Fifteen be **DISMISSED**;[25] and

(5)   Plaintiff's Claims One, Two, Three, Four, Five, Six, Eight, Nine, Ten, Eleven,

Twelve, and Thirteen **REMAIN**.[26]

In addition, it is hereby **ORDERED** that:

(1)   Plaintiff's Motion to File Surreply to Defendants' Motion to Dismiss [Doc. 94] is

**DENIED**;

(2)   The Prisoner Motion for Appointment of Counsel [Doc. 98] is **DENIED without**

**prejudice**;[27] and

---

[25] *See supra* n.24.

[26] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Prop. Known As 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings, conclusions of law, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

[27] Rule 72(a) of the Federal Rules of Civil Procedure provides that when a pretrial matter not dispositive of a party's claim or defense is referred to a Magistrate Judge to hear and decide, the

(3)     A copy of this Order and Recommendation, marked as legal mail, shall be sent to:

Khalfan Khamis Mohamed, #44623-054
Florence ADMAX U.S. Penitentiary
Inmate Mail/Parcels
PO Box 8500
Florence, CO 81226

and

Case Manager for Khalfan Khamis Mohamed, #44623-054
Florence ADMAX U.S. Penitentiary
Inmate Mail/Parcels
PO Box 8500
Florence, CO 81226

DATED:  February 22, 2022                          BY THE COURT:

Nina Y. Wang
United States Magistrate Judge

---

Magistrate Judge must issue a written order stating the decision.  Within fourteen (14) days after service of a copy of this Order, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a).  Failure to make any such objection will result in a waiver of the right to appeal the non-dispositive order.  *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.* 989 F.3d 747, 782 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS,* 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, such as when a "*pro se* litigant has not been informed of the time period for objecting and the consequences of failing to object").