IN THE UNITED STATES DISTRICT COUR
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-02516-RBJ-MDB

KHALFAN KHAMIS MOHAMED,

    Plaintiff,

v.

JONES,
HUDDLESTON,
OSAGIE,
BRUSH,
ESPINOZA,
MILLER,
LT. MURTON,
LT. ARMIJO, and
UNITED STATES OF AMERICA,

    Defendants.

---

### ORDER ON MOTION FOR RECONSIDERATIION

---

This matter is before the Court on defendants' motion to reconsider the order at ECF No. 120 in light of intervening Supreme Court precedent, *Egbert v. Boule*, 142 S. Ct. 1793 (2022). Defendants' motion is denied.

### FACTS

Plaintiff Khalfan Khamis Mohamed, an inmate at the United States Penitentiary Florence ADMAX (ADX Florence), filed suit against eight BOP officials pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that the officers beat him, confiscated his property, and denied him timely medical attention for injuries

1

sustained in the beating in violation of the Eighth Amendment, the First Amendment, and the Federal Tort Claims Act (FTCA).  *See* ECF Nos. 1, 64.

After reviewing defendants' first and second motions to dismiss, then-Magistrate Judge Nina Y. Wang issued a 79-page recommendation, which I accepted and adopted on May 18, 2022.  *See* ECF No. 103; ECF No. 120.  Accordingly, I granted defendants' motions to dismiss as to plaintiff's First Amendment claim (claim 7) and as to the FTCA claims of negligent supervision and performance (claims 14 and 15), denied defendants' motion to dismiss as to the FTCA battery claims (claims 11 through 13), and—the genesis of this motion—denied defendants' motions to dismiss as to the Eighth Amendment claims (claims 1 through 6 and 8 through 10).  *See* ECF No. 120 at 13.

In finding that a *Bivens* remedy was available for claims 1 through 6, I reasoned that there was "no meaningful difference" between the Eighth Amendment excessive force and failure-to-intervene claims at issue here and the Eighth Amendment deliberate indifference claim for which the Supreme Court provided a *Bivens* remedy in *Carlson v. Green*, 446 U.S. 14 (1980). *See id*. at 4.  Furthermore, I reasoned, even if the excessive force and failure-to-intervene claims presented a new context, there were "no special factors counseling against extending a *Bivens* remedy."  *Id*. at 5.

On June 8, 2022, the Supreme Court issued its decision in *Egbert v. Boule*, which addressed two questions: (1) whether a cause of action exists under *Bivens* "for First Amendment retaliation claims," and (2) whether a cause of action exists under *Bivens* for Fourth Amendment claims "against federal officers engaged in immigration-related functions."  *See* U.S. Supreme Court, Grant of Petition for Certiorari, November 5, 2021,

https://www.supremecourt.gov/docket/docketfiles/html/qp/21-00147qp.pdf. The majority in *Egbert* declined to provide a *Bivens* remedy in those two enumerated contexts.

Defendants here move to reconsider the denial of their motion to dismiss counts 1 through 6, arguing that *Egbert* forecloses the analysis on which I relied in finding that a *Bivens* remedy should be implied for plaintiff's Eighth Amendment excessive force and failure-to-intervene claims. *See* ECF No. 128 at 1. I have considered each of defendants' arguments that *Egbert* compels dismissal of plaintiff's claims 1 through 6, and I disagree.

## STANDARD OF REVIEW

Defendants file this motion under Rule 59(e) of the Federal Rules of Civil Procedure, which provides for a "motion to alter or amend [the] judgment" under certain circumstances. However, "a motion for reconsideration is an extreme remedy to be granted in rare circumstances." *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 944 (10th Cir. 1995). "The decision to grant reconsideration is committed to the sound discretion of the district court." *Id*. In exercising that discretion, "courts consider whether there has been an intervening change in the [controlling] law, new evidence, or the need to correct clear error or to prevent manifest injustice." *See id*.; *see also Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (clarifying that any intervening change in the law is not sufficient to warrant reconsideration; the intervening change must be in law that controls on the instant facts). A motion to reconsider is not to be used to "reargue issues by rehashing facts and arguments already addressed or available, yet neglected, in the original proceeding." *Jaffrey v. Portercare Adventist Health Sys.*, No. 15-CV-02297-NYW, 2017 WL 3437986, at *2 (D. Colo. Aug. 10, 2017).

3

## ANALYSIS

In deciding whether to imply a *Bivens* remedy for plaintiff's excessive force and failure-to- intervene claims, courts apply the two-part analysis set forth in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Under the framework set forth in *Abbasi*, a court must first determine whether the claim arises in a materially different context than *Bivens*, *Davis*, and *Carlson*—the cases representing the three general contexts in which a *Bivens* remedy has been recognized. *See* 137 S. Ct. at 1859-60. If the circumstances at issue present "meaningful differences" from those established contexts, the court must assess whether any special factors counsel hesitation in implying a remedy. *See id*.

The Supreme Court preserved this analytical framework in *Egbert*. *See* 142 S. Ct. at 1803. By contrast, defendants contort the statement in *Egbert* that the two-step inquiry "often resolves to a single question" into the proposition that courts should jettison that framework and merely ask whether there is "any reason to think that Congress might be better equipped to create a damages remedy." *See* ECF No. 128 at 3. This approach is incorrect. While the Tenth Circuit noted in *Silva v. United States* that the statement in *Egbert* could be read as casting doubt on the "existing two-step *Bivens* framework," it declined to "address or resolve any tension" between *Egbert* and *Abbasi* or *Hernandez* because doing so was "not necessary to dispose of the appeal before [the Court]." 45 F.4th 1134, 1139 n. 4 (10th Cir. 2022).

Respectfully, I conclude that any apparent tension is illusory, and the fact that the two-step inquiry will "often resolve" to a single step does not permit courts to assume that the single question will constitute a legitimate *Bivens* analysis in all cases. The frequency with which the two steps collapse into one simply reflects the limited contexts in which *Bivens* has been

4

recognized (meaning that the first step of the *Abbasi* framework is rarely dispositive). It is not a license to omit that step altogether. *See* 137 S. Ct. at 1859-60.

Here, defendants' proposed omission of the first step of the *Abbasi* framework is particularly inappropriate, because this case presents one of the situations in which the claims at issue do not materially differ from established *Bivens* cases. Because Mr. Mohamed's claims do not present new contexts, the inquiry that defendants stress (which branch should be responsible for fashioning new remedies) need not be reached. However, for the sake of completeness I will address each of defendant's arguments—roughly categorized according to the prong of the *Abbasi* framework implicated. I conclude that *Egbert* does not foreclose a remedy for the Eighth Amendment violations Mr. Mohamed has alleged, and it does not compel reconsideration of the order denying dismissal of those claims.

## I. NEW CONTEXT.

### A. Similarities to *Bivens*.

Defendants argue that the case here must constitute a new context because its factual parallels to *Bivens* resemble those present in *Egbert*, and the Court in *Egbert* ultimately held that a *Bivens* remedy was not available. *See* ECF No. 128 at 5. Defendants emphasize that the Court characterized the claim in *Egbert* as only "superficially" similar to *Bivens* when both involved Fourth Amendment claims against officers for conduct occurring on private property. *Id*. Based on that characterization, they argue that the claim here cannot be similar enough to *Carlson* to merit a *Bivens* remedy when "the *only* similarities" between plaintiff's claims and those in *Carlson* are that all "arise under the Eighth Amendment." *See id*. (emphasis in original). This argument is logically unsound and unpersuasive for several reasons.

5

As an initial matter, the underlying premise of their argument mischaracterizes the inquiry. Under the correct standard, a *Bivens* remedy is available when the facts at issue do not meaningfully differ from those of at least one established *Bivens* case. By contrast, defendants would invert the rule and require plaintiff to establish not only that the facts in his putative suit are similar to those in *Bivens*, but also that those similarities are of a particular and ephemeral flavor that the Supreme Court would find persuasive. *See* ECF No. 128 at 5 (reasoning that because "the Supreme Court found this type of similarity [claims arising under the same Constitutional provision] unpersuasive in *Egbert*," the claims here and in *Carlson* under the Eighth Amendment against correctional officers in federal prisons would likewise be inadequate to suggest that a remedy is available).

While in most situations a case that is "not meaningfully different" from another case will share factual similarities, the "last four decades of intervening case law"—to which defendants urge fealty—contain no requirement that a claim present a certain number of factual parallels or similarities of a certain profundity for *Bivens* to apply. *See id*. The proper inquiry is instead to assess whether there are meaningful differences. *See Abbasi*, 137 S. Ct. at 1859-60.

Moreover, defendants ignore that the reason the Court found that *Egbert* presented a new *Bivens* context was not that the factual parallels were inadequate or unpersuasive; it was that the border context and the associated national security implications represented an added factual *difference* that pervaded the entire factual scenario. *See Egbert*, 142 S. Ct. at 1820 (citing *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020)). In *Hernandez*, the Court declined to recognize a *Bivens* action related to conduct occurring at the United States/Mexico border, because "regulating the conduct of agents at the border unquestionably has national security implications" and imposes a "risk of undermining border security" that counsels against

6

extending *Bivens* there. *See Egbert*, 142 S. Ct. at 1820. In *Egbert*, the Court reasoned, the same reasoning "applie[d] with full force," given that the disputed conduct occurred feet from the United States/Canada border. *See id*.

To the extent that the similarities between *Bivens* and *Egbert* in the constitutional right implicated and the characteristics of the parties involved were "superficial," it was because—given the gravity of the national security interests at stake in the latter but not the former—the border context was so intertwined with the nature of the conduct and the consequences of affording a damages remedy in *Egbert* that it pervaded the factual scenario. *See id*. The outcome of *Egbert* is therefore an illustration of the principle recognized in *Abbasi*—that the presence of certain "special factors" can bleed into the first step of the analysis and constitute a meaningful difference. *See Abbasi*, 137 S. Ct. at 1849 (2017) (providing examples of differences that "might" be meaningful, including "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; …*or the presence of potential special factors that previous* Bivens *cases did not consider*") (emphasis added). Still, as the *Abbasi* Court emphasized, some differences remain "so trivial that they will not suffice to create a new *Bivens* context." *Id*. at 1865. *Egbert* does not alter or undermine that the inquiry is whether a given factual difference is meaningful, not whether the factual parallels are "persuasive."

Although as Justice Sotomayor recognized in her concurrence, *Egbert*'s rejection of a *Bivens* remedy for that plaintiff's First and Fourth Amendment claims "will make it harder for plaintiffs to bring a successful *Bivens* claim," the lower courts "should not read [*Egbert*] to render Bivens a dead letter." 142 S. Ct. at 1823. The specificity of the questions presented in *Egbert* is illustrative. The Court there ruled narrowly that *Bivens* does not extend to Fourth Amendment claims against federal officers "engaged in immigration-related functions" or to

7

claims under the First Amendment (which has not previously been vindicated by *Bivens*). It does not follow from *Egbert*'s recognition of the pervasive effects of the immigration context on a Fourth Amendment claim that future cases arising under the Fourth Amendment cannot be found "not meaningfully different" from *Bivens*.

Therefore, defendants' argument to extend the same logic to *Bivens* cases arising under the Eighth Amendment is without merit. *Egbert* does not vitiate the preceding decades of precedent. Here, the sole factor that distinguished *Egbert* from *Bivens* is not present. *Egbert* does not compel the conclusion (or even persuasively suggest) that this case is meaningfully different from *Carlson* and *Farmer*.

### B. "Conventionality" of claim.

Defendants also argue that then-Magistrate Judge Wang's recommendation and my order improperly relied on the "conventionality" of excessive force claims to conclude that the claims did not present a new context. *See* ECF No. 128 at 6. "If a claim is common or conventional," they argue, that fact should weigh *against* rather than in favor of *Bivens* relief. *See id*. (quoting *Egbert*, 142 S. Ct. at 1808) (The fact "that [First Amendment] retaliation claims are common, and therefore more likely to impose a significant expansion of Government liability, counsels against permitting Bivens relief.") (internal quotations omitted).

This argument is flawed. It mischaracterizes Judge Wang's reasoning by equating conventionality with commonality. In fact, Judge Wang's order referenced the conventionality of Mr. Mohamed's excessive force claim only in noting that *Abbasi* does not preclude "run-of-the-mill challenges to 'standard law enforcement operations' that fall well within *Bivens* itself." *See* ECF No. 103 at 29 (quoting *Jacobs v. Alam*, 915 F.3d 1028, 1038 (6th Cir. 2019). This statement on its face is uncontroversial because if a claim falls within *Bivens*, it is irrelevant

whether it is common or uncommon. However, her underlying reasoning, as I understood it, was that a "run-of-the-mill" claim is less likely to fall outside the established purview of *Bivens* than a novel claim, because claims for damages "based on individualized mistreatment by rank-and-file federal officers" are "exactly what *Bivens* was meant to address;" and there is "substantial judicial guidance regarding the unconstitutionality of excessive force" in those standard contexts. ECF No. 103 at 29-30 (citing *Reid v. United States*, 825 F. App'x 442, 444 (9th Cir. 2020) (unpublished)); *see also Ullery v. Bradley*, 949 F.3d 1282, 1290 (10th Cir. 2020) (defining cruel and unusual punishment under the Eighth Amendment).

Similarly, I noted that Eighth Amendment excessive force claims under *Bivens* are "well-established" in concluding that "Congress's decision not to create a new cause of action was made with the understanding that such a cause of action already existed," rather than with the intent to abrogate that remedy. Both Judge Wang's reasoning and mine are consistent with the *Abbasi* court's instruction that courts consider "the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted" and "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" when determining whether a given set of facts meaningfully differs from *Bivens* precedent. *See Egbert*, 142 S. Ct. at 1814.

As discussed above, the *Abbasi* inquiry is left intact after *Egbert*. *See id*. Therefore, it was proper for Judge Wang to consider the availability of precedent to guide judicial decision-making and for me to consider the extent to which Congress understood that "such a cause of action already existed under *Bivens*" (which in turn suggests that affording a *Bivens* remedy would be to promote the legislative mandate rather than to aggrandize the judiciary). The order did not, as defendants suggest, rely on an assumption that a claim commonly brought necessarily represents an established *Bivens* context. Rather, it found that there were no meaningful

9

differences from *Bivens* cases and no indication of separate factors suggesting that the judiciary would be ill-equipped to adjudicate the claims or would encroach into Congress's sphere in permitting a *Bivens* suit here.

The extent to which a claim is "well-established" only incidentally corresponds with the frequency with which the claim is brought (its commonality). Therefore, both the assertions that the order here is based on the commonality of plaintiff's claim and that it is *per se* improper to consider the conventionality of a claim are incorrect. This argument to reconsider is not persuasive.

### C.   Harms would otherwise be unredressed.

Defendants argue that the "final basis" for the conclusion that plaintiff's claims do not present a new context "was a finding that refusing to extend *Bivens* here 'would result in a situation in which the very essence of civil liberty permits suits against a BOP official who refused to treat a broken arm but forbids suits against a BOP official who maliciously and intentionally broke the plaintiff's arm.'" *See* ECF No. 128 at 7 (quoting ECF No. 120 at 6). Defendants assert that the court in *Egbert* held that "it is not the function of the judiciary 'to decide whether existing remedies should be augmented by the creation of a new judicial remedy,'" which implies that they believe the Court here engaged in that purportedly inappropriate function rather than the typical *Abbasi* analysis. *See* ECF No. 128 at 7-8.

First, *Egbert* says that a court should *ask* "whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." 142 S. Ct. at 1804. It does not say definitively that it is *not* the role of the court to do so. *Egbert* does imply that the answer to this question will often be no, but defendants mischaracterize its meaning to suggest that *Egbert* stripped courts of all discretion.

10

Second, this language from *Egbert* is not controlling here because it applies only to a court's decision to recognize *Bivens* in a new context, while the context here is not meaningfully different from previous cases. Moreover, even if the order here did "creat[e] a new judicial remedy" by extending *Bivens*, the limitation on courts' authority to augment a remedial scheme applies only if Congress intended that scheme to be complete without a *Bivens* remedy. *See Egbert*, S. Ct. at 1804 ("So long as Congress or the Executive has created a remedial process *that it finds sufficient* to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy.") (emphasis added).

The question of whether Congress "finds" a given set of remedies to comprise a complete and exclusive scheme without *Bivens* requires courts to assess Congress's legislative intent. In that inquiry, it is relevant to consider whether Congress believed *Bivens* already applied in this context (and therefore would not require duplicative enumeration), and whether attributing to the legislature an intent to exclude *Bivens* in a disputed context would create absurd results. *See, e.g., United States v. Est. of Romani*, 523 U.S. 517, 535 (1998) (noting that the fact that Congress rejected certain proposed provisions that would have amended the Tax Lien Act provided "no support" for the proposition that Congress rejected the underlying substance of those proposals, because Congress might have "thought the existing law already [reflected that content]"); *see also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1827 (2020) (recognizing the canon against absurdity as a "longstanding canon of statutory interpretation" that "tells courts to avoid construing a statute in a way that would lead to absurd consequences" and applying the canon to construe the language of Title VII of the Civil Rights Act of 1964).

Here, Judge Wang's and my attention to the absurdity of allowing a *Bivens* suit against an officer who failed to treat a prisoner's broken arm but not against an officer who maliciously

11

broke a prisoner's arm was not a naked attempt to usurp the legislative role and "superimpos[e]" a Bivens remedy in a new context; it was an attempt to effectuate the congressional will by considering what interpretation of the existing remedial scheme would avoid absurd or inconsistent results—which Congress presumably would have wanted. *See Bostock*, 140 S. Ct. at 1827; ECF No. 120 at 6. The absurdity that would be produced by denying a *Bivens* remedy in the latter context suggests that Congress did not intend to exclude *Bivens* and did not believe that the remedial scheme without *Bivens* was sufficient to "secure an adequate level of deterrence." *See Egbert*, S. Ct. at 1804.

       The Magistrate Judge's recommendations and my order denying dismissal did not rely on the fact that Mr. Mohamed's harms would go unredressed without *Bivens* for the impermissible purpose that defendants suggest but rather to assist in the inquiry into congressional intent that *Egbert* impliedly requires. *See id*. Therefore, this argument does not warrant reconsideration.

## II.   SPECIAL FACTORS.

### A.   Existing administrative grievance program.

Defendants argue next that *Egbert*'s "directive to focus solely on whether there is a safeguard in place to prevent constitutional harms from recurring contradicts the Tenth Circuit caselaw on which the Court relied" and warrants reconsideration of the Court's conclusion that the BOP's Administrative Remedy Process is not an alternative process.  ECF No. 128 at 9.

*Egbert* instructs courts that "the question whether a given remedy is adequate is a legislative determination that must be left to Congress."  *Egbert*, 142 S. Ct. at 1807.  This arguably conflicts to some extent with the Tenth Circuit caselaw requiring that alternative remedies "must be more than nothing."  *See Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 863 (10th Cir. 2016).  However, *Egbert* does not represent a blanket prohibition on using or referencing the adequacy of the remedy in a *Bivens* analysis.  While courts are not to supplant a legislative determination that a remedial scheme is complete and sufficient without *Bivens*, the conclusion that the legislature *does* find the existing scheme complete and sufficient without *Bivens* is a threshold determination that requires courts to consider facts probative of the legislature's subjective intent.  *See Egbert*, 142 S. Ct. at 1807; *see also Abbasi*, 137 S. Ct. at 1858 (reiterating that courts should "ask whether there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy").

The fact that a remedial scheme is extremely extensive or extremely limited could be one such indicator of legislative intent.  An utterly empty "remedial process" providing no actual relief, for example, would tend to suggest that Congress did not intend it to be a freestanding and exclusive remedy for constitutional violations, even if its inadequacy cannot on its face justify

13

affording *Bivens* relief. That analysis does not represent the court's encroaching on Congress's "calibration" of an appropriate remedy, as *Egbert* prohibits; it represents the court's seeking to accurately define the boundaries of the remedy Congress thought was appropriate in the first instance.

Where courts have "warrant to doubt" that the purported alternative remedial scheme "secured adequate deterrence and afforded [claimants] an alternative remedy," *Egbert* implies that a court would be justified in finding that the alternative scheme does not foreclose *Bivens* relief. *See* 142 S. Ct. at 1807 (finding that *Bivens* relief was unavailable and relying on the fact that there, as in *Hernandez v. Mesa*, 140 S. Ct. at 749, and *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71 (2001), the Court had "no warrant to doubt" that the remedial scheme secured adequate deterrence). Although the Supreme Court did not have "warrant to doubt" in *Hernandez*, *Malesko*, and *Egbert* that Congress considered the alternative remedies complete and adequate to secure deterrence of constitutional violations, there is such warrant to doubt here.

In *Hernandez*, the Court found that Congress had empowered Executive Branch officials to compensate non-U.S.-citizens for injuries suffered outside the United States under at least four different provisions of the Foreign Claims Act, and those "alternative avenues for compensation" served the same function as would damages actions against the officers. *See* 140 S. Ct. at 749. Here, by contrast, defendants fail to identify what remedy Mr. Mohamed could obtain through the prison grievance system. *See* ECF No. 103 (citing ECF No. 71 at 7). Nor does it appear that the administrative grievance process provides any possible "avenue for compensation." *See id*. Although, after *Egbert*, the fact that a remedial process does not provide monetary compensation is not dispositive as to its adequacy, it may constitute one factor creating "warrant to doubt" that the scheme is plenary. *Cf. Egbert*, 142 S. Ct. at 1807.

Defendants argue that *Malesko* stands for the proposition that the BOP administrative grievance program is "an alternative process that *is* available to redress past constitutional violations suffered by federal prisoners." ECF No. 128 at 9 (emphasis in original). This is not correct. The Court in *Malesko* found that "*Bivens* relief was unavailable because federal prisoners could, among other options, file grievances through an 'Administrative Remedy Program.'" *Egbert*, 142 S. Ct. at 1806 (citing 534 U.S. at 74). There could remain sound reason to doubt that Congress thought the administrative grievance process *alone* would be sufficient to deter official misconduct even if in *Malesko* the administrative remedy program augmented with multiple other forms of relief was presumed to be adequate. *Cf.* 534 U.S. at 74.

Likewise, the fact that the Court in *Egbert* found it plausible that Congress considered the Department of Homeland Security's disciplinary process an adequate deterrent does not compel the same finding here regarding the BOP's grievance process. *Egbert* represents the lower extreme of alternative remedies that the Court has concluded Congress would find adequate. *See* 8 U.S.C.A. § 1103(a)(2); 8 C.F.R. § 287.10 (a, b) (describing that complaints about misconduct by border patrol agents are filed with the Secretary of the Department of Homeland Security and investigated by the Department of Homeland Security or delegated to the Department of Justice); *see also Egbert* 142 S. Ct. at 1822 (J. Sotomayor, concurring) (criticizing this purported remedy as "a threadbare disciplinary review process expressly conferring no substantive rights").

I need not criticize the BOP's review process as far as it goes. Complaints filed against prison guards can move outside the purview of the regional prison systems and reach the General Counsel of the Bureau of Prisons on the second level of appeals. *See* P1330.18, Federal Regulations from 28 C.F.R. 542.10-19. However, complaints do not receive an independent review outside the Bureau of Prisons, and there is no internal avenue to seek monetary

compensation. That might be deemed adequate in some contexts, but it makes no sense when, as the previous example illustrated, those remedies are available to the inmate against the person who mistreats his broken arm but not against the person whose application of excessive force broke it.

Even if the administrative grievance process in *Egbert* were intended to be a complete remedial scheme, I do not infer that intent here. There is *more* reason to think Congress would take a minimalistic approach to remedies in a national security border context than in domestic circumstances of prisoner abuse, so there is little reason to think that Congress would implement a more draconian remedial scheme here than in *Egbert*. And in *Egbert*, complaints about misconduct by Border Patrol agents were received and managed by the Secretary of DHS, not by the direct supervisors of the agents.

This is not the "elaborate remedial system that ha[d] been constructed step by step, with careful attention to conflicting policy considerations" to which the Supreme Court looked in *Bush v. Lucas*, 462 U.S. 367, 388, (1983). This is not even *Egbert*'s alternative "regulatory scheme," in which the executive Department conducted centralized investigations and imposed sanctions for misconduct. Defendants' argument that the BOP grievance process forecloses *Bivens* relief here is not persuasive.

          **B.**     **Potential "harmful and inappropriate" consequences.**

Defendants argue that "the threat of personal liability could impede the proper functioning of BOP facilities by causing officials to alter their behavior and judgment to avoid individual liability," and that "extending *Bivens*" to Mr. Mohamed's claims would wreak havoc on BOP operations because "officers' desire[s] to avoid liability may cause them to hesitate in their response to disobedient behavior." ECF No. 128 at 10.

This argument proves too much. It is not a rationale against recognizing a *Bivens* remedy in these circumstances; it is an argument against *Bivens* itself. The Court has never drawn "artificial distinctions between line-level officers of the 83 different federal law enforcement agencies with authority to make arrests and provide police protection." *See* 142 S. Ct. at 1815 (J. Sotomayor, concurring) (citing Dept. of Justice, C. Brooks, Federal Law Enforcement Officers, 2016—Statistical Tables (NCJ 251922, Oct. 2019), https://bjs.ojp.gov/content/pub/pdf/fleo16st.pdf.). To conclude that it would be inappropriate to place line-level BOP guards under the threat of personal liability for fear of "imped[ing] the proper functioning of BOP facilities" would subvert the entire architecture of *Bivens* by implying that *no* officer can properly be subjected to personal liability. Moreover, causing defendants to "alter their behavior and judgment to avoid individual liability" is not a flaw in this application of *Bivens* but rather its essential *purpose*. *See Egbert*, 142 S. Ct. at 1798 ("*Bivens* is concerned solely with deterring the unconstitutional acts of individual officers.") (internal quotations omitted).

The importance of preserving order in federal prisons, while unquestionably compelling, does not carry with it a "clear and strong connection to national security" or represent a function "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry." *Compare Hernandez*, 140 S. Ct. at 744. Evaluating and enforcing the boundaries of the Constitution is a paradigmatic judicial function, and the fact that the context here is a federal prison facility does not immunize those officers from scrutiny. Relatedly, defendants' concern that the fear of liability may cause prison guards to "hesitate in their response to disobedient behavior" rings hollow. ECF No. 128 at 10. It is odd to argue that *Bivens* liability on a failure to intervene claim would be "harmful and inappropriate" because it

17

might create a dire situation in which an officer hesitates to intervene. These arguments against recognizing *Bivens* here do not compel reconsideration.

Finally, defendants argue that the court's permitting a *Bivens* suit here represents a "judicial intrusion" into the legislative sphere, in contravention of established principles of separation of powers. *See* ECF No. 128 at 12. It is true that "when a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis." *Abbasi*, 137 S. Ct. at 1857. But defendants fail to recognize that retracting constitutional protections merely because the violator is a federal official represents an abdication of the judicial role, and "whittling down the number of claims that remain viable" despite Congress having "recognized and relied on the *Bivens* remedy in creating and amending other remedies" does not respect separation of powers principles but rather nullifies them. *See Egbert*, 142 S. Ct. at 1823 (J. Sotomayor, concurring). The court has inquired into the congressional intent for the remedial scheme and attempted in good faith to animate that legislative intent. Defendants' proposal that the court do otherwise does not warrant reconsideration.

## ORDER

For the reasons above, reconsideration of the order denying dismissal is neither compelled nor persuasively supported by *Egbert*. Defendants' motion to reconsider is DENIED.

DATED this 24th day of October, 2022.

BY THE COURT:

_____

                                                    R. Brooke Jackson
                                                    Senior United States District Judge