IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 1:20-cv-2516-RBJ-MDB

Khalfan Khamis Mohamed,

      Plaintiff,

v.

United States of America,

      Defendant.

---

## DECISION & ORDER

---

## I.    <u>INTRODUCTION</u>

Plaintiff Khalfan Khamis Mohamed ("Mr. Mohamed"), a federal prisoner at the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX" or "ADX Florence"), brings this suit against defendant, the United States of America, under the Federal Torts Claims Act ("FCTA"), 28 U.S.C. § 1346.  Mr. Mohamed alleges that, on August 23, 2018, he was subjected to three separate instances of battery by corrections officers and other prison staff in the course of being escorted within the ADX facility.  *See* ECF No. 64, Second Amended Complaint, ¶¶ 158-160 (Claims 11-13).

In September 2025, this Court held a five-day bench trial on Mr. Mohamed's claims. After hearing the witnesses, reviewing the documentary and video evidence, and reviewing the relevant law, the Court issues the following findings of fact and conclusions of law. For the reasons that follow, the Court finds that Mr. Mohamed has satisfied his burden of proof with respect to the first alleged battery claim but not the other two. Specifically, Mr. Mohamed prevails on Claim 11 of his Second Amended Complaint; Claims 12 and 13 are dismissed. *Id.* Furthermore, the Court awards Mr. Mohamed $10,000 in damages.

## II.    FINDINGS OF FACT

### A. Mr. Mohamed's Background

Mr. Mohamed, a Tanzanian national, has been incarcerated in the federal system since 1999, when he was arrested for his role in the 1998 Al-Qaeda bombing of the United States embassy in Tanzania. *See U.S. v. Bin Laden*, 156 F.Supp.2d 359, 362-63 (S.D.N.Y. 2001) (describing Mr. Mohamed's crime and apprehension). In 2001, he was sentenced to life in prison plus 40 years with no chance of parole. *See U.S. v. Mohamed*, 98-cr-1023-08 (LAK), 2025 WL 2495198 at *1 (S.D.N.Y. Aug. 29, 2025) (denying Mr. Mohamed's motion for a sentence reduction).

While in pretrial detention in New York City, Mr. Mohamed was allegedly involved in an incident where his codefendant stabbed a corrections officer in the eye with a prison shank, causing the officer permanent brain damage. *See U.S. v.*

2

*Salim*, 787 F.Supp.2d 250 (S.D.NY. 2003).  Mr. Mohamed was never criminally

charged for his role in this incident.  However, in a decision issued prior to his

codefendant's sentencing, a federal court found that there was evidence that Mr.

Mohamed covered a surveillance camera and grabbed the officer's walkie-talkie

immediately before the attack.  *Id.* at 297, 300.  The court, however, rejected the

government's more expansive view of Mr. Mohamed's involvement in the planning

and execution of the attack.  *Id.* at 294-97.

Mr. Mohamed was found guilty of "serious charges" for the same conduct in

an administrative disciplinary hearing conducted by the Federal Bureau of Prisons

(BOP).  T. 9/8/25, 11: 5-13.  Mr. Mohamed says he was not present for this hearing

and had no representation.  *Id.* at 11: 12-13.  He maintains that he "had no part" in

the attack on the officer.  *Id.* at 11: 1-3.  This Court is not convinced.

After his criminal sentencing in 2001, Mr. Mohamed was sent from New York

to ADX Florence.  *Id.* at 14-15.  The only federal "supermax" prison, the ADX is

the "most restrictive BOP facility in the nation."  *Silverstein v. Federal Bureau of

Prisons*, 559 Fed.Appx. 739, 743 (10th Cir. 2014).  For Mr. Mohamed's first 14

years at the ADX, he was housed in "H-Unit," a "special security unit," for prisoners

placed under "special administrative measures" ("SAMs") by the Attorney General

of the United States.  T. 9/17/2025, 112: 8-22, 120: 11-16.  Prisoners with a SAMs

designation are subject to severe restrictions on their external communications as

well as their interactions with fellow inmates. *Id.* at 119: 14-25, 120: 1-15. In 2015, Mr. Mohamed's SAMs designation was lifted, and he was transferred from H-Unit to a general population housing area within the ADX. *See* T. 9/8/25, 14: 6-8.

Despite the challenging conditions at the ADX, Mr. Mohamed testified, and the record appears to bear out, that he committed himself to living his life "as peaceful as possible." T. 9/8/25, 11: 16-17. In the approximately 17 years prior to the underlying incident in this case, including 14 under the exceptionally harsh restrictions in H-Unit, Mr. Mohamed received just one citation—in 2002, for failing to provide a urine sample while he was in the middle of a lengthy fast. *Id.* at 13: 9-25, 14: 1-5; Plaintiffs' Ex. 50, Mr. Mohamed's BOP Disciplinary Records. Nor, aside from refusing a nutritional supplement while hunger striking one week after the underlying incident, has Mr. Mohamed received any citations in the seven years since. None of the corrections officers who testified could recall any prior incident where Mr. Mohamed was violent, disruptive, or disrespectful, nor could they recall hearing about him behaving in such a way. *See* T. 9/9/25, 73: 5-25, 74:1, 134: 6-13; T. 9/10/25: 3: 9-20, 121: 13-25, 122: 1-8; 136: 8-19; 162: 5-25, 163: 1-10.

Mr. Mohamed has instead occupied himself with intense religious study. He testified that he spent his many hours in solitary confinement reading, memorizing, and translating books, writing manuscripts, and journaling. *See* T. 9/8/25, 134: 2-10. In particular, prior to the incident, Mr. Mohamed had spent five or six years

4

working on three religious manuscripts.  *Id.* at 144: 22-23, 145: 1-25, 146: 1-7.  He also testified that, at the time of the incident, he had written some other "shorter" works and kept around 12 journals.  T. 9/9/25, 95: 1-10.

Although Mr. Mohamed did not have a substantial disciplinary history at the ADX, he frequently agitated for improved conditions through prolonged hunger strikes.  *See* T. 9/8/25, 11: 14-25, 12: 1-4, 21-25, 101: 1-18.  In his words, Mr. Mohamed learned that hunger striking was "the only peaceful means of protesting the system."  *Id.* at 11: 24-25, 12: 21-25.  During a hunger strike, Mr. Mohamed would not eat any food for weeks, although he would receive nutritional supplements.  *Id.* at  74: 25, 75: 1-13, 132: 4-14.  Even after the instant incident, where Mr. Mohamed suffered a broken ankle, he continued his hunger strike for another 42 days, missing well over 120 meals altogether.  *Id.* at 75: 2-13; Plaintiff's Ex. 28, Clinical Note, Oct. 4, 2018 (USA001619).  Whatever else may fairly be said about Mr. Mohamed, he does not lack for discipline.

## B. The "Shakedown" on August 19, 2018 and Mr. Mohamed's Hunger Strike

In August 2018, Mr. Mohamed was transferred to "C-Unit."  T. 9/8/25, 14: 6-9.  C-Unit is one of the "most restrictive" general population units at the ADX and is typically a first stop for inmates coming out of H-Unit before "filtering out into other [general population] housing units[.]"  T. 9/17/25, 120: 17-23.  There is no

explanation in the record as to why Mr. Mohamed, who had been in another general population unit for three years, was suddenly transferred to C-Unit.

On August 19th, shortly after he was transferred, there was a "shakedown" on Mr. Mohamed's range in C-Unit, meaning that corrections officers searched the inmates' cells for contraband.[1]  T. 9/8/25, 14: 6-25, 15: 1-3; T. 9/17/25, 121: 19-25, 124: 8-10, 154: 14-23.  Mr. Mohamed admits that he had many times the eight books that inmates are allowed by policy to keep in their cells.  T. 9/17/25, 155: 1-16.  Over his protests, the corrections officers removed his excess books during the shakedown.  *Id.*  At that time, however, the officers did not remove any of Mr. Mohamed's other personal property—notably, they left behind his manuscripts, journals, and other papers.  *Id.* at 155: 17-22.

Mr. Mohamed, upset that his additional books were removed, and believing that he was personally targeted, decided to go on a hunger strike.  T. 9/8/25, 14: 21-25, 15: 1-8.  The next morning, August 20, 2018, Mr. Mohamed declared his hunger strike to prison staff in a written letter.  *See* Plaintiff's Ex. 2, Aug. 20, 2018 Letter from Mr. Mohamed to Mr. A. Oliver (USA000059); T. 9/8/25, 18: 23-25, 19: 1-13.

### C. **Officer Brush searches Mr. Mohamed's Cell**

The BOP officially recognizes a hunger strike after an inmate misses nine meals (approximately 72 hours).  *See* Plaintiff's Ex. 1, BOP Memo on Hunger

---

[1] The "range" refers to a long hallway or corridor where the inmate cells are located.

Strikes, p. 3, § 6.   This recognition triggers several institutional protocols. Relevantly here, because a hunger striking inmate may not have "any commissary food items and private food supplies," correctional staff are required to do a cell search in order to remove them.  *Id.* at p. 6, § 9; *see also* T. 9/8/25, 21: 8-18; T. 9/17/25, 113: 16-24, 126: 10-21.

However, there is no prohibition against an inmate keeping *non-food* personal items during a hunger strike, such as manuscripts, notebooks, or other documents. *See* T. 9/10/25, 63: 4-25, 64: 1-24.   Even if items of that nature are initially confiscated to check to see if they contain food, once they are cleared, there is "no" "reason" why they would not be promptly returned to the inmate.  T. 9/9/25, 77: 2-3; *see also id.* at 70: 4-21; T. 9/10/25, 64: 11-18; T. 9/17/25: 82: 17-25, 83: 1-10. And in Mr. Mohamed's experience, his "journals," "notes," and "manuscripts," were never "touched" during a hunger strike.  T. 9/9/25, 130: 10-18.

On the morning of August 23, 2018, Mr. Mohamed's hunger strike had surpassed nine meals and was recognized by the ADX staff.  *See* T. 9/8/25, 20: 13-19; T. 9/9/25, 138: 15-25, 139: 1-8.  That day, Senior Officer Brush ("Officer Brush" or "Brush") had a conversation with Lieutenant Rudd ("LT. Rudd") about searching Mr. Mohamed's cell.  T. 9/9/25, 8: 2-8, 11: 8-13, 44: 11-14.  Neither Officer Brush nor Senior Officer Miller ("Officer Miller" or "Miller"), who was also involved in

this matter, recalled interacting with Mr. Mohamed before or having any awareness of his crime or disciplinary history. *See* T. 9/9/25, 4: 6-17; 41: 7-19, 191: 5-15.

Around 12:00 p.m., Officers Brush and Miller escorted Mr. Mohamed from his cell to the law library, a single-occupancy cell at the far end of the same hallway, so that a cell search could be done. *See* T. 9/8/25, 21: 11-25, 22: 1-10; T. 9/9/25, 139: 6-13, T. 9/10/25, 16: 1-13. Mr. Mohamed willingly submitted to hand restraints and went to the law library. T. 9/8/25, 21: 16-25; T. 9/9/25, 139: 9-20.

Once Mr. Mohamed was sequestered in the law library, Officer Brush conducted a search of Mr. Mohamed's cell. T. 9/9/25, 37: 5-8. Mr. Mohamed testified that from his vantage point in the law library, he observed Officer Brush go into his cell and, although he could not see inside the cell itself, could tell from the noises that Brush was "packing almost everything" in plastic bags. T. 9/8/25, 22: 16-22, T. 9/9/25, 94: 2-11; T. 9/17/25, 156: 21-25, 157: 1-2. Although the government's expert witness testified that he could not see so far as Mr. Mohamed's cell from the law library, the Court credits that Mr. Mohamed could tell that Officer Brush was aggressively searching his cell. *See* T. 9/17/25, 59: 5-17.

## D. <u>The Escort from the Law Library</u>

Sometime after 1:00 p.m., Officers Brush and Miller returned to escort Mr. Mohamed from the law library. *See* T. 9/8/25, 22: 22-25; T. 9/9/25: 11: 24-25, 12: 1-3, 141: 12-15. Here, recollections diverge materially.

8

Mr. Mohamed said that Officers Brush and Miller told him that Lieutenant Armijo ("Lt. Armijo") wanted him to remove his personal clothing and change into prison-issue khakis. T. 9/8/25, 22: 22-25, 23: 1-2. Mr. Mohamed said that he wanted to speak to the lieutenant because there is no policy that requires a hunger-striking inmate to wear prison garb. *Id.* at 23: 1-9. The officers left, and a short while later, returned to the law library and told him that he could meet with Lt. Armijo in his office. *Id.* at 23: 9-12. Mr. Mohamed did not want to go to the lieutenant's office as he had heard that inmates were assaulted there because it had no cameras. *Id.* at 23: 10-15. Moreover, in Mr. Mohamed's experience, senior staff at ADX would meet with inmates cell-side. *Id.* at 23: 24-25, 1-5. He had never been taken to a staff member's office. *Id.* at 23: 18-23.

Mr. Mohamed said that Officers Brush and Miller agreed to take him back to his cell instead, where Lt. Armijo would meet with him. *Id.* at 24: 6-8. And with that understanding, Mr. Mohamed "peacefully[ ] and willingly" submitted to his hand restraints and allowed the officers to escort him out of the library. *Id.* at 24: 6-10; *see also* 9/9/25, 99: 21-25, 100: 1.

Officers Brush and Miller remember this interaction differently. Officer Brush testified that Mr. Mohamed was "already disruptive in the law library" and "refus[ed] to submit to [hand] restraints." T. 9/9/25, 16: 6-7. Mr. Mohamed requested to talk to Lt. Rudd. *Id.* at 16: 6-9, 44: 18-21. Thus, Officer Brush decided

9

that he would take Mr. Mohamed to the range's observation cell to meet with him. *Id.* at 12: 7-17, 16: 3-9, 46: 8-12. He said he communicated this to Mr. Mohamed, who, after a "brief argument," submitted to the hand restraints. *Id.* at 16: 13-15; *see also id.* at 47: 10-12. Notably, Officer Brush made no mention of Mr. Mohamed being disruptive or argumentative in the law library in any of his post-incident statements. T. 9/9/25, 65: 3-17.

Officer Miller, for his part, did not recall Mr. Mohamed being disruptive or refusing his hand restraints in the law library. *Id.* at 142: 9-14, 150: 1-9. However, like Brush, Officer Miller testified that Mr. Mohamed requested to speak to a lieutenant, though he could not remember whom, and that he and Brush were escorting him to the observation cell to do so. *Id.* at 142: 15-25. Both Brush and Miller denied that, at any point, they planned to take Mr. Mohamed to his cell or the lieutenant's office or told Mr. Mohamed that he was going to either location. *Id.* at 13, 4-7, 47: 7-9, 143: 12-17.

The Court credits Mr. Mohamed's account of the interaction in the law library. As an initial matter, it is notable that in Officer Brush's affidavit submitted in connection with the Office of the Internal Affairs ("OIA") investigation in this case, he stated that he was escorting Mr. Mohamed to the lieutenant's office in pointed contradiction to his testimony. *See* Plaintiff's Ex. 2, Brush Aff., ¶ 10 (USA001975). While Officer Brush testified that this could have been a "clerical error," it is hard

to imagine that the investigator would have included this specific detail if it had not come from Brush.  T. 9/9/25, 30: 6-12.  Furthermore, Lieutenant Sookdeo's ("Lt. Sookdeo") memorandum, created on the date of incident, indicates that Mr. Mohamed was "being escorted back to his cell from the Law Library."  *See* Plaintiff's Ex. 2, Sookdeo Memo (USA000014).  Again, it is hard to surmise why Lt. Sookdeo, who wasn't present for that part of the incident, would have included this detail unless that is what he was told by Officers Brush and Miller.[2]  While these documents contradict one another, they collectively cast doubt on the assertion that Mr. Mohamed was initially going from the law library to the observation cell as Brush and Miller claim.

Furthermore, it is relevant that the witnesses agree that Mr. Mohamed requested to see the lieutenant—not the other way around.  Officers Brush and Miller, and Officer Baca, all testified that an inmate at ADX *can* refuse an escort to go somewhere or speak to someone within the institution if the activity is optional or the visit requested by them.  *See* T. 9/9/25, 5: 3-25, 6: 5-13, 135: 9-25, 136: 117; T. 9/10/25, 3: 21-25, 4: 1-8, 39: 8-15.  As Officer Miller explained, "[i]f you state you don't want to go see somebody, we're not going to force you to go see them."

---

[2]  In another document, the ADX Warden, Andre Matevousian, also stated that Mr. Mohamed was being escorted "to his assigned cell" at the time of the incident.  *See* Plaintiff's Ex. 2, Form 583 Report of Incident, p. 3 (USA000021). The record does not establish who Warden Matevousian spoke to or on what information he relied in creating this document.

T. 9/9/25, 136: 16-17.  Of course, if an inmate is *directed* to go somewhere or see someone within the institution, then the officers will take them there over their objection.  T. 9/10/25, 5-7; T. 9/17/25, 41: 6-15.  But, importantly, the witnesses agree that was not the situation here.  The only reason that Mr. Mohamed was being taken to see the lieutenant was because he asked to see him.  T. 9/9/25, 189: 13-25, 190: 1-7.

Finally, Officer Brush and the government expert testified in line with Mr. Mohamed that it was common for executive staff to meet with inmates at their cell. *See* T. 9/9/25, 21: 2-13; *see also* T. 9/17/25, 105: 17-21 ("A vast majority of communication with inmates housed at the ADX is cell side").

Together, these facts suggest that Mr. Mohamed was under the impression when he left the law library that he was being escorted back to his cell where he was going to meet with Lt. Armijo.  Mr. Mohamed clearly did not want to meet the lieutenant in his office or the observation cell.  He also clearly was not forced out of the law library; nor did Officers Brush and Miller seemingly have any reason to force him.  Mr. Mohamed voluntarily submitted to his restraints and the escort proceeded as usual until they arrived at Mr. Mohamed's cell, as discussed in the next section.

## E. **The First Alleged Battery**

After leaving the law library, the escort moved down the range.  Officer Brush walked next to Mr. Mohamed on his righthand side, maintaining one hand on him at

all times.  T. 9/9/25, 48: 18-22.  Officer Miller trailed just behind.  *Id.* at 169: 3-6.

When the escort reached Mr. Mohamed's cell, in the middle of the range, he turned

to his lefthand side, towards the recreation rooms and away from his cell door.  Here,

again, the parties offer competing accounts of what occurred.

Mr. Mohamed testified that when they reached his cell, he stopped, believing

that this was his destination.  T. 9/8/25, 24: 11-18.  He further testified that Officer

Brush was "pushing him forward."  *Id.* at 24: 16-19.  Brush told him to "turn against

the wall[ ] or face the wall."  *Id.* at 24: 21-23; *see also* T. 9/10/25, 101: 14-25, 102:

2-8, 126: 19-23.  Then, in Mr. Mohamed's words, Officer Brush "pulled [him]

around from the left side wall to the right one and hit [him] very hard against the

wall."  T. 9/8/25, 24: 24-25, 25: 1.  Furthermore, Mr. Mohamed testified that Officer

Brush was cussing at him, using racial slurs, and threatening to kill him, as he held

him against the wall.  *Id.* at 25: 12-15.

Officers Brush testified that when they reached his cell, Mr. Mohamed

suddenly stopped, "made a turn to left," and was "pulling away" from him.  T.

9/9/25, 48: 11-13.  Officer Miller provided the same account, as did Officer Baca,

who was watching the escort from behind a barred sliding door at the front of the

range.  *Id.* at 144: 1-4, 144: 23-25, 145: 1, 15-21; T. 9/10/25, 12: 24-25, 1-5, 19: 6-

23.  Officer Brush explained that when an inmate pulls away, it is an attempt to

"defeat the escort," and could cause the officer to lose control of the inmate.  *Id.* at

50: 8-11.  Therefore, he "placed" Mr. Mohamed up against the right side wall to "regain control of him."  *Id.* at 49: 15-19, 51: 24-25, 52: 1-3.  He did not give Mr. Mohamed a verbal warning before taking this action.  T. 9/9/25, 14: 19-25, 15: 1-7.

This portion of the events are captured on video.  *See* Plaintiff's Ex. 3a, Range Video, :37 – :45.  It is clear that when Mr. Mohamed reached his cell, he turned to his lefthand side.  Contrary to the claims of Officers Brush and Miller, and other correctional staff who testified about the video, it is not clear that Mr. Mohamed was attempting to "pull away" from his escort.  Mr. Mohamed does not appear to lunge or struggle to elude his restraints or Officer Brush's grip.  His body movement is consistent with someone turning in place rather than straining to break free.  Officer Brush swings Mr. Mohamed's body against the wall in one motion, slamming him.

This Court credits that Mr. Mohamed turned to face the wall in response to a command from Officer Brush.  The video, unfortunately, does not have sound. However, it makes little sense that Mr. Mohamed would have, of his own accord, simply and suddenly pulled away from the officers in an effort to defeat his escort. He was alone in the middle of a hallway with two officers who collectively outweighed him by over 400 pounds.  *See* T. 9/8/25, 35: 19-25, 36: 1-6.  Such an obviously futile gesture of active, physical resistance in the middle of a hunger strike is not consistent with Mr. Mohamed's long record of behavior at the ADX.

Furthermore, it is of no moment that Mr. Mohamed turned to the wall on his left rather than the wall on his right. He explained that, in his experience, when an officer tells an inmate to face the wall, if "they don't point [to] a particular wall, you face the wall whatever you think is easier for you, or whatever is closer to you." T. 9/9/25, 129: 22-25, 130: 1-5. In this instance, Mr. Mohamed thought they were stopping at his cell. Officer Brush indicated that they were not. When Officer Brush told him to face the wall, it made more sense for Mr. Mohamed to turn to his left, away from Brush's body, than to turn directly into his escorting officer.

After Officer Brush very forcefully moved Mr. Mohamed to the wall, he held him against it, face-first, for approximately 45 seconds while Officer Miller placed Mr. Mohamed in leg restraints and three other correctional staff members ran down the range to assist the escort team. *See* Plaintiff's Ex. 3a, Range Video, :45 – 1:27. Contrary to Mr. Mohamed's testimony, there is no evidence that Officer Brush "smashed [his] head several times" into the wall, or that he was being punched and kicked at that time. T. 9/8/25, 28: 15-16; *see also* T. 9/9/25, 103: 10-25, 104: 1-7. Nor, however, is there evidence to support Officer Brush's testimony that Mr. Mohamed was "actively resisting" while he held him against the wall. T. 9/9/25, 49: 17-19. Rather, Mr. Mohamed appears largely still as Officer Brush uses his arms and upper body to keep Mr. Mohamed pinned against the wall.

Subsequently, Officers Brush and Miller, now assisted by Officer Baca and maintenance workers Vaughn and Marshall, resumed escorting Mr. Mohamed down the range. *See* Plaintiff's Ex. 3a and 3b, Range Video, 1:27 – 1:33. A few seconds later, Mr. Mohamed, Officer Brush, and Mr. Vaughn went to the ground. *See* Plaintiff's Ex. 3b, Range Video, 1:34. Officer Miller crouched behind them. *Id.* Mr. Mohamed was held on the ground, with staff members either on top of or beside him, for approximately the next two-and-a-half minutes. *See id.* at 1:34 – 4:08. After Brush, Miller, Vaughn, and Marshall were relieved by arriving staff, Mr. Mohamed, visibly limping, was stood up and escorted off the range, out of camera view. *See id.* at 4:08 – 4:36. Mr. Mohamed claims that, at this point, he was bleeding from the forehead from when Brush smashed him against the wall, but the video is inconclusive. *See* T. 9/8/25, 31: 17-19; 9/9/25, 112: 15-25, 114: 21-24; *see also* Plaintiff's Ex. 3b, Range Video, 4:30 – 4: 36.

The parties agree that Mr. Mohamed's right ankle was fractured at some point between when he initially went to the ground and when he was stood up and escorted off the range. *See* T. 9/8/25, 7: 19-23; T. 9/9/25, 105: 15-25, 108: 24-25, 109: 1-5; T. 9/17/25, 201: 17-25. They sharply disagree on everything else.

Mr. Mohamed testified that, after he was taken off the wall, the escorting officers lifted him up from behind by his handcuffs. *See* T. 9/8/25, 27: 2-10. This maneuver, in addition to causing great pain to his wrist, forced him to walk on his

16

toes and lose his balance, at which point, the officers "forced [him] to the ground."
*Id.* at 27: 7-11; *see also id.* at 29: 11-12.  He further testified that, once on the ground,
the officers punched and kicked him approximately 70 times.  T. 9/9/25, 109: 6-13.
Furthermore, Mr. Mohamed said that Officer Brush, specifically, twisted his arms
and legs, and, at one point, pressed his boot into his jaw.  *Id.* at 105: 21-25, 110: 9-
10; *see also* T. 9/8/25, 18-21.  He also testified that Brush continued swearing at him
and threatening to kill him as they were on the ground.  T. 9/8/25, 29: 20-21.

The staff involved in taking or going with Mr. Mohamed to the ground have
given multiple, inconsistent accounts of the incident.  Initially, in their immediate
use-of-force video statements and memoranda, they uniformly stated that Mr.
Mohamed was "placed" on the ground; later, in their affidavits, some of the
witnesses claimed that Mr. Mohamed went to ground himself, causing the escorting
staff to fall with him in order to maintain control.[3]  *Compare* Plaintiff's Ex. 7,
Debrief Video; Plaintiff's Ex. 2, Brush Use of Force Memo (USA000068), Miller
Use of Force Memo (USA000069), Baca Use of Force Memo (USA000070),

---

[3]  The witnesses also gave shifting and inconsistent descriptions of Mr. Mohamed's alleged
resistance.  In his initial use-of-force memo, Officer Brush claimed that Mr. Mohamed "attempted
to lunge back and head butt" him before he went to the ground.  Plaintiff's Ex. 2, Brush Use of
Force Memo (USA000068).  It must be said that there is no record evidence tending to support
this, and at trial, Brush said the alleged attempted headbutting happened "right after" Mr.
Mohamed had hit the ground. T. 9/9/25, 62: 21-25, 63: 1.  Officer Miller, in his memo, said that
Mr. Mohamed was "attempting to pull away" again after they got off the wall. Plaintiff's Ex. 2,
Miller Use of Force Memo (USA000069).  Mr. Vaughn and Mr. Marshall, in theirs, said he "was
kicking his legs out and pushing against staff."  Plaintiff's Ex. 2, Vaughn Use of Force Memo
(USA000073); Plaintiff's Ex. 2, Marshall Use of Force Memo (USA000074).

Vaughn Use of Force Memo (USA000073), Marshall Use of Force Memo (USA000074) *with* Miller Aff. ¶ 9 (USA001999), Vaughn Aff. ¶ 7 (USA002004).

This latter view prevailed at trial. Brush, Miller, Baca, and Vaughn all testified that Mr. Mohamed pushed back and then went limp, taking them to the ground. *See* T. 9/9/25, 23: 3-16, 150: 10-20; T. 9/10/25, 31: 4-25, 72: 20-25, 73: 1-11. They also all denied that anyone hit, punched, or kicked Mr. Mohamed, twisted his limbs, placed their foot against his jaw, threatened to kill or verbally abused him. *See* T. 9/9/25, 63: 9-24, 184: 14-25, 185: 1-3; T. 9/10/25, 47: 6-19, 98: 2-16.

Ultimately, the Court is forced to rely largely on the video, although it is exceptionally poor quality. While the Court does not agree that Mr. Mohamed was pushing back, it does appear that his body was headed towards the ground before the escorting staff fell on top of him. It does not appear that they were pushing or riding him to the ground. There is no objective evidence that Mr. Mohamed was being "jacked up" by his handcuffs, and the Court does not credit this portion of his testimony. It should be noted that Mr. Mohamed was leg-cuffed, wearing shower slippers, recovering from the acute shock of having been slammed into the wall, and was in a physically weakened state. Under these circumstances, it is no great surprise that he struggled to maintain his balance as they walked him down the range.

Furthermore, this Court does not find that Brush or any other staff member deliberately assaulted Mr. Mohamed as he lay on the ground. Even in this poor

quality video, had the officers engaged in the extremely violent conduct Mr. Mohamed claims occurred on the ground – kicking and punching him repeatedly, stepping on his jaw, etc. – at least some of that movement would be visible. Instead, the relative stillness in the video tends to support the officers' testimonies that they were trying to "secure" Mr. Mohamed's head and limbs until new staff arrived. *Id.* at 171: 18-20; *see also id.* at 18: 21-25; T. 9/10/25, 94: 11-23. It is especially hard to countenance Mr. Mohamed's claims that Brush, who appears to be lying on top of or alongside Mr. Mohamed, somehow stepped on his jaw and twisted his legs from that position. Officer Brush certainly would have had to reposition his body to perpetrate those harms, and there is no objective evidence that he did so.

### F.  The Second and Third Alleged Batteries

Mr. Mohamed next testified that the officers continued to beat him up as they exited the range and took him to the observation cell. T. 9/8/25, 31: 20-25, 32: 1-10; T. 9/9/25, 112: 3-14, 119: 3-5. This is the second alleged battery.

The events at the observation cell constitute the third alleged battery. As they approached the observation cell, Mr. Mohamed testified, he saw Lieutenants Murton ("Lt. Murton") and Armijo standing next to one another. T. 9/8/25, 32: 11-14. Lt. Murton, he claims, directed the next part of the assault, although he did not personally participate. *Id.* at 32: 14-17. He told Mr. Mohamed that they were going "to show him how [general population] is," and to "stop talking" and "stop limping"

19

or they would beat him more. *Id.* at 32: 14-17, 33: 4-5. As they "pushed" him inside, Mr. Mohamed testified, Officer Miller struck him in the face with his knee. *Id.* at 32: 11-14; 33: 9-12.

Mr. Mohamed testified to even more extreme brutality inside the observation cell. *See id.* at 36-37. While he was in hand and leg restraints, he was thrown up against the wall, then onto the floor, and finally, onto a concrete bed. *Id.* at 36: 15-17. They punched and kicked him, grabbed his beard, spit on him, and verbally abused him, including threatening to send him to meet "[his] leader," Osama Bin Laden, "in hell." *Id.* at 36: 19-22. In total, he claims that he was also struck "approximately 70" times in the observation cell. T. 9/17/25, 161: 18-24.

Mr. Mohamed could not identify or recall everyone who participated in the attack but was positive that Officer Espinoza, whom he knew before, was one of them. *See* T. 9/8/25, 36: 7-10, 22-24. He believes that at least three officers assaulted him over the course of "approximately 15 to 20 minutes." T. 9/9/25, 120: 7-19; T. 9/8/25, 37: 6-9. Mr. Mohamed testified that Lt. Murton told the officers to avoid his face, and that he had someone clean it off before they took a picture of him. *Id.* at 162: 1-5; *see also* T. 9/9/25: 117: 20-24, 118: 6-9.

There is no video of what happened between the range and the observation cell or in the observation cell itself. Asked why he didn't have an officer turn on an available handheld video camera, Lt. Sookdeo testified that when he responded to

the observation cell, Mr. Mohamed was "pushing off the wall trying to get away from staff." *Id.* at 165: 5, 166: 4-5. Therefore, he made "the judgment" that he "needed to get the situation under control" first for the safety of staff. *Id.* at 171: 1-14. He ordered that Mr. Mohamed be put on the ground again to regain control, placed in hard ambulatory restraints, and then had the camera turned on for a medical assessment. *See id.* at 168: 18-19, 172: 15-25, 173: 1-3.

None of the other witnesses were able to shed any light on what happened in the observation cell. Officer Miller said he returned to his office after he was relieved on the range. T. 9/9/25, 182: 8-20, 183: 7-20. Lt. Murton had no memory of the incident, T. 9/10/25, 135: 20-23, 137: 1-6, and his affidavit merely denied Mr. Mohamed's allegations. Plaintiff's Ex. 2, Dec. 13, 2018 Murton Aff. (USA00203-04). Officer Espinoza testified, consistent with his affidavit, that he never went in the observation cell at all. T. 9/10/25, 129: 11-15; Plaintiff's Ex. 2, Espinoza Aff. (USA001982-83). Officer Cochran, who was in the observation cell, had no memory of the incident; however, his affidavit supported Lt. Sookdeo's testimony. T. 9/10/25, 111: 2-4; *see also* Plaintiff's Ex. 2, Cochran Aff., ¶¶ 7-8 (USA001978).

Once again, in light of the objective evidence, this Court cannot credit Mr. Mohamed's testimony regarding the second and third alleged batteries. Although the events directly at issue were not videotaped, the Court does have bookends from when he was escorted off the range and from the medical assessment, which were

21

20 minutes apart.  In both videos, the officers attending to Mr. Mohamed appear calm and no violence is being done to him.  Plaintiff's Ex. 3b, Range Video, 4:27 – 4:42; Plaintiff's Ex. 7, Medical Assessment Video.  More telling is the fact that Mr. Mohamed appears in the same condition after allegedly being hit approximately 70 times by multiple large officers while his hands and legs were restrained and he weighed less than 140 pounds.  Mr. Mohamed's chief complaints in the days and weeks after the incident were pain in his right wrist, right ankle, and jaw, all of which were likely the result of conduct that comprises his first battery claim on the range. *See* Plaintiff's Ex. 8, 2018 Medical Records (USA000243, USA000718, USA000097).  While Mr. Mohamed complained of pain in his face and "all over his body" in the medical assessment video and told the Court that he later developed "some bruises," it simply does square that an assault of this magnitude would leave no more significant trace.  T. 9/17/25, 162: 6-10; Plaintiff's Ex. 7, Medical Assessment.

**G. <u>The Aftermath</u>**

    1. <u>The loss of Mr. Mohamed's property</u>

Mr. Mohamed alleges that before he left the observation cell, Officer Brush told him, in essence, that he was not "done" with him, and that all of his manuscripts, journals, and other writings were going to be "flushed" or thrown "in the trash."  T.

9/8/25, 47: 4-9.  When Mr. Mohamed returned to his cell, he claims everything except his prison khakis, a blanket, and a pillow were gone.  *Id.* at 45: 9-22.

Mr. Mohamed testified that, to this day, he has never been given back his manuscripts, notes, journals, and legal papers.  T. 9/9/25, 130: 18-20, 131, 11-24.  Although Mr. Mohamed did not bring a claim for conversion, the issue of what happened to his property is important insofar as it sheds light on a potentially retaliatory motive or effort to dissuade Mr. Mohamed from speaking out about his alleged abuse.  *See* T. 9/10/25, 64: 8-24 (Officer Baca acknowledging that if Mr. Mohamed's items were thrown away it would likely be a sign of "retaliation").

The government disputes that Mr. Mohamed's property was not returned.  Brush denied that he told Mr. Mohamed that he would throw away his belongings.  T. 9/9/25, 61: 18-25, 62: 1-2.  He recalled searching Mr. Mohamed's cell and seeing some books, but nothing specific beyond that.  *Id.* at 37: 2-18.  He testified that he gave Mr. Mohamed a property slip itemizing the property he took from his cell and had nothing else to do with Mr. Mohamed's property.  *Id.* at 37: 19-25, 38: 1-6, 69: 22-25, 70: 1-24.  None of the other witnesses claimed to have any involvement with or knowledge of the removal and disposition of Mr. Mohamed's property.  *See id.* at 75: 13-15, 78: 18-21, 190: 11-25, 191: 1-4; T. 9/10/25, 63-64.

The government also relies on a series of documents tracing Mr. Mohamed's requests for the return of his property and the BOP's responses.  *See* Defendant's

Ex. GG, Administrative Remedies Forms (USA002294-2313).  However, these documents do not settle the matter.  Instead, they show Mr. Mohamed and the BOP talking past one another.

In multiple complaints and appeals, Mr. Mohamed claims that his property, including his "manuscripts, journals, notes, [and] … legal materials," were improperly and maliciously removed by Brush, and requests their immediate return. *See id.*, Nov. 13, 2018, Informal Resolution Form (USA002311); *see also id.* at USA002300, USA002301, USA002296, USA002312, USA002308-09, USA002294, USA002306 (in chronological order).  He also states that he was told by ADX staff that his property had been lost, and names two staff members who allegedly told him this.  *See id.*, Nov. 13, 2018 Informal Resolution Form (USA002311), Nov. 19, 2018 Request for Admin. Remedy (USA002312).

The BOP, in denying Mr. Mohamed's requests and appeals, claims that all of his belongings were returned to him without further issue or complaint, and that staff attempted to work with him to provide proof of ownership for confiscated items, but that he failed to do so.  *See id.*, Nov. 13, 2018 Informal Resolution Form (USA002311), Nov. 14, 2018 BOP Response (USA002299), Jan. 12, 2019 BOP Response (USA002313), Jan. 16, 2019 Regional Response (USA002297), Mar. 20, 2019 Regional Response (USA002310), Apr. 3, 2019 Central Office Response (USA002295), Jun. 25, 2019 Central Office Response (USA002307).

Initially, these responses are in tension with one another: Did Mr. Mohamed get everything back or did he fail to provide proof of ownership? Furthermore, the BOP official responses lack specificity. Despite their assertions, they contain virtually no information about who, when, and how the staff attempted to resolve Mr. Mohamed's complaints.[4] Finally, although they repeatedly state that Mr. Mohamed was provided a form detailing his confiscated property and its disposition, it has not been produced in this case. Nor is there any information in these responses about when Mr. Mohamed was allegedly given this form or its contents.

Additionally, following the end of his hunger strike, Mr. Mohamed grieved the loss of his writings in counseling sessions between 2018 and 2020. *See* Plaintiff's Ex. 28, Clinical Note, Oct. 25, 2018 (USA001609-10): Plaintiff's Ex. 29, Clinical Note, Sept. 12, 2019 (USA001677), Clinical Note, Nov. 11, 2019 (USA001665), Plaintiff's Ex. 30, Clinical Note, Jan. 22, 2020 (USA001755). It makes little sense that Mr. Mohamed would have continued to speak to mental health professionals for years about his property had it been returned to him. Between these records, and the deficiencies in the BOP's paperwork, this Court credits Mr.

---

[4] The one exception is that, in his response dated November 14, 2018, Complex Warden Matevousian states that Mr. Mohamed was permitted to "exchange any books he wanted" on September 20, 2018 to comply with the eight book policy, but this lone detail stands in contrast to the dearth of information about his other property. Def. Ex. GG, BOP Response (USA002299).

Mohamed's testimony that his manuscripts, journals, and other similar items, were taken by Brush during the search and never returned.

2.  Mr. Mohamed's alleged pain and suffering

Mr. Mohamed claims that as a result of the alleged batteries, he has suffered physically and mentally from August 23, 2018 until the present day.  As for the physical suffering, it is not disputed that Mr. Mohamed had a "nondisplaced fracture" of his right ankle during this incident, that he was temporarily placed in a wheelchair and cast, and that he has continued to experience pain and chronic swelling requiring pain medication and other supports (i.e., an ankle brace).  *See* T. 9/8/25, 87-114; Plaintiff's Exs. 8-15, Mr. Mohamed's Medical Records 2018-2025.

The records also show that Mr. Mohamed initially complained of right wrist and jaw pain, but X-rays on those parts were negative, and by his own admission, the wrist pain resolved "sometime after 2020."  T. 9/8/25, 103: 14-16; Plaintiff's Ex. 8,  2018  Medical  Records  (USA000090,  USA000097,  USA000343-35, USA000718); Plaintiff's Ex. 9, 2019 Medical Records (USA000432, USA000426).[5] Mr. Mohamed testified to some back pain as well but put forward no other evidence of either acute or long-term physical injuries or pain.  T. 9/8/25, 88: 7-17.

---

[5] The last complaint regarding Mr. Mohamed's wrist in the medical records was on March 18, 2019.  Plaintiff's Ex. 9, 2019 Medical Records (USA00432).  The last complaint regarding his jaw as on October 25, 2018.  Plaintiff's Ex. 8, 2018 Medical Records (USA000097).

At trial, Mr. Mohamed testified that he has experienced serious emotional and psychological problems as a result of this incident. *See id.* at 130: 6-23. He says he has lost his ability to concentrate and write, his ability to sleep, his appetite, and overall, his enjoyment of life. *Id.* He has become "fearful" of the staff, leading him to skip recreation, programming, and socializing outside of his cell. *Id.* at 130: 23-24, 132: 15-24, 133: 1-20. In his words, he is "not a functioning individual anymore," and "life is meaningless" now. T. 9/17/25, 183: 23, 187: 4; *see also id.* at 183-87 (describing, in detail, how this incident has affected his life).

Mr. Mohamed's psychological records paint a more nuanced picture. It is clear that from late 2018 to the present, Mr. Mohamed has struggled with his mental health and has consistently complained about various symptoms (difficulty sleeping, inability to concentrate, loss of appetite, feelings of hopelessness and despair, taking no pleasure in life, etc.), although they have ebbed and flowed. He has had 12 suicide risk assessments since the events of this case. Plaintiff's Ex. 35, Clinical Note, July 29, 2025 (USA002266). To relieve his psychological distress, he has attempted, with some apparent success, psychotropic medication, counseling, cognitive behavioral programming, and other coping mechanisms.

However, it is not clear that all of Mr. Mohamed's psychological issues can be fairly traced back to this incident. Mr. Mohamed previously experienced bouts of depression, for which he received medication as recently as 2015. *See* Plaintiff's

Ex. 29, Clinical Note, Sept. 4, 2019 (USA001680); Plaintiff's Ex. 30, Clinical Note, Oct. 9, 2019 (USA000953). He also admitted problems concentrating "for the last ten years" and issues sleeping "for a long time" prior to the 2018 incident. Plaintiff's Ex. 28, Clinical Note, Oct. 4, 2018 (USA001620). Mr. Mohamed was diagnosed with Other Specified Depressive Disorder in 2019 and Post-Traumatic Stress Disorder (PTSD) in 2022, although, in both instances, the records do not explicitly and directly attribute these conditions to the underlying incident.[6] *See* Plaintiff's Ex. 29, Clinical Note, Sept. 4, 2019 (USA001681); Plaintiff's Ex. 32, Clinical Note, May 13, 2022 (USA001850).

Overall, the psychological records show that Mr. Mohamed referenced numerous stressors unrelated to the use-of-force in this case that have adversely affected his mental health, including but not limited to, dissatisfaction with the book policy, the loss of his property, restrictions on calling his family members, recuperating from a Covid-19 infection, and frustrations with staff. *See e.g.*, Plaintiff's Ex. 28, Clinical Note, Sept. 10, 2018 (USA001636), Clinical Note, Oct. 25, 2018 (USA001610); Plaintiff's Ex. 30, Clinical Note, Jan. 1, 2022

---

[6] With respect to his PTSD diagnosis, the clinician wrote that Mr. Mohamed "has reported experiencing and witnessing *multiple traumatic events* while incarcerated that have caused him significant distress," but does not mention anything regarding the August 2018 incident, specifically. Plaintiff's Ex. 32, Clinical Note, May 13, 2022 (USA001850) (emphasis added).

(USA001755), Clinical Note, Mar. 3, 2022 (USA001864); Clinical Note, Dec. 13,
2022 (USA001810); Plaintiff's Ex. 35, Clinical Note, Feb. 2, 2025 (USA002275).

Furthermore, his daily functioning does not appear nearly as circumscribed as
Mr. Mohamed testified. The records are replete with references to Mr. Mohamed's
attempting to recreate his manuscripts, attending recreation and other programming,
working on obtaining his GED, memorizing and studying religious texts, pursuing
his legal cases, tidying his cell, talking to family, and enjoying the companionship
of a cell neighbor, among other healthy activities. *See* Plaintiff's Exs. 28-35.

None of this is to deny that Mr. Mohamed's mental health took a turn for the
worse in the years that followed this case, nor that this incident played a very real
and significant role in that. However, this Court finds that Mr. Mohamed has
overstated both the *degree* of his functional impairment due to his depression and
PTSD and also the *extent* to which this incident is directly and solely responsible.

## III.    CONCLUSIONS OF LAW

### A. Legal Standard

In order to prevail on any of his claims under the FTCA, Mr. Mohamed must
show that he suffered "personal injury" caused by the "wrongful act or omission" of
a federal employee acting within the scope of his employment, "under circumstances
where the United States, if a private person, would be liable to [Mr. Mohamed] …
in accordance with the law of the place where the act or omission occurred." 28

U.S.C. § 1346(b)(1).  BOP employees are federal "law enforcement officers," and their commission of battery may give rise to a claim under the FTCA.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 216, 218-19 (2008).

Here, because Mr. Mohamed alleges that BOP employees at the ADX committed battery, his claim is governed by the law of battery in Colorado. Colorado's standard jury instructions break the tort of battery into three elements. The plaintiff must prove that (1) the "defendant's act resulted in physical contact with the plaintiff"; (2) the defendant "intended to make harmful or offensive contact with the plaintiff"; and (3) the contact was harmful or offensive.  Colo. Jury. Inst. 4th, Civil 20:5 (2025) ("CJI-Civ.").  "Harmful contact" is contact that "causes physical pain, injury, illness or emotional distress"; "offensive contact" is contact "that would offend another's reasonable sense of personal dignity."  *Id.* at 20:6.

Furthermore, Mr. Mohamed must show that the individual who caused the harmful or offensive contact both "intended the contact" and "intended it to be harmful or offensive."  *White v. Muniz*, 999 P.2d 814, 818 (Colo. 2000).

**B. Liability**

The Court finds that Mr. Mohamed has established his first claim (Claim 11) to the extent that Officer Brush committed a battery against him when he moved Mr. Mohamed from the middle of the hallway directly into the wall and pressed him into it.  This immediate use of force was clearly both harmful and offensive physical

contact. *See e.g.*, *Pena v. Greffet*, 108 F.Supp.3d 1030, 1061-63 (D. N.M. 2015) (finding that a correctional officer's placement of an inmate against the wall could constitute a battery). In addition to Mr. Mohamed's testimony that he felt pain from this incident; the video speaks volumes. *See* T. 9/10/25, 9: 17-23; Plaintiff's Ex. 3a, Range Video, :37 - :45. Despite the repeated characterization of the conduct by Brush and other witnesses as "placing" Mr. Mohamed against the wall, as indicated in the Court's findings of fact, the amount of force used is consistent with slamming him into it. *See, e.g.*, T. 9/9/25, 129: 21-23, 45: 6; T. 9/10/25, 11: 4-6, 70: 20-25.

Mr. Mohamed has also satisfied the intent element for this part of his first claim. This Court finds that Officer Brush not only intended to move Mr. Mohamed against the wall but also that he intended this contact to be harmful and offensive to Mr. Mohamed. *See White*, 999 P.2d at 814. "Intent is generally shown through circumstantial evidence." *Abdo v. Balsick*, 18-cv-01622-KMT, 2019 WL 6726230, at *9 (D. Colo. Dec. 11, 2019). Therefore, in making this determination, the Court explicitly considers the amount of force Officer Brush used, as depicted in the video, and its conclusions, as detailed in the above findings of fact, that Mr. Mohamed was told that he was being escorted to his cell, that he was reasonably attempting to comply with Officer Brush's command to face the wall, that he was not pulling away, and that his manuscripts, journals, and other notes were never returned to him after Officer Brush searched his cell.

Although the government has asserted the common law defenses of self-defense and the law enforcement officer's privilege to use force with respect to all of Mr. Mohamed's claims, these defenses are unavailing here. ECF. No. 258 at 5-10. First, with respect to self-defense, the Court does not find that Officer Brush, in that moment, "reasonably believed, under the circumstances, it was necessary to use force to protect [himself or another officer] from an actual or threatened harm" presented by Mr. Mohamed. CJI-Civ. 20:12. Thus, the force Brush employed in moving Mr. Mohamed to the wall was necessarily more "than a reasonable person would have used under the same or similar circumstances." *Id.*

Nor does the law enforcement officer's privilege, which allows an officer to "assert the defense of good faith and reasonableness to an allegation of tortious conduct," alter the analysis. *See Valdez v. City & Cnty. of Denver*, 764 P.2d 393, 396 (Colo. App. 1988); *see also Woodley v. United States*, 20-cv-01114-RMR-NRN, 2022 WL 22625015, at *6 (D. Colo. Aug. 1, 2022) (citing *Valdez*), *recommendation adopted*, 2024 WL 1344110 (D. Colo. Mar. 12, 2024) (finding that the federal government may raise the law enforcement officer's privilege as a defense in the FTCA context). For the reasons stated, the Court does not find that Officer Brush's movement of Mr. Mohamed to the wall was done in good faith in furtherance of a "legitimate penological purpose." *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001). Nor was it reasonable. As discussed above, Mr. Mohamed testified credibly

that when an officer directs the inmate to face the wall, the inmate may turn towards either wall unless told differently.  *See* T. 9/17/25, 159: 1-25, 60: 1-4.  After Mr. Mohamed turned to the left, Officer Brush, by his own admission, did not give Mr. Mohamed a verbal command before aggressively slamming his body into the other wall.  *See* T. 9/9/25, 14: 19-25, 15: 1-7.  Even in a correctional institution, this conduct is objectively unreasonable.[7]  *See Pena*, 108 F.Supp.3d at 1063 (finding that correctional officer could not have "reasonably and honestly" believed that slamming plaintiff into the wall was "the minimum force necessary to resolve the situation").

Therefore, Mr. Mohamed has met his burden with respect to this part of his first claim—and this part only.[8]  As explained in Part II.E, above, the Court does not credit that Officer Brush slammed Mr. Mohamed's head into the wall multiple times,

---

[7] For the same reasons, Colorado's statutory laws providing correctional officers with certain defined privileges and duties, while perhaps generally available in a FTCA claim for excessive use of force, do not give rise to a defense to this particular part of Mr. Mohamed's claim.  *See* Colo. Rev. Stat. § 18-1-703(1)(b) (providing that an "authorized official of a jail, prison, or correctional institution may, in order to maintain order and discipline, use objectively reasonable and appropriate physical force"), Colo. Rev. Stat. § 17-1-20-122 (providing that "[i]f an inmate … resists the authority of any officer or refuses to obey any officer's lawful commands, it is the duty of such officer immediately to enforce obedience" by the reasonable use of force as necessary). Where the facts do not show that the tortious conduct was in service of "maintain[ing] order and discipline" or that Mr. Mohamed had "refuse[d] to obey any officer's lawful commands," the use of force was not objectively reasonable, appropriate, or necessary.

[8] The government agreed at trial that Mr. Mohamed's first claim "encompasses everything that happened between when [Mr. Mohamed] was [ ] stopped and turned and when they got him off [of] the floor." T. 9/17/25, 198: 3-14.  This includes his initial movement to the wall by Brush and all the alleged conduct afterward until he was finally escorted off the range.  *Id.* at 197-98.

nor that Officers Brush or Miller punched or kicked him while he was being pressed against the wall. Thus, those parts of Mr. Mohamed's first claim are meritless.

Similarly, there is no liability for Mr. Mohamed going to the ground after he was removed from the wall by the escorting team and assisting staff. As an initial matter, it is not clear that Mr. Mohamed has proved, as he must, that any of the officers "*desired* to cause offensive or harmful consequences by [t]his act." *White*, 999 P.2d at 819 (emphasis added). Here, the officers testified that their intent was simply to hold onto Mr. Mohamed as he went to the ground, and this led them to fall, too. *See* T. 9/9/25, 54: 24-25, 55: 1-17, 147: 6-5; 9/10/25, 91: 23-25, 92: 1-7, 94: 1-10, 178: 7-10. This is consistent with the Court's interpretation of the video. Contrary to Mr. Mohamed's belief, he was not pushed or otherwise forced to the ground. Nor does it appear that the officers deliberately fell *on top of* Mr. Mohamed as opposed to beside him. Of course, it seems likely that someone actually did fall on top of Mr. Mohamed, at least momentarily, in light of his fractured ankle, but it can't be said that any of the officers *desired* to make harmful or offensive contact with him, or that they knew it was a "substantial certainty" as a result of their falling to the ground. *Sandoval v. Martinez-Barnish*, 9-cv-02434-WJM-MJW, 2012 WL 2871667, at *4 (D. Colo. Jul. 12, 2012).

However, even if Mr. Mohamed has shown the requisite intent for battery, here, the law enforcement officer's privilege applies. In determining whether an

officer's conduct was reasonable, the Court may consider if it was consistent with their training or standard law enforcement practices. *See Diaz v. United States*, 11-cv-2028, 2013 WL 5462257, at *4-8 (S.D. Cal. Sept. 30, 2013) (finding that an officer acted "[i]n line with his training" in concluding that his use of force was "reasonable," defeating a battery claim under the FTCA). The government's expert witness testified that the BOP trains its officers that, when an inmate goes to the ground during an escort, the officer is supposed to hold on to "maintain control of that inmate." 9/17/25, 75: 4-10. Under these circumstances, the Court finds that the actions of the escort team and assisting staff were reasonable and the use of force was not excessive.

Additionally, as the evidence does not support Mr. Mohamed's claims of extreme physical abuse while the staff were on the ground with him, he has not sustained this part of his first claim, either.

Finally, as discussed in Part II.F, the Court does not find that Mr. Mohamed proved that he was beaten when he was led off the range (Claim 12) or inside the observation cell (Claim 13). Thus, his second and third battery claims are dismissed in their entirety.

### C. **Damages**

Turning to damages, this Court finds that Mr. Mohamed is entitled to only a *de minimis* amount for his physical pain and suffering. His only significant injury

was his broken ankle, and as discussed above, this was not the product of tortious conduct. His other documented injuries—pain to his jaw and his wrist—do not appear, by his own testimony, to be the result of Officer Brush slamming him against the wall. While the Court certainly believes that Mr. Mohamed felt real shock and pain when he was thrown against the wall, in light of its fleeting nature, only nominal damages are appropriate.

The Court reaches a different conclusion, however, with respect to Mr. Mohamed's emotional pain and suffering. Although the Court does not conclude that Mr. Mohamed's mental health problems over the last seven years are solely attributable to this incident, nor that his functioning has been completely destroyed, this incident has had a profound and lasting negative impact on him. In 18 years prior to the incident in BOP custody, Mr. Mohamed had no suicide risk assessments; since this incident, he has had 12. Even discounting whatever emotional harm Mr. Mohamed claims from the parts of this incident that this Court finds either did not occur or were not tortious, it is clear that being slammed into the wall unprovoked during an escort has done a great deal of damage to Mr. Mohamed's psyche. The Court does believe his depression and PTSD are at least, in part, caused by that wrongful act, and that he is significantly more fearful and anxious with respect to the prison staff as a result.

For these reasons, the Court awards Mr. Mohamed $10,000.

## VI. <u>CONCLUSION</u>

Accordingly, the Court enters judgment for plaintiff Mr. Mohamed, against defendant United States of America, as to the first claim (Count 11 of the Second Amended Complaint, ECF No. 64), and awards plaintiff $10,000 in damages. The Court dismisses the second and third claim (Count 12 and Count 13) with prejudice.

Dated: October 24, 2025        BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Court Judge